Michael F. Ram, SBN #104805
Email:  mram@rocklawcal.com
RAM, OLSON, CEREGHINO
   & KOPCZYNSKI LLP
101 Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone:  (415) 433-4949
Facsimile:  (415) 433-7311

Beth E. Terrell, SBN #178181
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray, *Admitted Pro Hac Vice*
Email:  jmurray@terrellmarshall.com
TERRELL MARSHALL LAW GROUP PLLC
936 N. 34th Street, Suite 300
Seattle, Washington  98103
Telephone:  (206) 816-6603
Facsimile:   (206) 319-5450

[Additional Counsel Appear on Signature Page]

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| ABANTE ROOTER AND PLUMBING, INC., MARK HANKINS, and PHILIP J. CHARVAT, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>ALARM.COM INCORPORATED, and ALARM.COM HOLDINGS, INC.,<br><br>        Defendants. | NO. 4:15-cv-06314-YGR<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>The Honorable Yvonne Gonzales Rogers<br><br>Complaint Filed: December 30, 2015<br><br>DATE:     April 25, 2017<br>TIME:     2:00 p.m.<br>LOCATION:  Courtroom 1 - 4th Floor |

TO:    THE CLERK OF THE COURT; and

TO:    DEFENDANTS ALARM.COM INCORPORATED AND ALARM.COM
       HOLDINGS, INC., AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 25, 2017, at 2:00 p.m., in Courtroom 1, 4th Floor, of the U.S. District Court for the Northern District of California, 1301 Clay Street, Oakland, California, 94612, Plaintiffs will move for class certification.  This motion will be made on the grounds that questions of law and fact common to the class predominate over any questions affecting individual members.

The motion will be based on: this Notice of Motion; the following Memorandum of Points and Authorities; the accompanying declarations of Beth E. Terrell, John W. Barrett, and Rachel E. Hoover; the Affidavit of Joe Moretti; the records and file in this action; and such other matters as may be presented before or at the hearing of the motion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ......................................................... iv

I.   INTRODUCTION ............................................................. 1

II.  ISSUE TO BE DECIDED ..................................................... 2

III. FACTUAL BACKGROUND ...................................................... 2

   A.   Alarm.com recruits dealers like Alliance to promote and sell its products ......... 2

   B.   Alarm.com actively supports the sales efforts of its dealers, including
        Alliance ............................................................... 3

   C.   Alarm.com has the right and ability to control Alliance's illegal
        telemarketing activities ............................................... 4

        1.   Alarm.com's contract with Alliance grants it the right to control
             Alliance .......................................................... 4

        2.   Alarm.com exercises control over Alliance's telemarketing
             activities conducted in the context of Alarm.com's Customer
             Lead Service program .............................................. 4

   D.   Outside the CLS program, Alarm.com turned a blind eye to telemarketing
        complaints about Alliance and reaped profits from the illegal calls .................. 5

   E.   Alliance placed millions of illegal telemarketing calls on Alarm.com's
        behalf to thousands of consumers, including Plaintiffs ....................... 8

        1.   Alliance placed millions of illegal calls to numbers registered on
             the National Do-Not-Call Registry, including Mr. Charvat's
             number ............................................................ 8

        2.   Alliance's agent sent hundreds of thousands of prerecorded
             messages to thousands of cell phones, including Mr. Abante's
             and Mr. Hankins's phones .......................................... 9

        3.   Alliance's agent sent thousands of prerecorded messages to
             hundreds of residential phones, including Mr. Hankins's phone ........... 10

IV.  STATUTORY BACKGROUND OF PLAINTIFFS' CLAIMS .................................. 11

V.   CLASS CERTIFICATION SHOULD BE GRANTED ................................. 12

A.      The Rule 23(a) requirements are satisfied ........................................................ 13

      1.      The proposed classes are sufficiently numerous...................................... 13

      2.      There are issues of law and fact common to all class members ............. 13

      3.      Plaintiffs' claims are typical of class members' claims.......................... 15

      4.      The classes will be adequately represented ........................................... 16

B.      The Rule 23(b)(3) requirements are satisfied .................................................... 17

      1.      Common issues predominate over any individual issues ....................... 17

      2.      A class action is a superior method for resolving claims under the TCPA ............................................................................................... 21

VI.     CONCLUSION............................................................................................................ 23

# TABLE OF AUTHORITIES

Page No.

## FEDERAL CASES

*Abdullah v. U.S. Sec. Assoc., Inc.*,
   731 F.3d 952 (9th Cir. 2013) .......................................................................... 13

*Agne v. Papa John's Int'l, Inc.*,
   286 F.R.D. 559 (W.D. Wash. 2012) ............................................ 14, 15, 18, 22

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997).......................................................................................... 17

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   133 S. Ct. 1184 (2013)................................................................................ 12, 17

*APB Assocs., Inc. v. Bronco's Saloon, Inc.*,
   315 F.R.D. 200 (E.D. Mich. 2016) ................................................................. 21

*Bee, Denning, Inc. v. Capital Alliance Grp.*,
   310 F.R.D. 614 (S.D. Cal. 2015) ......................................................... 1, 18, 21

*Birchmeier v. Caribbean Cruise Line, Inc.*,
   302 F.R.D. 240 (N.D. Ill. 2014)....................................................................... 18

*Booth v. Appstack, Inc.*,
   No. C13-1533 JLR, 2015 WL 1466247 (W.D. Wash. Mar. 30, 2015).................... 18, 19

*Celano v. Marriott Int'l Inc.*,
   242 F.R.D. 544 (N.D. Cal. 2007)..................................................................... 13

*City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*,
   296 F.R.D. 299 (D.N.J. 2013).......................................................................... 21

*Edwards v. First Am. Corp.*,
   798 F.3d 1172 (9th Cir. 2015) ......................................................................... 12

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ....................................................... 12, 13, 15, 16

*Erica P. John Fund, Inc. v. Halliburton*,
   563 U.S. 804 (2011)......................................................................................... 17

*Golan v. Veritas Entm't, LLC*,
    788 F.3d 814 (8th Cir. 2015) ................................................ 15

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................... 13, 15, 16, 17

*Hawk Valley, Inc. v. Taylor*,
    301 F.R.D. 169 (E.D. Pa. 2014) ............................................ 21

*Ikuseghan v. Multicare Health Sys.*,
    No. C 14-5539 BHS, 2015 WL 4600818 (W.D. Wash. July 29, 2015) ........ 16, 18, 19, 20

*Knutson v. Schwan's Home Serv., Inc.*,
    No. 3:12-cv-0964, 2013 WL 4774763 (S.D. Cal. Sept. 5, 2013) ................................. 18

*Krakauer v. DISH Network L.L.C.*,
    311 F.R.D. 384 (M.D.N.C. 2015) ................................... 14, 18, 19

*Kristensen v. Credit Payment Servs.*,
    12 F. Supp. 3d 1292 (D. Nev. 2014) ........................... 14, 18, 20, 21

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
    244 F.3d 1152 (9th Cir. 2001) ............................................. 22

