Stephen E. Taylor, SBN 058452
Jonathan A. Patchen, SBN 237346
Cheryl A. Galvin, SBN 252262
TAYLOR & PATCHEN, LLP
One Ferry Building, Suite 355
San Francisco, CA 94111
Telephone: 415-788-8200
Facsimile: 415-788-8208
E-mail: staylor@taylorpatchen.com
E-mail: jpatchen@taylorpatchen.com
E-mail: cgalvin@taylorpatchen.com

Ross Allen Buntrock
OBSIDIAN LEGAL PLLC
1821 Vernon St., NW
Washington, DC 20009
Telephone: (202) 643-9055
Email: ross@olspllc.com

[Additional Counsel Appear on Signature Page]

*Attorneys for Defendants Alarm.com Incorporated
and Alarm.com Holdings, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

|  |  |
|---|---|
| ABANTE ROOTER AND PLUMBING, INC., GEORGE ROSS MANESIOTIS, MARK HANKINS, and PHILIP J. CHARVAT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALARM.COM INCORPORATED, and ALARM.COM HOLDINGS, INC.,<br><br>Defendants. | Civil Action No. 4:15-cv-06314-YGR<br><br>**DECLARATION OF MARGARET SCHUCHARDT IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>DATE:  April 25, 2017<br>TIME:  2:00 p.m.<br>LOCATION:  Courtroom 1 – 4th Floor<br>JUDGE:  Honorable Yvonne Gonzalez Rogers |

1       I, Margaret Schuchardt, make the following Declaration based on personal knowledge

2   of the matters set forth herein.  If called upon, I could and would testify competently to the

3   following:

4       1.    I am a partner at Jaszczuk, P.C., counsel to Defendants Alarm.com Incorporated

5   
6   and Alarm.com Holdings, Inc. ("Alarm.com" or "Defendants") in this matter.  I submit this

7   Declaration in support of Defendants' Response to Plaintiffs' Motion for Class Certification.

8       2.    Attached hereto as Exhibit 1 is a true and correct copy of Alliance's Objection to

9   Plaintiff's Motion to Compel filed in *Abante Rooter, et al. v. Alarm.com*, No. 16-mc-00020-S-

10   PAS (D.R.I.).

11       3.    Attached hereto as Exhibit 2 is a true and correct copy of excerpts of the

12   Deposition of Stephen Trundle.  Defendants have designated this exhibit "Confidential" and are

13   therefore filing it under seal in accordance with Civil Local Rule 79-5.

14   
15       4.    Attached hereto as Exhibit 3 is a true and correct copy of excerpts of the

16   Deposition of Anne Ferguson.

17       5.    Attached hereto as Exhibit 4 is a true and correct copy of the documents bates

18   labeled PL-CHARVAT_000001-2.

19       6.    Attached hereto as Exhibit 5 is a true and correct copy of excerpts of the

20   Deposition of Philip Charvat.

21       7.    Attached hereto as Exhibit 6 is a true and correct copy of excerpts of the

22   Deposition of Fred Heidarpour.

23       8.    Attached hereto as Exhibit 7 is a true and correct copy of the Second Amended

24   Master Consolidated Complaint filed in *In re Monitronics Int'l, Inc.*, MDL No. 1:13-md-2493

25   (N.D. W.Va.).

9.    Attached hereto as Exhibit 8 is a true and correct copy of Plaintiffs' Third Supplemental Statement filed in *In re Monitronics Int'l, Inc.*, MDL No. 1:13-md-2493 (N.D. W.Va.).

10.    Attached hereto as Exhibit 9 is a true and correct copy of Plaintiffs' Fifth Supplemental Statement filed in *In re Monitronics Int'l, Inc.*, MDL No. 1:13-md-2493 (N.D. W.Va.).

11.    Attached hereto as Exhibit 10 is a true and correct copy of PL-CHARVAT_000011.

12.    Attached hereto as Exhibit 11 is a true and correct copy of excerpts of the Deposition of Mark Hankins.

13.    Attached hereto as Exhibit 12 is a true and correct copy of excerpts of the Deposition of Anya Verkhovskaya.

14.    Attached hereto as Exhibit 13 is a true and correct copy of the Memorandum in Opposition to Alarm.com Motion to Transfer and Consolidate Potential Tag-Along Action filed in *In re Monitronics*, MDL No. 1:13-md-2493 (N.D. W.Va.).

15.    Attached hereto as Exhibit 14 is a true and correct copy of Alarm 0018581-83. Defendants have designated this exhibit "Confidential" and are therefore filing it under seal in accordance with Civil Local Rule 79-5.

16.    Attached hereto as Exhibit 15 is a true and correct copy of Alarm 0018577-80.

17.    Attached hereto as Exhibit 16 is a true and correct copy of Plaintiffs Diana Mey's and Philip Charvat's Response to Honeywell International, Inc.'s Motion to Vacate Conditional Transfer Order filed in *In re Monitronics*, MDL No. 1:13-md-2493 (N.D. W.Va.).

1     18.     Attached hereto as Exhibit 17 is a true and correct copy of excerpts of the

2   Deposition of Rachel Hoover.

3         I declare under penalty of perjury under the laws of the United States of America that

4   the foregoing is true and correct.

5         EXECUTED in Chicago, IL on March 28, 2017.

6

7

8                               /s/ Margaret M. Schuchardt
                              Margaret M. Schuchardt
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I, Margaret M. Schuchardt, hereby certify that on March 28, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties registered to receive electronic service in the above-captioned action.

Dated:    March 28, 2017

Respectfully submitted,

JASZCZUK P.C.

By:  /s/ Margaret M. Schuchardt
Martin W. Jaszczuk (*pro hac vice*)
Margaret M. Schuchardt (*pro hac vice*)
Keith L. Gibson (*pro hac vice*)
JASZCZUK P.C.
311 South Wacker Drive, Suite 1775
Chicago, Illinois 60606
Telephone:  (312) 442-0509
Facsimile:  (312) 442-0519
mjaszczuk@jaszczuk.com
mschuchardt@jaszczuk.com
kgibson@jaszczuk.com

*Attorneys for Defendants Alarm.com*
*Incorporated and Alarm.com Holdings, Inc.*

# -EXHIBIT 1-

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| ABANTE ROOTER INC, et al. | Case No. 16-mc-00020-S-PAS |
| *Plaintiff,* | Hon. Patricia A. Sullivan |
| v. | Underlying Litigation: *Abante Rooter and Plumbing, Inc., et. al. v. Alarm.com, Inc., et. al.* USDC Northern District of California Civil Action No. 15-cv-06314-YGR Judge Yvonne Gonzalez-Rogers |
| ALARM.COM, | |
| *Defendant.* | |

**OBJECTION TO PLAINTIFF'S MOTION TO COMPEL**

Now comes Alliance Security Inc. (hereinafter "Alliance"), by and through its undersigned counsel, and hereby respectfully objects to Plaintiff's Motion to Compel a Response to Duly Served Subpoenas.

WHEREFORE, Alliance respectfully requests that Plaintiff's Motion to Compel a Response to Duly Served Subpoenas be denied, together with such other relief as this Honorable Court deems just and proper.

1

Dated: September 9, 2016

Respectfully Submitted,

Non-party, Alliance Security, Inc.
By its Attorney,

/s/ Sergio A. Spaziano
Sergio A. Spaziano, Esq. (Bar No. 8309)
Darrow Everett, LLP
One Turk Head Place, 12th Floor
Providence, Rhode Island 02903
T: (401) 453-1200
F: (401) 453-1201
E: sspaziano@darroweverett.com

## CERTIFICATE OF SERVICE

I, hereby certify that on September 9, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such to all counsel of record.

/s/ Sergio A. Spaziano
Sergio A. Spaziano, Esq.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ABANTE ROOTER INC, et al.<br><br>*Plaintiff*,<br><br>v.<br><br>ALARM.COM,<br><br>*Defendant*. | Case No. 16-mc-00020-S-PAS<br><br>Hon. Patricia A. Sullivan<br><br>Underlying Litigation:<br>*Abante Rooter and Plumbing, Inc., et. al.*<br>*v. Alarm.com, Inc., et. al.*<br>USDC Northern District of California<br>Civil Action No. 3:15-cv-06314-JCS<br>Judge Yvonne Gonzalez-Rogers |

## MEMORANDUM IN SUPPORT OF
## OBJECTION TO PLAINTIFF'S MOTION TO COMPEL

Now comes Alliance Security Inc. (hereinafter "Alliance"), by and through its undersigned counsel, and hereby respectfully submits this Memorandum in Support of its Objection to Plaintiff's Motion to Compel a Response to Duly Served Subpoenas.

On or about March 14, 2016, Plaintiff issued a Subpoena commanding non-party Alliance to produce certain documents and information in connection with the above-referenced underlying Civil Action No. 3:15-cv-06314-JCS in the United States District Court for the Northern District of California (hereinafter "Subpoena #1"). Alliance had initially filed a Motion to Quash Subpoena #1 with this Honorable Court but, notwithstanding the onerous and burdensome nature of the requests, later withdrew that motion and agreed to provide responses to Subpoena #1. Alliance accordingly conducted extensive searches through its electronic files in order to identify and compile information responsive to Plaintiff's requests and thereupon served a response to Subpoena #1 on May 26, 2016.

1

As the information being sought by Plaintiff is stored in electronic format throughout Alliance's computer systems, it was necessary for Alliance to deploy its information technology professionals to search Alliance's systems and run numerous queries in order to locate responsive information. Aware of and fully acknowledging the possibility that additional responsive information might be located in the future, Alliance reserved it's right to supplement its initial responses as additional responsive information was identified. Alliance thereafter provided Plaintiff with a First Supplemental Response to Subpoena #1 on or about June 17, 2016; a Second Supplemental Response to Subpoena #1 on or about June 24, 2016; and a Third Supplemental Response on or about August 22, 2016.

Alliance's system queries in search of documents responsive to, *inter alia*, Requests 5 and 7 of Subpoena #1 returned over one million potentially responsive items (hereinafter "Hits") the analysis of which would have been unduly burdensome and virtually impossible. Alliance accordingly, through its counsel, reached out to Plaintiff's counsel to discuss the situation and inquire as to whether the requests could be narrowed so as to more readily pinpoint the information Plaintiff was seeking. Plaintiff's counsel in turn provided a list of search terms for Alliance to use in narrowing its system queries. See Plaintiff's Exhibit 5. Alliance thereupon used Plaintiff's search terms in its queries and the resulting Hits were exponentially decreased. These remaining Hits were then either provided to Plaintiff in Alliance's Third Supplemental Response or were withheld as privileged and identified on Alliance's Privilege Log which was also provided to Plaintiff in connection with Alliance's Third Supplemental Request. It is apparent from Plaintiff's Motion to Compel that Plaintiff expected more documents to result from that query – admittedly not an unreasonable expectation considering the original unfiltered query returned over one million Hits. Nonetheless, upon narrowing the queries using Plaintiff's own search terms, only the documents which were provided in Alliance's Third Supplemental Response or identified in Plaintiff's Privilege Log were returned as Hits. Therefore, Plaintiff is now asking the Court

to compel Alliance to either produce documents which Plaintiff expressly excluded from the request, or to produce documents which simply do not exist.

As to Plaintiff's assertion that Alliance failed to provide information concerning its telephone dialing systems, Alliance, submitted all call logs in its possession which identify the calls made during the period in time at issue and provided all documentation in its possession concerning its telephone systems. Again, Alliance has no further information to provide and Plaintiff is asking this Court to compel production of non-existent documents.

Finally, Plaintiff, on page 5 of its Motion to Compel, alleges, inter alia, that "Plaintiffs have requested information about . . . who the other vendors were that Alliance also paid to make calls . . . ." This is an entirely false allegation as Plaintiff made no such request. Plaintiff did however make the following requests:

> Request No. 6: Documents that identify all vendors that you have used to generate leads for the Defendants since January 1, 2014 through the date of this response.
>
> Request No. 8: All call records of outbound telemarketing calls made promoting the Defendants goods or services by any third party that had a contractual relationship with you.

Alliance affirmatively responded that it was in possession of no information which was responsive to these requests. As to Request No. 6, Alliance sells home security systems. The Defendant, Alarm.com, is the provider of one discrete component of Alliance's systems, and not of any product or service which is sold by Alliance as a commodity separate and apart from its own security systems. Alliance therefore does not use any vendors to generate leads for the Defendants but rather only uses vendors to generate leads for itself − in order to sell its own security systems, of which Defendant's product or service is merely an integrated component. In an effort to continue to work with Plaintiff in good faith, Alliance, through its counsel, explained this distinction to Plaintiff's counsel.

3

Plaintiff's counsel thereupon issued a second Subpoena (hereinafter "Subpoena #2") with the same request but expanded to seek Alliance's list of all its lead providers – not merely those which Alliance had used to generate leads for the Defendants.   While Alliance found this request to be entirely objectionable on the grounds that it sought information which was completely outside the subject matter and scope of the underlying civil action, after further discussions between counsel for the parties, and Plaintiff's counsel's assurance that the lead provider list would remain confidential as proprietary business information, Alliance provided the list in its Response to Subpoena #2 on or about August 22, 2016.   As to Request No. 8, Alliance would not be in possession of any call records generated by any third parties.   Again, here, Plaintiff is now asking this Honorable Court to compel information which simply does not exist.

WHEREFORE, Alliance respectfully requests that Plaintiff's Motion to Compel a Response to Duly Served Subpoenas be denied, together with such other relief as this Honorable Court deems just and proper.

Dated: September 9, 2016

Respectfully Submitted,

Non-party, Alliance Security, Inc.
By its Attorney,

/s/ Sergio A. Spaziano
Sergio A. Spaziano, Esq. (Bar No. 8309)
Darrow Everett, LLP
One Turk Head Place, 12th Floor
Providence, Rhode Island 02903
T: (401) 453-1200
F: (401) 453-1201
E: sspaziano@darroweverett.com

4

## CERTIFICATE OF SERVICE

I, hereby certify that on September 9, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such to all counsel of record.

/s/ Sergio A. Spaziano
Sergio A. Spaziano, Esq.

# -EXHIBIT 2-

# FILED UNDER SEAL

-EXHIBIT 3-

ABANTE ROOTER AND PLUMBING v
ALARM.COM INCORPORATED

ANNE FERGUSON, CORPORATE
October 27, 2016

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3   - - - - - - - - - - - - - -x

 4    ABANTE ROOTER AND         :

 5    PLUMBING, INC., GEORGE    :

 6    ROSS MANESIOTIS, MARK     :   No. 3:15-cv-06314-YGR

 7    HANKINS, and PHILIP J.    :

 8    CHARVAT, individually     :

 9    and on behalf of all      :

10    others similarly          :

11    situated,                 :

12              Plaintiffs,     :

13       v.                     :

14    ALARM.COM INCORPORATED,   :

15    AND ALARM.COM HOLDINGS,   :

16    INC.,                     :

17              Defendants.     :

18   - - - - - - - - - - - - - -x

19          Deposition of ALARM.COM INCORPORATED,

20       By and through its Designated Representative

21                 ANNE FERGUSON

22                Washington, DC

23           Thursday, October 27, 2016

24                  9:09 a.m.
```

 1   complaint came in, and what was the nature of the
 2   complaint; do you recall?
 3        A    That a service provider was contacting the
 4   consumer with greater frequency than the consumer
 5   preferred.
 6        Q    Is there any, any indication that they were on
 7   the Do Not Call list or was it just the frequency of
 8   calls they were complaining about?
 9        A    Just the frequency of calls.
10        Q    Any indication whether they had been called on
11   their cell phone?
12        A    No, no indication.
13        Q    No indication, right, one way or the other.
14   And so it was determined that the lead had been provided
15   through the CLS; right?
16        A    Correct.
17        Q    Tell me what that means.
18        A    Alarm.Com has a customer lead service where
19   consumers can enter a lead funnel through the Alarm.Com
20   public site.  As part of that process if the consumer
21   goes all the way through the funnel, they explicitly
22   indicate their consent to be contacted via the methods
23   that they submit to, that they submit through that form.
24        Q    And so how were you or how was the company

1    able to determine that this consumer had come to the

2    company through the CLS?

3         A    We store that information when it is input.

4         Q    And where is that information stored?

5         A    Our data warehouse.

6         Q    I had to ask even though I know the answer.

7    And with regard to the information that -- well, let's

8    just talk about that particular consumer.  You go to the

9    data warehouse, you want to see, you know, did this

10   person come in through the CLS or was a lead generated

11   through the CLS.  What sort of information do you see in

12   the data warehouse about that particular consumer?

13        A    You would see information that the consumer

14   input themselves through the form.  You would also see

15   an indication of which service providers the individual

16   had selected that they wanted to be connected with.  If

17   the lead had been converted to a subscriber, that would

18   be noted as well.

19        Q    And so if the lead is generated through the

20   CLS and the consumer has selected more than one service

21   provider, what happens then in terms of that lead?

22        A    Once the consumer has indicated their consent

23   which they have to do by selecting a particular box,

24   then they are presented with a, a list of potential

```
1    service providers who service their geographic location
2    and who can deliver an installation via the consumer's
3    preferred method.  The consumer can then select via
4    check box which of those service providers they want to
5    be connected with.  It is entirely up to the consumer
6    how many of those they select, and then they would click
7    a submission button.  Once that is done the lead's
8    information would be sent to the service providers that
9    the lead indicated they wanted to be connected with.
10        Q    How is the lead information sent to the
11   service providers the consumer has selected?
12        A    There are two different ways.  It is e-mailed
13   to a specific e-mail address that the service provider
14   indicates is appropriate for inbound leads, and then the
15   information is also available via our service provider
16   portal which is a permissioned site that our service
17   providers can access to perform a variety of different,
18   different activities.
19        Q    Okay.  And presumably the e-mail or the entry
20   in the service provider portal includes a number at
21   which the consumer may be contacted; is that right?
22        A    It would include whatever number the consumer
23   indicated in the lead, in the form.
24        Q    Prior to providing that number to the service
```

1        Q     Leads.

2        A     We only accept leads through our -- we

3    transmit lead information back to our partners through

4    our customer lead service and through one other

5    marketing resource that we make available to our

6    partners which is a co-branded web page that they can

7    utilize that has a simple lead input form.  That is not

8    a shared lead.  That is information that is transmitted

9    directly to that service provider.

10       Q     Okay.  So let's talk about Alliance.Com --

11   Alliance.Com -- I'm going to call them that -- Alliance

12   Security for a minute.  Do you have an understanding as

13   to with regard to the subscribers that they deliver to

14   Alarm.Com where they obtained the information, I'll call

15   it lead information, but the information about those

16   subscribers to then market Alarm.Com's product to them?

17       A     Outside of the leads that they received

18   directly through the customer lead service from

19   Alarm.Com, I don't have specific information where they

20   are obtaining leads.

21       Q     Are there any limitations on the method by

22   which service providers can obtain leads outside of the

23   CLS?

24       A     We don't control or direct our service

```
 1    providers' marketing activities or sales activities.
 2         Q    So the answer's no, there are no limitations
 3    on that?
 4         A    (No verbal response.)
 5         Q    And I know I'm bouncing around a little bit,
 6    but it seems like it sort of makes some sense.
 7         A    One point of clarification.
 8         Q    Yeah.
 9         A    As part of our service provider agreement we
10    do ask, require that our service providers comply with
11    all applicable laws and regulations.  So to the extent
12    that they need to do that, that is part of our service
13    provider agreement.
14         Q    Okay.  What, if anything, does Alarm.Com do to
15    make sure that the service providers are complying with
16    that part of the agreement?
17         A    We do not put ourselves in the role of direct
18    compliance there.  However, if we were made aware of an
19    egregious case, that's something that we would
20    investigate and, if needed, take action on.
21         Q    I saw some references to an audit process that
22    was conducted with regard to a certain number of service
23    providers.  Are you familiar with that process?
24         A    I am familiar with our customer lead service
```

