- EXHIBIT 2-

Page 1

```
 1                    UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                          OAKLAND DIVISION
 4          * * * * * * * * * * * * * * * * * * * * * *
 5     ABANTE ROOTER AND
       PLUMBING, INC., MARK HANKINS
 6     and PHILIP J. CHARVAT,
       individually and on behalf of
 7     all others similarly situated,
 8                          Plaintiffs,
 9               vs.                   Case No. 4:15-cv-06314-YGR
10     ALARM.COM INCORPORATED and
       ALARM.COM HOLDINGS, INC.,
11
                            Defendants.
12
            * * * * * * * * * * * * * * * * * * * * * *
13
14                 DEPOSITION OF ANYA VERKHOVSKAYA
       A PORTION OF THIS TRANSCRIPT HAS BEEN DEEMED CONFIDENTIAL
15             TAKEN AT:   VERITEXT LEGAL SOLUTIONS
           LOCATED AT:  316 N. Milwaukee Street, Suite 575
16                          Milwaukee, Wisconsin
17                          March 6, 2018
                         8:58 a.m. to 12:00 p.m.
18
             REPORTED BY PATRICIA C. SCHUMACHER, R.P.R.
19
20          * * * * * * * * * * * * * * * * * * * * * *
21
22
23
24
25     Job No. 2822930
```

Page 5

1      month.

2   Q   And at that point what was your assignment when you

3       were first retained?

4   A   I was assigned to review call records, identify

5       connected calls, identify outbound calls and identify

6       two calls within a 12-month period 30 days after it

7       were on the National Do Not Call Registry.

8              In addition, I was asked to describe a few

9       other services and could be some other details that

10      I outline in my original report that I may not

11      recall at this time.

12  Q   You mentioned one of the things that you were asked to

13      do was to identify connected calls.

14             Can you tell us what connected calls are?

15  A   Correct.  Connected calls for the purposes of my first

16      report were defined as calls that were greater than

17      zero seconds and/or had a connected disposition.

18  Q   What do you mean by "a connected disposition"?

19  A   A disposition in the call records that indicated that

20      the call was connected.

21  Q   Do you know what call records you were given to review?

22      Do you know where they came from?

23  A   They were provided to me by plaintiffs' counsel.

24  Q   And do you know what the volume of those was when you

25      were first retained?

Page 6

1    A    I believe it is outlined in my first report.

2    Q    Do you know what the course of those records was

3         beyond -- You say you got them from plaintiffs'

4         counsel.  Do you know where plaintiffs' counsel got

5         them?

6    A    It was -- My understanding, it was produced to them in

7         the course of this litigation.

8    Q    Did they tell you who produced them?

9    A    I don't believe so.

10   Q    I'm going to ask you to look at a document that's been

11        marked as Verkhovskaya Exhibit No. 1, please.

12   A    I'm getting my glasses.

13   Q    Can you identify Exhibit 1, Ms. Verkhovskaya?

14   A    It is Responses and Objections of Plaintiffs and Anya

15        Verkhovskaya to Subpoena to Produce Documents.

16   Q    Have you seen this document before?

17   A    Yes, I have.

18   Q    In what connection have you seen it?

19   A    In providing objections to Subpoena to Produce

20        Documents for this deposition.

21   Q    Did you review this document for accuracy?

22   A    Yes, I did.

23   Q    If I could direct your attention to the second page of

24        the document, the first request for production, there's

25        a statement there of -- in response to request for

1    A    Is it one of the consent files?

2    Q    If you'd like to take a break.

3                   (A recess was taken.)

4    BY MR. SCHLESSINGER:

5    Q    Ms. Verkhovskaya, we had a little bit of off-the-record

6         discussion, but can you tell us, if you can, what

7         Verkhovskaya deposition Exhibit 7 is?

8    A    It's one of the audit files that people can subscribe

9         to to receive audit information on ported numbers, but

10        it's not something I used for this case.

11   Q    Do you know whose work product this is?

12   A    No.

13   Q    It's not something that you produced though?

14   A    No.

15                  (Exhibit 8 marked.)

16   BY MR. SCHLESSINGER:

17   Q    Ms. Verkhovskaya, you have in front of you a

18        document -- and this is the first page of a multipage

19        document, but it's Verkhovskaya Exhibit No. 8.

20                  Can you identify what that is?

21   A    It looks like one of the call records in this case.

22   Q    There's a reference to Alliance in the upper left-hand

23        corner.

