# -EXHIBIT 6-

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ABANTE ROOTER AND PLUMBING, INC.; MARK HANKINS, and PHILIP J. CHARVAT, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

Case No.: 4:15-cv-06314-YGR

ALARM.COM INCORPORATED and ALARM.COM HOLDINGS, INC.,

Defendants.

______________________________/

DEPOSITION OF RANDALL A. SNYDER

Friday, March 2, 2018

Las Vegas, Nevada

Reported by:
Michelle C. Johnson, RPR-CRR
NV CCR 771, CA CSR 5962

Job No. 2822905

one, you are opining that the Ytel device at issue here is an ATDS?

A. Yes.

Q. Number two, you are opining that 119,484 calls were made to 22,055 unique cellular telephone numbers?

A. Yes. And that opinion is based on another expert witness; I did not perform that analysis myself. But understanding how the analysis was done and the way it was performed, I concur with the results of the methodology of that analysis.

Q. Let's take these opinions one by one. Let's start with the ATDS opinion. What are the bases, the foundations, for your opinions?

A. Well, the first major one is that the Ytel Cloud Contact Center is sold, marketed, and maintains itself that it is a predictive dialer by definition.

The services agreement between Alarm.com and Ytel maintains that Ytel is providing a predictive dialer and predictive dialing functionality. That's the first big, main one.

The rest was analysis on how that operates, which is uploading lists of numbers into the dialing machine. And it has the ability to predictively dial those numbers.

Q. Where did you form your opinion that the services agreement is between Ytel and Alarm.com?

A. Well, I don't have the exhibit in front of me, so I may have misspoke. But I do have -- I think it was Exhibit C. And if you want to show me that, if you have it -- that showed a Master Services Agreement from -- for the Ytel system and what functionality it was providing.

Q. Yeah, I'll show that to you later. It's actually not with Alarm.com, though.

A. Okay.

Q. That wouldn't surprise you?

A. No. The -- I use that as evidence of -- let me put it this way: My analysis of the Ytel Cloud Contact Center and the results of that analysis and my conclusions and opinions would be the same regardless of who the defendant was in this case. That even objectively analyzing this system that's provided to hundreds of thousands of its customers has -- actually predictively dials calls and does other forms of automatic dialing, and therefore would qualify as an ATDS, regardless of who the defendant was.

Q. So at this point, you just don't know who the Ytel agreement was signed with?

MR. PARONICH: Objection.

Q. Is the method you utilized in reaching your opinion reliable?

A. I believe so.

Q. Why?

A. I don't know of another way to do it with 30-some years of engineering experience in telecommunications and call processing systems.

Q. So the method utilized in this case was to review the documents in paragraph 8?

A. Analyzed the system that was in use at the time the calls were made.

Q. Well, you didn't analyze the system.

A. Sure, I did.

Q. How did you analyze the system?

A. By reading about all of its capabilities from the manufacturer, getting evidence from fact witnesses that used the machine and device.

Q. Okay. So you reviewed the documents in paragraph 8 of your report?

A. Yes.

Q. But as we discussed, you didn't actually use the system yourself?

A. That's right. And that would be a worthless endeavor.

MR. JASZCZUK: This is a good stopping point.

certainly not sure.

Q. And what would have been the total length of those conversations?

A. Not long. It was more to make sure my understanding of her methodology was correct. We've worked together quite a bit, so I generally understand the steps she takes in her analysis. And then maybe I have some questions about some things just for my own education sometimes. And sometimes those calls have a personal component. Certainly, when we talk as co-experts in a case, part is professional, part is personal. I don't charge for that time.

Q. So could you tell me how long you, in total, approximately, spent talking to Anya Verkhovskaya on matters related to this case, not personal?

A. I really don't know.

Q. Does 15 minutes sound about right?

A. Probably more than that. But again, I'm reluctant to --

Q. Again, I'm trying to figure out could it be ten hours or likely less than half an hour?

A. No, it was on the smaller side of that.

Q. Likely less than half an hour?

A. Yeah, likely less than an hour, certainly. Could have been half an hour, could have been 20

minutes; I just don't recall.