*Manno v. Healthcare Revenue Recovery Grp., LLC*,
    289 F.R.D. 674 (S.D. Fla. 2013) ..................................... 18, 20

*Meyer v. Bebe Stores, Inc.*,
    No. 14-cv-00267-YGR, 2017 WL 558017 (N.D. Cal. Feb. 10, 2017) .......................... 18

*Mims v. Arrow Fin. Servs. LLC*,
    565 U.S. 368 (2012) ......................................................... 11

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ...................................... 13, 15

*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009) ............................................... 11

*Stemple v. QC Holdings, Inc.*,
    No. 12-cv-01997 BAS (WVG), 2014 WL 4409817 (S.D. Cal. Sept. 5, 2014) .............. 18

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ..................................................... 17

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................ 13, 14

*Whitaker v. Bennett Law, PLLC,*
    No. 13-3145, 2014 WL 5454398 (S.D. Cal. Oct. 27, 2014) ........................ 14, 15, 18, 19

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) ........................................................... 15, 21, 22


**FEDERAL STATUTES**

47 U.S.C. § 227(b)(1)(A)(iii) ...................................................................... 11, 19

47 U.S.C. § 227(b)(1)(B) ............................................................................ 11, 19

47 U.S.C. § 227(b)(3) ................................................................................. 21, 22

47 U.S.C. § 227(c)(5) ................................................................................. 11, 19


**FEDERAL RULES**

47 C.F.R. § 64.1200(c)(2) ........................................................................... 11, 19

Fed. R. Civ. P. 23(a)(1) .................................................................................. 13

Fed. R. Civ. P. 23(a)(2) .................................................................................. 13

Fed. R. Civ. P. 23(a)(3) .................................................................................. 15

Fed. R. Civ. P. 23(b)(3) ........................................................................... 17, 21, 22

Fed. R. Civ. P. 23(g)(1)(A) ............................................................................. 16


**OTHER AUTHORITIES**

*In re Joint Pet. filed by DISH Network, LLC*,
    28 F.C.C. Rcd. 6574 (2013) ............................................................................ 12

*Omnibus TCPA Order*,
    30 FCC Rcd. 7961, 2015 WL 4387780 (F.C.C. July 10, 2015) .................................... 11

Restatement (Third) of Agency § 2.01 (2006) ........................................................... 20

Restatement (Third) of Agency § 2.03 (2006) ................................................................ 20

Restatement (Third) of Agency § 4.01 (2006) ................................................................ 20

*Rules and Regs. Implementing the Tel. Consumer Prot. Act of 1991, Mem. and Order,*
    10 FCC Rcd. 12391 (F.C.C. 1995) ........................................................... 11, 12

## I.  INTRODUCTION

Courts throughout the Circuit and the country recognize that high-volume, low-dollar claims brought under the Telephone Consumer Protection Act (TCPA) are well-suited for resolution through class certification procedures. *See Bee, Denning, Inc. v. Capital Alliance Grp.*, 310 F.R.D. 614, 630 (S.D. Cal. 2015) ("In the context of the TCPA, the class action device likely is the optimal means of forcing corporations to internalize the social costs of their actions."). In fact, several of Plaintiffs' counsel recently demonstrated the classwide manageability of TCPA claims, successfully trying the TCPA claims of more than 18,000 class members in a single, five-and-a-half day trial against DISH Network in federal district court in North Carolina.

Like DISH, this case can and should be resolved through class certification. Facts obtained through discovery and outlined below show the following:

Defendant Alarm.com, Inc. sells cloud-based home security systems, but has no internal sales department. Instead, it outsources all sales efforts to authorized dealers, including a handful of selected "Premier Partners" who Alarm.com equips with almost everything needed to make sales, such as dedicated support staff and marketing tools like sales scripts and rebuttals, and who Alarm.com has the right to control through contractual dealer agreements.

Alarm.com was highly motivated to succeed in this competitive space, so much so that, with no apparent due diligence, it brought on as a Premier Partner a Rhode Island company called Alliance Security, one of the nation's worst TCPA scofflaws, whose tactics had caught the attention of national news media outlets like the Today Show and government agencies including the Federal Trade Commission. Not surprisingly, soon after joining up with Alarm.com, Alliance placed millions of illegal calls to sell its product to potential customers, including each of the Plaintiffs.

Plaintiffs allege that Alarm.com devised this willfully blind marketing arrangement to allow it to retain all the benefits of illegal telemarketing—the customers—while shedding the

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 1
Case No.4:15-cv-06314-YGR

risk associated with using illegal means to generate them. Although Alarm.com contests these allegations and denies responsibility for the TCPA violations committed on its behalf, the question at this stage is not whether Plaintiffs prevail on the merits, but whether their claims can be resolved fairly and efficiently on a classwide basis.

All requirements for certification are met here. Plaintiffs have obtained call records that allow the presentation of classwide proof through expert testimony, and whether Alarm.com is vicariously liable for Alliance's calls can be determined based on evidence pertaining to the relationship and course of dealing between the two companies. Class certification is properly used here to allow the efficient resolution of millions of TCPA violations through a single, well-managed proceeding.

## II. ISSUE TO BE DECIDED

Whether Plaintiffs' claims satisfy the requirements for class certification under Federal Rule of Civil Procedure 23(a) and 23(b)(3).

## III. FACTUAL BACKGROUND

**A.   Alarm.com recruits dealers like Alliance to promote and sell its products.**

Defendants Alarm.com, Inc., and Alarm.com Holdings, Inc. (together, Alarm.com), sell interactive, cloud-based security services and the hardware necessary for consumers to use those services through a network of "dealer partners" or "service providers," such as Alliance. Alliance, which was formerly known as Versatile Marketing Solutions or VMS, sells Alarm.com "subscriptions" to consumers. Ex. 1 at 19:6-17.[1] Alliance generally resells its consumer accounts to an associated monitoring company, Monitronics, Inc., though maintains a few itself. *Id.* at 24:12-20. Consumers make monthly payments to Monitronics for the Alarm.com service. For each subscription sold, Alliance or Monitronics pays Alarm.com an "activation fee" as well as a "monthly service charge." *Id.* at 19:6-20:8. Dealers also pay Alarm.com for the hardware that an Alarm.com subscription requires. *Id.*

---

[1] Unless otherwise noted, all exhibits are attached to the Declaration of Beth E. Terrell.

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 2
Case No.4:15-cv-06314-YGR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    Alarm.com actively supports the sales efforts of its dealers, including Alliance.**

To help its dealer partners sell more subscriptions and hardware, Alarm.com provides them with substantial resources and assistance. That assistance increases with the number of subscriptions sold. Alarm.com's "Premier Partner Program" rewards dealers who sell at least ten subscriptions and meet certain account activity requirements, providing them with a co-branded interactive services website, co-branded video content, $500 to spend on marketing materials, and an opportunity to participate in the Customer Lead Service program. Ex. 2 at 10834-35. Alarm.com pays enhanced marketing allowances — $1,250 and $2,000 respectively — to dealers who meet higher monthly customer goals of 100 and 1,000. The highest enrollment threshold proved no obstacle to Alliance. In 2015, Alliance remitted $718,786.05 for Alarm.com products and services, of which Alarm.com retained $558,802.05 and rebated $159,984.00 to Alliance. Ex. 1 at 23:17-26:4. Alarm.com never inquired into Alliance's telemarketing practices before permitting it to participate in the Customer Lead Service program. Ex. 3 at 106:17–107:8.