```
 1   audit process, if that's what you're referencing.
 2        Q    And tell me about that audit process.
 3        A    In an effort to ensure that the service
 4   providers that are part of the customer lead service are
 5   appropriately representing their relationship with
 6   Alarm.Com and utilizing services and resources that we
 7   provide appropriately, we do utilize Alarm.Com employees
 8   to audit how a participating service provider member of
 9   CLS is utilizing the program and how they are following
10   up with a lead.
11        Q    And tell me what that means.  What is the
12   audit process?  How does it happen?
13        A    We would have an individual from Alarm.Com or
14   from a third party that we work with submit lead
15   information as though it were a prospective consumer.
16   They would be then presumably contacted by whatever
17   service providers they indicated as part of that lead
18   funnel process they wanted to be connected with, and
19   then we would make note of how the service provider
20   followed up:  Did they e-mail?  Did they not?  Did they
21   call?  Did they not?  If they connected with the
22   consumer, how are they talking about Alarm.Com services,
23   if they were talking about Alarm.Com services, if they
24   were professional, courteous, respectful with the
```

# -EXHIBIT 4-

Class Action Cases involving Plaintiff Charvat.

- Charvat v. ADT, 1:11cv-01925 (N.D.Ill., Bucklo J.) (plaintiff appointed class rep. and settlement approved on June 21, 2013 in the amount of $15,000,000).

- Diana Mey and Philip Charvat v. Honeywell International, Inc. et al, Case No. 2:12cv-01721, USDC SD W.Va. (this is a TCPA class action to which Mr. Charvat was recently added as a co class representative).

- Charvat v. Travel Services et al, USDC N.D. Ill E. Div. 1:12-cv-5746 (TCPA class action).

- Charvat v. Allstate & Esurance, U.S. Dist., Northern Dist of Ilinois, Eastern Division Civil Action No. 1:2013-cv-7104 (TCPA class action).

- Charvat v. FTR Energy, CA No. 14-cv-00073-SRU (D.Ct. (TCPA class action).

- Charvat. Augeo Affinity Inc., District of Southern Ohio, 14-cv-00376 (TCPA class action).

- Charvat v. AEP Energy, Inc., Northern District of Illinois, Civil Action No. 14-cv-03121 (TCPA class action).

- Charvat v. PHH Mortgage Corp., Civil Action No. 1:14-CV-04165 D.JN. (TCPA class action).

- Charvat v. E-telequote Insurance, Inc, Civil Action No. 8:14-cv-01928 MD, Florida (TCPA class action).

- Charvat v. DeliverCareRx, Inc., Northern District of Illinois Civil Action No. 1:14-cv-6832 (TCPA class action).

- Charvat v. Columbus Advisory Group, Inc., U.S. Dist., Southern Dist of Ohio, Eastern Division, Civil Action No. 2:14-cv-01747 (TCPA class action).

- Charvat v. National Holdings, U.S. Dist., Southern Dist of Ohio, Eastern Division Civil Action No. 2:14-cv-02205 (TCPA class action).

- Charvat & Johansen v. National Guardian Life, Wisconsin, Western District, Civil Action No. 3:15-cv-00043 (TCPA class action).

- Charvat & Olson v. Health Benefits One, LLC, Southern Dist. of Florida, Civil Action No. 0:15-cv-61388 (TCPA class action)

- Charvat v. Plymouth Rock Energy, LLC, Eastern Dist. of New York, Brooklyn Division, Civil Action No. 2:15-cv-04106 (TCPA class action)

- Abante Rooter And Plumbing, Inc., George Ross Manesiotis, Mark Hankins, And Philip J. Charvat V. Alarm.Com Incorporated, And Alarm.Com Holdings, Inc.,

PL-CHARVAT_000001

Northern District of California, Civil Action No. 3:15-cv-06314 (TCPA class action)

- Charvat v. Shampon Lamport, LLC, U.S. Dist., Southern Dist of Ohio, Eastern Division Civil Action No. 2:16-cv-00120 (TCPA class action).

PL-CHARVAT_000002

# -EXHIBIT 5-

```
                                              Page 1
1                   UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                       OAKLAND DIVISION
3                          - - -
4     ABANTE ROOTER AND             :
      PLUMBING, INC., GEORGE        :
5     ROSS MANESIOTIS, MARK         :
      HANKINS, AND PHILIP J.        :
6     CHARVAT, INDIVIDUALLY AND     :
      ON BEHALF OF ALL OTHERS       :
7     SIMILARLY SITUATED,           :
                                    :
8          Plaintiffs,              :
                                    :
9          vs.                      :   Case No.
                                    :   4:15-CV-06314-YGR
10    ALARM.COM INCORPORATED        :
      AND ALARM.COM HOLDINGS,       :
11    INC.,                         :
                                    :
12         Defendants.              :
13
14                          - - -
15            DEPOSITION OF PHILIP J. CHARVAT
16                          - - -
17
                          March 14, 2017
18                        8:59 a.m.
                          VERITEXT LEGAL SOLUTIONS
19                        41 South High Street
                          Suite 210
20                        Columbus, OH 43215
21                          - - -
22            Reported by:  Tracy J. Schell
23                          - - -
24
25
```

Page 77

1    you seeking the $500 for each one of those calls?

2         A.   Well, I believe we're seeking willful or

3    knowing also, so that would make that 1,500.  But we

4    could potentially also seek for the recorded calls,

5    $3,000 per call.

6         Q.   So for the prerecorded calls, you think you

7    can seek up to $3,000 per call?

8         A.   Yes.

9         Q.   And is that what you are seeking in that

10   case?

11        A.   I'm not sure what the current pleading is on

12   that.  I believe it's probably seeking only the 1,500

13   figure.

14        Q.   Okay.  Sorry.  So maybe back to the list now.

15             So then on the third bullet point down,

16   Charvat versus Travel Services, et al.; do you see

17   that?

18        A.   Yes.

19        Q.   And that was also a TCPA class action?

20        A.   Yes.

21        Q.   And you were the class representative?

22        A.   Yes.

23        Q.   And did you give a deposition in that case?

24        A.   Yes.

25        Q.   And what's the resolution of that case?

1       A.   Yes.

2       Q.   Approximately how many?

3       A.   Three, less than five, but something like

4    that.

5       Q.   And just to be clear again then, so the list

6    that we're looking at are the class action lawsuits

7    where you are either the named plaintiff or the class

8    representative or something like that, right?

9       A.   Well, at least one of the named class

10   representatives.

11      Q.   In some of these there may be more than one?

12      A.   Yes.

13      Q.   Such as the one we're --

14      A.   Such as this one.

15      Q.   This one, yeah.

16           Other than these, which are the class action

17   cases then, you have also filed individual cases under

18   the TCPA; is that right?

19      A.   Yes.

20      Q.   How many of those have you filed?

21      A.   I'm not sure of the exact count.  It would be

22   70, 80, perhaps 100.

23      Q.   Do you have a list of those similar to this

24   list, Exhibit 74?

25      A.   Not that's current, no.

Page 152

1    end?

2             MR. BRODERICK:  Objection.

3        A.   Yes.

4        Q.   And then after that, the conversation with

5    Gene, that was with a live person; is that right?

6        A.   I certainly believe so.

7        Q.   In the avatar section, as you're calling it

8    here, at the beginning section, it refers to the GE

9    Home Security Systems; is that right?

10       A.   Yes.

11       Q.   And then in the -- further down, Gene refers

12   also to the special with General Electric; is that

13   right?

14       A.   I see Monitronics.  He might.

15            Can you point me to where you're looking?

16       Q.   Yeah.  He said, we're running a special with

17   General Electric.

18       A.   Yes.

19       Q.   So in this particular call, there was no

20   mention of alarm.com; is that right?

21       A.   No.

22       Q.   And then, in fact, Gene said he was with

23   Monitronics?

24       A.   Yes.

25       Q.   So toward the bottom, the last section there

Page 176

1    the documents which are at Charvat 09.  So I'll play

2    that now, Mr. Charvat.  I'm playing the recording now.

3                    (Audio played.)

4    BY MR. GIBSON:

5        Q.   So, Mr. Charvat, is that recording that we

6    just listened to, Charvat 030, a true and accurate

7    representation of the call as indicated in call six,

8    transcript Charvat 09?

9        A.   Yes.

10       Q.   And this is a call that you recorded on your

11   home recording system; is that right?

12       A.   Yes.

13       Q.   And then you typed up the transcript here

14   that's indicated as call six; is that right?

15       A.   Yes.

16       Q.   So here we have the first mention of

17   alarm.com in a transcript about two-thirds of the way

18   down; is that right?

19       A.   60 percent, but close.

20       Q.   60 percent of the way down?

21       A.   Mathematician.

22       Q.   But you say, why in the back did it say

23   something different place, alarm.com; is that right?

24       A.   Yes.

25       Q.   So the first mention of alarm.com in any of

1    these transcripts is actually by you in the call; is

2    that right?

3         A.   Yes.

4         Q.   And what was the basis for your asking about

5    alarm.com here in call six?

6         A.   The fact that the -- I've said it before

7    several times.  The contract that was handed to me by

8    Joe had a front side that referred to Alliance and a

9    backside that referred to my hypothetical and/or

10   proposed, if you will, contract that would be with

11   alarm.com had I bought the system, allowed the system

12   to be installed, whatever word you want to choose, and

13   also used a cell phone application to engage the alarm

14   system.

15        Q.   I think we know from the previous call that

16   Dave indicated he was with GE Security; is that right?

17        A.   Not entirely.

18        Q.   Well, in the previous call, call five,

19   doesn't he, in fact, say, yes, Phil, this is Dave

20   calling with GE Security?

21        A.   Yes.  But he's vague in this one, this call.

22   He refers to the security company.  This is a call that

23   was initiated by him and does not comport with the CSPA

24   or the TCPA because he doesn't state the name of the

25   entity on whose behalf he's calling as registered with

Page 178

1       the Secretary of State.

2               So I would dispute that it's clear that it's

3       GE.   I think he's dancing around on his company names

4       again.

5           Q.   Is this the same Dave in call six that called

6       you as indicated in call five?

7           A.   It would appear so.

8           Q.   So here in call six, am I correct that you

9       were not actually considering or intending to purchase

10      a home security system; is that right?

11          A.   Not at that time, that's correct.

12          Q.   Were you at any time during this process?

13          A.   Not during this process, no.

14          Q.   Have you at any time considered purchasing an

15      alarm/security system for your home?

16          A.   Not seriously.

17          Q.   And here it indicates that -- towards the

18      bottom where it says salesman, and then it says, yeah,

19      essentially.

20              Do you see that?

21          A.   Yes.

22          Q.   The second line up.   And it didn't even look

23      like you really wanted to go with that system.

24              Do you see that?

25          A.   Yes.

Page 209

1   you see that? Starting out, because the above real

2   damages.

3        A.   Yes.  Okay.  Just the sentence, or should I

4   read the whole thing?

5        Q.   Well, I was going to ask you about those two

6   sentences there starting with, because the above real

7   damages, and then the next sentence which starts out,

8   these are the damages I will seek in this case.

9             Do you see that?

10       A.   Yes.

11       Q.   So would I be correct that the damages you're

12  seeking against alarm.com in this case are damages in

13  the amount of $500 per violation or $1,500 if the

14  violation was willful?

15            MR. BRODERICK:  Objection.

16       A.   Yes.

17       Q.   And when it says per violation, do you intend

18  that to mean per call?

19       A.   Yes.

20       Q.   And so those are the full statutory damages

21  under the TCPA?

22       A.   Those are what I'm seeking in this lawsuit.

23  There's not necessarily --

24            MR. BRODERICK:  Objection.

25       A.   -- the full damages under the law.

Page 222

1      document?

2           A.   I don't recall we went over any of the terms

3      of either of the documents.  As you've heard on the

4      messages and I've said, I was very sick at the time and

5      I wanted to get the contracts and get back to bed.

6           Q.   Do you recall anything that Joe said to you

7      when he handed you either of these documents?

8           A.   I think there was something to the effect of,

9      if you get -- I would have to speculate a little bit.

10     I can't swear to anything that was said, but I believe

11     there was some mention of, this is -- I don't know.  I

12     don't know for sure.

13          Q.   And then going back then to the response to

14     the production requests, looking at response for

15     production number 29, we were starting to ask you about

16     this earlier.  And so your answer to request for

17     production number 29 refers to plaintiff Charvat 18 to

18     25, which is the documents we just marked as Exhibit

19     Number 81, correct?

20          A.   Yes.

21          Q.   I'm done with that one.

22                              - - -

23               (Deposition Exhibit 82 marked.)

24                              - - -

25          Q.   I'll mark this as Exhibit 82.  I'm going to

Page 223

1    mark Deposition Exhibit Number 82, which is Plaintiffs'

2    Third Supplemental Statement in the In Re:   Monitronics

3    International, Inc., Telephone Consumer Protection Act

4    Litigation.

5              First, I'll ask you to review this and let me

6    know if you have seen this before.

7        A.    So these are calls from -- I believe so, but

8    it's not familiar to me.  I didn't review it in

9    preparation for this complaint --

10       Q.    Okay.

11       A.    -- or this deposition.  I'm sorry.

12       Q.    That's all right.

13             So am I correct that these are, I believe, at

14   least some of the calls that you're claiming violated

15   the TCPA in the Monitronics case; is that fair?

16       A.    At least some of them I think it's fair to

17   say, yes.

18       Q.    And so if you look at B on the first page

19   there where it says, call details for, and then at

20   least part of that number is blacked out.

21             Do you see that?

22       A.    Yes.

23       Q.    So the 8940 is the last four digits of your

24   residential -- one of your residential lines; is that

25   right?

Page 224

1          A.   Yes.

2          Q.   And the 8940 number is the number that you're

3     claiming in this lawsuit that we're here to talk about

4     today that received the calls that allegedly violated

5     the TCPA; is that right?

6          A.   Yeah, the same line.

7          Q.   Same line.   In this particular document,

8     plaintiffs' third supplemental statement, am I correct

9     that none of the calls that you're alleging that

10    violate the TCPA in this litigation, the Abante Rooter

11    litigation, are listed on this document; is that right?

12              MR. BRODERICK:   Objection.

13         A.   Yeah.   As a factual matter, they couldn't be.

14         Q.   And why is that?

15         A.   The top line of the exhibit says it was filed

16    on 1-5-15, that predates the calls in dispute in this

17    case.

18         Q.   Okay.   I'm done with that one.

19                            - - -

20              (Deposition Exhibit 83 marked.)

21                            - - -

22         Q.   So I'm going to mark as Deposition Exhibit 83

23    a document In Re:   Monitronics International, Inc.,

24    Telephone Consumer Protection Act Litigation,

25    Plaintiffs' Fifth Supplemental Statement, and ask you

Page 225

1    to take a look at that and let me know if you've seen

2    that before.

3         A.   Yes, I believe I have.  The same thing, I

4    didn't look at it in preparation, but --

5         Q.   No, I understand.  But you would have seen it

6    as it relates to the Monitronics litigation?

7         A.   Yes.

8         Q.   So this document was filed on July 21, 2016;

9    is that right?

10        A.   Yes.

11        Q.   In Roman numeral I there on the first page is

12   Plaintiff Philip Charvat, and that's you?

13        A.   Uh-huh.

14        Q.   Yes?

15        A.   Yes.

16        Q.   So if you go there to Subsection B, which is

17   calls details for 614-895-8940, that's your residential

18   line; is that right?

19        A.   Yes.

20        Q.   And that's the one that you're claiming

21   received the calls that are at issue in our litigation,

22   the Abante Rooter litigation?

23        A.   It appears to be the same, although -- wait a

24   minute.  It appears that the -- if I recall, the Ashley

25   calls were the two that were combined into one

Page 226

1    recording may be the ones that are at 12:15.

2         Q.   Fair enough.  Let's go through that.  So

3    looking back also showing you Exhibit 75, which is in

4    front of you right now, and then going back to Exhibit

5    83 and kind of comparing those two documents, the

6    September 3, 2015 call at 9:46 a.m. relates to Alliance

7    Security, Inc.

8              Do you see that on Exhibit 83?

9         A.   Yes.

10        Q.   That would be the same call as call number

11   one in the Abante Rooter litigation, correct?

12        A.   Yes.

13        Q.   And then if we go to the next call, September

14   8, 2015 at 10:20 a.m. on Exhibit 83, do you see that?

15        A.   Yes.

16        Q.   So that would be the same call as call number

17   two in this Abante Rooter litigation, which is

18   9/8/15 --

19        A.   Yes.

20        Q.   -- at 10:20 a.m., correct?

21        A.   Yes.

22        Q.   And then the third call that's listed there

23   on Exhibit 83 under header B is September 8, 2015 at

24   12:15 p.m.

25              Do you see that?

Page 227

1          A.    Yes.

2          Q.    And that would be the same as the two calls

3     from Ashley that are listed as September 8, 2015 at

4     12:15 p.m. on Exhibit 75; is that right?

5          A.    Yes.

6          Q.    I'm curious.    In the Caller Phone column on

7     Exhibit 83, for those calls at 12:15 p.m. on September

8     8, 2015, it listed NA as the caller phone.

9               Do you see that?

10          A.    Caller phone, yes.

11          Q.    So why do you list NA there?    And I assume

12     that means not applicable, right?

13          A.    May I review the log sheet and the

14     transcripts?

15          Q.    Sure.

16          A.    I believe that --

17          Q.    I'm sorry, which exhibits do you want to

18     review?

19          A.    The one that you're questioning about, the

20     log sheets.

21          Q.    So Exhibit 78?

22          A.    Exhibit 78.    And your question, it's the

23     Ashley calls.    Yeah, unlike the first two that you

24     mentioned, there was no number associated in the log.

25     Those are the Ashley calls.    So there was nothing to

Page 228

1    fill in there that I gleaned from any source.

2         Q.   So those two calls, would you have been able

3    to tell the caller ID from looking at your phone?

4         A.   No.

5         Q.   Okay.  How was it that you were able to

6    determine the caller ID for the other calls?

7         A.   I don't have caller ID functionality on

8    either of the phones.

9         Q.   Okay.

10        A.   And as a matter of life's knowledge, the

11   caller ID is fabricated so often it's nearly worthless

12   anyway.

13             But to answer your question, Gene gave me the

14   number, 855-247-1249, in the first call -- and I'm just

15   checking that they're the same here -- and the phone

16   number 978-417-9133 in the second call.

17        Q.   Okay.  You can probably put those two

18   exhibits at least away for now.  Certainly if you want

19   to go back to them, you can.

20             So the two calls from Ashley are really

21   indicated as -- I'm sorry, one call on September 8,

22   2015 at 12:15 p.m.; is that right?

23        A.   Yes.

24        Q.   So then the next page, turning to the next

25   page at the top, the September 8, 2015 call at 5:40

Page 229

1    p.m., that would be call number five as we talked about

2    earlier; is that right?

3         A.   Yes.

4         Q.   And that's indicated on Exhibit Number 75 --

5         A.   Yes.

6         Q.   -- as one of the calls there?

7         A.   Yes.

8         Q.   And then going down to the next call on

9    Exhibit 83, it indicates September 9, 2015 at 12:35

10   p.m.

11            Do you see that?

12        A.   Yes.

13        Q.   So that would correspond to call six that we

14   talked about earlier that you're claiming in this

15   lawsuit; is that right?

16        A.   Yes.

17        Q.   And then call seven -- well, strike that.

18   Let me back up.

19            So the next call down on Exhibit 83 is

20   September 9, 2015 at 1:30 p.m.

21            Do you see that?

22        A.   Yes.

23        Q.   So that would correspond to call number

24   seven --

25        A.   Yes.

Page 230

1          Q.   -- that you're claiming in this lawsuit; is
2      that right?
3          A.   Yes.
4              MR. BRODERICK:  What time is that?
5              MR. GIBSON:  1:30 p.m.
6          Q.   As shown on Exhibit 65 -- or, I'm sorry,
7      Exhibit 75, correct?
8          A.   Yes.
9          Q.   So then would it be accurate for me to say
10     that all of the calls that you're claiming in the
11     Abante Rooter litigation that violate the TCPA are also
12     being claimed in the Monitronics litigation as
13     violating the TCPA?
14             MR. BRODERICK:  Objection.
15         A.   It's a supplemental statement.  I believe I
16     prepared it in response to a request to state all
17     subsequent calls that came in from Alliance and/or
18     Monitronics perhaps, but I'm not sure they're being
19     claimed.  That's, again, back to the issue that my
20     attorneys will have to address.
21         Q.   So -- okay.  So I just want to make sure I
22     understand that answer.
23             So you're saying that you're not sure that
24     all of the calls as contained in plaintiffs' fifth
25     supplemental statement are being claimed in the

Page 231

1    Monitronics litigation?

2            MR. BRODERICK:   Objection.

3        A.   I haven't reviewed that in preparation for

4    this and I'm not sure.

5        Q.   Okay.

6        A.   As I said, it was my understanding that a

7    supplemental discovery request came in to update all

8    calls subsequent to the previous discovery request in

9    that case.

10       Q.   So if you read that first sentence on the

11   plaintiffs' fifth supplemental statement that starts

12   out, pursuant to the court's July 29, 2014 order, do

13   you see that?

14       A.   Yes.

15       Q.   If you could read that statement for me --

16   the rest of that sentence for me.

17       A.   Plaintiffs submit this supplemental statement

18   to provide details of the calls and telephone numbers

19   for each plaintiff added in the first amended master

20   consolidated.   This --

21           Do you want the rest?

22       Q.   No, that's fine.

23           So we assume that the first amended master

24   consolidated is referencing the complaint or pleading

25   in that Monitronics case.   Okay?

1      A.   I won't assume it, but if it is, it is.

2      Q.   So if it is, then these calls would be

3   providing details of the calls being added to that

4   first amended master consolidated complaint; would you

5   agree with me?

6           MR. BRODERICK:  Objection.

7      A.   I don't know that to be a fact.  Like I said,

8   it could just be supplemental discovery requests.

9      Q.   If you assume with me that it is a

10  supplemental statement amended to the amended

11  complaint, if you can assume that with me --

12     A.   I'd rather not assume anything.  You know,

13  you can prove whether it is or isn't with the

14  complaints and the documents that have been filed.

15     Q.   I understand.  I understand.  I just want to

16  get at this.

17          So if you assume with me that it is, in fact,

18  that, a supplement to the complaint in the Monitronics

19  litigation, would you then agree with me that all of

20  the calls that you're claiming in this litigation, in

21  the Abante Rooter litigation, are also being claimed in

22  the Monitronics litigation?

23          MR. BRODERICK:  Objection.

24     A.   No, I wouldn't.

25     Q.   What am I missing?  Why wouldn't you agree

1    with me on that?

2         A.    Well, you've asked me to adopt an assumption,

3    I think is one phrase for it in the law, or

4    incorporating an assumption.  And whether or not it is

5    or isn't is something that can be factually determined.

6    I'm not here to speculate on assumptions.  And I have

7    been, present company explicitly excluded, lied to by

8    people in your position as to assumptions for purposes

9    of my deposition testimony.

10             So for that reason, I don't have direct

11   personal knowledge to answer the question that you're

12   asking me.

13             MR. GIBSON:  I want to take a short break to

14   look over my notes and I think I'm starting to wind

15   down.

16                  (Recess taken.)

17   BY MR. GIBSON:

18        Q.   Mr. Charvat, thank you for your patience in

19   answering questions today.

20             I do just want to go back to Exhibit 83 and

21   Exhibit 75 just for a minute.

22             If you look at these two documents, again,

23   Exhibit 75 is the calls that we've talked about earlier

24   today that you're alleging in this lawsuit violate the

25   TCPA, is that right, 75?

1          A.    Yes.

2          Q.    And whether Exhibit 83 is a supplemental

3     discovery response or something amending the pleading,

4     whatever, but what I want to ask you is, would you

5     agree with me that the calls that are listed on Exhibit

6     75 are all also included under Section I, B, of Exhibit

7     83?

8          A.    Yes.

9          Q.    Okay.  I'm done with those.

10               In the Monitronics litigation, as related to

11     that, have you ever heard of a company called

12     Honeywell?

13          A.    Yes.

14          Q.    And what's your understanding of what

15     Honeywell's role or responsibility is as it relates to

16     the Monitronics litigation?

17               MR. BRODERICK:  Objection.

18          Q.    Or strike that.  Let me ask a better

19     question.

20               What is your understanding of the allegations

21     against Honeywell in the Monitronics litigation?

22          A.    Again, I didn't review that prior to this,

23     but my understanding was the allegations were that

24     there were cooperating -- some sort of mutual

25     relationship to sell their products and services,

-EXHIBIT 6-

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                     OAKLAND DIVISION
 4
                                        )
 5   ABANTE ROOTER and PLUMBING, INC.,  )
     GEORGE ROSS MANESIOTIS, MARK       )
 6   HANKINS and PHILIP CHARVAT,        )
     Individually and on behalf of all  )
 7   others similarly situated,         )
                                        )
 8      Plaintiffs,                     )
                                        )
 9                                      )
                                        )  No:4:15-cv-06314
10   vs.                                )               YGR
                                        )
11   ALARM.COM INCORPORATED, AND        )
     ALARM.COM HOLDINGS, INC.           )
12                                      )
        Defendants.                     )
13
14
                 DEPOSITION OF FRED HEIDARPOUR
15
16                    Phoenix, Arizona
                      March 10, 2017
17                       8:30 a.m.
18
19
20
21
22
23
24   Prepared by:
     Rosanne P. Huebener, CRR
25   Certification No. 50897
```