24                  Do you know who Alliance is?

25   A    A set of files that I reviewed were named as Alliance

1      as a part of the file name.

2   Q  Do you know what that signifies?

3   A  I do not.

4   Q  Do you know who made the calls that are reflected on

5      this call record?

6   A  I do not.

7   Q  You don't know the individuals, but you also don't know

8      the entities that were actually making these phone

9      calls?

10  A  I don't recall this information right now.

11  Q  Do you know who the defendants are in this case?

12  A  Alarm.com.

13  Q  Do you know if anyone employed by Alarm.com made any of

14     the calls that are at issue in this case?

15  A  I don't have an opinion on that.

16  Q  Do you know the content of any of the calls that were

17     made that are at issue in this case?

18  A  I do not.

19  Q  Do you know what business Alarm.com is in?

20  A  Alarm business.

21  Q  Do you know any more specifically than that?

22  A  No.

23  Q  Does it matter to your conclusions what the content of

24     the call was?

25  A  No.

Page 54

1    Q    Does it have to have been a call that was trying to

2         sell something?

3                   MR. DONOVAN:   Object to the form.

4                   THE WITNESS:   I don't have an opinion on this

5         matter.

6    BY MR. SCHLESSINGER:

7    Q    Does it have to have been a call that mentioned

8         Alarm.com?

9                   MR. DONOVAN:   Object to the form.

10                  THE WITNESS:   I don't have an opinion on this

11        matter.

12   BY MR. SCHLESSINGER:

13   Q    Do you know if there are fields missing from the

14        copies -- the copy of Exhibit 8 that's in front of you?

15   A    I don't believe the fields are missing.  The call date

16        is not expanded.

17   Q    If it were expanded, there would actually be a date

18        there rather than just those number signs?

19   A    Correct.

20   Q    I guess those are hashmarks.

21                  In your cleanup work to prepare these call

22        records for further analysis, were there some phone

23        numbers listed that were not ten-digit phone

24        numbers?

25   A    I don't recall at this time.

Page 64

1              It's been marked as Verkhovskaya deposition Exhibit 11.
2              Again, that has the initials VMS up in the top
3              left-hand corner.
4                        Are these more -- Does this document
5              represent more call records?
6     A    Correct.
7     Q    The first column there has four numbers.  The first
8              one -- The first row it's "4429."
9                        Do you know what that represents?
10    A    No, I do not.
11    Q    And then going down roughly ten or 12 rows, the first
12             entry under the "disposition" column, it says "no
13             answer."
14                       Do you see that has a duration of what
15             looks like 11 seconds?
16    A    Yes, I do.
17    Q    And would a call that says "no answer" with a duration
18             of 11 seconds, would that be included in your analysis
19             or would you have discarded this entry?
20    A    My recollection is that it was included.
21    Q    It was included?
22    A    That is my recollection.
23    Q    Was there any cut-off line in terms of duration that
24             you used for that analysis?
25    A    Yes.

1  Q   What was that?

2  A   Zero seconds.

3  Q   So anything over zero seconds would be included?

4  A   That is correct.

5  Q   Do you know how those durations were determined?

6  A   Are you referring to the durations in column -- in the

7      third column?

8  Q   Yes.

9  A   Based on my understanding and experience over the years

10     of working with these call logs, the automated system

11     documents the length of connection.

12 Q   So it's your understanding that this indication of 11

13     seconds duration indicates that the call was collected

14     for 11 seconds?

15 A   Connected, yes.

16 Q   What did I say, collected?  Connected for 11 seconds.

17     I'm sorry.

18 A   That's okay.

19 Q   So from the time that whatever recorded this

20     information had an indication that the phone call was

21     answered until the time that it was terminated was 11

22     seconds?

23 A   Whether answered or not.

24 Q   Well, what starts the duration if it's not answered?

25 A   Either a fax machine, an answering machine, or a human

Page 66

1        being answering the phone.

2    Q   So it is answered in some sense?  It may not be

3        answered by a human being, but what starts the duration

4        is a pickup on the receiving end?

5    A   That's how we treat these type of call logs if other

6        data is not available.

7    Q   Do you know whether other data was available for this?

8    A   As I said, I requested it, and I was told that it was

9        not available.