Q. Okay, now I have questions for you -- I'm sorry, one more question.

How much time did you spend drafting your report?

A. I guess that's on my -- I think we provided you with -- I have one invoice that I have not sent to Terrell Marshall yet because my -- the total amount of time spent came within the initial retainer. So I haven't sent them an invoice. But I sent to them what I had a balance on it, so I might be four or five hours, something like that, total.

It is difficult for me to separate out, as we've been doing, specific tasks, because a lot of times, I do them combined. I'm drafting a report and reading and studying and writing and reading and analyzing and studying and writing intermixed and intermingled, then there will be a phone call in there or something like that. So that's just my process. I don't read everything in a chunk of time, record that time, and write everything in a chunk of time, record that time. It's very -- for me, it's very mixed together.

Q. What about the time you spent assembling the exhibits to your report; how long would that have

The other clause, which is --

Q. Can you just clarify which two clauses?

A. Yes. "From a list of numbers" and "to dial such numbers without human intervention." The first clause, "to store or produce numbers to be called using a random or sequential number generator," my understanding is that that is, in the industry, litigation industry in the TCPA, is almost always under dispute what that means.

I have my personal feelings and there are some additional FCC regulations that clarify that statement, but I'm not relying on that statement for my conclusions and opinions.

Q. Understood. And Mr. Snyder, we've gone through this several times, so I understand your testimony. It's really a matter of, for the record, making sure that everybody else does too. So let me try to summarize that, then.

Am I correct in saying that you contend that the Ytel system that was used in the case at issue here satisfies the second clause of paragraph 10, which is, quote, dials from a list or database of numbers, and that it also satisfies the third clause in paragraph 10, which states, quote, and to dial such numbers without human intervention. Correct?

A. Correct.
Q. And do you contend that the Ytel system at issue in this case satisfies the first clause in paragraph 10, which is, quote, has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, end quote?
A. Generally, yes.
Q. I have to go into the "generally" now. We have to unpack that.
A. Yes.
Q. Tell me why you said "generally."
A. Because the clause says -- and I'm just using plain and ordinary English, not the law or not my interpretation of the law. But it says "store or produce telephone numbers to be called." I would contend that the Ytel Cloud Contact Center stores telephone numbers to be called, so as a portion of that clause, I believe that is true.
I understand there is some dispute on that issue, but my understanding of the FCC regulations clearly states that the operative meaning of that clause is to store or produce, without the second part, "using a random or sequential number generator." You cannot store numbers using a random number generator, for instance.

saying. What you're referring to is that the language isn't a model of clarity, necessarily. So what I'm trying to figure out is, assuming that a court decides that here is what it actually means, even though you and I might think it's logical or illogical, whatever that may be, that's what I'm trying to get on the record.

A. That's correct. And that's why I say informal and from plain and ordinary English and from my engineering background, this is -- the courts have been in dispute about this clause for as long as the TCPA has existed.

Q. Okay. With all of that in mind, then, and it's on the record, let me try to get that final answer on it.

So you are not contending that the Ytel system has the present or potential capacity to store phone numbers to be called, using a random or sequential number generator?

A. Correct.

Q. And you are not contending that the Ytel system has the present or potential capacity to produce phone numbers to be called, using a random or sequential number generator?

A. Correct.

any legal opinions in this case.

Q. Okay. And if we take the word "legal" out, you are making no formal opinion as to whether Nationwide used the Ytel system throughout the time period in question here?

A. No, I was not asked to opine on that. I was simply asked to opine on the characteristics of the Ytel equipment that is alleged to be in use -- I assume alleged, or there would be no case here -- alleged to be in use at the time these calls were made.

Q. Understood. So in fairness to you, so we know what your opinion is, you are assuming that it was the Ytel system that was used by Nationwide to make the calls at issue in this case?