Alarm.com emphasizes this cooperative sales and marketing approach in the literature it disseminates to dealers. Ex. 2 at 10774 ("What's possible if …. [w]e execute on a sales plan that leverages cutting edge technology, addresses what your consumers see on TV, and move quickly with a clear and concise game plan …. Together. What happens then?"). Alarm.com offers its dealers a dedicated support staff, comprehensive training opportunities, and a "full suite of marketing and sales tools," including brochures, flyers, interactive demos for the iPad, calling scripts, rebuttals, and email templates. Ex. 4 at 16670 ("The big takeaway here is that Alarm.com provides the resources to make you successful."). Alarm.com touts its "innovative mobile app," designed to provide dealers with "actionable insight into trends and activities," and featuring monthly reports, reminiscent of a bank statement, that reflect key business trends and figures. *Id.* at 16670–79.

Alarm.com promotes its relationship with its dealers on its website, proclaiming that its "services are available exclusively through a network of top security Dealers who are committed to delivering better security at the highest level of customer service." *See* www.alarm.com/

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 3
Case No.4:15-cv-06314-YGR

partners/partners.aspx (last visited Mar. 5, 2017). Dealers log in to an Alarm.com website through a "partner portal," where they can create customer accounts, access subscriber information, and receive extensive support, documentation, and training. Ex. 4 at 16671. Alarm.com encourages dealers to use the Alarm.com logo and to include the slogan "powered by Alarm.com" on their websites. Ex. 3 at 92:16-94:9. Since at least 2012, Alarm.com has drafted scripts for dealers to use when making telephone calls to potential customers. *Id.* at 95:20-97:9. Perhaps the most important resource Alarm.com provides to dealers is a line of credit that sometimes exceeds $1,000,000, and, at least in one case, was as much as $4,000,000. Ex. 1 at 13:1-14:5. Through the extension of substantial credit lines, Alarm.com bankrolls the operations of its dealers and service providers.

**C.**     **Alarm.com has the right and ability to control Alliance's illegal telemarketing activities.**

    1.     Alarm.com's contract with Alliance grants it the right to control Alliance.

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████

    2.     Alarm.com exercises control over Alliance's telemarketing activities conducted in the context of Alarm.com's Customer Lead Service program.

Alarm.com provides high-performing dealers like Alliance the opportunity to participate in a customer lead service program called "CLS." Ex. 2 at 10834-35. Through this program,

Alarm.com provides dealers with leads from potential customers who inquire about Alarm.com on the Alarm.com website. Ex. 3 at 31:18-32:5.

Alarm.com closely controls dealers who participate in the CLS program. For example, ████████████████████████████████████████████████████████████████ ████████████████████ *See* Ex. 6. Alarm.com regularly audits CLS dealers to evaluate whether they are engaging in best telemarketing practices. Ex. 3 at 151:16–152:9. Indeed, Alliance has been audited approximately twenty times since 2014. *Id.* at 59:3–13. During these audits, Alarm.com found problems with Alliance's telemarketing practices, including overcalling, using an automated dialing system to make calls, and leaving prerecorded messages. *Id.* at 59:14–61:10. As a result of these audits, Alliance at times was named a "problem dealer." *Id.* at 147:5–17.

**D.     Outside the CLS program, Alarm.com turned a blind eye to telemarketing complaints about Alliance and reaped profits from the illegal calls.**

Alarm.com admits that the CLS program generates only a small percentage of Alarm.com subscribers. *See* Ex. 7 at 69:17-70:8; Ex. 8 at 55:10-56:13. For leads generated outside the CLS program, Alarm.com readily admits that it does not "actively monitor or control the sales and marketing practices of our service providers." Ex. 3 at 172:15-176:16. Alarm.com will take action to ensure compliance with telemarketing laws only if it is "made aware of an egregious case." *Id.* at 36:10-37:20. But with respect to Alliance, at least, Alarm.com took no action despite knowing of its repeated violations of telemarketing laws.

Alliance is a serial violator of state and federal telemarketing laws. In July 2010, the Pennsylvania Attorney General fined VMS/Alliance $28,000 for telemarketing in violation of Pennsylvania's Do Not Call registry, and in a settlement agreement VMS/Alliance admitted to violations of the state telemarketer act. *See* Ex. 9. In January 2012, the Attorney General for the State of Kentucky fined VMS/Alliance $20,000 for telemarketing in violation of Kentucky's Do Not Call registry. *See* Ex. 10.

On April 27, 2012, the Today Show aired a segment about aggressive telemarketers repeatedly targeting consumers even though the consumers' phone numbers had been placed on

the National Do-Not-Call Registry. *See* Ex. 11. The segment specifically called out Alliance CEO and founder Jay Gotra for the telemarketing conduct of Alliance's predecessor, VMS Alarms.

Around the same time the Today Show segment was aired, the FTC investigated Alliance. This investigation resulted in the FTC imposing a $3.4 million fine on Alliance for making millions of calls to consumers on the National Do-Not-Call Registry. Ex. 12. In another case against Alliance, a federal court awarded partial summary judgment to a plaintiff who was called while on the National Do-Not-Call Registry, concluding that Alliance lacked consent to make the calls. Ex. 13.

Alarm.com knew about the Today Show segment and was concerned that the national publicity would hurt Alliance's sales. Alarm.com contacted Mr. Gotra, who brushed it off as a "minor problem with the software they were using" to generate maximum sales. Ex. 14 at Bates 1252. Alarm.com was reassured that Alliance's "attrition and quality is good and the telemarketing piece will not affect them." *Id.* ████████████████████████

███████████████████████████████████████████████████████████████

████████████████████ *See* Ex. 8 at 69:8-70:12.

Alarm.com continued to wring its hands over the potential effect of poor publicity on profits. In 2014, Alarm.com forwarded to Alliance an article on TCPA compliance that had brought their dealer partner to mind. Ex. 15 at 696. ██████████████████████

████████████████████████ Ex. 8 at 70:22-72:4. Quite the opposite: in March 2015, Alarm.com affirmatively condoned the unlawful conduct by deleting Alliance's negative reviews from the Alarm.com website. Upon reaching that decision, Alarm.com informed Alliance that it had "talked to our marketing team regarding Alliance's star rating in our dealer site. We decided it would be best to have a fresh start so we've removed the old star ratings. This brought your star rating from: 2.7 to a 5. I should mention this is a clean slate, but we will not be able to remove any reviews going forward." Ex. 16 at 205.