1          A.     The medical practice was like a clinic,
2     medical clinic.
3          Q.     You own that?
4          A.     In Arizona, you can.  Just FYI.
5          Q.     Yes, I'm sure it's all above board.   I
6     wasn't suggesting that.  So you own that.  That's
7     one of the your business?
8          A.     That was, but we close it down.
9          Q.     Who is the lawsuit against?
10          A.     Howard Norman, Dr. Howard Norman.
11          Q.     Any other time that you can recall that
12     you have given trial testimony or arbitration
13     testimony?
14          A.     I don't recall.
15          Q.     And then so we have the three cases here
16     where you have given deposition testimony.
17                 Was Central Processing and Birch
18     Communications, were those TCPA cases?
19          A.     Yes.
20          Q.     And have you filed -- strike that.
21     Doctor -- did those two, are those included in
22     the six other class actions that you have filed?
23          A.     Yes.
24          Q.     So if we have this case -- strike that.
25                 So Abante Rooter is the plaintiff in

Page 87

1    this case, right?

2         A.   Yes.

3         Q.   Was Abante Rooter the plaintiff in

4    Central Processing?

5         A.   No.

6         Q.   Was that you individually?

7         A.   Yes.

8         Q.   Was Abante Rooter the plaintiff in Birch

9    Communications?

10        A.   Yes.

11        Q.   Were you a plaintiff in that case

12   individually also?

13        A.   I don't know.  I don't think so.

14        Q.   In the -- so we have this case, Abante

15   Rooter, is the plaintiff, and then we have six

16   other class actions, is that right?

17        A.   I believe it's -- including these, five

18   others.

19        Q.   So this one and five others?

20        A.   Yes.

21        Q.   In the five other cases, Central

22   Processing and Birch Communications were two of

23   those, is that right?

24        A.   Yes.

25        Q.   Who were the other three?

-EXHIBIT 7-

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

IN RE MONITRONICS INTERNATIONAL,           MDL No. 1:13-MD-2493
INC. TELEPHONE CONSUMER
PROTECTION ACT LITIGATION

This document relates to:

*Bennett v. Monitronics International, Inc.*
Case No. 1:14-CV-00034

*Charvat v. Monitronics International, Inc.*
Case No. 1:14-cv-162

*Dolemba v. Monitronics International, Inc., et al.*
Case No. 1:14-CV-00066

*Hodgin et al. v. Monitronics, International, Inc.*
Case No. 1:13-CV-00263

*Mey v. Monitronics, International, Inc., et al.*
Case No. 5:11-CV-90

*Mey et al. v. Honeywell International, Inc. et al.*
Case No. 1:14-CV-00059

*O'Shea v. Alliance Security, LLC, et al.*
Case No. 1:13-CV-00264

**SECOND AMENDED MASTER CONSOLIDATED COMPLAINT**

738243

**TABLE OF CONTENTS**

I.      Introduction and Statement of the Case ............................................................. 1

II.     Jurisdiction and Venue ...................................................................................... 3

III.    Parties and Definitions ....................................................................................... 4

IV.     Applicable Law .................................................................................................. 6

        A.    TCPA § 227(b) regulates autodialer and artificial or prerecorded voice calls to
              cellular and residential phones. .................................................................. 6

        B.    TCPA § 227(c) regulates telemarketing calls made to phone numbers listed on the
              Do Not Call Registry. ................................................................................ 7

        C.    The TCPA imposes liability on entities that do not directly place illegal calls. ........ 8

V.      Factual Basis for the Complaint ......................................................................... 9

        A.    Allegations regarding calls placed to Plaintiffs. ......................................... 9

              Plaintiff Jason Bennett ........................................................................ 10

              Plaintiff Edith Bowler ......................................................................... 10

              Plaintiff Philip J. Charvat ................................................................... 12

              Plaintiff Scott Dolemba…………………...…………………………….12

              Plaintiffs Michael and Janet Hodgin ................................................... 13

              Plaintiff James "Garry" Hough ........................................................... 13

              Plaintiff Diana Mey ............................................................................. 15

              Plaintiff Kerry O'Shea ........................................................................ 20

        B.    VMS/Alliance placed telemarketing calls in violation of the TCPA. ...................... 22

        C.    ISI Alarms placed telemarketing calls in violation of the TCPA. ........................... 22

        D.    UTC is liable for the TCPA violations of UTC Authorized Dealers. ...................... 22

        E.    Monitronics is liable for the TCPA violations of Monitronics Authorized Dealers. 26

        F.    Honeywell is liable for the TCPA violations of UTC Authorized Dealers ............. 30

VI.     Class Action Allegations ................................................................................... 32

VII.   Legal Claims ............................................................................................................. 34

VIII.   Relief Sought ............................................................................................................. 35

## I.   INTRODUCTION AND STATEMENT OF THE CASE

1.      According to the Federal Trade Commission's recent Biennial Report to Congress, the emergence of new communications technologies has caused the number of illegal telemarketing calls to explode in the last four years. For example, VoIP technology allows callers to make higher volumes of calls inexpensively from anywhere in the world. Telemarketers have embraced these technological advances, causing consumer complaints about illegal telemarketing calls to skyrocket, rising from 63,000 per month in 2009, to approximately 200,000 per month in 2012.

2.      The sheer volume of illegal telemarketing overwhelms the enforcement efforts of government agencies such as the FTC and the Federal Communications Commission. Consequently, private consumer enforcement actions, which Congress authorized when it enacted the TCPA in 1991, play a critical role in combatting illegal telemarketing.

3.      Plaintiffs bring this action to enforce the TCPA in the face of rampant illegal telemarketing in the home-security industry. Telemarketing abuses are enabled through a compensation structure between alarm manufacturers (such as Defendants UTC and Honeywell), alarm-monitoring companies (such as Defendant Monitronics), and alarm dealers (such as Defendants VMS/Alliance and ISI Alarms).

4.      Under this business structure, alarm dealers receive large cash payments or equipment discounts when they sell manufacturers' alarm systems and assign alarm-monitoring contracts to the alarm-monitoring companies. To facilitate the sales, the bigger companies like UTC, Monitronics and Honeywell permit their much smaller dealers to use their trademarks and trade names, access their proprietary customer-service databases and pricing information, and

hold themselves out as authorized dealers of the much larger, better known, and more reputable companies.

5.      All sales participants benefit from the arrangement. Alarm manufacturers, who have no direct-to-consumer sales efforts, are able to sell tens of millions of dollars of their products through a new retail channel. Alarm-monitoring companies such as Monitronics also have no direct-to-consumer sales functions, and, through their dealers' efforts, are able to secure hundreds of thousands of lucrative alarm-monitoring contracts.  And dealers receive tens of millions of dollars for generating new business for their sales partners.

6.      Nothing is inherently wrong with this business model. Problems arise, however, when authorized dealers, emboldened by the rewards they receive from the manufacturers and alarm-monitoring companies, resort to illegal telemarketing to generate business.

7.      In many instances, including here, the manufacturers and monitoring companies turn a blind eye to their dealers' illegal telemarketing, and gratefully accept the new business they generate. The manufacturers and monitoring companies take the view that compliance is the dealers' sole responsibility, and fall back on self-serving contractual provisions that purport to shield them from liability for the illegal telemarketing campaigns that generate millions of dollars of business for them.

8.      Under the TCPA, these efforts to shirk responsibility fail. The TCPA imposes liability not only on the entities that physically dial illegal telemarketing calls, but also on those entities that benefit from them.

9.      Vicarious liability is an essential feature of the remedial provisions and purposes of the TCPA. According to the FCC, the agency charged with interpreting the statute, a seller is not shielded from liability simply because *others* violate the law on its behalf and for its benefit.

2

This is so in part because the dealers and lead-generators that place illegal calls often are judgment proof and difficult to identify, and sellers are best positioned to monitor and control their activities. Under these circumstances, and in service of protecting consumers from the nuisance and privacy-invasion of unwanted telemarketing, liability is imputed to the more reputable and more financially solvent sellers such as Monitronics, UTC, and Honeywell.

10.     This case implicates the critical nature of vicarious liability under the TCPA. Here, comparatively small dealers placed millions of illegal telemarketing calls to sell UTC and Honeywell alarm-systems and generate alarm-monitoring business for Monitronics.

11.     Plaintiffs bring the action to enforce the TCPA's strict limits on telemarketing calls placed through automated telephone dialing systems ("ATDS") and artificial or prerecorded voice messages, and calls placed to numbers listed on the Do Not Call Registry. On behalf of the proposed classes defined below, Plaintiffs seek statutorily-authorized damages of $500-$1500 per illegal call, as well as injunctive relief requiring Defendants to comply with the law.

## II.  JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2).  This matter in controversy exceeds $5 million, as each member of the proposed classes of tens of thousands is entitled to up to $1500 in statutory damages for each unlawful call. Further, Plaintiffs reside in multiple states, and allege national classes, which results in at least one class member belonging to a state different than one or more of the Defendants. Therefore, both elements of diversity jurisdiction under the Class Action Fairness Act of 2005 are present, and this Court has jurisdiction.

13.     This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this action involves violation of a federal statute, the TCPA.

3

14.    Venue is proper in this District under 28 U.S.C. §§ 1931(b)-(c) and 1441(a),

because the Defendants are deemed to reside in any judicial district in which they are subject to

personal jurisdiction at the time the action is commenced, and because Defendants' contacts with

this District are sufficient to subject them to personal jurisdiction.

15.    Venue for the coordinated pretrial proceedings is also proper in this District

pursuant to the Transfer Order issued by the JPML.

16.    Venue in the districts in which the underlying cases were originally filed was also

proper for the reasons set forth by Plaintiffs in their original complaints.

### III.  PARTIES AND DEFINITIONS

17.    This action is brought by the following Plaintiffs:

    a.  Jason Bennett, a resident of Alabama;

    b.  Edith Bowler, a resident of Washington;

    c.  Philip J. Charvat, a resident of Ohio;

    d.  Scott Dolemba, a resident of Illinois;

    e.  Michael and Janet Hodgin, residents of Washington;

    f.  James "Garry" Hough, a resident of North Carolina;

    g.  Diana Mey, a resident of West Virginia; and

    h.  Kerry O'Shea, a resident of California.

18.    The action is brought against the following Defendants:

    a.  Alliance Security, Inc., a Delaware corporation. Alliance Security, Inc. is the

        new corporate name of Versatile Marketing Solutions, Inc., d/b/a VMS

        Alarms, a Rhode Island corporation. In this complaint, Alliance Security is

referred to as "VMS/Alliance," or sometimes "VMS." VMS/Alliance is an alarm-systems dealer.

b.  Honeywell International, Inc., a Delaware corporation that manufactures and sells alarm systems.

c.  ISI Alarms NC, Inc., a North Carolina corporation and former alarm-systems dealer.

d.  Kevin Klink and Jayson Waller, residents of North Carolina who owned and operated ISI Alarms at the time the telemarketing calls at issue were placed.

e.  Monitronics International, Inc., a Texas corporation. Monitronics is an alarm-monitoring company.

f.  UTC Fire and Americas Corporation, Inc., a Delaware corporation.  It sometimes does business as GE Security, and is referred to herein as "UTC," "GE Security" or "GE." UTC is an alarm-systems manufacturer.

19.   As used in this Complaint, the term:

a.  "Monitronics Authorized Dealer" means a security-systems dealer who has or had an agreement with Monitronics that permits it to hold itself out as an authorized dealer or distributor of Monitronics services, and who uses telemarketing in its sales efforts;

b.  "Honeywell Authorized Dealer" means a security-systems dealer who has or had an agreement with Honeywell that permits it to hold itself out as an authorized dealer or distributor of Honeywell security products, and who uses telemarketing in its sales efforts; and

5

  c. "UTC Authorized Dealer" means a security-systems dealer who has or had an agreement with UTC that permits it to hold itself out as an authorized dealer or distributor of UTC or GE Security products, and who uses use telemarketing in its sales efforts.

 20. VMS/Alliance is or was a Monitronics Authorized Dealer and UTC Authorized Dealer.

 21. ISI Alarms is or was a Monitronics Authorized Dealer and Honeywell Authorized Dealer.

 22. Defendants Waller and Klink are liable for ISI's conduct because:

  a. They are or were officers or agents of ISI, and are subject to liability for its violations of the TCPA under 47 U.S.C. § 217;

  b. they personally authorized the conduct that the Plaintiffs allege violated the TCPA; and

  c. they directed and instructed ISI employees and other agents to engage in conduct that violates the TCPA.

## IV. APPLICABLE LAW

**A. TCPA § 227(b) regulates autodialer and artificial or prerecorded voice calls to cellular and residential phones.**

 23. 47 U.S.C. § 227(b) regulates so-called "robocalls"—calls placed using an automated telephone dialing system ("ATDS"), and calls using an artificial or prerecorded voice.

 24. Regarding telephone numbers assigned to a cellular telephone service, the statute prohibits calls using an artificial or prerecorded voice, and ATDS calls—other than emergency calls or calls placed with the prior express consent of the called party. *Id.* § 227(b)(1)(A).

6

25.     With respect to residential telephone lines, the statute prohibits all calls using an artificial or prerecorded voice—again, other than emergency calls or calls made with prior express consent. *Id.* § 227(b)(1)(B).

26.     In other words, with respect to nonconsensual, nonemergency calls to *cell phones*, both ATDS and artificial/prerecorded voice calls are prohibited; with respect to nonconsensual, nonemergency calls to *residential phones*, only artificial/prerecorded voice calls are prohibited.

27.     The TCPA requires prior express consent from the called party with respect to calls placed to both cell phones and residential phones. Prior express consent is consent that is clearly and unmistakably conveyed by the call recipient to the party placing the call; implied consent is not sufficient.

28.     Persons who receive calls in violation of these provisions may bring an action to recover the greater of the monetary loss caused by the violation, or $500. *Id.* § 227(b)(3). If the Court finds the defendant willfully or knowingly violated § 227(b), the Court may increase the award to up to $1500 per violation. *Id.*

**B.     TCPA § 227(c) regulates telemarketing calls made to phone numbers listed on the Do Not Call Registry.**

29.     Consumers who do not want to receive telemarketing calls may indicate their preference by registering their telephone numbers on the national Do Not Call Registry. *See* 47 C.F.R. § 64.1200(c)(2). According to the FTC, the Registry, which was established in 2003, currently has over 223 million active registrations. A listing on the Registry must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator. *Id.*

30.     Because a telephone subscriber listed on the Registry must take an affirmative step to register his or her number, a telemarketer who wishes to call a person listed on the

7

Registry must take a similarly affirmative step, and must obtain the registrant's ***signed, written agreement*** to be contacted by the telemarketer. *Id.* § 64.1200(c)(2)(ii). The written agreement must also include the telephone number to which the calls may be placed. *Id.*

31.     A person whose number is on the Registry and has received more than one telephone solicitation within any twelve-month period by or on behalf of the same entity in violation of the TCPA, can sue the violator and seek the same statutory damages available under § 227(b)—the greater of actual damages or $500, a figure that may be trebled for willful or knowing violations.  47 U.S.C. § 227(c)(5).

32.     Telemarketers who wish to avoid calling numbers listed on the Registry can easily and inexpensively do so by "scrubbing" their call lists against the Registry database. The scrubbing process identifies those numbers on the Registry, allowing telemarketers to remove those numbers and ensure that no calls are placed to consumers who opt-out of telemarketing calls.

**C.     The TCPA imposes liability on entities that do not directly place illegal calls.**

33.     It has long been the law that a seller of goods or services can be liable for TCPA violations even if the seller does not directly place or initiate the calls.

34.     As explained by the FCC, the TCPA and its regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Mem. and Order, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

35.     The FCC reiterated this principle in 2005, when it stated that "a company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our telemarketing rules, and calls placed by a third party on behalf of that company are treated as if

8

the company itself placed the call." *See* Rules and Regulations Implementing the Telephone

Consumer Protection Act of 1991; Request of State Farm Mutual Automobile Insurance

Company for Clarification and Declaratory Ruling, Declaratory Ruling, 20 FCC Rcd. 13664,

13667 ¶ 7 (2005).

      36.     The FCC reaffirmed this in 2013, when it held (a) with respect to violations of §

227(b), a seller may be liable under principles of apparent authority, actual authority, and

ratification for telemarketing violations placed by third parties, and (b) with respect to violations

of § 227(c), a seller may be liable under those same principles, and, under the express terms of

the statute, for calls placed "on behalf of" the seller. *In re Joint Pet. Filed by Dish Network,* 28

FCCR 6574 (2013).