10   Q   Did you ask for deposition transcripts?

11   A   I don't think so.

12   Q   And you weren't provided with any of those?

13   A   No.

14   Q   Do you know what equipment was used to create this data

15       record?

16   A   No.

17                  (Exhibit 12 marked.)

18   BY MR. SCHLESSINGER:

19   Q   Ms. Verkhovskaya, you have in front of you a document

20       that's been marked as Verkhovskaya deposition

21       Exhibit 12.  And is it fair to say this is another call

22       record that you used?

23   A   Yes.

24   Q   There is maybe two-thirds of the way down the page a

25       row that has an entry -- Let me start that question

Page 67

1     over.

2                     About two-thirds of the way down on

3     Verkhovskaya Exhibit No. 12, there's an entry that

4     says "failed."

5                     Do you see that?

6     A   Yes.

7     Q   Do you know how you treated that call or calls that say

8         "failed"?

9     A   May I have a copy of my report again?

10    Q   You can certainly have this copy.

11    A   It was included.

12    Q   It was included?

13    A   Yes.

14    Q   What was your understanding of what was signified by

15        "failed"?

16    A   Could be failed sale.  It could be I don't have enough

17        understanding but should additional information be

18        provided and I am asked as determined by court or both

19        parties to remove these numbers, that would be an easy

20        fix.

21                     MR. SCHLESSINGER:  I'm sorry, could you read

22        back the answer.

23                     (Answer read.)

24    BY MR. SCHLESSINGER:

25    Q   Do you think it was a mistake to include all that says

Page 68

1      "failed"?

2  A   No, I don't.

3  Q   So your opinion is that the call that's reflected by

4      that entry on Exhibit No. 12 was a call that should be

5      included in your analysis as a violation of the TCPA,

6      correct?

7  A   I don't issue legal opinion as to what is a violation

8      of TCPA.  I issue data analysis opinion stating that

9      based on my analysis of the call data, a certain number

10     of records fit the definition of having two calls

11     within a 12-month period after being on the NDNCR for

12     31 days and non-business telephone numbers.  That's the

13     scope of my opinion.

14 Q   Well -- And this call that's reflected with the word

15     "failed," you're regarding as a call within the

16     parameters that you just described, correct?

17 A   That is my recollection that I included these types of

18     calls.

19 Q   Is there something in your report that caused you to

20     give the testimony you just gave?

21 A   Yes.

22 Q   And what is that?

23 A   I do not state that I had information to exclude these

24     types of calls and excluded them.

25 Q   So, therefore, you conclude that you did not exclude

Page 69

1      them?

2   A  Correct.

3   Q  I note that the duration listed for this call is seven

4      seconds.

5              Is that why you included this call?

6   A  That is correct.

7   Q  So your analysis was done based on the duration column

8      without regard to what it said in the disposition

9      column; is that correct?

10  A  For this particular report, yes.

11  Q  What about the call below that that says "busy"?

12  A  It was treated in the same way.

13  Q  And do you have an understanding of what the word

14     "busy" means as used on this document?

15  A  As I stated earlier, I asked for these types of

16     information and did not receive it.

17  Q  So you didn't reach any conclusion as to what "busy"

18     meant?

19  A  Correct.

20  Q  And you treated this as a call that would be included

21     in your analysis?

22  A  Correct.

23              (Exhibit 13 marked.)

24  BY MR. SCHLESSINGER:

25  Q  Ms. Verkhovskaya, you're looking at deposition Exhibit

1    A    No.

2    Q    And then there's one close to the bottom that says

3         "Agent ERRO."

4              Do you know what that refers to?

5    A    Probably agent error, but, no, I don't.

6    Q    And do you know whether, for example, that agent error

7         call was included in your analysis?

8              MR. DONOVAN:  I'm going to just object and

9         explain only to the extent that because we don't have

10        complete columns here, we don't know if that is even

11        the extent of the disposition.  It's kind of hard for

12        her to answer given how unclear the document is.

13             THE WITNESS:  It was included.

14   BY MR. SCHLESSINGER:

15   Q    And what are you looking at to make that determination?

16   A    I looked to make sure that this call log was part of

17        the production records as referenced in my report.

18   Q    And you looked at your call mapping which is Exhibit

19        No. 10 to make that determination?

20   A    No, in my report.  In call mapping, there's a listing

21        of files, and then I compared that listing of files to

22        my report.

23   Q    I see.  And the part of your report that you looked at

24        is the listing of the call record numbers that you

25        included?