A. Yes. However, my opinion would not change that the Ytel dialer is in fact an ATDS regardless of Nationwide or its usage or the time frame involved. Just objectively, this system would still qualify as an ATDS, in my opinion.

Q. Understood. But for all that you know, if Nationwide used the Johnson 3000, not made by Ytel, your opinion would not be that the system that Nationwide used qualifies as an ATDS because your assumption is that Nationwide used the Ytel system?

A. Yeah. And that's basically information from the attorneys and other documentation. Again, I don't state that opinion one way or the other that -- I do state the opinion that Nationwide used this, the defendants used this system, but that's an assumption provided by the attorneys and other evidence.

Q. Okay, then I understand. So I think these questions will go really quick, then.

Do you know when Nationwide began using the Ytel system?

A. I don't recall. I think it's in one of the pieces of evidence. I don't recall. I do recall, I think, the class period for this is just over a year or something like that, or 14 months or 15 months or something. But I don't recall the start dates and end dates.

Q. My next question was going to be whether you recall the end date.

Do you know which version of the Ytel system Nationwide was using during the various time frames at issue in this case?

A. No.

Q. Did you speak with anyone at Nationwide to determine which version of the system was used?

A. No. And that would probably be inappropriate

of me.

Q. Did you speak with anyone at Ytel to determine which version of the system was allegedly used by Nationwide?

A. No.

Q. As of what date did you analyze the Ytel system? Do you know what I mean by that?

A. Yes.

Over the course that I performed the analysis in this case, probably the dates are in the nonsubmitted invoice I have, which I have a balance on it, of when I was retained to when I drafted the final report, or when the final report was finished. So that would be the time frame.

In some cases -- I don't recall if I did it in this case. In some cases, I use the Internet Archive, the web archive Wayback Machine, to see if I can find public information at the time, on the website of the manufacturer, to see if there was some fundamental change in the functionality of the system.

I don't recall if I did that in this case or not. I know I looked at the website, but I don't know if I looked at the Internet archive of that website. But I am sure that over the last several years, Ytel, the Ytel cloud contact dialing system was a predictive

people that received calls. It's typically you start with calls were initiated or made. And the FCC has plenty of regulations on that that I understand.

With that said, in many cases when you are automatically dialing calls en masse, oftentimes you get busy signals; you get fast busy signals, meaning there is congestion in the network and the call doesn't go through; you get no answer. Maybe if there's voicemail, you get no answer and the call is forwarded to voicemail, that might be considered a completed call, but if there is no answer, that might be considered a not completed call; you might get a special information tone, the number you have reached is not in service, et cetera.

So my understanding, from a technological standpoint or what I would say in the telecom field, is a completed call that's answered in some form, either by an automated voicemail system or an answering machine or a human. Calls that are not answered for a variety of reasons would be calls that were not completed.

And typically, that's also what defines billable events from your carrier's perspective. So for instance, if I'm on my cell phone and I make a call and I get a busy signal, that doesn't show up as

a billable call with minutes used on my cell phone bill. Only completed calls count. And I think those are old regulations, actually old telephony regulations that go back many years.

So my understanding are completed calls -- or not completed calls are calls that were initiated by the system, but perhaps were not answered in some form.

Q. Do you then have an opinion whether, under the TCPA, certain of the categories of the calls that you just mentioned should or should not be included in a list such as the one that Ms. Verkhovskaya sent you?

MR. PARONICH: Objection.

But go ahead.

THE WITNESS: I don't. All I know is that my understanding is that the TCPA talks about calls made and initiated; it doesn't talk about calls answered.

And from an informal, personal standpoint, I would tend to be conservative when counting these numbers to make sure that I excluded anything that might be questionable. That's personally what I do, and I think that's what Anya did in this case.

BY MR. JASZCZUK:

Q. So from your standpoint, would you include, for instance, the category you mentioned, which are