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 6
Case No.4:15-cv-06314-YGR

Alarm.com was aware that deleting the negative reviews was objectionable and deceiving to consumers because it had refused to take the same action at Alliance's behest in 2013, about a year after the Today Show segment. Ex. 17 ("The argument was made and we met a firm wall of resistance."). Alarm.com's "firm wall" had softened somewhat by early 2015, and it agreed to remove the reviews to keep Alliance from taking its accounts to a competitor:

> Honeywell views Alliance as a leader with a significant number of sub-dealers who will almost blindly follow Alliances lead. I realize this business means a lot to us and with their focus on creating significant numbers of healthy accounts, they are a relationship that will deliver high value activations. It's not necessarily a new opportunity but rather an opportunity to hang on to the business of a Dealer Partner that is growing at significant rate . . . . My understanding is that we have worked in financial incentives in the past to win business and believe we should be prepared to do the same with Alliance for the "close" on Thursday.

Ex. 18 at 5628. ██████████████████████████████████████████████

████████████████████████████████████████ Ex. 8 at 71:3-12. Indeed, Alarm.com has never taken any measures to enforce █████████████████████████ ████████████████████ Ex. 3 at 177:21-178:14. ██████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████ Ex. 19.

Alarm.com has maintained its strong relationship with its dealer-partner, turning a blind eye to Alliance's continued defiance of the law. Indeed, as reflected in an August 2015 internal memorandum, Alarm.com had no problem with Alliance's results:

> [T]hrough aggressive recruiting and the best funding deal in the industry, Alliance has poached telemarketing teams from many existing Alarm.com and Moni dealers (amongst others) and seen significant growth.

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 7
Case No.4:15-cv-06314-YGR

Ex. 20. The same memorandum admired Alliances' growth and the new customers it had

delivered to Alarm.com: "To grow at the rate they have based on their yearly volume from 2014

is incredible." *Id.*

**E.   Alliance placed millions of illegal telemarketing calls on Alarm.com's behalf to thousands of consumers, including Plaintiffs.**

    1.   Alliance placed millions of illegal calls to numbers registered on the National Do-Not-Call Registry, including Mr. Charvat's number.

On September 3, 2015, Mr. Charvat received a telemarketing call during which he spoke

with an agent of Alliance. Alliance phoned Mr. Charvat even though his number was listed on

the National Do-Not-Call Registry and without heed to Mr. Charvat's request more than thirty

days earlier to be removed from Alliance's internal call list. After several follow-up calls, which

also lacked the requisite consent, Mr. Charvat agreed to speak in person with Alliance

concerning a home security system. On September 9, 2015, an Alliance representative came to

Mr. Charvat's home and presented him with an Alarm.com contract. Asked about the apparent

discrepancy in service providers, the representative explained that after Alliance installed the

security hardware, Alarm.com would provide the remote activation and monitoring system.

Complaint (Dkt. No. 1), ¶¶ 122-41; *see also* Ex. 21 at 7. The contract that Mr. Charvat was given

on that day came with "Alarm.com Terms." Ex. 22 at 5.

Mr. Charvat was not alone. In response to a subpoena, Alliance provided records of

telemarketing calls it made promoting Alarm.com's goods and services. *See* Exs. 23 & 24 at 1–2.

Plaintiffs retained experienced expert Anya Verkhovskaya to analyze these records, which she

did using a methodology identical to the methodology she has successfully used in other TCPA

cases. *See* Ex. 25 & Ex. 26, ¶¶ 3, 9, 10, 26. Ms. Verkhovskaya determined that Alliance placed

3,829,467 calls to 398,189 residential telephone numbers that received two or more calls within a

twelve-month period and that were placed after the telephone numbers had been on the Do-Not-

Call Registry for at least thirty days. *See* Ex. 25, ¶¶ 9–26. Mr. Charvat's residential telephone

number was included in the list of numbers that Ms. Verkhovskaya identified as having received

at least two calls in a twelve-month period after the number had been on the National Do-Not-Call Registry for at least thirty days. *Id.* at ¶ 27.

2. <u>Alliance's agent sent hundreds of thousands of prerecorded messages to thousands of cell phones, including Mr. Abante's and Mr. Hankins's phones.</u>

On December 9, 2015, Fred Heidarpour, the owner of Plaintiff Abante Rooter & Plumbing, received a prerecorded telemarketing call on Abante's cellular telephone, pitching an Alliance Security home alarm system "powered by Alarm.com." Later that day, he answered a second call on the Abante telephone, and he received a third call on December 11, 2015. All calls were placed to sell Alarm.com services, on behalf of the Defendants. Plaintiff Abante did not provide express written consent to receive these calls. Complaint, ¶¶ 75-84, 90-91; *see also* Ex. 27 at 8-9, 11.

Mr. Hankins also received at least one prerecorded call promoting Alarm.com services on his cellular telephone on October 5, 2015. Mr. Hankins did not provide his prior consent to receive the call. Complaint, ¶¶ 109-10, 112-18, 120; *see also* Ex. 28 at 5.

In response to a subpoena, Alliance identified Nationwide Alarms, Inc. as a company that made calls promoting Alarm.com services and produced calling records of those calls. Ex. 24. Plaintiffs contacted Nationwide and learned that Nationwide retained an individual named Justin Ramsey to send prerecorded messages to individuals who were potentially interested in the services of the companies for which Alliance served as an authorized dealer. Affidavit of Joe Moretti, ¶ 3. Mr. Ramsey's telemarketing practices have led to an FTC lawsuit that is currently pending against him. Ex. 29.[2] Nationwide then called individuals who pressed "1" in response to Mr. Ramsey's prerecorded messages. In response to a subpoena, Nationwide produced calling records listing the telephone numbers it called following Mr. Ramsey's prerecorded messages. Moretti Aff. ¶ 6.

---

[2] Mr. Ramsey's calling campaign acted in complete disregard for the Do Not Call list. In fact, as the FTC alleges, in an e-mail to a business associate on June 15, 2015, Mr. Ramsey stated, "i HATE THE DNC ABSOLUTELY FU**ING HATE IT." Ex. 29 at ¶ 48.

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 9
Case No.4:15-cv-06314-YGR

Plaintiffs analyzed the Nationwide records and determined that Nationwide had called 22,118 unique cell phone numbers following Mr. Ramsey's prerecorded messages. Declaration of Rachel E. Hoover, ¶ 11. These cell phone numbers included Plaintiff Abante and Mr. Hankins's cell phone numbers. *Id.*, ¶¶ 13-14. Plaintiffs have retained experienced TCPA expert Jeff Hansen. To the extent an expert witness is needed at trial to identify cell phone numbers from Nationwide's call records, Mr. Hansen is qualified to do so. *See* Ex. 30, ¶ 4. In his Preliminary Expert Report, Mr. Hansen describes the methodology he would use to identify cell phone numbers from calling records were he asked to do so. *See id.*, ¶¶ B.1–10. This methodology is identical to the methodology Plaintiffs used to identify calls that Mr. Ramsey placed to cellular telephones. *See generally* Hoover Decl.