## V.  FACTUAL BASIS FOR THE COMPLAINT

**A.**     **Allegations regarding calls placed to Plaintiffs.**

      37.     Plaintiffs and their claims are detailed below, but are summarized as follows:

| Plaintiff Name | Call received on | | Direct or vicarious alleged against | | | | | Claims | |
|---|---|---|---|---|---|---|---|---|---|
| | Residence | Cell | VMS/Alliance | UTC | Monitronics | Honeywell | ISI | Count 1 | Count 2 |
| Bennett | | X | | | X | | | X | |
| Bowler | X | | | X | X | | | X | X |
| Charvat | X | | X | X | X | X | X | X | X |
| Dolemba | | X | X | | X | | | X | |
| Hodgin | X | | | X | X | | | X | |
| Hough | X | | X | X | X | | | X | X |
| O'Shea | | X | X | X | X | | | X | X |
| Mey | X | X | X | X | X | X | X | X | X |

9

38.     Each Plaintiff received illegal telemarketing calls on a residential or cellular telephone line, from or on behalf of the Defendants indicated, who are liable either under theories of direct liability (as in the case of Defendants VMS/Alliance and ISI Alarms) or vicarious liability (as in the case of Defendants Monitronics, UTC, and Honeywell, whose authorized dealers placed the illegal telemarketing calls).

### *Plaintiff Jason Bennett*

39.     In December of 2013, Plaintiff Jason Bennett received numerous illegal prerecorded message calls utilizing at ATDS on his cellular telephone, (xxx) xxx-1830.

40.     During several of the calls, Mr. Bennett, in order to determine who was placing the calls, pressed one to speak with a sales representative. On two occasions, he spoke with a representative named "Ron," who stated he was promoting the sale of home alarm systems and Monitronics alarm-monitoring services.

41.     These calls were placed by or at the direction of one or more Monitronics Authorized Dealers for the purpose of promoting the sale of Monitronics alarm-monitoring services.

42.     The calls were placed from caller IDs (602) 753-9875, (630) 869-1358 (two calls), and (312) 273-1588.

### *Plaintiff Edith Bowler*

43.     Plaintiff Edith Bowler listed her residential telephone number (xxx) xxx-8882 on the national Do Not Call Registry in January of 2008.

44.     Nonetheless, since June of 2012, Ms. Bowler has received numerous illegal prerecorded message calls from or at the direction of:

10

    a.   UTC Authorized Dealers for the purpose of selling or promoting the sale of UTC alarm systems; and

    b.   Monitronics Authorized Dealers for the purpose of selling or promoting the sale of Monitronics alarm-monitoring services.

45.    Ms. Bowler received one such call in October of 2012. The prerecorded message provided the option of pressing a number on the telephone keypad to speak with a sales representative. Ms. Bowler did so in order to determine who was placing the call. She spoke with a representative who told her the company calling her was Monitronics, and directed her to the Monitronics website for more information about the company.

46.    Ms. Bowler received prerecorded telemarketing messages on two occasions in January of 2013 that also promoted the sale of alarm systems and monitoring provided by Monitronics.

47.    In July of 2013, Ms. Bowler received a prerecorded telemarketing message and again pressed one to speak with a sales representative. The representative identified his company as Security One, which he said was the "the marketing department for GE." The call also was placed to promote Monitronics alarm-monitoring services.

48.    On another such call in August of 2013, Ms. Bowler spoke with a sales representative who identified herself as "Kelly" from "Home Protection." She told Ms. Bowler the security system offered was a GE system, and that Monitronics would do the alarm monitoring. Kelly transferred Ms. Bowler to another representative for additional information. That representative, "Mike," told Ms. Bowler he was a "screener for the marketing company," but that "we are Monitronics—we do the monitoring." Mike also directed Ms. Bowler to the Monitronics website.

11

49.     In addition to Security One and Home Protection, authorized dealers believed to have placed calls to Ms. Bowler include All Safe Protection Services and Maximum Security.

### *Plaintiff Philip J. Charvat*

50.     Beginning in July of 2012, Plaintiff Philip J. Charvat received numerous live and prerecorded/ATDS calls from ISI attempting to sell him alarm systems manufactured by Honeywell, and alarm-monitoring services provided by Monitronics.

51.     The calls were placed to Mr. Charvat's residential telephone lines, (xxx) xxx-1341, and (xxx) xxx-8940, numbers listed on the national Do Not Call Registry as of September 2011.

52.     On more than one occasion, a telemarketer represented to Mr. Charvat that he or she was an employee representative of Monitronics, Honeywell, or "ISI Honeywell."

53.     From 2009 through 2013, Mr. Charvat also received numerous live and prerecorded calls on his residential telephone line from VMS/Alliance attempting to sell him alarm systems manufactured by UTC, and alarm-monitoring services provided by Monitronics.

54.     Like Ms. Mey, Mr. Charvat received calls from VMS/Alliance after receiving sham "safety survey" calls from Total Survey Solutions, or TSS. The survey calls were placed by TSS, on behalf of VMS/Alliance.

### *Plaintiff Scott Dolemba*

55.     On December 11, 2013, Plaintiff Scott Dolemba received an illegal prerecorded message on his cellular telephone line, (xxx) xxx-6518.

56.     The number displayed on Mr. Dolemba's caller ID was 772-236-0990.

12

57.     Mr. Dolemba answered the call. The prerecorded message invited him to press a key to speak with a sales representative. Mr. Dolemba did so in order to determine who placed the call.

58.     Mr. Dolemba spoke with an Alliance Security sales representative who was promoting the sale of alarm systems and Monitronics alarm-monitoring services.

### Plaintiffs Michael and Janet Hodgin

59.     Plaintiffs Michael and Janet Hodgin placed their residential telephone number (xxx) xxx-6729 on the national Do Not Call Registry in August of 2009.

60.     Nonetheless, in November of 2012, the Hodgins received an illegal prerecorded message call from or at the direction of a Monitronics Authorized Dealer  and UTC Authorized Dealer for the purpose of selling or promoting the sale of their goods or services.

61.     The prerecorded message the Hodgins received gave the option of pressing a number on the telephone keypad to speak with a sales representative. Plaintiff Janet Hodgin did so in order to determine who was behind the call.

62.     Ms. Hodgin was connected to a sales representative named "John" with All Safe Security in Florida. John told Ms. Hodgin that the alarm-system equipment, a GE Security system, was "free," and that she would only be required to pay Monitronics a monthly monitoring fee.

### Plaintiff James "Garry" Hough

63.     Plaintiff James "Garry" Hough placed his residential telephone number, (xxx) xxx-7994, on the national Do Not Call Registry in May of 2007.

64.     Nonetheless, since August of 2012, Mr. Hough has received numerous illegal prerecorded message calls from or at the direction of:

13

    a.  VMS/Alliance;

    b.  UTC Authorized Dealers for the purpose of selling or promoting the sale of UTC alarm systems; and

    c.  Monitronics Authorized Dealers for the purpose of selling or promoting the sale of alarm-monitoring services provided by Monitronics.

65.    Several of these calls consisted of prerecorded messages to the effect that the FBI was warning about break-ins or rising crime in the area. On several occasions, Mr. Hough pressed a number to connect to a sales representative as prompted in the message and, when connected, asked the telemarketer to stop calling him.

66.    On one such call, in October of 2012, Mr. Hough spoke with a representative named "Jesse," who gave Mr. Hough the website for his company, www.2giglifestyle.com. At the time, this was the website for DG Security, which stated that DG Security, along with Alliance Security and Monitronics, "strive to be number one in all aspects of their industry."

67.    On another, in June of 2013, Mr. Hough spoke with a sales representative named "Derek," who identified his company as a Monitronics dealer.

68.    On another June 2013 call, Mr. Hough spoke with a sales representative who identified himself as a "middle person," and said the call Mr. Hough received was from Alliance Security.

69.    Minutes after receiving that call, Mr. Hough received a second call, from a representative named "Jabari," who told Mr. Hough the monitoring company was Monitronics.

70.    In August of 2013, Mr. Hough received a prerecorded message, pressed a number to speak with a sales representative, and was connected to a representative named "Lisa." Lisa told him the caller was GE Security, who was working with Monitronics.

### *Plaintiff Diana Mey*

71.     Plaintiff Diana Mey has two cellular telephone numbers, (xxx) xxx-7421 and (xxx) xxx-1607, and one residential telephone number, (xxx) xxx-1943.

72.     All are listed on the national Do Not Call Registry.

73.     Despite these listings, Ms. Mey received dozens of calls promoting the sale of alarm systems and alarm-monitoring services.

74.     Ms. Mey received illegal live or prerecorded message calls from or at the direction of:

       a.   VMS/Alliance;

       b.   UTC Authorized Dealers for the purpose of selling or promoting the sale of UTC alarm systems;

       c.   Monitronics Authorized Dealers for the purpose of selling or promoting the sale of Monitronics alarm-monitoring services;

       d.   ISI Alarms; and

       e.   Honeywell Authorized Dealers for the purpose of selling or promoting the sale of Honeywell alarm systems.

**Mey allegations regarding VMS/Alliance, Monitronics, and UTC**

75.     Some of the calls Ms. Mey received were sham "safety survey" calls. During these calls, Ms. Mey would receive a call from a representative of an Indian company called "Total Survey Solutions," or "TSS." The caller would purport to be conducting a "safety survey," would ask Ms. Mey whether she owned her own home, and would ask a series of questions about existing security systems in the home. The caller would conclude the call by

15

telling Ms. Mey that because she had participated in the "survey," she "could be selected" to receive a free GE security system.

76.     In truth, the "survey" was intended to generate, and did generate, thousands of sales leads for VMS, so VMS could generate new accounts for itself, new alarm-monitoring customers for Monitronics, and alarm-system sales for UTC.

77.     TSS would send thousands of sales leads "surveys" to VMS each month. After it received the leads, a VMS representative would call the "survey participant"—here, Ms. Mey. During the course of that call, the representative would inform Ms. Mey that she had "participated in our Home Safety survey" and had been selected to receive a "free" $1200 General Electric wireless security system. According to the script, which included the VMS and Monitronics logos, to receive her free system Ms. Mey would need to pay an activation fee and a monthly monitoring fee.

78.     During several of the calls Ms. Mey received, sales representatives made statements to the effect that the calls were placed on behalf of Monitronics and UTC, and that each was involved in VMS's telemarketing sales campaign. For example:

> a.   On September 15, 2010, Ms. Mey received a telemarketing call from caller ID (352) 352-0352. When Ms. Mey answered the phone, the caller told her she worked for Monitronics. When Ms. Mey began asking questions to determine who was behind the calls, a supervisor informed her he was located in Rhode Island (where VMS is headquartered), but refused to provide additional information and terminated the call after Ms. Mey pressed for more information.

16

b.  On March 23, 2011, Ms. Mey received a call from "Megan with VMS." Megan told Ms. Mey that "General Electric" would be giving her a $1200 security system for free, stated the earlier "survey" that Ms. May received was sponsored by General Electric, and characterized the survey as "one of our General Electric Safety Surveys."

c.  Later that day, Ms. Mey received a call from a VMS manager named Dennis Castro. Mr. Castro emphasized VMS's connection to Monitronics, whom he called "the number one monitoring service in the country." He told Ms. Mey that VMS/Alliance was GE's "partner," and told her "there's only a handful of companies in the world that partners [sic] with General Electric." He also told Ms. Mey that GE performed the safety survey.

d.  On another occasion, July 11, 2011—months after Ms. Mey filed suit against VMS—Ms. Mey received a call from caller ID "401-654-5377 Providence RI." Ms. Mey spoke with a VMS employee named Matthew Jay who told her that "VMS General Electric Alarms" had selected her to receive a $1200 security system with free installation.

e.  Mr. Jay made representations about the intertwined nature of the relationship between the three Defendants. He told Ms. Mey he worked for both General Electric and VMS, and described VMS as a "local authorized General Electric dealership."

f.  Mr. Jay told Ms. Mey that Monitronics was VMS's alarm monitoring company, that VMS was the "same company" as Monitronics, and that GE and Monitronics were "same company."

17

g.  On July 25, 2011—again, months after this lawsuit was filed—Ms. Mey

received a call from a man who identified himself as "Ricky from VMS, your

local General Electric dealer," although the caller ID had been manipulated to

falsely reflect that the call was from "POLITICAL RP 406-948-8852."  Ricky

told Ms. Mey he was calling from "the promotional department in Tampa,

Florida," said he would have a manager call her back, but hung up the phone

before Ms. Mey could get more information.

h.  Later that day, a VMS employee named Jeff called Ms. Mey. Jeff reminded

Ms. Mey that he had just spoken with Ricky about the General Electric

Security system. During the course of the call, he represented that GE,

Monitronics, and VMS were separate entities, but were "partners," and that

GE "sponsored" the initial survey.

i.  On July 28, 2011, Ms. Mey received a call from a woman who identified

herself as "Michelle . . . From VMS alarms, your General Electric dealer."

Michelle stated that she was calling because "General Electric has randomly

selected you to receive a new wireless home security system at no charge."

During the call, another employee named "Richard," who identified himself as

a senior supervisor with VMS, came on the line.  Ms. Mey told Richard not to

call her again, and to take her number off his call list.  Ms. Mey told Richard

she wanted a copy of the company's written telemarketing policy, but Richard

hung up on Ms. Mey.

18

      j.   Beginning October 26, 2011, Ms. Mey received a series of calls, some from numbers with blocked caller IDs, from callers purporting to be calling from GE and Monitronics.

      k.   On an earlier occasion, Ms. Mey spoke with a VMS representative and asked to speak with a manager about the services.  A manager named "Ryan" called Ms. Mey from a number identified on her caller ID as originating from "401-533-9592 MONITRONICS."

79.     The prerecorded messages played during the calls to Ms. Mey often had messages similar to those received by other Plaintiffs. For example:

> The FBI reports there is a crime every fifteen seconds.  It is also reported that one in three people over the age of sixty-five fall in any given year. Do not become one of these statistics.  Press one now to find out how you can get a complete security system with installation.  Thank you and congratulations.  If you would like to have your phone number removed, press two now.  Otherwise, press one to speak to a representative.  Thank you.

and

> The FBI reports there is a home break in every fifteen seconds.  Your local police recommend you protect your home. If you would allow us to stick a small sign in your yard, we will install a new security system at absolutely no cost to you whatsoever. To hear more, press one now.  To be placed on our do not call list, press nine.

80.     When Ms. Mey would speak with a sales representative to determine the origin of these calls, she often was informed that Alliance was calling her regarding a free home security system that she had won, and that Alliance would be installing the alarm and Monitronics would monitor the system.

81.     On one such call in August of 2013, Ms. Mey was informed that Monitronics would be doing the monitoring.

82.     In addition to VMS/Alliance, the authorized dealers who are believed to have placed calls to Ms. Mey include Space Co. Security, FGF Alarms, and Home Secure Solutions.

**Mey allegations regarding ISI Alarms, Monitronics, and Honeywell**

83.     Since March 7, 2012, Ms. Mey has received numerous calls from ISI attempting to sell her alarm systems manufactured by Honeywell, and alarm-monitoring services provided by Monitronics.

84.     The calls were made by live telemarketers and by using an autodialer to deliver a prerecorded message.

85.     On more than one occasion, a telemarketer represented to Ms. Mey that he or she was a representative or employee of "Honeywell" or "ISI Honeywell."

*Plaintiff Kerry O'Shea*

86.     Since November of 2012, Plaintiff Kerry O'Shea has received numerous illegal telemarketing calls on his cellular telephone, (xxx) xxx-6734, a number he listed on the national Do Not Call Registry on January 18, 2012.

87.     These calls were placed by or at the direction of:

a.   VMS/Alliance;

b.   UTC Authorized Dealers for the purpose of selling or promoting the sale of UTC alarm systems; and

c.   Monitronics Authorized Dealers for the purpose of selling or promoting the sale of Monitronics alarm-monitoring services.

88.     Several of these calls used prerecorded messages and automatic telephone dialing systems, or ATDS.

89.     During the course of one such call in June of 2013, Mr. O'Shea spoke with a representative named "Melissa," who was calling on behalf of Alliance and Monitronics. Mr. O'Shea asked to be placed on their internal do no call list. To ensure that this was done, Mr. O'Shea asked to speak with a supervisor, and was transferred to "Daniel," who confirmed Mr. O'Shea would be placed on the caller's internal do not call list.

90.     On another such call in July of 2013, Mr. O'Shea spoke with a representative named "Samuel," who was calling on behalf of Alliance and Monitronics. Mr. O'Shea asked to be placed on their internal do not call list.

91.     During another call that month, Mr. O'Shea spoke with a representative of Alliance named "Jeremy." Jeremy told Mr. O'Shea it was a waste of time to be put on the do not call list.

92.     During yet another call a few months later, Mr. O'Shea received a prerecorded message promoting the installation of a GE alarm system. To determine who was placing the call, Mr. O'Shea was connected via an interactive voice recording to a representative named "Bruce," located in Tampa, Florida. Bruce identified the security system as a GE system, identified his company as Alliance Security, and identified Monitronics as the company that would do the monitoring.

93.     In January 2014, Mr. O'Shea received an ATDS call, answered, and heard a brief period of music before a representative came on the line. The representative stated he was calling from Alabama, for Safe Home Technologies and Monitronics. Mr. O'Shea again asked for the calls to stop, and asked to be placed on the companies' internal do not call list.

**B.     VMS/Alliance placed telemarketing calls in violation of the TCPA.**

94.     VMS/Alliance is liable under all Counts for placing calls as alleged above.

95.     VMS is liable under Count One (47 U.S.C. § 227(b)(1)) because it or its agents used an ATDS or artificial or prerecorded voice to place nonexempt calls to cellular or residential telephones without the recipient's prior express consent.

96.     VMS is liable under Count Two (47 U.S.C. § 227(c)) because it or its agents placed telemarketing calls to numbers on the DNC Registry without the recipient's signed, written agreement to receive telemarketing calls.

**C.     ISI Alarms placed telemarketing calls in violation of the TCPA.**

97.     ISI Alarms is liable under all Counts for placing calls as alleged above.

98.     ISI Alarms is liable under Count One (47 U.S.C. § 227(b)(1)) because it or its agents used an ATDS or artificial or prerecorded voice to place nonexempt calls to cellular or residential telephones without the recipient's prior express consent.

99.     ISI Alarms is liable under Count Two (47 U.S.C. § 227(c)) because it or its agents placed telemarketing calls to numbers on the DNC Registry without the recipient's signed, written agreement to receive telemarketing calls.

**D.     UTC is liable for the TCPA violations of UTC Authorized Dealers.**

100.    With respect to telemarketing calls placed to Plaintiffs and putative class members, UTC is liable for the TCPA violations of UTC Authorized Dealers because:

a.   UTC Authorized Dealers placed calls on behalf of, and for the benefit of, UTC;

b.   UTC Authorized Dealers placed calls under UTC's actual authority;

c.   UTC Authorized Dealers placed calls under UTC's apparent authority; or

22

      d.   UTC ratified the illegal conduct of UTC Authorized Dealers.

101.   The following facts support these allegations:

      a.   UTC does not sell alarm systems directly to homeowners or businesses. Instead, it puts its products into the hands of consumers solely through the retail sales efforts of others, including UTC Authorized Dealers.

      b.   UTC sells its alarms to a middleman, EDIST Distribution Company, which then sells them to UTC Authorized Dealers.

      c.   UTC sets the prices EDIST may charge to UTC Authorized Dealers.

      d.   UTC also deals directly with UTC Authorized Dealers. For example, it recruited VMS/Alliance's president, Jay Gotra, to become a UTC Authorized Dealer in approximately 2008-2009, and knew at the time that VMS/Alliance obtained customers through telemarketing.

      e.   UTC extends special pricing and volume-purchase discounts to UTC Authorized Dealers. For UTC, the goal of this arrangement is to have those dealers purchase all of their alarm systems from UTC.

      f.   The relationships between UTC and UTC Authorized Dealers are dictated by agreements that subject the Authorized Dealer to UTC's control.

      g.   For example, the VMS/Alliance-UTC relationship is governed by a Dealer Agreement executed on June 1, 2009. Under this agreement:

         (i)  VMS/Alliance may hold itself out to the public as a "GE Security Authorized Dealer," or as a "GE authorized dealer."

         (ii)  VMS/Alliance must exclusively purchase UTC security products when entering into contracts with consumers.