1   A    And the listing of the file names, yes.

2   Q    So then just to make sure this is clear, the call

3        that's referred to as "Agent ERRO" was included in your

4        analysis?

5   A    Correct.

6   Q    There's a couple entries up above that that say "Do Not

7        Cal."

8            Do you know whether those were included?

9   A    Yes, they were included.

10  Q    Do you know what the do not call, if that's what it

11       says, do you know what that refers to?

12  A    In this particular file, I do not.

13           (Exhibit 15 marked.)

14  BY MR. SCHLESSINGER:

15  Q    Ms. Verkhovskaya, again, Exhibit -- You're looking at

16       Exhibit 15.  Again, that appears to be call records,

17       correct?

18  A    Correct.

19  Q    There's -- In the next to last column, if, in fact,

20       that says "Disposition" for the first row, it looks

21       like that's cut off, but it says "Not Available."

22           Do you know what that refers to?

23  A    No.

24  Q    Do you know whether that was included in your analysis?

25  A    Yes, it was.

1   Q   And then the next one down says "Call Back."

2           Do you know what that refers to?

3   A   I can make an assumption for all of these, but I don't

4       know what it refers to in this content.

5   Q   If it's a reasonable assumption, I'd be interested in

6       what your assumption is.

7   A   It would be either the person asked to call back or the

8       agent decided that we should call them back.

9   Q   Do you know what you assumed in connection with your

10      analysis?

11  A   I don't think it was relevant as long as the calls were

12      connected.

13  Q   So you did include this particular call in your

14      analysis?

15  A   Yes.

16  Q   Then the next one down says "Disconnect," I think.

17          Do you know whether that was included?

18  A   It was.

19  Q   And do you know what disconnect refers to there?

20  A   No, I do not.

21  Q   A little bit further down there's one that says

22      "Hung-Up."

23          Do you know what that means?

24  A   I can assume that the person hung up.

25  Q   And that would have been included in your analysis?

Page 75

1   A   Yes.

2   Q   The next one after "Hung-Up," it says "Pitch No," and I

3       don't know what it says after that.

4                   Do you know what that says?

5   A   Maybe pitch no sale.

6   Q   Do you know whether that was included?

7   A   Yes, it was.

8   Q   There's one all the way down near the bottom that says

9       "Not interested" perhaps.

10                  You would have included that one in your

11      analysis?

12  A   Correct.

13                  (Exhibit 16 marked.)

14  BY MR. SCHLESSINGER:

15  Q   Ms. Verkhovskaya, the document in front of you has been

16      marked as Verkhovskaya Exhibit 16, that's more call

17      records, correct?

18  A   Correct.

19  Q   And the information on here that's different from

20      anything that we looked at before is in the second

21      column over from the right, there's a whole series of

22      names with numbers after them listed.

23                  Do you know what that refers to?

24  A   No, I do not.

25  Q   Did that have any impact on your analysis?

1   A   No, it did not.

2   Q   I'm sorry to do it this way, but I wanted to ask you

3       about paragraph 29 of your report which says that you

4       can identify names and addresses associated with

5       particular numbers.

6               Do you see where I'm referring to?

7   A   Yes.

8   Q   How do you go about doing that?

9   A   This is an established process that has been used in

10      many cases and approved by many courts and class cert

11      and settlement administration stages of the class

12      action litigations and particularly TCPA where we

13      submit a set of telephone numbers and the timeframe to

14      LexisNexis and then they provide us with name and

15      address associated with that phone number at the time

16      of the calls.

17  Q   So when you say here that you can identify the names

18      and addresses associated with the numbers, what you're

19      saying is you rely on LexisNexis to provide you that

20      information and you just use the information LexisNexis

21      provides to you, correct?

22  A   Correct.

23  Q   You don't do any additional analysis or inputting on

24      that information?

25  A   Well, then we use that information as described in my

1     report to submit to national change of address database

2     to get the most up-to-date addresses for these

3     individuals.

4  Q  Is it fair to say that telephone numbers are sometimes

5     abandoned by particular users and then given to

6     subsequent users?

7  A  Sometimes they are over-assigned.

8  Q  Do you know how often that occurs?

9  A  It varies from one phone to another.

10  Q  This procedure that you employed, with the assistance

11     of your vendors, identified who the -- what name and

12     address were associated with the telephone number at

13     the time the call was made, correct?