   3.   <u>Alliance's agent sent thousands of prerecorded messages to hundreds of residential phones, including Mr. Hankins's phone.</u>

Mr. Hankins received a prerecorded telemarketing call on his residential telephone line. The call was an interactive prerecorded message offering home security services and provided automated options to reach live operators. Mr. Hankins did not provide his prior express consent to receive this call. Complaint, ¶¶ 109-11, 120; *see also* Ex. 28 at 5.

Plaintiffs' analysis of Nationwide's call records shows that Nationwide placed calls to 22,102 unique landline telephone numbers following Mr. Ramsey's prerecorded messages. Hoover Decl., ¶ 12. A few of these telephone numbers may have been assigned to businesses at the time of the calls and thus not qualify as "residential" numbers. During the merits phase of this case, Plaintiffs will retain an expert to identify and exclude these numbers. Terrell Decl., ¶ 37. There likely will be very few business numbers to exclude. Ms. Verkhovskaya identified only 53 business numbers out of the 4,629 telephone numbers that received two or more calls within a twelve-month period after being on the National Do-Not-Call registry for at least thirty days. *See* Ex. 25, ¶ 25. This amounts to 1% of the numbers called.

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 10
Case No.4:15-cv-06314-YGR

**IV.  STATUTORY BACKGROUND OF PLAINTIFFS' CLAIMS**

Congress enacted the TPCA to prevent "intrusive nuisance calls" to consumers' telephones that it determined were "invasive of privacy." *Mims v. Arrow Fin. Servs. LLC*, 565 U.S. 368, 371 (2012); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). Even though the TCPA is more than 25 years old, "[m]onth after month, unwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *Omnibus TCPA Order*, 30 FCC Rcd. 7961, 7964, 2015 WL 4387780, at *2 (F.C.C. July 10, 2015).

Three provisions of the TCPA give rise to the Plaintiffs' claims in this case:

- **Autodialer calls to cellular lines**. The TCPA renders it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

- **Prerecorded calls to residential lines**. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes." 47 U.S.C. § 227(b)(1)(B).

- **National-Do-Not-Call restrictions**. The TCPA makes it unlawful for any entity to make more than one call in a twelve-month period to any number that is registered with the National Do-Not-Call Registry. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

These prohibitions apply not only to sellers of goods and services that make calls directly, but also to the sellers' authorized marketing agents. FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See Rules and Regs. Implementing the Tel. Consumer Prot. Act of 1991*, *Mem.*

*and Order*, 10 FCC Rcd. 12391, 12397 ¶ 13 (F.C.C. 1995). The FCC affirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers*." In re Joint Pet. filed by DISH Network, LLC*, 28 F.C.C. Rcd. 6574, 6574 (2013).

## V. CLASS CERTIFICATION SHOULD BE GRANTED

Plaintiffs requesting class certification must demonstrate "that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). While district courts must conduct a "rigorous" analysis of the Rule 23 requirements, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013). "A court, when asked to certify a class, is merely to decide a suitable method of adjudicating the case and should not 'turn class certification into a mini-trial' on the merits." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015) (quoting *Ellis*, 657 F.3d at 983, n.8).

Plaintiffs request certification of three classes:

**Cell Phone Class (Plaintiff Abante Rooter & Plumbing, Inc.):** All persons in the United States to whom: (a) Alliance or its agents, on Defendants' behalf, instituted one or more non-emergency telephone calls; (b) promoting Defendants' goods or services; (c) to a recipient's cellular telephone number; (d) through the use of an automatic telephone dialing system or an artificial or prerecorded voice; (e) at any time since October 15, 2013.

**Residential Class (Plaintiff Hankins):** All persons in the United States to whom: (a) Alliance or its agents, on Defendants' behalf, initiated one or more non-emergency telephone calls; (b) promoting Defendants' goods or services; (c) to a recipient's residential telephone line; (d) through the use of an artificial or prerecorded voice; (e) at any time since October 15, 2013.

**National Do-Not-Call Class (Plaintiff Charvat):** All persons in the United States who: (a) received more than one call, made by Alliance on Defendants' behalf; (b) promoting Defendants' goods or services; (c) in a twelve-month period; (d) on their cellular telephone line or residential telephone line; (e) whose

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 12
Case No.4:15-cv-06314-YGR

cellular or residential telephone line number(s) appear on the National Do-Not-Call Registry; (f) at any time since December 30, 2011.[3]

As discussed below, each of the proposed classes satisfies the Rule 23 requirements.

**A.  The Rule 23(a) requirements are satisfied.**

1.    The proposed classes are sufficiently numerous.

A class must be "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). Although there is no "magic number," numerosity is generally satisfied when the class comprises 40 members or more. *Celano v. Marriott Int'l Inc.*, 242 F.R.D. 544, 548-49 (N.D. Cal. 2007). The classes have thousands of members, satisfying the numerosity requirement. The National Do-Not Call Class consists of approximately 398,189 members and the Residential and Cell Phone Classes each have thousands of members. Ex. 25 (Verkhovskaya report) at 9–26; Hoover Decl., ¶¶ 11-12.

2.    There are issues of law and fact common to all class members.

The second threshold to certification requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement has "'been construed permissively' and '[a]ll questions of fact and law need not be common to satisfy the rule.'" *Ellis*, 657 F.3d at 981 (alteration in original) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)); *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010) (noting that "common" does not mean "complete congruence"). Commonality can be satisfied by even a "single *significant* question of law or fact." *Abdullah v. U.S. Sec. Assoc., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (citation and internal quotation marks omitted). As the Supreme Court has explained, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" such that "all their claims can be productively litigated at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted). The common

[3] Excluded from the proposed classes are Defendants, any entity in which Defendants have a controlling interest or that has a controlling interest in Defendants, and Defendants' legal representatives, assignees, and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 13
Case No.4:15-cv-06314-YGR

questions must generate common *answers*" that are "apt to drive the resolution of the litigation." *Id.* (citation omitted). Commonality is thus satisfied where the claims of all class members "depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*; *see also Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 567 (W.D. Wash. 2012) (finding that where the plaintiff alleged that "all class members were sent substantially similar unsolicited text messages by the same defendants, using the same automatic dialing technology, commonality is satisfied").

   This case presents several common questions that drive the resolution of all class members' claims, including: (1) whether Alarm.com is liable for Alliance's telemarketing conduct; (2) whether Alarm.com is liable for Alliance's agent's telemarketing conduct; (3) whether Alliance's telemarketing calls encouraged the purchase of Alarm.com goods or services; (4) whether Alliance called numbers on the National Do-Not-Call Registry; (5) whether Alliance placed calls to mobile telephone numbers using a prerecorded message; and (6) whether Alliance placed calls to residential numbers using a prerecorded message. These significant and common questions satisfy the commonality requirement. *See, e.g.*, *Krakauer v. DISH Network L.L.C.*, 311 F.R.D. 384, 394-95 (M.D.N.C. 2015) (finding that common questions included vicarious liability and determination of whether or not calls were made to individuals on the National Do-Not-Call Registry); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) (finding that vicarious liability issues satisfied commonality because the issue "turns on the federal common law of agency and can arise from actual authority, apparent authority, or ratification" a determination of which will depend either on the defendants' conduct rather than class members); *Whitaker v. Bennett Law, PLLC,* No. 13-3145, 2014 WL 5454398, at *5 (S.D. Cal. Oct. 27, 2014) (finding that commonality was satisfied where the central issue was whether the defendant used an ATDS or prerecorded or artificial voice to make unsolicited calls).