      (iii)VMS/Alliance is obligated to "promote, market and sell [UTC] security

           products."

      (iv)UTC is obligated to provide sales training to VMS/Alliance regarding the

           UTC products sold.

      (v) VMS/Alliance is required to purchase a minimum number of security kits

           per month in order to obtain better pricing on GE Security products.

h.   UTC has similar contracts with other UTC Authorized Dealers who it permits

     to hold themselves out as authorized to promote, market and sell UTC

     products.

i.    UTC benefits from its relationships with UTC Authorized Dealers because

     they purchase large quantities of UTC products. For example, in 2010,

     VMS/Alliance spent approximately $2.3 million on UTC equipment.

j.    UTC's dealer agreements also provide for rebates for products sold, in

     addition to special pricing.  With respect to VMS/Alliance, the rebates are

     given as a credit that UTC instructs EDIST to give VMS/Alliance when

     purchasing more UTC products.

k.   As a way to grow their business relationship, UTC and VMS/Alliance

     negotiated a marketing agreement in order to aid VMS's marketing costs—

     even after this lawsuit was filed, and after UTC knew VMS/Alliance was the

     subject of scores of illegal telemarketing complaints.

l.    UTC has known for years that some UTC Authorized Dealers, including

     VMS/Alliance, use "lead generators" to generate telemarketing sales leads,

     and was aware of the TCPA-compliance risks of working with lead

generators. Despite this knowledge, UTC offered its Authorized Dealers no or inadequate training regarding telemarketing compliance, and failed to take effective action to stop them from violating the TCPA.

m. UTC also has known for years that hundreds of consumers and government agencies have lodged illegal telemarketing complaints against its Authorized Dealers, but UTC failed to take effective action to stop the illegal conduct. For example, in July of 2010, the Attorney General for the State of Pennsylvania fined VMS/Alliance for telemarketing in violation of Pennsylvania's Do Not Call registry, but UTC took no action against it in response.

n. To the contrary, despite knowing VMS/Alliance was the subject of numerous illegal telemarketing complaints, that same year UTC awarded VMS/Alliance a top national sales award, the "UTC Fire & Security Liberty Award," for its business-generation efforts.

o. UTC only terminated the dealer after the Court granted partial summary judgment against VMS/Alliance, and found that its claimed "opt-in consent" or "survey consent" was insufficient to allow it to place telemarketing calls to telephone numbers listed on the national Do Not Call Registry.

p. These facts demonstrate UTC's corporate policy of disregard for TCPA compliance. This policy has resulted in widespread illegal telemarketing by UTC Authorized Dealers with respect to Plaintiffs and putative class members.

**E.**    **Monitronics is liable for the TCPA violations of Monitronics Authorized Dealers.**

102.    With respect to the telemarketing calls placed to Plaintiffs and putative class members, Monitronics is liable for the TCPA violations of Monitronics Authorized Dealers because:

      a.    Monitronics Authorized Dealers placed the calls on behalf of, and for the benefit of, Monitronics;

      b.    Monitronics authorized dealers placed the calls under Monitronics' actual authority;

      c.    Monitronics authorized dealers placed the calls under Monitronics' apparent authority; or

      d.    Monitronics ratified the illegal conduct of Monitronics Authorized Dealers.

103.    The following facts support these allegations:

      a.    Monitronics does not sell monitoring services directly to homeowners or businesses. Instead, it obtains monitoring contracts solely through the retail sales efforts of others, including Monitronics Authorized Dealers.

      b.    Some Monitronics Authorized Dealers are exclusive to Monitronics. For example, as an exclusive Monitronics dealer, VMS/Alliance assigns 99% of all its monitoring contracts to Monitronics, which has a right of first refusal to purchase all of its monitoring contracts. For the very small number of contracts VMS/Alliance does not sell to Monitronics, it hires Monitronics to provide monitoring services.

      c.    The relationships between Monitronics and its Authorized Dealers are dictated by agreements that subject the dealers to Monitronics' control.

26

d.   For example, VMS/Alliance and Monitronics are parties to an Alarm

Monitoring Purchase Agreement. The Agreement imposes a host of

requirements on VMS/Alliance, including:

   (i)   Monitronics requires VMS to maintain an insurance policy with a

   minimum $2 million general aggregate limit, and requires VMS to list

   Monitronics an additional insured on its liability insurance.

  (ii)   Monitronics requires VMS to have customers sign alarm monitoring

   purchase agreements, the terms of which are drafted by Monitronics, and

   are referred to by Monitronics as "approved contracts."  VMS may not

   alter the terms of these contracts.

 (iii)   Monitronics has a right of first refusal with respect to all monitoring

   contracts VMS secures and decides to sell. Monitronics purchases

   approximately 98% of the contracts that VMS offers to it.  Monitronics

   does not have a similar right of first refusal with all of its authorized

   dealers.

  (iv)   Monitronics requires that VMS complete a quality assurance form with

   respect to each monitoring contract sold to Monitronics.

   (v)   Monitronics requires that VMS provide it with a copy of the "sales and

   installation agreement" for all of its customers, despite the fact that

   Monitronics is not originally a party to that agreement.

  (vi)   Monitronics requires VMS to guarantee at least twelve months of revenue

   on each contract sold to Monitronics, and if Monitronics does not realize

27

that twelve months of funding, a "chargeback" occurs between
Monitronics and VMS.

(vii)   Monitronics has an individual non-solicitation/non-compete agreement
with Jasit Gotra, VMS's president, requiring him not to solicit contracts
that Monitronics has purchased from VMS.

(viii)   VMS must pledge *all* of its accounts (including those that Monitronics
does not purchase) as a security interest to Monitronics.

(ix)   Monitronics must obtain "favorable pricing" from UTC for VMS.

e.   Monitronics has similar contracts with other Monitronics Authorized Dealers,
including ISI Alarms.

f.   Monitronics grants Authorized Dealers access to Monitronics' "central
station" and "dealer website," which allows the dealers to manage their
accounts.

g.   Monitronics also regularly uses its Authorized Dealers to service its accounts.
For example, for VMS-originated accounts monitored by Monitronics, VMS
performs all necessary maintenance.

h.   Monitronics has what it calls a "revenue sharing bonus" or "bonus purchase
price" agreement with some of its Authorized Dealers. For example, it shares
revenue with VMS/Alliance if it maintains a certain monthly sales volume.

i.   Monitronics describes its relationships with its dealers in terms that
demonstrate joint venture, partnership, and agency relationships with those
dealers, and in fact is engaged in such relationships with them.  For example,
Monitronics' website states:

(i) "Our dealer program is unique in the industry with one goal— create happy and successful business partners."

(ii) "When you succeed, we succeed."

(iii) "Whether it's getting the funding you need quickly and reliably or help in developing business processes—Monitronics stands ready to help you reach your goals."

(iv) "Monitronics dealers enjoy shared resources, knowledge and unprecedented support from an industry leader."

(v) "Monitronics supports your business with consulting, training, marketing materials, equipment discounts, and leads distribution programs."

j.   Monitronics has known for years that some of its Authorized Dealers, including VMS/Alliance and ISI Alarms, use lead generators to generate telemarketing sales leads, and is aware of TCPA-compliance risks associated with using lead generators.

k.   Monitronics has also known for years that some of its Authorized Dealers, including VMS/Alliance and ISI Alarms, have been the subject of scores of illegal telemarketing complaints lodged by consumers and government agencies.

l.   Nonetheless, despite this knowledge, Monitronics has provided its Authorized Dealers no or inadequate training regarding TCPA compliance, and has failed to take effective action against them to end the illegal telemarketing.

m.  Monitronics rewards and even celebrates its Authorized Dealers who engage in illegal telemarketing. For example, it has recognized VMS/Alliance with:

29

  (i) The "top sales award for 2009" due to the "quantity of contracts offered by VMS/Alliance and purchased by Monitronics";

  (ii) Its "Dealer of the Year" award for 2010 in order to "distinguish [VMS] and to encourage other dealers"; and

  (iii) A trip to the 2011 Super Bowl, "due to the quality and quantity of contracts" VMS/Alliance sold to Monitronics in the previous year and "to encourage other dealers to try and achieve similar results."

n. In fact, even after this Court concluded VMS/Alliance lacked valid consent to place telemarketing calls to Plaintiff Mey, and after VMS/Alliance's telemarketing practices were the subject of national news reports, Monitronics has continued to do millions of dollars of business with the company.

o. These facts reveal Monitronics' corporate-wide policy of disregard for TCPA compliance. This policy has resulted in widespread illegal telemarketing by Monitronics Authorized Dealers with respect to Plaintiffs and putative class members.

**F. Honeywell is liable for the TCPA violations of UTC Authorized Dealers**

  104. As a manufacturer of alarm systems, Honeywell generally does not sell its products directly to consumers. Instead, it markets and distributes its alarm systems through authorized dealers, including ISI, who are paid commissions based in part on the amount of Honeywell products they sell.

  105. Honeywell describes its relationships with its dealers in terms that demonstrate joint venture, partnership, and agency relationships with those dealers, and in fact is engaged in such relationships with them.

30

106.    For example, on its website, Honeywell informs its authorized dealers, "Our success is only possible with your success.  You are our business."

107.    The website also invites dealers to "partner" with Honeywell by selling Honeywell products.

108.    Honeywell has written dealer agreements with its authorized dealers.

109.    Under the dealer agreements, Honeywell allows dealers to use the Honeywell trade name, trademark and service mark to market and sell Honeywell alarm systems.

110.    The dealer agreements give Honeywell the authority to oversee its dealers' conduct.  For example, Honeywell can fine or terminate dealers who violate the law or internal Honeywell policies, including telemarketing laws and policies.

111.    Honeywell gives its dealer access to information normally within Honeywell's exclusive control.  For example, through Honeywell's website and other means, Honeywell dealers can access promotional materials, product guides and pricing information.

112.    Despite its authority, Honeywell has failed to control and prevent its dealers, including ISI, from engaging in and benefiting from illegal telemarketing.

113.    Moreover, Honeywell has received numerous telemarketing complaints from other consumers, and has known that ISI and other authorized dealers were generating business for Honeywell through illegal telemarketing.

114.    Despite this knowledge, Honeywell failed to take effective steps to end this illegal conduct.

115.    Instead, Honeywell profited from and ratified the conduct by continuing to accept and new business generated by ISI and other authorized dealers engaged in illegal telemarketing.

31

## VI.    CLASS ACTION ALLEGATIONS

116.    Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following classes:

a. ***The UTC-Monitronics-Alliance Class***: All persons or entities within the United States who received, on or after May 18, 2007, a non-emergency telephone call (excluding TSS Survey Class calls) from or on behalf of UTC, Monitronics, or VMS/Alliance, promoting goods or services:

(i)  to a cellular telephone number through the use of an automatic telephone dialing system or an artificial or prerecorded voice; or

(ii) to a residential telephone number through the use of an artificial or prerecorded voice; or

(iii) to a cellular or residential telephone number registered on the national Do Not Call Registry and who received more than one such call within any twelve-month period.

b. ***TSS Survey Class:*** All persons or entities within the United States whose telephone numbers were listed on the Do Not Call Registry, and to whom, at any time on or after May 18, 2007, more than one call within any twelve-month period from or on behalf of Defendants UTC, Monitronics, or VMS/Alliance was placed based upon sales leads provided by Total Survey Solutions, promoting goods or services.

c. ***The Honeywell-Monitronics-ISI Class:*** All persons or entities within the United States who received, on or after April 30, 2008, a non-emergency telephone call from or on behalf of Honeywell, Monitronics, or ISI, promoting goods or services:

32

     (i)  to a cellular telephone number through the use of an automatic telephone dialing system or an artificial or prerecorded voice; or

     (ii) to a residential telephone number through the use of an artificial or prerecorded voice; or

     (iii) to a cellular or residential telephone number registered on the national Do Not Call Registry and who received more than one such call within any twelve-month period.

117.    Excluded from the Classes are Defendants; any entities in which they have a controlling interest; their agents and employees; any Judge to whom this action is assigned and any member of such Judge's staff and immediate family; and claims for personal injury, wrongful death and/or emotional distress.

118.    Plaintiffs propose that the following persons serve as class representatives:

    a.  *The UTC-Monitronics-Alliance Class:* Plaintiffs Bennett, Bowler, Charvat, Dolemba, Hodgin, Hough, Mey, and O'Shea.

    b.  *The TSS Survey Class:* Plaintiffs Mey and Charvat.

    c.  *The Honeywell-Monitronics-ISI Class:* Plaintiffs Mey and Charvat.

119.    The class members are identifiable through telephone records and telephone number databases used to transmit calls to class members.

120.    Numerosity is satisfied. There are hundreds of thousands of class members. Individual joinder of these persons is impracticable.

121.    There are questions of law and fact common to Plaintiffs and to the proposed classes.

122.    Plaintiffs' claims are typical of the claims of class members.

123.    Plaintiffs are adequate representatives of the classes because their interests do not conflict with the interests of the class members, they will fairly and adequately protect the interests of the class members, and they are represented by counsel skilled and experienced in class actions.

124.    Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.

125.    The likelihood that individual members of the classes will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

## VII.    LEGAL CLAIMS

### Count One:

#### Violation of § 227(b)(1) for calls made using an ATDS or artificial/prerecorded voice

126.    Each Defendant violated 47 U.S.C. § 227(b)(1) by making calls, either directly or through the actions of others, using an automatic telephone dialing system or an artificial or prerecorded voice to cellular telephone numbers without the prior express consent of the called party, or using an artificial or prerecorded voice to a residential telephone number without the prior express consent of the called party.

### Count Two:

#### Violation of § 227(c) for calls placed to numbers listed on the Do Not Call Registry

127.    Each Defendant violated 47 U.S.C. § 227(c) by sending, either directly or through the actions of others, telephone solicitation calls to telephone numbers listed on the national Do Not Call Registry.

## VIII.  RELIEF SOUGHT

Plaintiffs request the following relief:

1.      That the Court certify the classes proposed above under Rule 23(b)(3) of the Federal Rules of Civil Procedure;

2.      For each violation of the TCPA, a $500 penalty awarded to Plaintiffs and each class member;

3.      For each willful or knowing violation of the TCPA, a $1500 penalty awarded to Plaintiffs and each class member;

4.      That the Defendants, and their agents, or anyone acting on their behalf, be immediately restrained from altering, deleting or destroying any documents or records which could be used to identify the members of the classes; and

5.      That Plaintiffs and all class members be granted such other and further relief as is just and equitable under the circumstances.

**Jury trial demanded.**

BAILEY & GLASSER, LLP


By:   /s/ John W. Barrett
      John W. Barrett
      Jonathan R. Marshall
      209 Capitol Street
      Charleston, West Virginia  25301
      Telephone:  (304) 345-6555
      Facsimile:  (304) 342-1110
      Email: jbarrett@baileyglasser.com
      Email: jmarshall@baileyglasser.com

        *Co-Lead Counsel, Liaison Counsel, and*
        *Counsel for Plaintiffs Mey and Charvat*

Beth E. Terrell
Mary B. Reiten
TERRELL MARSHALL DAUDT &
    WILLIE PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
Telephone:  (206) 816-6603
Facsimile:  (206) 350-3528
Email:  bterrell@tmdwlaw.com
Email:  mreiten@tmdwlaw.com

        *Co-Lead Counsel and Counsel for
        Plaintiffs Bowler, Hodgin, and Hough*

Rob Williamson
Kim Williams
WILLIAMSON & WILLIAMS
936 North 34th Street, Suite 300
Seattle, Washington  98103
Telephone: (206) 466-6230
Facsimile:  (206) 535-7899
Email:  roblin@williamslaw.com
Email: kim@williamslaw.com

        *Counsel for Plaintiffs Bowler, Hodgin
        and Hough*

Edward A. Broderick
Anthony Paronich
BRODERICK LAW, P.C.
125 Summer St., Suite 1030
Boston, Massachusetts  02110
Telephone:  (617) 738-7080
Email: ted@broderick-law.com

-and-

Matthew P. McCue
LAW OFFICE OF MATTHEW P. McCUE
179 Union Avenue
Framingham, Massachusetts  01790
Telephone:  (508) 620-1166
Facsimile:  (508) 319-3077
Email: mmccue@massattorneys.net

        *Counsel for Plaintiffs Mey and Charvat*

36

Ronald A Marron
Alexis Marie Wood
Beatrice Skye Resendes
Kas Gallucci
LAW OFFICES OF RONALD
  A. MARRON
651 Arroyo Drive
San Diego, California  92103
Telephone:  (619) 696-9006
Facsimile:  (619) 564-6665
Email: ron@consumersadvocates.com
Email: alexis@consumersadvocates.com
Email: skye@consumersadvocates.com
Email: kas@consumersadvocates.com

-and-

Douglas J. Campion
LAW OFFICES OF DOUGLAS
  J. CAMPION, APC
409 Camino Del Rio South, Suite 303
San Diego, California   92108
Telephone:  (619) 299-2091
Facsimile:  (619) 858-0034
Email: doug@djcampion.com

*Counsel for Plaintiff O'Shea*

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Francis R. Greene
EDELMAN, COMBS, LATTURNER &
GOODWIN, LLC
120 S. LaSalle Street, 18th floor
Chicago, Illinois 60603
Telephone:  (312) 739-4200
Facsimile:   (312) 419-0379

*Counsel for Plaintiff Dolemba*

John R. Cox
9786-A Timber Circle
Spanish Fort, Alabama 36527
Telephone:  (251) 517-4753

37

Email:  jrc@jrcoxlaw.com

Earl P. Underwood, Jr.
Kenneth J. Riemer
UNDERWOOD & RIEMER, PC
21 S. Section Street
Fairhope, Alabama 36532
Telephone:  (251) 990-5558
Email:  epunderwood@alalaw.com
Email:  kjr@alaconsumerlaw.com

*Counsel for Plaintiff Bennett*

38

-EXHIBIT 8-

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION

| | |
|---|---|
| IN RE: MONITRONICS INTERNATIONAL, INC., TELEPHONE CONSUMER PROTECTION ACT LITIGATION | No. 1:13-md-02493-IMK-JSK |
| THIS DOCUMENT RELATES TO: ALL CASES | **PLAINTIFFS' THIRD SUPPLEMENTAL STATEMENT** |

Pursuant to the Court's July 29, 2014, order, Plaintiffs submit this Third Supplemental Statement to provide details of the calls to and telephone numbers for each Plaintiff added in the First Amended Master Consolidated. This Third Supplemental Statement is based on the facts known to date and Plaintiffs will revise or supplement this Statement as necessary.

### I.   Plaintiff Philip Charvat

A.   Plaintiff's Telephone Number(s), Type and Company

| Phone Number | Type | Carrier | National Do-Not-Call Registration |
|---|---|---|---|
| -8940 | Residential | AT&T | September 12. 2011 |
| -1351 | Residential | AT&T | September 12. 2011 |

B.   Call Details for -8940

| Date | Time | Caller Phone | Dealer Name[1] |
|---|---|---|---|
| 9/15/09 | 1:10 P.M. | 401-490-3493 | VMS Alarms |
| 9/15/09 | 5:20 P.M. | 401-490-2735 | VMS Alarms[2] |

---

[1] "Dealer Name" refers either to the name or identifying information used by the caller when speaking with or leaving a message for a Plaintiff or has been determined through the consumer's investigation.

[2] During this call. the Plaintiff requested that he receive no more calls from VMS.