14  A  Correct.

15  Q  And then you ran that through a change of address

16     database to see whether the address had changed,

17     correct?

18  A  Correct.

19  Q  Did you do anything to see whether the person using the

20     telephone number currently is the same person who was

21     using the telephone number at the time the call was

22     made?

23  A  It's not part of our standard process but if asked, we

24     can do that as well.

25  Q  Have you done that in this case?

1    A    No.

2    Q    And so you won't be expressing any opinion on that

3         subject at trial?

4    A    Correct.

5    Q    The -- That same paragraph of your opinion refers to

6         the name and address of the user/subscriber.

7                   Is the user and subscriber the same thing

8         in your mind?

9                   MR. DONOVAN:  Object to the form.

10                  THE WITNESS:  Subscriber and user is.  User

11        and subscriber sometimes may or may not be.

12   BY MR. SCHLESSINGER:

13   Q    And what do you mean by that?

14   A    Subscriber is more likely not as always a user.

15   Q    So the subscriber is the name of the person in whose

16        name that telephone number is held?

17   A    Correct.

18   Q    And that's according to whatever service assigns that

19        number?

20   A    Correct.

21   Q    But then somebody else might be using that phone --

22   A    Correct.

23   Q    -- that's not the subscriber?

24   A    (Nods.)

25   Q    So when you're -- In that circumstance where the user

1      of the phone is not the same as the subscriber, which

2      did you use for your analysis, the user or the

3      subscriber or both?

4   A  I would like to clarify paragraph 29.

5   Q  Thank you.

6   A  It states "I can" which means I did not do that in this

7      case yet, but I can identify both.

8   Q  But you haven't done that yet?

9   A  Correct.

10  Q  Is it your intention to do that?

11  A  I have not been asked to do that.

12  Q  If you were to do that, how would you identify first

13     the subscriber?

14  A  Through the process that I described in my report, by

15     working with LexisNexis and relying on their data.

16  Q  You'd use the same process, just change the date?

17  A  No.  I ask the process to -- I use the process to

18     identify the subscriber which I describe here.

19  Q  Okay.  And that would be to identify the subscriber at

20     the time the call was made?

21  A  That is correct.

22  Q  And would you use that same process to identify the

23     user at the time the call was made?

24  A  Yes.  I would communicate to LexisNexis that I would

25     need them to return all users associated with that

```
 1         telephone number.
 2    Q    Do you have an understanding of how LexisNexis
 3         determines who the user is of a phone number as
 4         contrasted with the subscriber?
 5    A    The subscriber is an individual registered with the
 6         phone company as an individual authorized to make
 7         financial changes and making payments.
 8              The user is an individual that associates
 9         himself with the telephone number.  For example, a
10         kid goes to college and he fills out a Starbucks --
11         Starbucks frequent visitor card and puts his phone
12         number down, that would be an identification of a
13         user of a certain phone number.
14    Q    And if LexisNexis has information indicating -- For
15         example, I'm the subscriber and my daughter goes to
16         college and takes the phone that I'm the subscriber for
17         with her and goes to Starbucks, which name would
18         LexisNexis provide if you asked them to do the
19         analysis?  Would they provide both my name and my
20         daughter's name?
21    A    As users?
22    Q    As user and subscriber or as user.
23    A    Both.  Both as users.
24    Q    So the information that you get from LexisNexis
25         provides multiple names associated with particular
```

1       phone numbers?

2    A  Correct.

3    Q  Do you make any assumptions about which name is the

4       right one to use?

5    A  No.  If we ask to do it that way, all names are used.

6    Q  But, again, in this case you haven't done that?

7    A  Correct.

8    Q  Do you know what CLS records are?  It's this reference

9       in paragraph 13 of your report.

10   A  (Witness peruses document.)  I believe those are

11      consent records that were provided to me by class

12      counsel.

13   Q  And by consent records you mean records where the

14      recipient of the call had given consent to receive a

15      call?

16   A  Correct.

17   Q  And what use did you make of those?

18   A  I removed all of them.

19   Q  Do you know, Ms. Verkhovskaya, if the FCC takes a

20      position on what constitutes government numbers?

21             MR. DONOVAN:  Object to the form.

22             THE WITNESS:  I'm not sure I understand your

23      question.

24   BY MR. SCHLESSINGER:

25   Q  Well, part of what your opinion includes is separating