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 14
Case No.4:15-cv-06314-YGR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

       3.      <u>Plaintiffs' claims are typical of class members' claims.</u>

Typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Typicality exists when the class representatives and the class members are subjected to and injured by the same course of conduct. *Ellis*, 657 F.3d at 984. "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* (quoting *Hanon*, 976 F.2d at 508). Therefore, "[l]ike the commonality requirement, the typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez*, 591 F.3d at 1124 (quoting *Hanlon*, 150 F.3d at 1020).

Plaintiffs' claims are typical of the claims of other class members because they arise from the same course of conduct by Alarm.com and are based on the same legal theories. Typicality is readily satisfied in TCPA cases like these one, where the claims are based on the defendant's common, coordinated telemarketing campaigns. *See, e.g.*, *Whitaker*, 2014 WL 5454398, at *5 (finding typicality satisfied because each class member's claim "revolves exclusively around [the defendant's] conduct as it specifically relates to the alleged violations of the TCPA"); *Agne*, 286 F.R.D. at 569 (finding typicality satisfied where the plaintiff's claims, "like all class members' claims, arise from text marketing campaigns commissioned by Papa John's franchisees and executed by the same marketing vendor …"); *see also Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 821 (8th Cir. 2015) (finding typicality satisfied where the plaintiff did not hear the same telemarketing message as other class members, but both messages had the same promotional purpose).

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 15
Case No.4:15-cv-06314-YGR

4.      <u>The classes will be adequately represented.</u>

The adequacy requirement is satisfied when the class representatives will "fairly and adequately protect the interests of the class." To make this determination, "courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis*, 657 F.3d at 985 (quoting *Hanlon*, 150 F.3d at 1020). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Id.* In considering the adequacy of plaintiffs' counsel, the court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

None of the Plaintiffs has an antagonistic or conflicting interest with the members of the proposed classes. To the contrary, Plaintiffs have demonstrated their commitment to the class by actively participating in the litigation. Each of the Plaintiffs has worked with counsel to develop the class claims, respond to discovery, and prepare for their deposition. Plaintiffs are scheduled to be deposed in the coming weeks. Terrell Decl., ¶ 5. Rather than seeking individual remuneration, each of the named plaintiffs has been a zealous advocate for the interests of the class.

Plaintiffs have also retained experienced and capable counsel who will vigorously prosecute the class claims. Plaintiffs' counsel have substantial experience in litigating class action lawsuits asserting TCPA claims, and have all been appointed to serve as class counsel in similar cases. *Id.*, ¶ 4; *see also Ikuseghan v. Multicare Health Sys.*, No. C 14-5539 BHS, 2015 WL 4600818, at *6 (W.D. Wash. July 29, 2015) (finding adequacy satisfied where the plaintiff's counsel served as counsel "in other class action lawsuits, including a previous TCPA case"). Plaintiffs' counsel have devoted a significant amount of time to investigating the potential claims

1   and will continue to commit the resources necessary to represent the class. Terrell Decl., ¶ 3.

2   Plaintiffs and their counsel have demonstrated their commitment to prosecuting this case on

3   behalf of all class members and therefore satisfy the adequacy requirement.

4   **B.   The Rule 23(b)(3) requirements are satisfied.**

5         Class certification is appropriate under Rule 23(b)(3) when "questions of law or fact

6   common to the members of the class predominate over any question affecting only individual

7   members, and … a class action is superior to other available methods for the fair and efficient

8   adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Both requirements are satisfied for the

9   proposed classes in this case.

10        1.      Common issues predominate over any individual issues.

11        The predominance requirement "tests whether proposed classes are sufficiently cohesive

12  to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,

13  623-24 (1997). Predominance is satisfied when "the common, aggregation-enabling issues in the

14  case are more prevalent or important than the non-common, aggregation-defeating, individual

15  issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted). "[A]

16  common question is one where 'the same evidence will suffice for each member to make a prima

17  facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (citation

18  omitted). A plaintiff does not need to "prove that each 'element of her claim is susceptible to

19  classwide proof.'" *Amgen,* 133 S. Ct. at 1196 (2013) (citation and alterations omitted). Rather,

20  "[w]hen common questions present a significant aspect of the case and they can be resolved for

21  all members of the class in a single adjudication, there is clear justification for handling the

22  dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022

23  (citation omitted).

24        The predominance analysis "begins, of course, with the elements of the underlying

25  action." *Erica P. John Fund, Inc. v. Halliburton*, 563 U.S. 804, 809 (2011). Courts routinely

26

27

28  PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
    AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 17
    Case No.4:15-cv-06314-YGR

certify TCPA claims because the elements are amenable to classwide proof.[4] In fact, this Court

recently certified TCPA claims in a case involving a text messaging campaign. Order Granting in

Part and Denying in Part Plaintiffs' Motion for Class Certification, *Meyer v. Bebe Stores, Inc.*,

No. 4:14-civ-00267 (N.D. Cal. Aug. 22, 2016), ECF No. 106. The Court found that each of the

elements of the plaintiff's TCPA claim could be established with common proof. *Id.* at 8-12. The

Court then denied the defendant's motion to decertify the TCPA claim last month. *Meyer v. Bebe*

*Stores, Inc.*, No. 14-cv-00267-YGR, 2017 WL 558017 (N.D. Cal. Feb. 10. 2017).

As in *Meyer*, predominance is satisfied in this case because the elements of Plaintiffs'

claims can be established with common proof. Each of the elements focuses primarily on the

conduct of Alarm.com and Alliance, and Alliance's agents, which made calls on Alarm.com's

behalf. Plaintiffs must establish four elements to prove the claim asserted by the Cell Phone

Class: (1) an automatic telephone dialing system (ATDS) or an artificial or prerecorded voice

(2) was used to place calls (3) to a telephone number assigned to a cellular telephone service