EXHIBIT
82

| Date | Time | Caller Phone | Dealer Name[1] |
|------|------|------|------|
| 12/08/09 | 11:12 A.M. | 401-427-0929 | VMS Alarms |
| 12/14/09 | 7:58 P.M. | 401-401-4010 | VMS Alarms |
| 12/16/09 | 1:52 P.M. | 401-490-3493 | VMS Alarms |
| 12/17/09 | 12:45 P.M. | 508-463-3018 | VMS Alarms |
| 1/7/11 | 5:15 P.M. | 918-442-0729 | VMS Alarms |
| 1/7/11 | 5:25 P.M. | 401-434-4585 | VMS Alarms |
| 1/10/11 | 8:40 P.M. | N/A | VMS Alarms |
| 2/28/11 | 11:13 A.M. | 202-495-7111 | VMS Alarms |
| 2/28/11 | 11:20 A.M. | N/A | VMS Alarms |
| 2/2/12 | 7:18 P.M. | 404-213-5512 | VMS Alarms |
| 7/18/2012 | 6:35 P.M. | N/A | ISI Alarms/Security Solutions |
| 7/24/2012 | 12:25 P.M. | N/A | ISI Alarms/Security Solutions |
| 7/27/2012 | 4:00 P.M. | N/A | ISI Alarms/Security Solutions |
| 7/31/2012 | 7:53 P.M. | 800-650-2702 | ISI Alarms/Security Solutions |
| 8/7/2012 | 11:45 A.M. | 800-385-3079 | Alliance/Security Solutions |
| 9/11/2012 | 11:08 A.M. | 866-201-4666 | ISI Alarms |
| 9/25/2012 | 2:45 P.M. | 877-746-2559 | Alliance |
| 8/23/2013 | 1:05 A.M. | N/A | Alliance |
| 10/17/2013 | 4:45 P.M. | N/A | Alliance |

C.  Call Details for ██████-1351

| Date | Time | Caller Phone | Dealer Name[1] |
|------|------|------|------|
| 12/07/09 | 11:38 A.M. | 401-401-4010 | VMS Alarms |
| 12/07/09 | 11:40 A.M. | 401-401-4010 | VMS Alarms |

- 2 -

Case 1:14-cv-00215-JPB-JES   Document 24   Filed 01/05/15   Page 3 of 5   PageID #: 170

| Date | Time | Caller Phone | Dealer Name[1] |
|------|------|-------------|----------------|
| 12/16/09 | 10:25 A.M. | 401-490-3493 | VMS Alarms[3] |
| 11/18/10 | 8:53 P.M. | Blocked | VMS Alarms/TSS Survey |
| 11/19/10 | 3:02 P.M. | Blocked | VMS Alarms/TSS Survey |
| 11/23/10 | 4:59 P.M. | N/A | VMS Alarms |
| 11/23/10 | 5:20 P.M. | Blocked | VMS Alarms |
| 11/23/10 | 5:32 P.M. | Blocked | VMS Alarms |
| 12/13/11 | 4:40 P.M. | 614-253-4544 | VMS Alarms |
| 1/31/13 | 1:57 P.M. | N/A | Alliance |
| 2/1/13 | 11:00 A.M. | N/A | Alliance |

## II.   Diana Mey (additional calls)

A.  Plaintiff's Telephone Number(s), Type and Company

| Phone Number | Type | Carrier | National Do-Not-Call Registration |
|--------------|------|---------|-----------------------------------|
| �enjoy-1943 | Residential | AT&T | 07/01/03 |
| ▐▐▐-7346 | Cell | AT&T | 04/16/04 |

B.  Call Details

| Date | Time | Caller Phone | Dealer Name[1] |
|------|------|-------------|----------------|
| 10/30/14 | 6:46 p.m. | 520-277-0420 | GE Security Professionals |
| 10/30/14 | 6:53 p.m. | 520-277-0420 | GE Security Professionals/ Alliance Security |
| 12/01/14 | 2:30 p.m. | 530-427-6500 | General Electric |

---

[3] During this call, the Plaintiff requested that he receive no more calls from VMS.

- 3 -

Dated: January 5, 2015.                    Respectfully Submitted,

                                           BAILEY & GLASSER LLP


                                           By:  /s/ Jonathan R. Marshall
                                                 Jonathan R. Marshall
                                                 209 Capitol Street
                                                 Charleston, West Virginia  25301
                                                 Telephone:  (304) 345-6555
                                                 Facsimile:  (304) 342-1110
                                                 Email: jmarshall@baileyglasser.com

                                           *Liaison Counsel*

                                                 John W. Barrett
                                                 BAILEY & GLASSER, LLP
                                                 209 Capitol Street
                                                 Charleston, West Virginia  25301
                                                 Telephone:  (304) 345-6555
                                                 Facsimile:  (304) 342-1110
                                                 Email: jbarrett@baileyglasser.com

                                                 Beth E. Terrell
                                                 Mary B. Reiten
                                                 TERRELL MARSHALL DAUDT
                                                   & WILLIE PLLC
                                                 936 North 34th Street, Suite 300
                                                 Seattle, Washington  98103-8869
                                                 Telephone:  (206) 816-6603
                                                 Facsimile:  (206) 350-3528
                                                 Email:  bterrell@tmdwlaw.com
                                                 Email:  mreiten@tmdwlaw.com

                                           *Co-Lead Counsel for Plaintiffs*

- 4 -

CERTIFICATE OF SERVICE

I, Jonathan R. Marshall, hereby certify that on January 5, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to all attorneys of record.

By: __/s/ Jonathan R. Marshall____
Jonathan R. Marshall

-EXHIBIT 9-

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: MONITRONICS INTERNATIONAL, INC., TELEPHONE CONSUMER PROTECTION ACT LITIGATION | No. 1:13-MD-02493-JPB-MJA |
| THIS DOCUMENT RELATES TO ALL CASES | PLAINTIFFS' FIFTH SUPPLEMENTAL STATEMENT |

Pursuant to the Court's July 29, 2014, order, Plaintiffs submit this Fifth Supplemental Statement to provide details of the calls to and telephone numbers for each Plaintiff added in the First Amended Master Consolidated. This Fifth Supplemental Statement is based on the facts known to date and Plaintiffs will revise or supplement this Statement as necessary.

### I.   Plaintiff Philip Charvat (additional calls)

A. Plaintiff's Telephone Number(s), Type and Company

| Phone Number | Type | Carrier | National Do-Not-Call Registration |
|---|---|---|---|
| -2073 | Personal Cell | Verizon | December 13, 2015 |

B. Call Details for (614) 895-8940

| Date | Time | Caller Phone | Dealer Name[1] |
|---|---|---|---|
| 9/3/2015 | 9:46 A.M. | 855-247-1249 | Alliance Security Inc. |
| 9/8/2015 | 10:20 A. M. | 978-417-9133 | Alliance Security Inc. |
| 9/8/2015 | 12:15 P.M. | N/A | Alliance Security Inc. |

[1] "Dealer Name" refers either to the name or identifying information used by the caller when speaking with or leaving a message for a Plaintiff or has been determined through the consumer's investigation.



EXHIBIT

83

| Date | Time | Caller Phone | Dealer Name[1] |
|---|---|---|---|
| 9/8/2015 | 5:45 P.M. | 855-247-1249 | Alliance Security Inc. |
| 9/9/2015 | 12:35 P. M. | N/A | Alliance Security Inc. |
| 9/9/2015 | 1:30 P. M. | N/A | Alliance Security Inc. |
| 11/30/2015 | 12:15 P. M. | 855-879-2905 | Alliance Security / Monitronics |
| 1/13/2016 | 11:25 A.M. | N/A | Unknown |

## II. Diana Mey

C. Plaintiff's Telephone Number(s), Type and Company

| Phone Number | Type | Carrier | National Do-Not-Call Registration |
|---|---|---|---|
| ▓▓▓▓-9200 | Wireless | AT&T | 09/08/15 |

D. Call Details

| Date | Time | Caller Phone | Dealer Name |
|---|---|---|---|
| 04/25/16 | 1:11 p.m. | 408-796-3014 | Alliance Security |
| 04/25/16 | 1:14 p.m. | 304-281-9200* | Alliance Security |
| 05/05/16 | 7:25 p.m. | 407-530-1853 | Prerecord Vince with American Home Security. |
| 05/06/16 | 5:54 p.m. | 407-530-1853 | Prerecord Vince with American Home Security. |
| 05/06/16 | 8:29 p.m. | 407-530-1853 | Prerecord Vince with American Home Security. |
| 05/07/16 | 10:23 a.m. | 407-530-1853 | Alliance Security |
| 05/09/16 | 11:49 a.m. | 201-857-9080 | "Family Protections"; Alliance Security |
| 05/12/16 | 2:34 p.m. | 470-200-0588 | Prerecord Carol with Interactive Security. |

| Date | Time | Caller Phone | Dealer Name |
|------|------|--------------|-------------|
| 05/13/16 | 8:54 p.m. | 470-200-0588 | IVR Carol with Home Security Promotions. |
| 05/13/16 | 8:57 p.m. | 470-200-0588 | IVR Carol with Home Security Promotions immediately calls back & transfers to rep with Alliance Home Security |
| 05/16/16 | 6:38 p.m. | 540-628-9534 | Prerecorded msg from April, Home Security Specialist. (Hangs up) |
| 05/19/16 | 1:44 p.m. | 919-231-9443 | NCS Security; Alliance Security |

Dated: July 21, 2016.                    Respectfully Submitted,

BAILEY & GLASSER LLP

By: __/s/ Jonathan R. Marshall___
       Jonathan R. Marshall
       209 Capitol Street
        Charleston, West Virginia  25301
       Telephone:  (304) 345-6555
       Facsimile:  (304) 342-1110
       Email: jmarshall@baileyglasser.com

*Liaison Counsel*

       John W. Barrett
       BAILEY & GLASSER, LLP
       209 Capitol Street
       Charleston, West Virginia  25301
       Telephone:  (304) 345-6555
       Facsimile:  (304) 342-1110
       Email: jbarrett@baileyglasser.com

3

Case 5:16-cv-00082-JPB-JES Document 59 Filed 07/21/16 Page 4 of 4 PageID #: 404

Beth E. Terrell
Mary B. Reiten
TERRELL MARSHALL DAUDT
& WILLIE PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 350-3528
Email: bterrell@tmdwlaw.com
Email: mreiten@tmdwlaw.com

*Co-Lead Counsel for Plaintiffs*

CERTIFICATE OF SERVICE

I, Jonathan R. Marshall, hereby certify that on July 21, 2016, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send notification to

all attorneys of record.

By: /s/ Jonathan R. Marshall
Jonathan R. Marshall

4

-EXHIBIT 10-

Calls to 614 895-8940

9/03/15   9:46 AM

9/08/15  10:20 AM
9/08/15  12:15 AM (two calls)
9/08/15   5:45 PM

9/09/15  12:35 PM
9/09/15   1:30 PM

-EXHIBIT 11-

Page 1

```
 1            UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                   OAKLAND DIVISION
 3            CASE NO: 4:15-CV-06314-YGR
 4
 5   ABANTE ROOTER AND PLUMBING, INC., GEORGE ROSS
     MANESIOTIS, MARK HANKINS, and PHILIP J. CHARVAT,
 6   individually and on behalf o all others similarly
     situated,
 7
             Plaintiffs,
 8
     vs.
 9
     ALARM.COM INCORPORATED and
10   ALARM.COM HOLDINGS, INC.,
11           Defendants.
     _____/
12
13
                         442 W. Kennedy Boulevard
14                       Suite 240
                         Tampa, FL 33606
15                       March 17, 2017
                         at 9:00 a.m.
16
17
             DEPOSITION OF MARK HANKINS
18
19      Taken on behalf of the Defendants before
20   PHILIP RYAN, RPR, Court Reporter, Notary Public in
21   and for the State of Florida at Large, pursuant to
22   Defendants' Notice of Taking Deposition in the
23   above cause.
24
25
```

Page 124

1     A.    Right.

2     Q.    Do you know whether the notes that are Hankins 21

3  reference or refer to the screen shot on Hankins 20 or the

4  screen shot on Hankins 22?

5     A.    I would assume one of them but, no, I do not.  I

6  don't have all the stuff memorized in that detail.  I'm

7  sure it can be clarified later.

8     Q.    So let's turn then to Hankins 21.  And tell me

9  what this is.

10     A.    Okay.  That would have been reflective of a call

11  received on my cell phone number with the -- where I spoke

12  to some -- and I don't know -- in this case I'm assuming

13  that Stacy was the -- was the name of the voice assist,

14  that the voice assist was going by.  But I spoke to

15  National Alarm.  They had an ultimate home automation and

16  security package color touch screen, keypad at the front

17  door, yard signs and window stickers, made by Two Gig,

18  somebody called CSA.  And I, I -- there's a -- something

19  that may be a symbol.  I don't know what I did there.  But

20  they monitor -- it may be CSAN, CSAM, CSAP.  I can't read

21  my own handwriting there.

22     It has an interactive cellular.  Said she doesn't know

23  whose -- and, again, I'm not sure what my note was there.

24  But it looks like 99, but that doesn't make sense.  And

25  then Alarm.com at the very bottom.

Page 125

1      Q.   Where do you see what you think says the 99?

2      A.   After she doesn't know whose.  And it might be I

3  was trying to say -- trying to make a brief note on

4  manufacturer -- or, no, Two Gig was the manufacturer.  So

5  she doesn't know whose --

6      Q.   Could that be app, A-P-P?

7      A.   It's possible.  But then Alarm.com came up.  So,

8  she may have looked it up at that point.

9      Q.   Do you have a specific recollection whether she

10  brought up Alarm.com or whether you brought up Alarm.com

11  on this call?

12      A.   I brought up, was there a phone app.  And then I

13  think, you know, as my memory becomes a little better, I

14  think I brought up that there was a phone app.  And I

15  said, well, whose app?  She didn't know, and then she

16  found out.  She came back with the information.

17      And then if you look on the left side of the line --

18  and I don't know why I put it over there, but door sensor,

19  motion or door -- and I don't know why it says S-E-N-S-A-T

20  motion censor and then 10-pound dog.

21      Q.   So that's referring to your dog?

22      A.   Right.  She asked how big the dog was because

23  they do that for how they tune the sensor.

24      Q.   So if I'm correct then, you're not sure on this

25  call whether this -- or strike that.

Page 131

1      A.    Probably he said we are a nationwide franchise.

2      Q.    Did he say anything about what the life-saving

3  product was or what that meant?

4      A.    Probably just part of his spiel, that an alarm

5  system was a life-saving product.

6      Q.    So here in this call mentioned nationwide,

7  American Home Security, GE, and Alarm.com.  Are those the

8  only names in the entities that were mentioned on this

9  call?

10      A.    Right.

11      Q.    Do you recall whether Brandon brought up the name

12  Alarm.com or whether you asked about it first?

13      A.    I would have asked him, you know, who made the

14  system and who made the -- or who was doing the app.  So,

15  my assumption is that he did not volunteer this, that it

16  was my probing questions.  And, again, that would be kind

17  of indicated by the line where I started questioning him.

18      Q.    And are you aware of any recording of this call?

19      A.    None whatsoever.

20      Q.    How long did this call last?

21      A.    Again, the typical, you know, five to ten

22  minutes.

23      Q.    Can you tell me what facts or evidence you

24  believe support the fact that this call violated the TCPA?

25      A.    That it was the voice-assisted technology that

Page 147

1        Q.    Okay.

2        A.    That would be representative of it.

3        Q.    So the Exhibit 90 and then the supplemental

4    answers to interrogatories which indicate the call on

5    February 16th would be illustrative of that; is that

6    right?

7        A.    Exactly.

8        Q.    As you sit here today, can you recall the details

9    or specifics of any other call you've received related to

10   sales or marketing of alarm security systems that we

11   haven't already talked about?

12       A.    I believe there have been some along the line

13   that I have provided that -- counsel that prove not to be

14   germane to this case.  So, yeah, I get them.

15       Q.    And why is it you believe they're not germane to

16   this case?

17       A.    Specifically, lack of a mention of Alarm.com.

18       Q.    Did you receive calls from Alliance that did not

19   members Alarm.com?

20       A.    I don't know.

21       Q.    Okay.  Do you recall the names of any companies

22   that may have called you to try to sell you alarm security

23   systems that did not mention Alarm.com?

24           MR. DONOVAN:  Object to the form.

25           THE WITNESS:  No, I don't recall.

-EXHIBIT 12-

Page 1

1                    UNITED STATES DISTRICT COURT
2                   NORTHERN DISTRICT OF CALIFORNIA
3

         *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
4
5

     ABANTE ROOTER AND PLUMBING, INC., ET AL.
6            Plaintiff,
7
8
             vs.                    Case No. 3:15-CV-06314
9
10
11     ALARM.COM INCORPORATED, and
       ALARM.COMHOLDINGS, INC.,
12            Defendants.
13
14

         *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
15
16

              DEPOSITION OF ANYA VERKHOVSKAYA
17
18           TAKEN AT:  VERITEXT LEGAL SOLUTIONS
          LOCATED AT:  316 North Milwaukee Street
19                  Milwaukee, Wisconsin
                   February 17, 2017
20               9:54 a.m. to 1:04 p.m.
21
22       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
23
24           REPORTED BY ANNICK M. JAQUET
              REGISTERED MERIT REPORTER
25            CERTIFIED REALTIME REPORTER

Page 62

1          some examples.  For example, in Krakauer versus

2          DISH we had a second set of records stating

3          DISH customer that indicated to us during the

4          data analysis that those individuals were, in

5          fact, DISH customers and had established

6          business relationship, and we removed those

7          records from our final opinion and that was

8          accepted by the jury.

9     Q    All right.  Was that removal something that was

10         agreed upon by counsel in that case?

11    A    Yes.

12    Q    Okay.  But let's say there is no agreement.

13         You can't tell -- you couldn't tell by looking

14         at the data set that you had before you whether

15         or not an individual had consented or had an

16         established business relationship, correct?

17    A    Based on the data set that was provided to me

18         prior to this written report I did not have

19         enough data to make that data analysis

20         determination.

21    Q    Okay.  Well, absent someone giving you another

22         set of data that everyone agrees comprises

23         consent or established business relationship

24         would there be another way to go about limiting

25         the data set?

Page 63

1    A    Yes.

2    Q    How so?

3    A    Calling everybody and asking them the question.

4    Q    Fair enough.  So if there is a contested issue

5         of whether or not consent existed or whether or

6         not established business relationship existed,

7         really the only way to determine who consented

8         and who didn't is to call everyone on the list,

9         right?

10                   MR. PARONICH:  Objection.  But I

11        interrupted you, so sorry.  I was slow.  Go

12        ahead.

13                   THE WITNESS:  That's not the way that

14        it is usually done, but if everyone agrees it

15        could be done, I suppose.

16   BY MS. SCHUCHARDT:

17   Q    Well, let's clarify that.  How is it usually

18        done?

19   A    To give you -- to take you back to my example

20        in DISH versus Krakauer we were provided with a

21        set of records that indicated established

22        business relationship, and those records were

23        removed.

24   Q    Right.  But in that particular instance the

25        parties agreed or stipulated that those records

-EXHIBIT 13-

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE MONITRONICS INTERNATIONAL,
INC. TELEPHONE CONSUMER                      MDL No. 2493
PROTECTION ACT LITIGATION

---

## MEMORANDUM IN OPPOSITION TO ALARM.COM
## INCORPORATED AND ALARM.COM HOLDINGS, INC.'S
## MOTION TO TRANSFER AND CONSOLIDATE POTENTIAL TAG-ALONG ACTION

### Argument Summary

The Panel established this MDL to consolidate TCPA cases that "share common factual allegations regarding Monitronics' policies and procedures for calling consumers, directly or through agents, for the purpose of selling home security products or services, as well as its procedures for obtaining and recording the consumer's consent for such calls."  *In re Monitronics TCPA Litig.,* 988 F. Supp. 2d. 1364, 1367 (J.P.M.L. 2013).

The *Abante* action[1] implicates none of those common allegations.  Unlike any of the 20-plus cases the Panel has transferred to the MDL since its formation in December 2013, the *Abante* complaint alleges no claims against Monitronics or its telemarketing agent, Alliance Security.  Injecting a fourth alleged principal (Alarm.com) into an action that has been litigated for years based on a consolidated complaint alleging claims against three unrelated principals (Monitronics, UTCFSA, and Honeywell) would slow the resolution of all the cases, and may even require wholesale reconsideration of the transferee court's schedule, not to mention halt the *Abante* proceedings currently set for class certification motions just eight months away.

The Clerk of the Panel was correct in summarily determining *Abante* should not be transferred. The Panel should deny Alarm.com's motion.

---

[1] *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.,* No. 3:15-06314 (N.D. Cal.).

## Background

Plaintiffs do not dispute the material facts asserted in Alarm.com's recitation of the procedural background.  For present purposes, it suffices to state that this Panel created the MDL on December 16, 2013 by consolidating four actions that "primarily involve[d] allegations that Monitronics – a home security and alarm monitoring company – violated the [TCPA] when Monitronics or one of its agents placed telemarketing calls to persons on the National Do Not Call Registry or to residential or wireless telephones without the individual's consent."  *In re Monitronics TCPA Litig.*, 988 F. Supp. 2d. at 1365.  Defendants in those actions are Monitronics, UTCFSA, Honeywell, and Alliance Security.

Although the legal claims in *Abante* are based on the same TCPA provisions at issue in the Monitronics MDL, *Abante* alleges claims solely against Alarm.com.  Filed on December 30, 2015, in the United States District Court for the Northern District of California, *Abante* is now governed by a case management order setting class certification briefing for January, 2017, and a December 22, 2016, mediation deadline.