---

[4] *See, e.g., Ikuseghan*, 2015 WL 4600818, at *7 (common issues predominated for class of
individuals who received automated debt collection calls on their cell phones); *Krakauer*, 311
F.R.D. at 399-400 (common issues predominated for class of individuals who received
automated calls on their cell phones); *Booth v. Appstack, Inc.*, No. C13-1533 JLR, 2015 WL
1466247, at *9-12 (W.D. Wash. Mar. 30, 2015) (predominance was satisfied for a class of
individuals and small businesses who received automated debt collection calls on cell phones);
*Bee, Denning, Inc. v. Capital Alliance Grp.*, 310 F.R.D. 614, 628-29 (S.D. Cal. 2015) (common
issues predominated for class members who prerecorded telemarketing calls on their cell
phones); *Kristensen*, 12 F. Supp. 3d at 1305-08 (predominance was satisfied for class of
individuals who received telemarketing text messages on their cell phones); *Whitaker*, 2014 WL
5454398, at *6 (common issues predominated for class of individuals who received automated
debt collection calls on their cell phones); *Stemple v. QC Holdings, Inc.*, No. 12-cv-01997 BAS
(WVG), 2014 WL 4409817, at *10 (S.D. Cal. Sept. 5, 2014) (predominance was satisfied for a
class of individuals who received autodialed debt collection calls on their cell phones);
*Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 252-55 (N.D. Ill. 2014)
(predominance was satisfied for classes of individuals who received automated telemarketing
calls on either cell or residential phones); *Manno v. Healthcare Revenue Recovery Grp., LLC*,
289 F.R.D. 674, 689-90 (S.D. Fla. 2013) (predominance was satisfied for a class of Florida
residents who received automated calls on their cell phones); *Knutson v. Schwan's Home Serv.,
Inc.*, No. 3:12-cv-0964, 2013 WL 4774763, at *10 (S.D. Cal. Sept. 5, 2013) (common issues
predominated for a class of individuals who received prerecorded and autodialed telemarketing
calls on their cell phones); *Agne*, 286 F.R.D. at 570-71 (predominance was satisfied for class of
individuals who received text messages on their cell phones).

---

(4) without the express prior consent of the called party. 47 U.S.C. § 227(b)(1)(A)(iii). To prove the claim asserted by the Residential Class, Plaintiffs must establish that (1) an artificial or prerecorded voice (2) was used to place calls (3) to a residential telephone number (4) without the prior express consent of the called party. 47 U.S.C. § 227(b)(1)(B). To prove the claim asserted by the National Do-Not-Call Class, Plaintiffs must establish that (1) more than one telephone solicitation call was made (2) within a twelve-month period (3) to a number that was placed on the National Do Not Call Registry at least 30 days before the call was made (4) without the prior express consent of the called party. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). Each of these elements will be proven with common evidence.

Use of prerecorded voice. The question of whether Alliance (through its agent, Nationwide Alarm, LLC) used a prerecorded voice to make calls to members of the Cell Phone and Residential Classes on Alarm.com's behalf is common to all proposed class members. *See, e.g.*, *Booth*, 2015 WL 1466247, at *10; *Whitaker*, 2014 WL 5454398, at *5. Plaintiffs will use expert testimony to prove that Alarm.com's agents employed prerecorded messages to make the telemarketing calls.

Calls to cell phones, residential phones, and phone numbers registered with the National Do-Not-Call Registry. Common evidence also exists to show that calls were made to cell phones, to residential lines, and to phone numbers that were registered with the National Do-Not-Call Registry for at least 30 days. Plaintiff's expert, Anya Verkhovskaya, has identified members of the National Do-Not-Call Classes from records produced by Alliance by (1) isolating all outbound telemarketing calls by Alliance Security that had a disposition of "answered" and a duration of 0:00:01 or greater; (2) refining the results by further isolating all numbers where two calls were made in a twelve-month period; (3) reviewing the refined results to determine which numbers had been on the National Do-Not-Call Registry for at least thirty days prior to the call; and (4) removing any numbers that were identified as belonging to a business. Ex. 25 at 7-10. Other courts have approved this method of identifying class members. *See Krakauer*, 311 F.R.D. at 390-91; *Ikuseghan* 2015 WL 4600818, at *4; Order Certifying a Class at 10-11, *Biringer v.*

*First Family Ins., Inc.*, No. 4:14-cv-00566 (N.D. Fla. Aug. 4, 2016) ECF No. 79. Plaintiffs' expert Jeff Hansen will be able to identify members of the Residential and Cell Phone Classes from records produced by third party Nationwide Alarm, LLC. *See* Ex. 3, ¶¶ B.1–10.

Consent. The issue of whether class members consented to receive the telemarketing calls does not raise individualized issues that preclude class certification. The only class members who even arguably consented to the telemarketing calls are those who participated in Alarm.com's customer lead service by filling out an online form on Alarm.com's website. Whether filling out this website form constitutes consent is a common issue. *See Ikuseghan*, 2015 WL 4600818, at *7 (finding that the issue of whether filling out the defendant's standardized forms constituted express consent was a common issue). Alarm.com maintains records of these individuals in its data warehouse. Ex. 3 at 31:24–32:18. Plaintiffs can, if necessary, identify and exclude those individuals from the Classes. *See Manno*, 289 F.R.D. at 689-90 (certifying class where class members who consented were excluded from the class).

Vicarious liability. The issue of whether Alarm.com is vicariously liable for Alliance's telemarketing violations "turns on the federal common law of agency and can arise from actual authority, apparent authority, or ratification." *Kristensen*, 12 F. Supp. 3d at 1306; *see also In re DISH*, 28 F.C.C. Rcd. at 6584. Actual authority exists "when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006). The determination of actual authority therefore focuses on the relationship between the defendants. *Kristensen*, 12 F. Supp. 3d at 1306. An agent acts with apparent authority "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement § 2.03. Because this inquiry addresses "how a reasonable person would perceive" the relationship between Alarm.com and Alliance, there is no need to delve into individualized class members' perception. *Kristensen*, 12 F. Supp. 3d at 1306. Finally, ratification arises when the principal affirms the agent's prior act. Restatement § 4.01. The focus

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 20
Case No.4:15-cv-06314-YGR

is therefore on Alarm.com's conduct, "without concern for any conduct by the class members." *Kristensen*, 12 F. Supp. 3d at 1306; *see also Bee, Denning*, 310 F.R.D. at 628 (finding that vicarious liability was a common issue that predominated in the case); *Hawk Valley, Inc. v. Taylor*, 301 F.R.D. 169, 188 (E.D. Pa. 2014) (holding that common issues predominate for determination of vicarious liability in unsolicited fax case because trial would focus on the nature and extent of the relationship between the defendants).

Damages. The determination of damages is also a classwide issue because damages for a TCPA claim are proscribed by statute. Plaintiffs will be entitled to $500 for each negligent violation of the TCPA and treble damages--$1,500 for each violation—if Alarm.com's violations were "willful or knowing." 47 U.S.C. § 227(b)(3). The question of whether Alarm.com's conduct was willful or knowing will be resolved with common proof since it focuses on Alarm.com's conduct. *See, e.g.*, *APB Assocs., Inc. v. Bronco's Saloon, Inc.*, 315 F.R.D. 200, 215 (E.D. Mich. 2016) (finding that the question of whether the defendants' actions were willful in a TCPA case was a common legal question); *City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*, 296 F.R.D. 299, 322 (D.N.J. 2013) (same); *see also* Order at 11-12, *Meyer v. Bebe Stores, Inc.*, No. 4:14-civ-00267 (N.D. Cal. Aug. 22, 2016), ECF No. 106.

The common issues in this case overwhelmingly predominate over any individualized issues. This is why one court recognized that "[i]n the context of the TCPA, the class action device likely is the optimal means of forcing corporations to internalize the social costs of their actions." *Bee, Denning,* 310 F.R.D. at 630.