## Argument

### 1. *Abante* does not share common factual allegations about Monitronics' policies and procedures, and is therefore beyond the scope of the Monitronics MDL.

In the original transfer order, the Panel stated it was creating this MDL to consolidate cases that "share common factual allegations regarding Monitronics' policies and procedures for calling consumers, directly or through agents, for the purpose of selling home security products or services, as well as its procedures for obtaining and recording the consumer's consent for such calls."  *In re Monitronics TCPA Litig.*, 988 F. Supp. 2d 1365, 1367 (J.P.M.L. 2013).

The *Abante* complaint does not raise those issues at all. It alleges claims only against Alarm.com, and alleges Alarm.com is responsible for telemarketing calls by its agents, including Alliance Security. Indeed, *Abante* has nothing to do with Monitronics' telemarketing efforts.

While Monitronics is mentioned in the *Abante* complaint, it is mentioned — in a single paragraph — only because a contract between it and Alarm.com supports allegations that the two Alarm.com entities named as defendants in the complaint "manifest a unity of business interest and hold themselves out to the public and investors as a single entity." But the complaint makes no allegations against Monitronics at all, and therefore by definition does not "share common factual allegations" regarding Monitronics' telemarketing policies.

And because the *Abante* complaint alleges no claims against Monitronics, Monitronics will not be the subject of discovery in *Abante.* That case will focus on matters unique to Alarm.com, such as *its* practice (if any) of obtaining consent, *its* contracts with telemarketing agents, and *its* policies regarding TCPA compliance. None of these critical issues fits within the scope of the Panel's transfer orders.

## 2. Transfer would disrupt the MDL by injecting a fourth alleged principal into the litigation, effectively requiring the transferee court to reset discovery.

From its inception, the thrust of the Monitronics MDL has been vicarious liability— whether and to what extent are alleged principals Monitronics (which sells alarm-monitoring services), UTCFSA (which sells alarm systems) and Honeywell (same) legally responsible for TCPA violations committed by their authorized dealers. With few exceptions (addressed below), all of the transferred cases allege these principal-agent relationships.

These principal-agent relationships have informed the transferee court's discovery plan and scheduling order. To connect the allegations in a manner that would allow for coordinated and sensible case management, the transferee court directed Plaintiffs to file a consolidated class

- 3 -

action complaint (ECF No. 23), which Plaintiffs' counsel did more than *two years ago* (ECF No. 34). That pleading in turn informed the court's case management order, entered the summer of 2014, providing for a discovery period applicable to all claims to close on August 29, 2015, with class certification motions filed pursuant to the consolidated complaint the following month.

After that, substantial discovery and motions practice occurred until, on June 17, 2015, the case was stayed on a limited basis pending resolution by the United States Supreme Court of two significant cases, *Campbell-Ewald Company v. Gomez*, 768 F.3d 871, 875 (9th Cir. 2014), *cert. granted*, No. 14-857, and *Robins v. Spokeo, Inc.*, 742 F.3d 409 (9th Cir. 2014), *cert. granted*, No. 13-1339. (ECF No. 462.)  Even during the stay, Plaintiffs' counsel continued to meet-and-confer to resolve disputes on outstanding discovery.  In addition, with Defendants' consent, Plaintiffs' counsel continued to aggressively pursue documents and data subpoenaed from twelve third parties.

In short, the transferee court has overseen more than a year-and-a-half of active litigation framed by common and consolidated allegations against the three alleged principals and their telemarketing agents.  Injecting Alarm.com into the mix will almost certainly cause the transferee court to hit the reset button, losing the months of progress made, requiring another consolidated complaint, and having written discovery respecting Alarm.com start from square one, thus detracting from the just and efficient conduct of the litigation.

This potential for delay contrasts sharply with the current state of the proceedings in *Abante,* where the Court recently entered a case management order setting a January, 2017, deadline for class certification motions and requiring mediation by December 22, 2016.

3. **Although the Panel has transferred actions that do not allege claims against Monitronics, those actions, unlike *Abante*, fit squarely within the scope of the MDL.**

As Alarm.com points out, the JPML has transferred a few actions that do not allege claims against Monitronics. These cases alleged claims against Alliance Security that "will overlap with discovery" in the Monitronics MDL, thus justifying what the Panel called "the limited expansion of the MDL to include an action solely against Alliance[.]" *See In re Monitronics Litig.*, MDL No. 2493, ECF No. 173 at 2 (J.P.M.L. Oct. 9, 2014).

Alarm.com's transfer motion asks the Panel to make an *unprecedented* expansion, not a limited one, as in the Alliance-only cases. Transferring *Abante* would inject substantial class action claims against an entirely new entity into a case that has progressed in an orderly fashion under a years-old consolidated complaint against three entirely different principals. *Abante* would inject not only entirely new principal-agent relationships, but also claims involving different products, different lead-generation vendors, and new calling records. Consolidating *Abante* with *Monitronics* also would almost certainly require a new consolidated complaint, a measure that was not required in the Alliance-only cases.

4. **Overlap between counsel and one plaintiff does not support transfer.**

Alarm.com finds it significant that several of the Plaintiffs' counsel in *Abante* are also counsel in the MDL, and one of the MDL plaintiffs is also a plaintiff in *Abante*. Alarm.com cites no authority at all for its view that this should matter, and does not explain why these facts make this case appropriate for transfer. Plaintiffs' counsel in Alarm.com litigate cases together in courts throughout the country, and their decisions to pursue those cases should have no bearing on the transfer analysis. Nor is it of any moment that Plaintiff Charvat received illegal

prerecorded calls both from telemarketers promoting Alarm.com, and from telemarketers promoting other companies.

Equally off-base and indeed odd is Alarm.com's continued insinuation that *Abante* Plaintiffs' counsel somehow acted improperly in not notifying the Panel of the filing of the *Abante* action. Plaintiffs' counsel did not notify the Panel of the filing of the *Abante* action because they did not believe the case fit within the scope of the JPML's creation of the MDL—a belief that was reinforced when the Clerk also determined the case was "not appropriate for inclusion in this MDL." *In re Monitronics Litig.*, MDL No. 2493, ECF No. 354. Nothing has changed since that initial determination; the arguments Alarm.com raised in its motion to transfer also were raised in its rejected notice of potential tag-along action.

### 5.  There is no risk of inconsistent class certification rulings.

Monitronics argues that consolidation is necessary to prevent inconsistent class certification rulings, but fails to specify any issues that it believes might be inconsistently resolved at class certification or how it might be prejudiced. Monitronics' speculation regarding inconsistent rulings is wholly without basis and should be rejected. The central common issue that must be resolved in the *Abante* action is whether Defendants are directly or vicariously liable for calls placed on Defendants' behalf. This question is wholly distinct from the central common issue raised in the Monitronics litigation, which is whether Monitronics, UTCFSA, and Honeywell are vicariously liable for calls placed on their behalf. Resolution of these separate questions will require analysis of unique documentary evidence and different individuals will need to be deposed. Moreover, any ruling in the *Abante* case would not bind the defendants in the Monitronics litigation. Thus, no prejudice would exist should one court certify a class and the other court decline to do so.

Almost all of the cases on which Monitronics relies involve a common defendant and thus are distinguishable. *See In re: Med. Informatics Eng'g, Inc., Customer Data Sec. Breach Litig.*, MDL No. 2667, --- F. Supp. 3d ---, 2015 WL 8540979, at *1 (J.P.M.L. Dec. 10, 2015) (consolidating cases against defendant Medical Informatics Engineering, Inc.); *In re Charlotte Russe, Inc., Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 505 F. Supp. 2d 1377, 1377–78 (J.P.M.L. 2007) (consolidating two cases against defendant Charlotte Russe, Inc.); *In re Sugar Indust. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975) (noting C&H's presence as a defendant in all the actions "gives rise to common issues").

*In re Pharmacy Benefit Mgrs. Antitrust Litig.*, 452 F. Supp. 2d 1352 (J.P.M.L. 2006) is also inapposite. In that case, all of the consolidated actions arose out of allegations that a particular group of defendants violated federal antitrust laws. *See In re Pharmacy Benefit Mgrs. Antitrust Litig.*, 452 F. Supp. 2d 1352 (J.P.M.L. 2006) (noting "[a]ll actions arise out of allegations that certain conduct by the pharmacy benefit manager (PBM) defendants — including the negotiation of rates for the same of prescription drugs by retain pharmacies — violated the federal antitrust laws"). By contrast, the actions consolidated in the Monitronics litigation arise out of allegations that Monitronics violated the TCPA by illegally telemarketing its products while *Abante* alleges that Alarm.com violated the TCPA by illegally telemarketing its products. *Abante* contains no allegations regarding the legality of Monitronics' practices.

This case also differs from *In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation*, 844 F. Supp. 1553, 1554 (J.P.M.L. 1994). In that case, all of the consolidated cases raised the same common issues, including (1) whether TMJ implants are defective and unreasonably dangerous, (2) whether defendants failed to adequately test the implants and constituent materials or warn of possible risks to TMJ implant recipients, and (3)

- 7 -

whether implants' various constituent materials are prone to break down in recipients' bodies. Because the common issues were identical, a risk of inconsistent class certification rulings existed. In this case, the central issue raised in the *Monitronics* litigation differs from *Abante*. Thus, no risk of inconsistent rulings exists.

### 6. Any double recovery could be offset.

Both Monitronics and Alliance maintain the *Abante* action should be transferred to the MDL because overlap in the litigation could result in a double recovery. This wholly speculative assertion is a red herring. The court could offset any double recovery at the time of judgment. Furthermore, the risk of potential double recovery does not warrant injecting a new defendant who sells a unique product with unique lead-generation vendors and unique data into an MDL that has been ongoing for several years. Such a result would undermine the efficiencies of the MDL process.

### Conclusion

For all the above reasons, Alarm.com's motion to transfer should be denied.

Dated:  April 22, 2016.                           Respectfully submitted,

                                                  BAILEY & GLASSER LLP


                                                  By:  /s/ John W. Barrett
                                                      John W. Barrett
                                                      209 Capitol Street
                                                      Charleston, West Virginia 25301
                                                      Telephone: (304) 345-6555
                                                      Facsimile: (304) 342-1110
                                                      Email: jbarrett@baileyglasser.com

                                                  *Attorneys for Plaintiffs Abante Roofing and
                                                  Plumbing, Inc., et al.*

- 8 -

# -EXHIBIT 14-

# FILED UNDER SEAL

-EXHIBIT 15-


**Alliance Security**
*helping keep you safe*

— Every 10 Minutes Alliance Security Protects Another Family —Call (866) 796-4937 Today!

### Get a Free Security Quote

**START HERE!**

# Get This Special Winter Deal Now!

Free Equipment & Free Installation. Ask About Same-Day Installations.

$ **0** *  NO UPFRONT COSTS

EXPIRES SOON 4/30/2016

Requires new monitoring agreement.

○ Own    ○ Rent

Credit Score Above 580?    ○ Yes    ○ No

GET MY FREE QUOTE

By clicking "Get My Free Quote", you provide express written consent for Alliance Security to contact you at the land line or cell number provided, using standard methods including automatic telephone dialing and prerecorded voice systems. You are not required to consent to make a purchase from us.


**firefighter**

**Limited-Time Special Offer!**
**Free Fire & Smoke Monitoring Sys**
Included With Every Installation

ALARM 0018577

## Your Home Security Package Options:

Our monitored security system gives you control over many different functions through out your home. The equipment is simple to use and offers you a complete home security solution at your finger tips. It's never been easier to help keep you safe.

### HIGH-RES TOUCH SCREEN CONTROL PANEL

THE BRAINS BEHIND YOUR SMART HOME. FAST. RESPONSIVE. INTELLIGENT. THIS SLEEK CONTROL PANEL SEAMLESSLY INTEGRATES YOUR SYSTEM'S COMPONENTS. ITS BRILLIANT INTERFACE PUTS HOME SECURITY AT YOUR FINGERTIPS.

### BURGLAR-IN-MOTION DETECTOR

SENSORS WILL PICK UP SOMEONE LURKING INSIDE YOUR HOME– PROVIDING ADDED SECURITY IN BEDROOM HALLWAYS AND STAIRCASES. REST EASY KNOWING YOUR FAMILY IS SAFE (AND IT'S PET FRIENDLY TOO).

### GLASS-BREAK SENSOR

YOUR FAMILY'S SAFE THROUGH SOUND WITH THIS SENSOR BECAUSE IT RECOGNIZES THE SOUND OF BREAKING GLASS. IF A BURGLAR BREAKS A WINDOW, THIS SENSOR WILL ACTIVATE AND SEND HELP.



### 720 HD WIRELESS WI-FI CAMERA*

ENJOY THE SHOW (AND PEACE OF MIND). FULLY ACCESSIBLE ON ALARM.COM, MONITOR REAL-TIME FOOTAGE AND RECEIVE EXCEPTIONALLY CRISP VIDEO CLIPS OPTIMIZED FOR INSTANT PLAYBACK BY EMAIL OR TEXT. *ADDITIONAL CHARGES APPLY.

### WEB & MOBILE APP CONTROL*

SYSTEM ACCESS AT YOUR FINGERTIPS. IMAGINE LIGHTNING-SPEED HOME CONTROL. IT'S COMPATIBLE WITH IOS AND ANDROID. IT FULLY INTEGRATES YOUR SYSTEM AND IS SURE TO BE AT THE TOP OF YOUR MOST-USED APPS ROSTER. *ADDITIONAL CHARGES APPLY.

### KEYCHAIN REMOTE

READY TO PULL OUT OF THE DRIVEWAY, AND YOUR CHILD FORGETS SOMETHING? SAVE MUCH-NEEDED ENERGY AND ARM/DISARM YOUR SYSTEM FROM THE CAR WITH THIS SMALL DEVICE. AND IT'S PERFECT FOR THOSE RAINY DAYS.

**24/7 MONITORING AND SUPPORT**
WHEN YOUR SYSTEM IS ACTIVATED, A LIVE DISPATCHER WILL RESPOND THROUGH YOUR CONTROL PANEL WITHIN SECONDS IF IT'S A FALSE ALARM, JUST TELL US AND WE'LL CALL OFF THE DOGS.

## Powerful Remote Control Apps

ALARM 0018578



- Remote Control "Nanny"
- Personalized Real-Time Notifications
- Protect Your Family at all Times





- Live Video Security Feeds
- System Access at Your Fingertips
- Motion Detection System

- Climate Control
- Lighting Controls
- Keyless Entry Control

Additional charges apply for remote control

## The Alliance Triple Advantage

The Alliance Triple Advantage is based on the 3 biggest challenges homeowners face when
they are in the market for an alarm system and what we do to help solve them.



**$500 Back To You**

If the unthinkable happens . If your home
is broken into and sustains damage or
loss, we will reimburse you up to $500
towards your homeowners insurance
deductible. It's our way of helping to keep
you safe! See terms and conditions for
details.



**On Time Every Time**

You can expect our licensed technician to
install your alarm system at a specific time

ALARM 0018579

install your alarm system at a specific time that meets your needs. Our installers

arrive within 1 hour of your scheduled installation window. If we're late, even by a minute, you'll receive a free* month of monitoring on us. *Only applicable to installations. See terms & conditions for details



**Fire Protection On Steroids**

No home security system is complete without fire protection. That's why we include our Fire Fighter "special alert" sensor in every package (without an increase in your monitoring rate). *Home must be equipped with hardwired smoke detectors for whole house coverage

* Additional charges apply for extra features, see Terms and Conditions for more details. You can also access our Privacy Policy.

ALARM 0018580

-EXHIBIT 16-

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| **IN RE:** MONITRONICS INTERNATIONAL, INC. TELEPHONE CONSUMER PROTECTION ACT LITIGATION | ) ) ) ) )   MDL No. 2493 |

### PLAINTIFFS DIANA MEY'S AND PHILIP CHARVAT'S RESPONSE TO HONEYWELL INTERNATIONAL, INC.'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-1)

Diana Mey and Philip Charvat, plaintiffs in the tag-along action of *Mey & Charvat, et al. v. Honeywell International, Inc., et al.* ("*Mey II*"), oppose Honeywell International, Inc.'s Motion to Vacate Conditional Transfer Order (CTO-1). As grounds for their opposition, Ms. Mey and Mr. Charvat incorporate the response of Monitronics International, Inc.   Additionally, Ms. Mey and Mr. Charvat state that if Honeywell is somehow exempted from transfer to the MDL proceedings pending before Judge Irene Keeley in the Northern District of West Virginia, but the Mey/Charvat claims against Monitronics *are* transferred, plaintiffs would face the untenable prospect of proving liability for *the same* telemarketing calls in two different courts. This would create an unacceptable risk of inconsistent rulings and duplication, as well as a remarkably confusing process for resolving claims at trial. It is exactly these kinds of circumstances that make consolidation desirable and appropriate.

Ms. Mey and Mr. Charvat respectfully urge the Panel to deny Honeywell's motion to vacate.

Dated: February 6, 2014

PLAINTIFFS


*/s/ John W. Barrett*
John W. Barrett
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 *facsimile*
jbarrett@baileyglasser.com

2

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

**IN RE:** MONITRONICS                        )
INTERNATIONAL, INC. TELEPHONE    )      MDL No.  2493
CONSUMER PROTECTION ACT              )
LITIGATION                                             )
                                                                )

### PROOF OF SERVICE

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, I hereby certify that copies of the foregoing **"Plaintiffs Diana Mey's and Philip Charvat's Response to Honeywell International, Inc.'s Motion to Vacate Conditional Transfer Order (CTO-1)"** was served on all parties electronically via ECF, or as indicated below, on:

Frederick W. Kosmo, Jr.
Meryl C. Maneker
Robert Kenneth Dixon
Wilson Turner Kosmo, LLP
550 West C. Street, Suite 1050
San Diego, CA 92101
fkosmo@wilsonturnerkosmo.com
mmaneker@wilsonturnerkosmo.com
rdixon@wilsonturnerkosmo.com
*Counsel for Monitronics International, Inc.*
*USDC, Central District of California, No. 8:13-cv-01054*

Jeffrey A. Holmstrand
Flaherty Sensabaugh & Bonasso PLLC
1225 Market Street
Wheeling, WV 26003
JHolmstrand@fsblaw.com
*Counsel for Monitronics International, Inc.*
*USDC, Northern District of West Virginia, No. 5:11-cv-00090*

Ashley Lauren Watkins
John Goldmark
Kenneth E. Payson
Davis Wright Tremaine
1201 Third Avenue, Suite 2200
Seattle, WA  98101-3041
ashleywatkins@dwt.com
johngoldmark@dwt.com
kenpayson@dwt.com
*Counsel for Monitronics International, Inc.*
*USDC, Western District of Washington, No. 2:13-cv-00321*

Benjamin Dyer
Margaret Jeanne Carlson
Culp & Dyer, LLP
222 East McKinley Street, Suite 210
Denton, TX   76201
bdyer@cdhllp.com
*Counsel for Monitronics International, Inc.*
*USDC, Western District of Washington, No. 2:13-cv-00321*

William D. Wilmoth
Karen Kahle, Esquire
Kristen Andrews Wilson
Steptoe & Johnson PLLC
Post Office Box 751
Wheeling, WV 26003
William.wilmoth@steptoe-johnson.com
Karen.kahle@steptoe-johnson.com
Kristen.Andrews@Steptoe-johnson.com
*Counsel for UTC Fire and Security Americas Corporation*
*USDC, Northern District of West Virginia, 5:11-cv-00090*

Gordon H. Copland, Esquire
Steptoe & Johnson, PLLC
400 White Oaks Blvd.
Bridgeport, WV 26330
Gordon.Copland@steptoe-johnson.com
*Counsel for UTC Fire and Security Americas Corporation*
*USDC, Northern District of West Virginia, 5:11-cv-00090*

Niall A. Paul
Clifford F. Kinney, Jr.
John R. Teare, Jr.
Spilman Thomas & Battle PLLC
300 Kanawha Boulevard, East
Charleston, WV 25321
NPaul@spilmanlaw.com
Ckinney@spilmanlaw.com
JTeare@spilmanlaw.com
*Counsel for Versatile Marketing Solutions, Inc.*
*USDC, Northern District of West Virginia, 5:11-cv-00090*

Christina S. Terek
Spilman Thomas & Battle, PLLC
1217 Chapline Street
P.O. Box 831
Wheeling, WV 26003
cterek@spilmanlaw.com
*Counsel for Versatile Marketing Solutions*
*USDC, Northern District of West Virginia, 5:11-cv-00090*

Lauri A. Mazzuchetti
Kelley Drye & Warren LLP
200 Kimball Drive
Parsippany, NJ   07054
lmazzuchetti@kelleydrye.com
*Counsel for Honeywell International Inc.*
*USDC, Southern District of West Virginia, 2:12-cv-01721*