2.    A class action is a superior method for resolving claims under the TCPA.

The Court should certify the class if it finds that a "class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The purpose of the superiority requirement is to ensure judicial economy and that a class action is the "most efficient and effective means of resolving the controversy." *Wolin*, 617 F.3d at 1175 (citation omitted). Courts consider four factors in evaluating the superiority requirement: "(A) the class members' interests in individually controlling the prosecution or defense of

separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). All of these factors support class certification in this case.

Given the large number of class members, the small dollar value of their individual claims, and the multitude of common issues present, use of the class action device is the most efficient and fair means of adjudicating the claims that arise out of Alarm.com's unlawful telemarketing scheme. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources and promotes consistency and efficiency of adjudication. Additionally, it is likely that most class members lack the resources necessary to seek individual legal redress for Alarm.com's misconduct and, without class treatment, would have no effective remedy for their injuries. *See Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (cases involving "multiple claims for relatively small individual sums" are particularly well suited to class treatment); *see also Wolin*, 617 F.3d at 1175 ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."); *Agne*, 286 F.R.D. at 571 ("Five hundred dollars is not sufficient to compensate the average consumer for the time and effort that would be involved in bringing a small claims action ….").

A class action is also superior because class litigation under the TCPA is easily manageable. Given the predominance of common issues, the case can be tried almost entirely using classwide proof of the relationship between Alarm.com and Alliance as well as Alliance's telemarketing activities. Plaintiffs' counsel recently tried a TCPA class action in federal court, involving more than 18,000 class members, in just five days of testimony. *See* Declaration of John W. Barrett, ¶ 2 & Exs. 1 & 2. It is "far more efficient" to litigate Plaintiffs' claims based on a common course of conduct "on a classwide basis rather than in thousands of individual and overlapping suits." *Wolin*, 617 F.3d at 1176; *see also Meyer*, 2017 WL 558017, at *4 ("In a case

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 22
Case No.4:15-cv-06314-YGR

1    involving the statutory damages at issue here, it is unlikely that individual plaintiffs would

2    actually incur the time and expense to bring these claims. Thus, but for a class action, such

3    violations of the TCPA may never be brought to light.").

4                                    **VI.  CONCLUSION**

5            Because the Rule 23 requirements are satisfied, Plaintiffs respectfully request that the

6    Court: (1) certify the three proposed classes; (2) appoint Abante Rooter & Plumbing, Inc., Mark

7    Hankins, and Phillip Charvat to serve as class representatives; (3) appoint Plaintiffs' counsel to

8    serve as class counsel for the proposed classes; and (4) direct Plaintiffs to submit a proposed

9    notice plan and form of notice within a reasonable time.

10           RESPECTFULLY SUBMITTED AND DATED this 7th day of March, 2017.

11                                            TERRELL MARSHALL LAW GROUP PLLC

12                                            By:   Beth E. Terrell, SBN #178181
13                                                  Beth E. Terrell, SBN #178181
                                                    Email: bterrell@terrellmarshall.com
14                                                  Jennifer Rust Murray, *Admitted Pro Hac Vice*
                                                    Email:  jmurray@terrellmarshall.com
15                                                  936 North 34th Street, Suite 300
                                                    Seattle, Washington  98103
16                                                  Telephone:  (206) 816-6603
                                                    Facsimile:   (206) 319-5450
17

18                                                  Michael F. Ram, SBN #104805
19                                                  Email:  mram@rocklawcal.com
                                                    RAM, OLSON, CEREGHINO
20                                                    & KOPCZYNSKI LLP
                                                    101 Montgomery Street, Suite 1800
21                                                  San Francisco, California 94104
                                                    Telephone:  (415) 433-4949
22                                                  Facsimile:  (415) 433-7311

23

24

25

26

27

28
     PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
     AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 23
     Case No.4:15-cv-06314-YGR

1

2

3

4

5

6

7

John W. Barrett, *Admitted Pro Hac Vice*
E-mail: jbarrett@baileyglasser.com
Jonathan R. Marshall, *Admitted Pro Hac Vice*
Email:  jmarshall@baileyglasser.com
Ryan McCune Donovan, *Admitted Pro Hac Vice*
Email:  rdonovan@baileyglasser.com
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, West Virginia  25301
Telephone:  (304) 345-6555
Facsimile:   (304) 342-1110

8

9

10

11

12

13

Edward A. Broderick
Email: ted@broderick-law.com
Anthony I. Paronich, *Admitted Pro Hac Vice*
Email: anthony@broderick-law.com
BRODERICK & PARONICH, P.C.
99 High Street, Suite 304
Boston, Massachusetts 02110
Telephone:  (617) 738-7080
Facsimile:   (617) 830-0327

14

15

16

17

Matthew P. McCue
E-mail: mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3
Natick, Massachusetts  01760
Telephone:  (508) 655-1415
Facsimile:   (508) 319-3077

18

*Attorneys for Plaintiffs and the Proposed Classes*

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 24
Case No.4:15-cv-06314-YGR

<u>CERTIFICATE OF SERVICE</u>

1

2          I, Beth E. Terrell, hereby certify that on March 7, 2017, I electronically filed the

3   foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

4   such filing to the following:

5

6          Stephen E. Taylor, SBN #058452
           Email: staylor@taylorpatchen.com
7          Jonathan A. Patchen, SBN #237346
           Email: jpatchen@taylorpatchen.com
8          Cheryl A. Cauley, SBN #252262
           Email:  ccauley@taylorpatchen.com
9          TAYLOR & PATCHEN, LLP
           One Ferry Building, Suite 355
10         San Francisco, California 94111
           Telephone:  (415) 788-8200
11         Facsimile:   (415) 788-8208

12
           Martin W. Jaszczuk, *Admitted Pro Hac Vice*
13         Email: mjaszczuk@jaszczuk.com
           Margaret M. Schuchardt, *Admitted Pro Hac Vice*
14         Email:  mschuchardt@jaszczuk.com
           Keith L. Gibson, *Admitted Pro Hac Vice*
15         Email:  kgibson@jaszczuk.com
           JASZCZUK P.C.
16         311 South Wacker Drive, Suite 1775
           Chicago, Illinois 60606
17         Telephone: (312) 442-0311

18
19         Ross A. Buntrock, *Admitted Pro Hac Vice*
           Email: ross@olspllc.com
20         OBSIDIAN LEGAL PLLC
           1821 Vernon Street NW
21         Washington, DC 20009
           Telephone: (202) 643-9055
22
23
           *Attorneys for Defendants Alarm.com Incorporated and Alarm.com Holdings,*
24         *Inc.*

25

26

27

28
PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION - 25
Case No.4:15-cv-06314-YGR

DATED this 7th day of March, 2017.

TERRELL MARSHALL LAW GROUP PLLC

By:  /s/ Beth E. Terrell, SBN #178181
    Beth E. Terrell, SBN #178181
    Email: bterrell@terrellmarshall.com
    936 North 34th Street, Suite 300
    Seattle, Washington  98103-8869
    Telephone:  (206) 816-6603
    Facsimile:  (206) 350-3528

*Attorneys for Plaintiffs*