Alysa Hutnik
Kelley Drye & Warren LLP
Washington Harbour, Suite 400
3050 K Street NW
Washington, DC 20007
Ahutnik@kelleydrye.com
*Counsel for Honeywell International Inc.*
*USDC, Southern District of West Virginia, 2:12-cv-01721*

Alexander Macia
Charity K. Flynn
Spilman Thomas & Battle PLLC
300 Kanawha Boulevard, East
Charleston, WV 25321-0273
*amacia@spilmanlaw.com*
*cflynn@spilmanlaw.com*
*Counsel for Honeywell International Inc.*
*USDC, Southern District of West Virginia, 2:12-cv-01721*

Harry F. Bell, Jr.
Jonathan W. Price
The Bell Law Firm PLLC
30 Capitol Street
P. O. Box 1723
Charleston, WV 25326-1723
hfbell@belllaw.com
jwprice@belllaw.com
*Counsel for ISI Alarms NC, Inc.*
*USDC, Southern District of West Virginia, 2:12-cv-01721*

Robert B. Newkirk, II
Newkirk Law Office
19810 West Catawba Avenue
Cornelius, NC   28031
Rbn3@robertnewkirk.com
*Counsel for ISI Alarms NC, Inc.*
*USDC, Southern District of West Virginia, 2:12-cv-01721*

Sean P. Flynn
Foley and Mansfield, LLP
300 South Grand Avenue, Suite 2800
Los Angeles, CA   90071
sflynn@foleymansfield.com
*Counsel for Alliance Security, LLC*
*USDC, Central District of California, 8:13-cv-01054*

Abbas Kazerounian
Jason A. Ibey
Kazerounian Law Group, APC
245 Fischer Aveue – Suite D1
Costa Mesa, CA   92626
ak@kazlg.com
Jason@kazlg.com
*Counsel for George Cain*
*USDC, Southern District of California, 3:13-cv-01549*

Richard J. Foster
Law Office of Richard J. Foster
500 East Pacific Coast Hwy., Suite 210-A
Seal Beach, CA   90740
foster@fosterlawandsports.com
*Counsel for George Cain*
*USDC, Southern District of California, 3:13-cv-01549*

Joshua B. Swigart
Hyde & Swigart
2221 Camino Del Rio South, Suite 101
San Diego, CA    92108
josh@westcoastlitigation.com
*Counsel for George Cain*
*USDC, Southern District of California, 3:13-cv-01549*

Beth E. Terrell
Kimberlee L. Gunning
Terrell Marshall Daudt & Willie PLLC
936 North 34th Street, Suite 300
Seattle, WA   98103-8869
bterrell@tmdwlaw.com
*Counsel for Janet Hodgin and Michael*
*Hodgin; Edith Bowler; Kenneth Clark and*
*James G. Hough*
*USDC, Western District of Washington, 2:13-cv-00321*

Kim Williams
Roblin John Williamson
Williamson & Williams
2239 W. Viewmont Way W.
Seattle, WA   98199
kim@williamslaw.com
roblin@williamslaw.com
*Counsel for Janet Hodgin and Michael*
*Hodgin; Edith Bowler; Kenneth Clark and*
*James G. Hough*
*USDC, Western District of Washington, 2:13-cv-00321*

Ronald A. Marron
Beatrice Skye Resendes
Alexis Marie Wood
Law Offices of Ronald A. Marron, APLC
651 Arroyo Drive
San Diego, CA   92103
ron@consumersadvocates.com
skye@consumeradvocates.com
alexis@consumeradvocates.com
*Counsel for Kerry O'Shea*
*UDC, Central District of California, 8:13-cv-01054*

Douglas J. Campion
Law Offices of Douglas J. Campion
409 Camino Del Rio South Suite 303
San Diego, CA   92108
doug@djcampion.com
*Counsel for Kerry O'Shea*
*UDC, Central District of California, 8:13-cv-01054*

Daniel A. Edelman
Cathleen M. Combs
Francis Richard Greene
James O. Latturner
Edelman, Combs, Latturner & Goodwin,LLC
120 South LaSalle Street, 18th Floor
Chicago, IL 60603
courtecl@edcombs.com
ccombs@edcombs.com
fgreene@edcombs.com
jlatturner@edcombs.com
*Counsel for Merrill Primack*
*USDC, NDWV 1:14-cv-00004*
*(Member Case - USDC, NDWV, 1:13-md-02493-IMK)*

Dated: February 6, 2014

*/s/ John W. Barrett*
John W. Barrett
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 *facsimile*
jbarrett@baileyglasser.com

-EXHIBIT 17-

Page 1

1                UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      OAKLAND DIVISION

4     _____
                                    )
5     ABANTE ROOTER AND PLUMBING,    )
      INC., MARK HANKINS, and        ) NO. 4:15-cv-06314-YGR
6     PHILIP J. CHARVAT,             )
      individually and on behalf     )
7     of all others similarly        )
      situated,                      )
8                                    )
                    Plaintiffs,      )
9                                    )
          v.                         )
10                                   )
      ALARM.COM INCORPORATED, and    )
11    ALARM.COM HOLDING, INC.,       )
                                     )
12                  Defendants.      )
                                     )
13    _____

14           DEPOSITION UPON ORAL EXAMINATION OF

15                      RACHEL HOOVER

16    _____

17

                          Taken at
18             936 N. 34th Street, Suite 300

19

20

21

22                                                      .

23

24

      REPORTED BY:   Thad Byrd, CCR
25    REPORTED ON:   March 21, 2017

Page 6

1     say, and he can read back the question.

2          The reason that's important is because with

3     everything that he's taking down, the record will reflect

4     that you answered the question that's asked; okay?

5     A.    Okay.

6     Q.    Let me start off just with some preliminary

7     background questions, and then we'll move in to talk

8     about your declaration, which is the reason we're here to

9     depose you today; okay?

10    A.    Okay.

11    Q.    Can you tell me your birth date?

12    A.    May 29th, 1983.

13    Q.    And what is your current address?

14    A.    6527 32nd Avenue Northwest.

15    Q.    And that's in Seattle?

16    A.    Yes.

17    Q.    How long have you lived in Seattle?

18    A.    My entire life.

19    Q.    And are you currently employed?

20    A.    Yes.

21    Q.    Who are you employed with?

22    A.    Terrell Marshall Law Group.

23    Q.    How long have you been employed with Terrell

24    Marshall Law Group?

25    A.    Since March 2011.

Page 7

1     Q.   And what is your current job title?

2     A.   Paralegal and office manager.

3     Q.   How long have you been a paralegal and office

4     manager for Terrell Marshall?

5     A.   Since I started.

6     Q.   If you could just tell me generally on a day to day

7     sort of daily basis, what are your job duties and

8     responsibilities for Terrell Marshall?

9     A.   I assist the attorneys as needed in the litigation.

10    Then on the office manager side of things, I deal with

11    staffing issues, anything that kind of arises in that

12    realm.

13    Q.   Where did you work before Terrell Marshall?

14    A.   I worked at the Law Offices of Karen A. Willie.

15    Q.   I generally have a pretty good idea of what Terrell

16    Marshall does in terms of their law practice.  What does

17    the Law Office of Karen Willie do?

18    A.   Karen did civil litigation.  She focused on water

19    law, which is really I guess property damage caused by

20    landslides and flooding, a little bit of real estate

21    litigation, probably some other things that are not

22    popping to mind.

23    Q.   And how long did you work there?

24    A.   I have -- I worked for Karen since I was 18.

25    Q.   So maybe if I do the rough math, you worked there

Page 8

1      for maybe up to 10 years?

2      A.    A little bit -- I've been working for Karen for 15

3      years.   Terrell Marshall Law Group and Willie merged in

4      March 2011.

5      Q.    Got it, so Karen Willie is an attorney here?

6      A.    She was.  She is no longer.

7      Q.    While you were working for the Law Office of Karen

8      Willie, so before it merged in here with Terrell

9      Marshall, were you working full time since you were 18

10     years old?

11     A.    No.  I worked part time until I was 22 when I

12     finished school and then began working full time.  I

13     believe in that period of time between 18 and 22 there

14     were like summers I worked full time.

15     Q.    Sure.  What did you do for Karen Willie?  The same

16     kind of thing you do here?

17     A.    When I started when I was 18, she hired me as her

18     receptionist.  I worked on and off I would say through

19     school, so I was her receptionist first and then a legal

20     assistant.  Then when I was available to work full time,

21     she hired me as her office manager.

22     Q.    Did you do what we would call paralegal

23     responsibilities when you worked for Karen Willie?

24     A.    Yes.

25     Q.    So when you worked for Karen Willie, could you give

Page 9

1    me an idea of what kind of paralegal responsibilities you

2    had?

3    A.    Similar to what I do here.  It was a very small

4    firm.  She was one to three attorneys max.  I kind of did

5    it all, but assisting with whatever's going on with the

6    litigation, helping to prepare pleadings and discovery

7    and anything that came up working with clients.

8    Q.    Can you tell me about your educational background?

9    A.    Starting when?

10   Q.    Well, did you graduate from high school?

11   A.    Yes.

12   Q.    And what year did you graduate from high school?

13   A.    2001.

14   Q.    What did you do after you graduated from high

15   school?

16   A.    I started working for Karen, and I went to college.

17   Q.    Where did you go to college?

18   A.    University of Washington.

19   Q.    And for someone who's not from here, that's in the

20   Seattle area; right?

21   A.    It is.

22   Q.    So you went to the main campus?

23   A.    Yes.

24   Q.    When did you graduate from there?

25   A.    2005.

1    Q.   What was your degree?

2    A.   Economics.

3    Q.   Have you had any other schooling besides the

4    University of Washington?

5    A.   No.   I studied abroad in Sydney, Australia, but that

6    was while I was at the University of Washington.

7    Q.   Sure.   Was that for like a semester or for a year or

8    something?

9    A.   Yes, a semester.

10   Q.   Now, here you said your title at Terrell Marshall is

11   paralegal and office manager; is that right?

12   A.   Yes.

13   Q.   Do you have any kind of a certificate as a

14   paralegal?

15   A.   No.

16   Q.   Have you had any formal training as a paralegal?

17   A.   Only on-the-job-training.

18   Q.   So no classroom work or certificates or anything

19   like that?

20   A.   No.

21   Q.   So you said that you have not given any depositions

22   in the past; right?   This is your first deposition?

23   A.   Correct.

24   Q.   Can you tell me what you did to prepare for your

25   deposition today?

Page 13

```
1     Q.   Can you tell me the names of the other cases?

2     A.   Booth versus Appstack.

3     Q.   Can you spell the last part, Appstack?

4     A.   Appstack, A-P-P-S-T-A-C-K.

5     Q.   And any others you can remember?

6     A.   No.

7     Q.   What kind of case was Booth v. Appstack?

8     A.   It was a Telephone Consumer Protection Act case.

9     Q.   What was your declaration used for in that case?

10    A.   What do you mean?

11    Q.   Was it used in support of a motion for class

12    certification?

13    A.   I honestly don't remember.

14    Q.   Do you remember when that was?

15    A.   Within the last year and a half.

16    Q.   Do you recall where that case is pending?

17    A.   It's not currently pending.  It was in the Western

18    District of Washington.

19    Q.   I have to ask this question, but have you ever been

20    disclosed as a Federal Rule of Civil Procedure 26 expert

21    witness?

22    A.   No.

23    Q.   It's my understanding, and I believe this is correct

24    that you're not being submitted as an expert witness in

25    this case; is that right?
```

1    A.    That is correct.  I'm not being submitted as an

2    expert.

3    Q.    Regarding the preparation of your declaration, did

4    you talk to any of the plaintiffs' experts in this case?

5    A.    About my declaration?

6    Q.    Yes.

7    A.    No.

8    Q.    I understand maybe you've talked to them in the past

9    about other things like documents and sending them

10   materials and things like that.  That's not what I'm

11   talking about.

12   A.    Correct.  I did not speak to him about -- I did not

13   speak to any expert about my declaration.

14   Q.    Did you review any other documents in preparation

15   for your declaration than are stated in the declaration?

16   A.    May I see the declaration?

17   Q.    Fair enough.

18         (Exhibit 100 was marked for identification.)

19   Q.    I'll just say on the record this is the declaration

20   of Rachel E. Hoover in support of plaintiffs' motion for

21   class certification.  It looks like it was filed on March

22   7th, 2017.

23   A.    Thank you.

24   Q.    I'll just withdraw that last question.  We'll get to

25   that again.

Page 26

1    is that correct?

2    A.    I believe so.

3    Q.    And they produced those records without Bates

4    numbers, and then those Bates numbers were added by

5    plaintiffs' counsel's office; is that right?

6    A.    I believe so.

7    Q.    Do you have any knowledge of how Nationwide

8    collected these records when they responded to the

9    subpoena?

10   A.    No.

11   Q.    Did you do anything to verify the reliability of the

12   Nationwide documents that you reviewed in preparation of

13   your declaration?

14   A.    No.

15   Q.    Do you have any knowledge as to how those records

16   are maintained by Nationwide in the normal and ordinary

17   course of their business?

18   A.    No.

19   Q.    In preparation for your analysis in your declaration

20   in this case, were you relying on the Nationwide records

21   to be authentic?

22             MS. MURRAY:   Object to form.

23   Q.    You can answer if you can.

24   A.    I was just asked to use those records, so that's

25   what I did.

Page 28

1    not really my call to make as to whether -- I mean, all I

2    did was compare one set of spreadsheets with another set,

3    and so it really -- for what I did, it doesn't matter

4    what those numbers represent just for comparison

5    purposes.

6    Q.    So, for example, if the numbers on the spreadsheets

7    that Nationwide produced or the spreadsheets that

8    Nationwide produced aren't accurate, couldn't that impact

9    the number of unique cellphone numbers that you find in

10   paragraph 11 of your declaration?

11   A.    If what was in the spreadsheets, the Nationwide

12   spreadsheets -- do you mean if the Nationwide

13   spreadsheets -- if the numbers in them weren't

14   actually --

15   Q.    Correct.

16   A.    (Continuing) -- numbers that were called?

17   Q.    Yes.

18   A.    Sure.

19   Q.    And so if there's something inaccurate in those

20   numbers, it could impact, for example, the number of

21   unique cellphones you find in paragraph 11 or the number

22   of unique landline phone numbers you find in paragraph

23   12?

24   A.    It's possible.

25   Q.    And as you sit here today, you have no knowledge or

1    testimony about whether the Nationwide records are in

2    fact reliable or accurate; true?

3    A.    Yes.   That was not what I was asked to do.

4    Q.    So that's true?

5    A.    True.

6    Q.    Do you still have the spreadsheets up in front of

7    you?

8    A.    I don't have any of them open.

9    Q.    Fair enough.   Let's go through them now, so

10   Nationwide 12 -- let me pull it up here so I can follow

11   along with you.   Nationwide 12, could you tell me what

12   this is or what this represents?

13   A.    I was told that these represent call detail records.

14   Q.    Who told you that?

15   A.    The attorneys I work with.

16   Q.    Ms. Murray or someone here in the office?

17   A.    Yes.

18   Q.    Did you talk at all with Ms. Verhovskaya's office

19   about specifically what these records were?

20   A.    Yes, in the sense that I probably spoke to them

21   about them being Nationwide call records.

22   Q.    So, for example, do you see at the bottom there

23   where it kind of lists -- I'll call it the title of the

24   document or whatever it says.   It says Hankings vicidial

25   log.   Do you see that?

Page 63

1     that correct?

2     A.    Yes.

3     Q.    So then I think I want to go back to my kind of

4     original question.

5          Does the fact that there are a significant number of

6     more or less than 10 digits rows of information removed

7     as part of your paragraph 5, does that suggest to you in

8     any way a problem or an issue with the reliability of the

9     Nationwide documents?

10    A.    No.

11    Q.    Would you agree with me that that's a pretty

12    significant number, I mean close to 183,000 approximately

13    that were removed from the total in paragraph 3 versus

14    the total that's in paragraph 5?

15    A.    That is a large number.

16    Q.    Does that large number suggest to you any problem or

17    issue with the reliability of the Nationwide records?

18              MS. MURRAY:   Objection, asked and answered.

19    Q.    You can answer.

20              MS. MURRAY:   Go ahead.

21    A.    No.  Also as part of this declaration, I wasn't

22    asked to really address any issue like that.

23    Q.    So the more or less than 10 digits, you don't know

24    whether that means the calls did or didn't go through; is

25    that right?

Page 64

1    A.    I don't know.

2    Q.    And am I correct that the only document that you're

3    relying on to support the reliability of the Nationwide

4    documents is the affidavit of Joe Moretti?

5            MS. MURRAY:   Object to form.

6    A.    Yes.

7    Q.    I think I'm done with that one.  Let's move on to

8    paragraph 6 of your declaration.  Do you see that?

9    A.    Yes.

10   Q.    So if you could tell me, what is the IMS wireless

11   cell block identifier database?

12   A.    It is a list of all -- it's a list of the first

13   seven digits of every telephone number that was initially

14   assigned as a cellular telephone number.

15   Q.    Where did you find or locate that database?

16   A.    From IMS.

17   Q.    And what is IMS?

18   A.    I believe it stands for Interactive Marketing

19   Solutions.

20   Q.    And where was that database located, like on a

21   website or where?

22   A.    You can download it from their website.

23   Q.    What is Interactive Marketing Solutions?

24   A.    It's a company that offers marketing solutions.

25   Q.    It's a private company?

Page 89

1      A.   That these lists are regularly used for this purpose

2      to identify cellphone numbers.

3      Q.   So then turning now to paragraph 10 again, the new

4      number we have, which is the 190,068 number which is the

5      correct number, your testimony is that should match if

6      you add up the 125,346 and the 64,726?

7      A.   I apologize.  There's also a typo in one of these

8      numbers.  The last digit -- the first number should be

9      125,342.

10     Q.   And you belive that's just a typo?

11     A.   Yeah.

12     Q.   So if we turn to paragraph 11 of your declaration,

13     do you see the unique number of cellphone numbers?

14     A.   Yes.

15     Q.   So what is it that you're trying to I guess get at

16     or get to in this paragraph 11?

17     A.   Just the list of -- really a list of cellphone

18     numbers that were called that appears in these records, a

19     unique list of the numbers that appear in these records.

20     Q.   So a list of the unique cellphone numbers that

21     Nationwide called; correct?

22     A.   Yes.

23     Q.   And so there you started with the list of over

24     388,000; right?

25     A.   Yes.

Page 99

1     Q.   Is there any reason that you're aware of that

2     Mr. Hansen could not have done the same analysis that you

3     did in this case?

4     A.   That's not really my job.

5     Q.   So I get that would be no?  You're not aware of any

6     reason why he couldn't have done that?

7     A.   I don't know.

8     Q.   Do you know or do you have any intention to testify

9     at the trial of this matter?

10    A.   It's never been discussed.

11    Q.   Is there any reason that you're aware of that you

12    could not testify at the trial of this matter regarding

13    the declaration and the analysis that you did?

14    A.   No.

15    Q.   And you've read Mr. Hansen's expert report?

16    A.   Yes.

17    Q.   And here in the motion, it says that in his

18    preliminary expert report, Mr. Hansen describes the

19    methodology he would use to identify cellphone numbers

20    from calling records were he asked to do so.  Do you

21    recall seeing that in the motion?

22    A.   Sure, yes.

23    Q.   I'm happy to show it to you if you'd like to read

24    it.

25    A.   I mean, I -- yes.  I read it at some point, and I

1    don't remember the sentence exactly.

2    Q.   Do you know how, if any way that Mr. Hansen's

3    methodology is different than the methodology you did in

4    your analysis and declaration?

5    A.   No.  I'm not aware.

6    Q.   In fact, the next sentence -- again, I'm happy to

7    show this to you -- says this methodology is identical to

8    the methodology plaintiff used to identify calls that

9    Mr. Ramsey placed to cellular telephones, and then it

10   says see generally Hoover declaration.  This is the last

11   sentence there that I've highlighted.

12   A.   Okay.

13   Q.   Do you recall seeing that generally in the motion?

14   A.   Yes.

15   Q.   Do you have any reason to disagree with that

16   statement?

17   A.   No.

18   Q.   Do you agree that the methodology that Mr. Hansen

19   would use is identical to the methodology that you used

20   to identify calls that Mr. Ramsey placed to cellular

21   telephones?

22            MS. MURRAY:  Object to form, calls for

23   speculation.

24   Q.   You can answer.

25            MS. MURRAY:  Lacks foundation.