1  Chiharu Sekino, SBN #306589
   Email: csekino@sfmslaw.com
2  SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
   44 Montgomery Street, Suite 650
3  San Francisco, California 94104
   Telephone: (415) 429-5272
4
   Beth E. Terrell, SBN #178181
5  Email: bterrell@terrellmarshall.com
   Jennifer Rust Murray, *Admitted Pro Hac Vice*
6  Email:  jmurray@terrellmarshall.com
   TERRELL MARSHALL LAW GROUP PLLC
7  936 N. 34th Street, Suite 300
   Seattle, Washington 98103
8  Telephone: (206) 816-6603

9  [Additional Counsel Appear on Signature Page]

10 *Attorneys for Plaintiffs and the Proposed Class*

11             UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF CALIFORNIA
12                  OAKLAND DIVISION

13 ABANTE ROOTER AND PLUMBING,
   INC., MARK HANKINS, and PHILIP J.      NO. 4:15-cv-06314-YGR
14 CHARVAT, individually and on behalf of all
   others similarly situated,             **PLAINTIFFS' RESPONSE TO**
15                                         **DEFENDANTS' MOTION FOR**
                  Plaintiffs,              **SUMMARY JUDGMENT; NOTICE OF**
16                                         **CROSS-MOTION FOR PARTIAL**
          v.                               **SUMMARY JUDGMENT;**
17                                         **MEMORANDUM OF POINTS AND**
   ALARM.COM INCORPORATED, and            **AUTHORITIES**
18 ALARM.COM HOLDINGS, INC.,
                                           JURY TRIAL DEMAND
19                Defendants.
                                           Complaint Filed:  December 30, 2015
20
                                           Honorable Yvonne Gonzalez Rogers
21
                                           DATE:       July 24, 2018
22                                         TIME:       2:00 p.m.
                                           LOCATION:   Oakland Courthouse
23                                                     Courtroom 1 - 4th Floor

24
   PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
   JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
   JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES
   CASE NO. 4:15-CV-06314-YGR

1

**NOTICE OF MOTION**

2

TO:    THE CLERK OF THE COURT; and
3    TO:    DEFENDANTS ALARM.COM INCORPORATED AND ALARM.COM HOLDINGS,
         INC., AND THEIR ATTORNEYS OF RECORD:

4         PLEASE TAKE NOTICE that on July 24, 2018, at 2:00 p.m., in Courtroom 1, 4th Floor,

5    of the U.S. District Court for the Northern District of California, 1301 Clay Street, Oakland,

6    California, 94612, Plaintiffs will move for cross-motion for partial summary judgment.  This

7    motion will be made on the grounds that no genuine issue of material fact exists as to whether

8    the Ytel dialing system is an ATDS.

9         The motion will be based on: this Notice of Motion; the following Memorandum of

10    Points and Authorities; the accompanying declaration of Beth E. Terrell and the attached

11    exhibits, Plaintiffs' Response to Defendants' Separate Statement of Undisputed Facts; the

12    records and file in this action; and such other matters as may be presented before or at the

13    hearing of the motion.

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - i
CASE NO. 4:15-CV-06314-YGR

1

# TABLE OF CONTENTS

2

**Page No.**

3  I.    INTRODUCTION ........................................................................................... 1

4  II.   STATEMENT OF FACTS ............................................................................. 2

5        A.   Alarm.com sells alarm monitoring subscriptions through — not to —
             its dealers ............................................................................................. 2

6

7        B.   The Dealer Agreement gives Alarm.com the right to control Alliance ............... 3

8        C.   Alarm.com knew about the unlawful calls and had the ability to control
             Alliance's calling, but steadfastly refused to reign Alliance in .......................... 5

9        D.   Alliance and Nationwide placed millions of unlawful calls between
             2012 and 2016 ..................................................................................... 9

10

11       E.   Alarm.com benefitted from the unlawful telemarketing ...................................... 9

     III.  STATEMENT OF ISSUES ........................................................................... 10

12

13   IV.   AUTHORITY AND ARGUMENT ................................................................. 10

14       A.   Issues of fact exist as to whether Alarm.com can be held vicariously
             liable ................................................................................................ 10

15            1.    Plaintiffs do not allege actual authority under an employer-
                  employee theory .......................................................................... 11

16

17            2.    A reasonable jury could find Alarm.com liable under a classical
                  agency theory .............................................................................. 13

18            3.    A jury could find Alarm.com liable under an apparent authority
                  theory ....................................................................................... 17

19

20            4.    A jury could find Alarm.com ratified Alliance's unlawful
                  telemarketing .............................................................................. 19

21       B.   The Ytel dialer that Nationwide used to place calls to cell phones is an
             ATDS .................................................................................................. 22

22

23   V.    CONCLUSION ........................................................................................... 25

24

# TABLE OF AUTHORITIES

**Page No.**

## FEDERAL CASES

*Abante Rooter & Plumbing v. Farmers Grp., Inc.*,
   No. 17-cv-03315-PJH, 2018 WL 288055 (Jan. 4, 2018) ................................................ 18

*ACA Int'l v. FCC*,
   885 F.3d 687 (D.C. Cir. 2018) ....................................................................... 2, 22, 23, 24

*Aranda v. Caribbean Cruise Line, Inc.*,
   179 F. Supp. 3d 817 (N.D. Ill. 2016) ...................................................................... 15, 21

*Baird v. Sabre, Inc.*,
   636 F. App'x. 715 (9th Cir. 2016). ................................................................................ 23

*Dominguez v. Yahoo!*,
   8 F. Supp. 3d 637 (E.D. Pa. 2014) ................................................................................ 24

*Dominguez v. Yahoo!, Inc.*,
   No. 13-1887, 2017 WL 390267 (E.D. Pa. Jan. 27, 2017) .............................................. 24

*Fields v. Mobile Messengers Am., Inc.*,
   No. C 12-05160 WHA, 2013 WL 6774076 (N.D. Cal. Dec. 23, 2013) ........................ 24

*France v. Ditech Fin., LLC*,
   No. 8:17-cv-03038-SCB-MAP, 2018 WL 1695405 (M.D. Fla. Apr. 6, 2018).............. 23

*Gomez v. Campbell-Ewald Co.*,
   768 F.3d 871 (9th Cir. 2014) ........................................................................................ 12

*Hodgin v. UTC Fire & Sec. Ams. Corp.*,
   885 F.3d 243 (4th Cir. 2018) ............................................................................. 13, 20, 21

*In re Dumont*,
   581 F.3d 1104 (9th Cir. 2009) ....................................................................................... 25

*In re Monitronics*,
   223 F. Supp. 3d 514 (N.D. W. Va. 2016) ..................................................................... 13

*In re Nigeria Charter Flights Contract Litig.*,
   520 F. Supp. 2d 447 (E.D.N.Y. 2007) .......................................................................... 19

*Jones v. Royal Admin. Servs., Inc.*,
    887 F.3d 4433 (9th Cir. 2018) .................................................................. 1, 11

*Krakauer v. Dish Networks L.L.C.*,
    1:14:-CV-333, 2017 WL 2455095 (M.D.N.C. June 6, 2017) .................................. 15, 17

*Kristensen v. Credit Payment Servs. Inc.*,
    879 F.3d 1010 (9th Cir. 2018) .................................................... 1, 10, 19, 20

*Makaron v. GE Sec. Mfg., Inc.*,
    No. CV-14-1274-GW (AGRx), 2015 WL 3526253 (C.D. Cal. May 18, 2015) ....... 12, 13

*Manuel v. NRA Grp., LLC*,
    200 F. Supp. 3d 495 (M.D. Pa. 2016) .............................................................. 24

*Marshall v. CBE Grp., Inc.*,
    No. 2:16-cv-02406-GMN-NJK, 2018 WL 1567852 (D. Nev. March 30, 2018)............ 24

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
    873 F.3d 1045 (9th Cir. 2017) .............................................................. 13, 14

*Meeks v. Buffalo Wild Wings, Inc.*,
    No. 17-cv-07129-YGR, 2018 WL 1524067 (N.D. Cal. Mar. 28, 2018)........................ 12

*Mey v. Venture Data*,
    245 F. Supp. 3d 771 (N.D. W. Va. 2017) ........................................................ 18

*Meyer v. Portfolio Recovery Assoc., LLC*,
    707 F.3d 1036 (9th Cir. 2012) ...................................................................... 24

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ...................................................................... 13

*Reyes v. BCA Fin. Servs., Inc.*,
    --- F. Supp. 3d ---, 2018 WL 2220417 (S.D. Fla. May 14, 2018)............................ 23, 24

*Thomas v. Taco Bell Corp.*,
    879 F. Supp. 2d 1079 (C.D. Cal. 2012) .......................................................... 12

**FEDERAL STATUTES**

28 U.S.C. § 2344........................................................................................ 23

47 U.S.C. § 227(a)(1)................................................................................. 22

1

47 U.S.C. § 227(b)(1)(A)(iii) ....................................................................................... 25

2

### OTHER AUTHORITIES

3

*In re Joint Petition filed by Dish Network, LLC,*
    28 FCC Rcd. 6574 (2013).......................................................................................*Passim*

*In the Matter of Rules and Regulations Implementing the TCPA of 1991,*
    18 FCC Rcd. 14,014 (2003)............................................................................... 23

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,*
    23 FCC Rcd. 559 (2008)................................................................................... 23

Restatement (Third) of Agency § 1.01 ............................................................... 14, 15

Restatement (Third) of Agency § 2.02 ............................................................... 15, 16

Restatement (Third) of Agency § 2.03 .......................................................... 17, 18, 19

Restatement (Third) of Agency § 4.0 ....................................................................... 19

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

## I. INTRODUCTION

2

3        The Ninth Circuit follows the FCC's approach to vicarious liability under the TCPA.

4    *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018). The FCC has

5    determined that vicarious liability is essential to serve the TCPA's remedial purpose of

6    protecting Americans from "unwanted telephone invasions." *In re Joint Petition filed by Dish*

7    *Network, LLC*, 28 FCC Rcd. 6574, 6587 (2013). Vicarious liability is important because

8    reputable, traceable, and solvent companies that benefit from illegal telemarketing "are in the

9    best position to monitor and police TCPA compliance by third-party telemarketers," and, unless

10   the beneficiaries are held accountable, consumers would be left without recourse, relegated to

11   futilely chasing down third-party telemarketers that are commonly "judgment proof,

12   unidentifiable, or located outside the United States." *Id.* at 6588.

13       The statute's consumer protection goals are achieved by applying vicarious liability to

14   cases like this one, where Alarm.com farmed out the dirty and legally risky work of

15   telemarketing to known illegal telemarketers like Alliance/VMS that generated millions of

16   dollars in sales. Alarm.com placed profit ahead of compliance. Alarm.com steadfastly refused to

17   take action against Alliance/VMS despite actual knowledge of Alliance/VMS's ongoing,

18   systemic telemarketing violations. To this day, Alliance remains a valued and profitable source

19   of Alarm.com subscriptions, generating new customers using illegal telemarketing.

20       Rather than confront all of the vicarious liability theories Plaintiffs allege—as discussed

21   at length in their response to Alarm.com's pre-summary judgment letter and at the subsequent

22   hearing—Alarm.com has moved for summary judgment on **a theory Plaintiffs do not even**

23   **assert**. Moreover, Alarm.com relies on the analysis of a case the Ninth Circuit recently clarified

24   is limited "to actual authority and vicarious liability under an employer-employee theory"—a

theory Plaintiffs have never asserted—and "the facts and arguments properly before the court."

*Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 449 n.3 (9th Cir. 2018). In outlining the ten-

factor test for use in "determining whether a principal, who has hired third-party telemarketers,

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 1
CASE NO. 4:15-CV-06314-YGR

exercises sufficient control to be held vicariously liable under the TCPA *to the same degree that an employer may be held liable for the actions of its employees*" the Court "express[ed] no opinion on the usefulness of these factors in establishing other common law theories for holding a principal liable for the conduct of its agent." *Id.* at 451 n.4.

Plaintiffs allege that Alarm.com is vicariously liable for Alliance's telemarketing violations based on three theories: (1) implied actual authority; (2) apparent authority; and (3) ratification. Alarm.com never mentions Plaintiffs' implied actual authority theory. Having not moved on that theory, Alarm.com's motion must be denied. Alarm.com's reluctance to face this theory is not surprising, since the evidence confirms that it had the power to stop Alliance's illegal telemarketing but failed to do so. Alarm.com has also not shown that it is entitled to judgment as a matter of law on Plaintiffs' apparent authority theory. A reasonable jury could find that consumers believed Alarm.com authorized Alliance to place the unlawful calls based on manifestations that are "traceable" to Alarm.com. Nor has Alarm.com demonstrated an absence of material facts as to Plaintiffs' ratification theory; to the contrary, the evidence shows that Alarm.com ratified unlawful calls by accepting the benefits of the calls in the form of millions of dollars in profit. And finally, the dialer used to place calls to cell phones in this case qualifies as an ATDS even after *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), and it is undisputed that Alliance's agent, Nationwide, used the dialer to place calls to cell phones. Alarm.com's motion should be denied and Plaintiffs granted summary judgment on this issue.

## II.  STATEMENT OF FACTS

**A.    Alarm.com sells alarm monitoring subscriptions through — not to — its dealers.**

Alarm.com sells interactive, cloud-based security services and the hardware necessary for consumers to use those services through a network of "dealer partners" or "service providers," such as Alliance. Alliance, which was formerly known as Versatile Marketing Solutions or VMS, ████████████████████████████. Ex. 1 at ALARM-6-7; Ex. 2 at 54:2-6. [1]

---

[1] Unless otherwise indicated, all exhibits are to the Declaration of Beth E. Terrell.
PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 2
CASE NO. 4:15-CV-06314-YGR

The Subscription Agreements that the customers sign prominently display the Alarm.com logo and the title "Alarm.com Terms," state that Alarm.com has "authorized" Alliance to market and sell its services with certain hardware and other products, and provide that the "Alarm.com Terms" are part of any agreement that the customer has with the dealer. Ex. 3.

Alarm.com's assertion that it "sells its software to approximately 6,000 authorized dealers" (Mtn at 4:8-9) is not true. Dealers like Alliance ████████████████████████ ████████████████████████████████████████████████. Ex. 1 ¶ 3.1 (requiring Alliance ████████████████████████████████████████████; Definitions (defining ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████). Alliance is not a party to the Subscription Agreements.

Once Alliance signs a customer up for an Alarm.com subscription, Alliance creates an account for the new subscriber using Alarm.com's service provider portal. Ex. 4 at 55:9-22; Ex.5 at 16671. Alliance then collects "monthly service charges" and "activation fees" from the end users and remits those payments to Alarm.com. Ex. 6 at 19:6-20:8. If Alliance's Dealer Agreement with Alarm.com terminates, ████████████████████████████████████ ████████████████████████████████████. Ex. 1.

**B.    The Dealer Agreement gives Alarm.com the right to control Alliance.**

The Alarm.com Dealer Agreement (Ex. 1) imposes a host of requirements on Alliance. It requires Alliance ████████████████████████████████████████████████████████ ████████████████████████████████. *Id.* ¶ 3.4. Alliance must ████████████████ ████████████████████████████████████████████████████████████████████ ██████████. *Id.* ¶ 3.2. Alliance must ████████████████████████████████████████ ████████████████████████████. *Id.* Alliance must ████████████████████████████ ████████████████████████████████████████████████████████████



. *Id.* ¶ 3.4. Alliance must
. *Id.* ¶ 3.3. Alarm.com
. *Id.* ¶ 5.2. Alarm.com
. *Id.* ¶ 7.1. Alliance can
*Id.* at ¶ 3.3.

Alarm.com asserts that dealers choose "whether and how" to incorporate Alarm.com software into their "fully integrated security systems" and Alarm.com is "just one" of many hardware and software components. Mtn at 4:12–20. Not so. Until summer 2017, Alliance was required to exclusively sell Alarm.com products and services. Ex. 2 at 109:18-110:2. This requirement ████████████████████████████████████████. Ex. 1 at Alarm-17; *see also* Ex. 7 at 163:2-20. As Alarm.com's industry expert conceded, the only way Alliance could choose to use a service other than Alarm.com is if it terminated the Dealer Agreement. Ex. 8 at 55:15-56:13. The Agreement also requires ████████████ ████████████████████████. Ex. 1 at Alarm-6.

Alarm.com suggests that Alliance was not promoting its services, but an account update sent to Alarm.com's Vice-President of Sales noted that Alliance had "seen explosive growth because of their effort to incorporate us in to every sale." Ex. 9. Although Alliance sold security systems with components manufactured by other entities (so long as the components were "Alarm.com Ready"), Alliance's business cards had only two logos—Alarm.com and Alliance. Ex. 8 at Ex. 8. Alarm.com also required Alliance to include the slogan "powered by Alarm.com" on its website as a condition for receiving marketing funds. Ex. 8 at Ex. 7. And Mr. Kaufer admitted that Alliance promoted Alarm.com. Ex. 8 at 130:13-133:9.

It is also not true that Alliance sells Alarm.com services on its "own account." Mtn at 4:19-20. The Dealer Agreement ████████████████████████████████. *See* Ex. 1 at ALARM-14-15. Although Alliance must ██████████████████

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 4
CASE NO. 4:15-CV-06314-YGR

1

(*see id.* ¶ 6.1),

2

3

. Ex. 1 at ALARM-6. For example,

4

5

. *Id.* ¶ 11.6.

6  Alarm.com contends that the Dealer Agreement does not give it the ability to control or

7  monitor Alliance's marketing techniques and activities. Alarm.com's customer lead service

8  program, "CLS," belies Alarm.com's assertions. Alarm.com

*See* Ex. 34

9

Ex. 4 at 151:16–152:9, 59:3–13

10

11  Even outside the CLS program, Alarm.com supported

12  dealers, providing brochures, flyers, calling scripts, rebuttals, training, dedicated support staff,

13  co-branded marketing collateral such as business cards, shirts, and hats, subscription and attrition

14  reports, and funding. Ex. 4 at 11:18-12:2, 13:5-18, 51:2-10, 92:8–93:17 & 95:20-97:9, 98:14-

111:7, 136:1-17; Ex. 10; Dkt. Nos. 196-2, 196-3, 196-4; Ex. 11; Ex. 8 at Ex. 8.

15  **C.     Alarm.com knew about the unlawful calls and had the ability to control Alliance's**
   **calling, but steadfastly refused to reign Alliance in.**

16

17  Alarm.com acknowledges that it had the ability to control Alliance's illegal telemarketing

18  practices. Outside of the CLS program, Alarm.com says that it does not "actively monitor or

   control the sales and marketing practices of our service providers." Ex. 4 at 172:15-176:16. But

19  Alarm.com admits it can take action to ensure compliance with telemarketing laws when it is

20  "made aware of an egregious case." *Id.* at 36:10-37:20.

21  Alarm.com knew about Alliance's egregious telemarketing violations but did nothing to

22  stop them. In late April or early May of 2012, the Today Show aired a segment about aggressive

23  telemarketers repeatedly targeting consumers whose phone numbers were on the NDNC

   Registry. *See* Ex. 12. The segment reported that VMS admitted to violations of Pennsylvania's

24

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 5
CASE NO. 4:15-CV-06314-YGR

telemarketing laws and paid $28,000 to settle, and paid $20,000 in penalties to the state of Kentucky for telemarketing violations. *Id.* at 4. The segment also reported that VMS had been sued in a class action lawsuit and, notwithstanding that lawsuit and the fact that the lead plaintiff's telephone number was on the NDNC registry, VMS continued to call the plaintiff. *Id.*

Alarm.com concedes it knew about the Today Show segment "soon after it aired." Mtn at 7:8-13. Alarm.com claims that it "investigated the matter further" and VMS "assured Alarm.com that safeguards were in place that would prevent any future violations." *Id.* But the email on which it relies states only that Alarm.com's Vice President of Sales, Nate Natale, "spoke to Jay" Gotra who told him that VMS had "a lot of safeguards in place to make sure this doesn't happen." Ex. 13. It is not clear from the email whether Mr. Gotra assured Mr. Natale that the safeguards were in place "to make sure this doesn't happen in the future" or whether the violations occurred despite the purported "safeguards." *Id.* The email suggests the violations occurred due to the large volume of sales VMS generated. *Id.* (Gotra represented that "[t]o generate as many sales as they do this was a minor problem with the software they were using"). The only other "assurances" were VMS's commitment to continue selling a large volume of Alarm.com products and Monitronics' assurance that the segment "will not affect them." *Id.*

The email shows that, far from taking the segment seriously, Mr. Natale found the fact that the Today Show had featured Mr. Gotra's yellow Ferrari to be "kind of funny." *Id.* CEO Steve Trundle also minimized the segment, saying he tended "not to trust the mass market news media other than the [Wall Street Journal] too much because I have seen their reporting consistently be biased and sometimes slanderous." *Id.* Mr. Trundle testified that ████████████ ██████████████████████████████████████████████████████████████████ Ex. 7 at 69:8-70:6. ████████████████████████████████████████████████████████████████████ *Id.* at 70:5-12; Ex. 4 at 174:10-175:24. ████████████████████████████████████████ ████████████████████████████████ *Id.* at 70:22-72:4; Ex. 4 at 176:12-16.

Had Alarm.com conducted even the most cursory investigation, it would have learned that VMS's allegedly "minor problem with its software" had been an ongoing problem; the Pennsylvania AG fined VMS in 2010 and the telemarketing violations continued through 2011 when VMS was sued in a class action lawsuit in West Virginia and 2012 when the Kentucky AG fined VMS once again. *See* Ex. 14; Ex. 15; Ex. 16. Alarm.com would have discovered that the West Virginia court rejected Mr. Gotra's claim that VMS only called people who "opted in" to receiving calls and granted summary judgment for the plaintiffs on VMS's "consent" defense. *See* Ex. 17. Had Alarm.com monitored Alliance after the Today Show aired, it would have learned that Alliance continued to place calls to telephone numbers on the NDNC Registry and continued to get sued. Exs. 18 and 19; Ex. 30.

Citing a document that VMS provided to the FTC in response to a Civil Investigative Demand issued weeks after the Today Show aired, Alarm.com notes that VMS made the same representations to the FTC. *See* Mtn at 7 (citing Dkt. No. 196-13). But unlike Alarm.com, the FTC did not take VMS's "assurances" at face value. Instead, the FTC conducted an extensive investigation that culminated in a Stipulated Final Order for Permanent Injunction and Civil Penalty Judgment in the amount of $3.4 million. *See* Ex. 20.

Over the next several years, Alliance's telemarketing practices raised additional red flags. During audits associated with the CLS program, Alarm.com named Alliance a "problem dealer" due to its telemarketing practices, including overcalling, using an automated dialing system to make calls, and leaving prerecorded messages. Ex. 4 at 59:3–61:10, 147:5–17. Alarm.com did not inform Alliance of the audits results. Ex. 2 at 107:19-108:1.

Even after it was sued in 2015, Alarm.com did not discuss with Alliance whether it complied with the TCPA. Ex. 21 at 26:6-14 (Alarm.com "typically do[es] not police or get involved in a dealer's business or investigate their telemarketing practices or otherwise"). And the calls continued. Mr. Charvat received a call from Alliance promoting Alarm.com's services on November 14, 2017—nearly two years after he sued Alarm.com. Ex. 22. Alliance was sued

again just two months ago by the FTC, which characterized Alliance and Gotra as "recidivist violators" of the telemarketing laws. Complaint ¶ 2, *FTC v. Alliance Security, Inc.*, No. 1:18-cv-10548 (D. Mass. Mar. 22, 2018).

Alarm.com's expert admitted that a company in the alarm industry "perhaps should exert control over a dealer if it was aware there were [telemarketing] problems." Ex. 8 at 99:8-102:6. Mr. Kaufer said Alarm.com "could check, they could investigate, they could determine what was happening, and they could potentially place limitations on Alliance going forward." *Id.* at 101:18-24. It could also "choose to invoke paragraph 7.1 of the agreement to terminate Alliance for violating the law." *Id.* at 102:2-6. Alarm.com's second industry expert, Joseph Colosimo, testified that if he worked with a company subject to an injunction prohibiting TCPA violations and was informed that the telemarketer may still be engaging in the prohibited conduct, he would investigate. *See* Ex. 23 at 42:24-44:6. Plaintiffs' expert testified that Alarm.com could have "sent [Alliance] a letter, get proof of what they're doing, do an investigation and to the extent they weren't satisfied or to the extent based on the egregious nature of what Alliance did, they could have given them notice and turned those radios off immediately"—the effect of which is that the customer "has no monitoring." Ex. 24 at 120:1-121:16.

The Electronic Security Association's "Code of Ethics" requires members to "comply with all applicable laws that prohibit or regulate solicitations, including honoring all applicable do-not-call lists and all other requests not to be called." *Id.* at 122:18–123:19; *see also* Ex. 24 at Ex. 7. ESA members must train employees and representatives who market security products on their behalf, "to implement appropriate and effective controls to ensure compliance with the Code." Ex. 24 at 121:17-122:17. Alarm.com's expert, Mr. Colosimo, testified that "dealers tend to be a little bit unethical in the way they go to market, misrepresentation of who they work for, why they're there. So the industry in trying to control the problems that w[ere] going on in the industry decided to write a Code of Ethics for ethical alarm companies to follow to try to control the problem with dealer networks out there." Ex. 23 at 19:14-20:7.

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 8
CASE NO. 4:15-CV-06314-YGR

Mr. Colosimo opined that the Code did not bind Alarm.com because it is an "associate member" of the ESA. Ex. 25. Mr. Zwirn contacted the ESA and confirmed that the Code applies to **all** members, including associate members. Ex. 26. Mr. Colosimo insisted that the Code did not apply to Alarm.com because Alarm.com is a manufacturer that does not have a contractual relationship with the end user. Ex. 23 at 22:2-23:24. But the Subscription Agreements are between Alarm.com and end users. Mr. Colosimo also did not know that Alarm.com dictates the terms of the Subscription Agreements. *Id.* at 25:6-26:4 ("Q. But you don't know if Alarm.com required Alliance to offer its service only under certain terms? A. I don't know. I don't know."). Mr. Kaufer admitted that Alarm.com is a member of the ESA bound by the Code. Ex. 8 at 88:7-16. He testified that he believed Alarm.com abided by the Code, but conceded that "if Alarm.com became aware that one of its dealers was engaging in conduct that violated the Do Not Call registry" that conduct "might be" covered by the Code. *Id.* at 89:1-9.

**D.    Alliance and Nationwide placed millions of unlawful calls between 2012 and 2016.**

After the Today Show aired in April 2012, Alliance and its representatives placed 3,002,373 calls to 393,762 unique residential telephone numbers after those telephone numbers were listed on the NDNC Registry for at least 31 days and calls were placed to each number at least twice within a twelve-month period. Dkt. No. 99-1 at ¶ 34. Alliance's agent, Nationwide, which was owned by a former Alliance employee, used a predictive dialer called Ytel to place to place 119,484 calls to 22,055 unique cell phone numbers. Dkt. No. 196-20 ¶ 57; Ex. 27 at 17:5-18:9, 18:17-19, 19:15-20:1. The Ytel dialing system has the inherent capacity to store telephone numbers to be dialed and then dial them automatically. Ex. 28. When used in "automatic" mode, the system beeps so call center employees know when to pick up the call. Ex. 28, Ex. A at 22:4-13. Nationwide placed 30,812 calls in "AUTO mode" to 15751 cell phones. Ex. 28 ¶ 12.

**E.    Alarm.com benefitted from the unlawful telemarketing.**

Instead of taking steps to ensure that it would no longer receive leads from Alliance's potentially illegal telemarketing, Alarm.com reaped the benefits of Alliance's sales. Alarm.com

considered Alliance a "platinum partner," which means that Alliance generated a minimum of 5,200 accounts annually. Ex. 4 at 108:2-19. In 2013, Alliance activated 6,759 new subscribers. Ex. 9. Between January and July 2014, Alliance generated 12,760 new accounts. *Id.* Alliance's growth continued in 2015. Ex. 29. Alarm.com charged between $4.50 and $9.95 per month for each plan, (Ex. 6 at Ex. 31), and thus realized hundreds of thousands of dollars in recurring revenue from Alliance's sales each year. Alliance also purchased hardware to support the systems from Alarm.com. Ex. 6 at 22:15-25:19 & Ex. 6 at Ex. 31 at 21 (Alarm.com received over $1 million in revenue from Alliance between 2012 and 2015).

## III. STATEMENT OF ISSUES

1.      Should Alarm.com's motion for summary judgment be denied because Alliance did not address Plaintiffs' implied actual authority theory and instead moved for judgment of a theory of actual agency that Plaintiffs do not assert and issues of fact exist on Plaintiffs' theory?

2.      Should Alarm.com's motion for summary judgment be denied because genuine issues of material fact exist as to whether Alarm.com can be held vicariously liable for Alliance's calls on theories of apparent authority, and ratification?

3.      Should Alarm.com's motion for summary judgment on Plaintiffs' cell phone claim be denied because the Ytel dialer is an ATDS (and Plaintiffs' motion granted)?

## IV. AUTHORITY AND ARGUMENT

**A.      Issues of fact exist as to whether Alarm.com can be held vicariously liable.**

The FCC's 2013 ruling in *Dish Network* governs vicarious liability under the TCPA. *Kristensen v. Credit Payment Servs.*, 879 F.3d 1010, 1014 (9th Cir. 2018). In *Dish*, the FCC explained that companies that can stop TCPA violations but fail to do so may be vicariously liable for those violations because "the seller is in the best position to monitor and police TCPA compliance by third-party telemarketers[.]" 28 F.C.C. Rcd. at 6588. Seller liability is "consistent with the statute's consumer protection goals" because it "give[s] the seller appropriate incentives to ensure that their telemarketers comply with [the FCC's] rules." *Id.* If a seller is allowed "to

avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties," consumers would be left "in many cases without an effective remedy for telemarketing intrusions" particularly "if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case." *Id*.

Vicarious liability is not limited "to circumstances in which formal agency exists and the principal exerts immediate direction and control." *Id*. at 6587 n.107; *accord Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 448-449 (9th Cir. 2018) (noting that multiple theories of agency liability exist). Consistent with the goal of ensuring that companies do not hire telemarketers and then leave them unsupervised to rampantly violate the TCPA, companies may be held vicariously liable for TCPA violations under the following theories: (1) actual or "classical" agency; (2) apparent authority; and (3) ratification. *Dish,* 28 F.C.C. Rcd. at 6586-87.

1.    <u>Plaintiffs do not allege actual authority under an employer-employee theory.</u>

Alarm.com contends that Plaintiffs cannot prove that it is liable for Alliance's telemarketing violations on an actual or "classical" agency theory but focuses its motion on a theory Plaintiffs do not assert. As Plaintiffs informed Alarm.com in their response to its letter requesting a summary judgment motion pre-filing conference, they allege an implied actual authority theory based on Alarm.com's power to stop Alliance's illegal telemarketing but failure to do so. Ex. 37. Plaintiffs explained their theory again at the April 6 hearing. Alarm.com omits any reference to implied actual authority in its motion, which must therefore be denied.

Alarm.com instead focuses on the ten-factor test the Ninth Circuit outlined in *Jones* for determining whether a defendant "can be held vicariously liable to the same degree that an employer may be held liable for the acts of its employees." 887 F.3d at 449. Two days before the summary judgment motion pre-filing conference, the Ninth Circuit amended *Jones* to clarify that it is "limited to the facts and arguments properly before the court," *id.* at 449 n.3, and the ten-factor test was "limited to the issue before the court," which was "whether a principal, who has hired third-party telemarketers, exercises sufficient control to be held vicariously liable under the

TCPA *to the same degree that an employer may be held liable for the actions of its employees*." *Id.* at 451 n.4. The Court explained that "in limiting our analysis to actual authority and vicarious liability under an employer-employee theory we are not foreclosing the application of other principles from the common law of agency." *Id.* at 449 n.3 (citing *Dish*, 28 FCC Rcd. at 6584). The Court "express[ed] no opinion on the usefulness" of the ten-factor test" in establishing other common law theories for holding a principal liable for the conduct of its agent." *Id.* at 451 n.4.

It is not surprising that the Ninth Circuit *sua sponte* amended *Jones* to clarify the narrow scope of its holding, since the ten-factor test it applied is inconsistent with its other decisions (and other courts' decisions) addressing vicarious liability under the TCPA, as well as the FCC's *Dish* order. *See, e.g., Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878-79 (9th Cir. 2014) (deferring to the FCC's interpretation of vicarious liability in *Dish*), *aff'd*, 136 S. Ct. 663 (2016). Tacitly acknowledging the narrowness of the *Jones* holding, Alarm.com claims the Ninth Circuit applied principles that other courts have used to determine whether a defendant had sufficient control over a telemarketer to be vicariously liable. But none of the cases Alarm.com cites supports its contention that the *Jones* test has any relevance to this case, where Plaintiffs' implied actual authority theory does not turn on the same indicia of control as an employer-employee relationship. In *Meeks v. Buffalo Wild Wings, Inc.*, the plaintiff alleged that defendant Yelp's co-defendant had the ability to control a restaurant's texts but did not allege (like Plaintiffs in this case) that Yelp impliedly authorized unlawful texts because it knew about unlawful conduct and acquiesced to it, No. 17-cv-07129-YGR, 2018 WL 1524067, at *6 (N.D. Cal. Mar. 28, 2018). In *Thomas v. Taco Bell Corp.*, the plaintiff sought to hold the parent of an entity that conducted a single text message campaign vicariously liable but did not allege the parent corporation was aware of ongoing TCPA violations (and presumably could not because there was only a single campaign). 879 F. Supp. 2d 1079 (C.D. Cal. 2012), *aff'd*, 879 F. App'x 678 (9th Cir. 2014). Alarm.com also cites two cases arising out of telemarketing of alarm systems that involved different facts. In *Makaron v. GE Security Manufacturing, Inc.*, the only evidence of agency was

the telemarketer's limited license to use the manufacturer's trademarks. No. CV-14-1274-GW (AGRx), 2015 WL 3526253, at *6 (C.D. Cal. May 18, 2015). And in *In re Monitronics*, the telemarketers did not sign consumers up for long-term contracts with the manufacturers, and the manufacturers repudiated the telemarketers' TCPA violations upon learning of them. 223 F. Supp. 3d 514, 520 (N.D. W. Va. 2016), *aff'd sub nom Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 252 (4th Cir. 2018).

Not only does *Jones* not apply because its analysis is limited to a narrow theory not at issue in this case, the case is also factually distinguishable. The telemarketer in *Jones* sold extended automobile warranties for multiple companies, including the defendant's competitors. 887 F.3d at 446. During the calls, the telemarketer would first sell the "concept" of the warranty and then pick a service plan to sell. *Id.* The Ninth Circuit found this fact significant, citing it in assessing three of the ten factors. *See id.* at 451-53. Alarm.com contends that Alliance is like the telemarketer in *Jones* because it sold security systems made up of multiple components and thus operated as an independent contractor for many different companies. But Alliance did not sell any products or services that **competed** with Alarm.com's. It sold Alarm.com's services ███████████████████████████████████████████████████████ Ex. 2 at 109:18-110:2; Ex. 1 at Alarm-17; Ex. 7 at 163:2-20; Ex. 8 at 55:15-56:13; Ex. 9.

    2.    <u>A reasonable jury could find Alarm.com liable under a classical agency theory.</u>

Alarm.com fails to address Plaintiffs' classical agency theory, which alleges that Alliance had "implied actual authority" to place the calls due to Alarm.com's acquiescence.[2] This theory first requires a finding of an agency relationship. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d

---

[2] Plaintiffs summarize the law and facts supporting Alarm.com liability under this theory even though the Court should not consider any new argument and evidence that Alarm.com may proffer on this theory in its reply. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 13
CASE NO. 4:15-CV-06314-YGR

1045, 1054 (9th Cir. 2017) (quoting Restatement (Third) of Agency § 1.01). The principal must have the "right to control" the actions of the agent. Restatement § 1.01, cmt c.

Alarm.com does not really challenge the fact that Alliance and Alarm.com had an agency relationship, nor could it. The Dealer Agreement expressly requires Alliance ███████████████████████████████████████████████. Ex. 1 ¶ 3.1 ███████████████████████████████████████████████, ¶ 3.2 ███████████████████████████████████████████████, ¶ 3.3 ███████████████████████████. By permitting Alliance to ███████████████████████████████, Alarm.com has assented that Alliance act on its behalf. *See* Restatement § 1.01, cmt g, illus. 11 (a company that negotiates and enters into contracts between a principal corporation and third parties acts on behalf of the principal corporation and thus is an agent in connection with those contracts). Indeed, the Dealer Agreement requires Alliance ███████████████████████████████████████████ ███████████████████████████████████████████████████ Ex. 1 ¶ 3.4.

Alarm.com was also able to control Alliance's telemarketing if it chose to do so. The Dealer Agreement ███████████████████████████████████████ ██████████████████. Ex. 1 ¶¶ 5.2, 7.1. Alarm.com also admits that it can take action to ensure compliance with telemarketing laws when it is "made aware of an egregious case." Ex. 4 at 36:10-37:20. Alarm.com's industry experts confirm that Alarm.com had authority to discipline or terminate Alliance for telemarketing violations. Ex. 8 at 99:8-102:6; Ex. 23 at 42:24-44:6.

Although the Dealer Agreement says ████████████████████ ███████████████████████████████████████████████

Restatement § 1.01, cmt. c. Regardless of a contract's language, the cornerstone of agency is whether the agent "enter[s] into transactions on the principal's account." *Id.* Alliance did exactly that when it ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████. Ex. 1 ¶ 6.1. This evidence is sufficient to create an issue for fact for the jury. *See Krakauer v. Dish Networks L.L.C.*, 1:14:-CV-333, 2017 WL 2455095, at *3 (M.D.N.C. June 6, 2017) (affirming jury verdict that telemarketer was an agent despite evidence that the contract and the parties considered the telemarketer to be an independent contractor).

Alarm.com points to language in the Dealer Agreement that says Alliance is ████████████████████████████████████████████████. Ex. 1 ¶ 3.2(a)-(b). This provision ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████. *Id.* ¶ 3.3. The requirement that Alliance ████████████ is like an indemnification provision allocating legal liability to Alliance for claims arising out of its sales activity—a provision that sellers like Alarm.com use to protect their interests. *See Dish*, 28 FCC Rcd. at 6591.

When an agency relationship exists, the next step is to determine whether the agent is acting within the scope of its authority, which may be implied by conduct and proven circumstantially. Restatement § 2.02 cmt. c. "While express actual authority is proven through words, implied actual authority is established through circumstantial evidence." *Id.* "A principal grants implied actual authority to an agent when the principal's reasonably interpreted words or conduct would cause an agent to believe that the principal consents to have an act done on her behalf." *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 831 (N.D. Ill. 2016); *see also* Dkt. No. 88 at Ex. 2 (Final Jury Instructions at 5-6, *Krakauer v. Dish Network L.L.C.*, No. 1:14-cv-00333-CCE-JEP (N.D. W.Va. Jan. 19, 2017), ECF No. 293). "In determining whether an agent's action reflected a reasonable understanding of the principal's manifestations of

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 15
Case No. 4:15-cv-06314-YGR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

consent, it is relevant whether the principal knew of prior similar actions by the agent and acquiesced in them." Restatement § 2.02, cmt. e. The FCC held in *Dish* that a principal can be vicariously liable "for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct." 28 FCC Rcd. at 6592 & n.138.

Substantial evidence shows that Alarm.com knew about Alliance's pattern of unlawful telemarketing but did nothing to stop it. CEO Steve Trundle admitted ██████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████. Ex. 7 at 69:8-70:6. Alarm.com's only response ████████████████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████. *Id.* These statements were directly contradicted by the Today Show segment, which reported that Alliance had been subject to multiple enforcement actions over the years. Ex. 13. Alarm.com ██████████████████ ████████████████████████. Ex. 7 at 69:8-70:6; Ex. 4 at 172:15-176:16. It was not reasonable for Alarm.com to rely on Mr. Gotra's "assurances." Alarm.com's own expert admitted that Alarm.com had the power to reign in Alliance and probably should have done so. Ex. 8 at 75:15-76:21, 99:8-102:6. Plaintiffs' expert agrees. Ex. 24 at 120:1-121:16.

There can be no dispute that Alarm.com should have known that Alliance continued to violate the TCPA. *See Dish*, 28 FCC Rcd. at 6592 (extending vicarious liability to principals who "reasonably should have known" that the telemarketer was violating the TCPA on their behalf); Restatement § 1.04(4) (a person has notice of a fact if she "knows the fact, has reason to know the fact, has received an effective notification of the fact, or should know the fact to fulfill a duty owed to another person"). Had Alarm.com investigated or monitored Alliance's conduct, it would have learned about Alliance's ongoing unlawful telemarketing. A simple docket search

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 16
CASE NO. 4:15-CV-06314-YGR

reveals over 50 lawsuits filed against Alliance alleging telemarketing violations since 2014, including cases consolidated in the Monitronics MDL. Ex. 30. Despite these red flags, Alarm.com ███████████████████████████████████████████████████. Ex. 7 at 69:8-70:6; Ex. 4 at 172:15-176:16. Alarm.com did the opposite, negotiating an exclusive contract in March 2015 that provided Alliance with preferential pricing and sales incentives. Ex. 31.

A jury can conclude from Alarm.com's acquiescence to Alliance's conduct that Alliance reasonably believed Alarm.com consented to the tactics it was using to sell Alarm.com's services, even tactics involving unlawful telemarketing calls, and reasonably believed that its tactics were in Alarm.com's best interest because they resulted in sales. This evidence is sufficient to defeat summary judgment. *See Krakauer*, 2017 WL 2455095, at *3 (M.D.N.C. June 6, 2017) (finding similar evidence supported jury's verdict that agent's telemarketing violations were in the scope of its authority).

Without any citation to the record, Alarm.com asserts that it is "simply implausible" that it has the resources and manpower to oversee and control its 6,000 dealers. Mtn at 15:19-22. Even if relevant, this assertion is disputed. Alarm.com's industry experts, who were retained to provide support on this very point, conceded that once Alarm.com learned about Alliance's pattern of unlawful conduct, Alarm.com could have and should have investigated and exerted its control over Alliance to prevent further telemarketing violations. Ex. 8 at 99:8-102:6; Ex. 23 at 42:24-44:6; *see also* Ex. 24 at 120:1-121:16.

3.    <u>A jury could find Alarm.com liable under an apparent authority theory</u>.

Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03, cmt. c. "Apparent authority can arise in multiple ways, and does not require that a principal's manifestation must be directed to a specific third party in a communication made directly to that person." *Dish*, 28 FCC Rcd. at 6586 & n. 102 (citing Restatement § 2.03, cmt. c). A principal may make a manifestation "by directing an agent to make statements to third parties or directing

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 17
CASE NO. 4:15-CV-06314-YGR

1    or designating an agent to perform acts or conduct negotiations, placing an agent in a position

2    within an organization, or placing an agent in charge of a transaction or situation." *Id.*

3        In *Dish*, the FCC stated that apparent authority may be supported by evidence that (1) the

4    seller allows the outside sales entity access to information and systems that normally would be

5    within the seller's exclusive control; (2) the outside sales entity's ability to enter consumer

6    information into the seller's sales or customer systems; (3) the authority to use the seller's trade

7    name, trademark and service mark; and (4) the seller approved, wrote or reviewed the outside

8    entity's telemarketing scripts. 28 FCC Rcd. at 6592. These factors are satisfied. Alliance had

9    access to Alarm.com's computer systems through a "dealer portal" and was required to enter

10   information about every subscriber into Alarm.com's computer system. Ex. 4 at 55:9-22; Ex. 5 at

11   16671. Alarm.com █████████████████████████████████████████

12   ████████████. Ex. 1 ¶ 3.2(d). Alarm.com provided Alliance with pre-approved scripts, which

13   included using the Alarm.com name. Ex. 4 at 95:20-97:9. Alliance was prohibited ████████

14   ████████████████████████████████████

15   █████████. *Id.* ¶ 3.3. Apparent authority exists in this case. *See Mey v. Venture Data*, 245 F.

     Supp. 3d 771, 789 (N.D. W. Va. 2017) (denying summary judgment where the evidence was

     consistent with the "Dish Network factors").

16       Alarm.com does not address the *Dish* factors, arguing instead that it is not enough for a

17   supplier to makes its products available through dealers. This case is nothing like a typical

18   supplier/dealer relationship. Alarm.com gave Alliance the authority to enter into contracts on its

19   behalf and then told potential customers on its website that they could purchase Alarm.com

20   goods and services through Alliance. These facts distinguish this case from *Makaron* and

21   *Monitronics*, which involved a telemarketing dealer that purchased supplies through a dealership

22   and resold them to customers. *Abante Rooter & Plumbing v. Farmers Grp., Inc.*, No. 17-cv-

23   03315-PJH, 2018 WL 288055, at *5-6 (Jan. 4, 2018), is also inapposite, since the Dealer

24   Agreement expressly authorizes Alliance ████████████████████████████

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 18
CASE NO. 4:15-CV-06314-YGR

1    ████████████████████. Ex. 1 ¶ 3.3.

2        Under the Restatement, apparent authority "does not presuppose the present or prior

3    existence of an agency relationship as defined in § 1.10." Restatement § 2.03, cmt. a. "Apparent

4    authority is the power held by an agent **or other actor** to affect a principal's legal relations with

5    third parties when a third party reasonably believes the actor has authority to act on behalf of the

6    principal and that belief is traceable to the principal's manifestations." *Id.* (emphasis added).

     Thus, the disclaimer that Alarm.com includes in its Subscription Agreement is not dispositive,

7    particularly since the Subscription Agreement prominently displays the Alarm.com logo and the

8    title "Alarm.com Terms," states that Alarm.com has "authorized" Alliance to market and sell its

9    services with certain hardware and other products, and provides that the "Alarm.com Terms" are

10   part of any agreement that the customer has with the dealer. Ex. 3. Based on these manifestations

11   directly attributable to Alarm.com, a reasonable consumer could assume that Alliance "has

12   authority to act on behalf of" Alarm.com. Restatement § 2.03.

13       4.    A jury could find Alarm.com ratified Alliance's unlawful telemarketing.

14       A company ratifies a telemarketer's TCPA violations if it "knowingly accepts the

     benefits of the transaction." Restatement § 4.01, cmt. d. Ratification typically applies to an entity

15   that accepts benefits knowing the material facts, but also applies when a company accepts the

16   benefits of a transaction despite knowing that it does not have all material facts. *Kristensen*, 879

17   F.3d at 1014. In other words, an entity may not evade liability by burying its head in the sand to

18   avoid learning relevant facts. *See In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d

19   447, 467 (E.D.N.Y. 2007) ("having once ratified its agents' acts, [a principal] cannot afterwards

20   avoid the effect of such ratification by showing that it was not acquainted with all the facts of the

     transaction ratified, when it was always in a position and was in possession of means of learning

21   them"). If a principal "has knowledge of facts that would have led a reasonable person to

22   investigate further, but the principal ratified without further investigation," the principal has

23   "assumed the risk of liability" and is vicariously liable. *Kristensen*, 879 F.3d at 1014.

24

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 19
CASE NO. 4:15-CV-06314-YGR

1
2
3
4
5

Ratification in the TCPA context "may occur 'through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences.'" *Dish*, 28 FCC Rcd. at 6587. As just one example, the FCC explained that a company may be bound by even unauthorized conduct of a telemarketer if the company "is aware of ongoing conduct encompassing numerous acts by [the telemarketer]" and yet "fail[s] to terminate," or, in some circumstances, "promot[es] or celebrat[es]" the telemarketer. *Id.* at 6587 n.104.

6
7
8
9
10
11
12
13

It is not true, as Alarm.com asserts, that an agency relationship is a "precondition" for ratification. Ratification applies when an actor "acts as an agent or **purports to be** one." *Kristensen*, 879 F.3d at 1014 (emphasis added). Alarm.com argues that the unlawful conduct disclosed in the Today Show segment does not show that Alarm.com had knowledge of the calls at issue in this case. But that is not the test. The segment alerted Alarm.com to a pattern of conduct that had been ongoing for several years. This is precisely the type of "red flag" that triggers a duty to investigate to determine whether the telemarketer was engaging in unlawful activities. *See id.* at 1015 (distinguishing knowledge that an agent is engaging in "an otherwise commonplace marketing activity" from knowledge of "unlawful conduct").

14
15
16
17
18
19
20
21
22
23

Alarm.com's own experts testified that it was not reasonable for Alarm.com to turn a blind eye to telemarketing violations. Ex. 8 at 99:8-102:6; Ex. 23 at 42:24-44:6. The ESA Code of Ethics confirms that Alarm.com's conduct was unreasonable, as it requires ESA's members, including Alarm.com, to train their representatives and implement effective controls to ensure that they comply with the law. Ex. 24 at Ex. 7. Had Alarm.com thoroughly investigated Alliance's conduct in 2012 when the Today Show aired, it could have prevented the calls at issue in this case. As the Fourth Circuit points out in *Hodgin*, this is exactly what UTC did by terminating its agreement with Alliance after its efforts to stop the unlawful calls were unsuccessful. 885 F.3d at 252-53 (evidence that UTC "repudiated" the unlawful calls was unrebutted). The FTC also did not rely on Mr. Gotra's "assurances," issuing Alliance a civil investigative demand on June 2012 that resulted in a $3.4 million fine in 2014. Ex. 20.

24

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 20
CASE NO. 4:15-CV-06314-YGR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Alarm.com contends that Plaintiffs "have developed zero evidence" that it knew Mr. Gotra had not kept the promises he made in 2012. Mtn. at 20:14-18. Not so. In early 2014, Alarm.com named Alliance a "problem dealer" due to its telemarketing practices. Ex. 4 at 59:3–61:10, 147:5–17. In June 2014, Alarm.com's VP of Sales forwarded Alliance an article on TCPA compliance that "reminded" him of Alliance. Ex. 32. Alarm.com suggests that it changed its practices after it was sued in December 2015, but its VP of Sales gave the party line when asked if Alarm.com asked Alliance if it was complying with telemarketing laws after this lawsuit was filed: "We typically do not police or get involved in a dealer's business or investigate their telemarketing practices or otherwise." Ex. 21 at 26:6-14.

Alarm.com ███████████████████████████████████████████████████████████████████████████████████████████████████████████. Ex. 7 at 71:3-12; Ex. 4 at 177:21-178:14. Alarm.com instead ███████████████████████████████████████████████████████████████████████████████████████████████. Ex. 31. A reasonable jury could find that Alarm.com "assumed the risk of liability" by failing to investigate, monitor, and control Alliance's unlawful telemarketing practices after being put on alert in 2012. Indeed, the FCC found just such a situation warranted imposing liability. *Dish*, 28 FCC Rcd. at n. 104.

Alarm.com also wrongly maintains that there is no evidence that it benefitted from the unlawful calls because Plaintiffs did not purchase Alarm.com's services. Mtn at 23-24. The court in *Aranda* rejected an identical argument, finding that an issue of fact existed even though the named plaintiffs did not purchase anything where the evidence showed the defendants were aware of unlawful telemarketing calls but "continued to accept business flowing" from those calls. *See Aranda*, 179 F. Supp. 3d at 833. And unlike *Hodgin*, 885 F.3d 243, Plaintiffs have proffered evidence that Alarm.com profited from Alliance's telemarketing.

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 21
CASE NO. 4:15-CV-06314-YGR

**B.     The Ytel dialer that Nationwide used to place calls to cell phones is an ATDS.**

The TCPA defines "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1). The Ytel Cloud Contact Center that Alliance's agent Nationwide Alarms used to place calls to cell phones is a predictive dialer. The system provides "several types of automatic telephone dialing software services including predictive dialing, power dialing, progressive dialing and preview dialing services." Dkt. No. 196-20 at ¶ 42. Ytel's Master Service Agreement confirms that the system includes "predictive dialing technology." *Id.*, Ex. C (YTEL 18). Nationwide's CEO testified that Nationwide used the system in both manual and automatic dialing mode and when calls were placed in "automatic dialing mode," the system would locate an available call center employee, and then "beep" at that employee signaling that the call should be answered. Ex. 27 at 20:19-22:13. This is a telltale sign of a predictive dialer. Ex. 28 ¶ 9. Calling records show that Nationwide placed 30,812 calls to cell phones in "automatic" mode. *Id.* ¶ 12.

Alarm.com contends that the D.C. Circuit, in *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), "vacated the FCC order on which Plaintiffs' theory of liability relies." Mtn. at 21:18-20. This characterization overstates the holding *ACA*, in which the D.C. Circuit set aside only the FCC's 2015 efforts to clarify the equipment that constitutes an ATDS:

> In this case, a number of regulated entities seek review of a 2015 order in which the [FCC] sought to clarify various aspects of the TCPA's general bar against using automated dialing devices to make uninvited calls. The challenges encompass four issues addressed by the agency's order: (i) which sorts of automated dialing equipment are subject to the TCPA's restrictions on unconsented calls; … *** We set aside, however, the [FCC's] effort to clarify the types of calling equipment that fall within the TCPA's restrictions.

*ACA Int'l*, 885 F.3d at 691-92. In explaining the standard against which it issued its opinion, the D.C. Circuit narrowed the reach of its decision to the FCC's 2015 order:

> Under the Administrative Procedure Act, we assess whether the [FCC's] challenged actions in its 2015 order were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *** Applying these

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 22
CASE NO. 4:15-CV-06314-YGR

1

2

standards to petitioners' four sets of challenges to the [FCC]s] 2015 Declaratory Ruling, we set aside the [FCC's] explanation of which devices qualify as an ATDS[.]

3

*Id.* at 694-95.

4

In 2003, and again in 2008, the FCC determined that a predictive dialer is an ATDS for

5

purposes of the TCPA. *In the Matter of Rules and Regulations Implementing the TCPA of 1991*,

6

18 FCC Rcd. 14,014, 14,115 ¶ 165 (2003); *In re Rules and Regulations Implementing the*

7

*Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559 (2008). Because the FCC's 2003

8

and 2008 orders were not appealed under the Hobbs Act and the D.C. Circuit lost jurisdiction to

9

vacate them at the end of the sixty-day timeframe to file such an appeal, *see* 28 U.S.C. § 2344,

they bind this court. *See Baird v. Sabre, Inc.*, 636 F. App'x. 715, 716 (9th Cir. 2016).

10

Since *ACA Int'l*, at least three courts have confirmed that a predictive dialer is an ATDS.

11

*France v. Ditech Fin., LLC*, No. 8:17-cv-03038-SCB-MAP, 2018 WL 1695405, at *8 (M.D. Fla.

12

Apr. 6, 2018) (a predictive dialer makes calls "from a list of numbers fed into the device"); *Reyes*

13

*v. BCA Fin. Servs., Inc.*, --- F. Supp. 3d ---, 2018 WL 2220417, at *11-12 (S.D. Fla. May 14,

14

2018) (a predictive dialer remains an ATDS after *ACA Int'l* if it was configured and utilized as

15

such and there was no evidence of human intervention in placing the calls); and *Swaney v.*

16

*Regions Bank*, No. 2:13-cv-00544-JHE (N.D. Ala. May 22, 2018) (attached as Ex. 33) (the

17

argument that equipment "must have the capacity to store or produce numbers using a random or

18

sequential number generator even if that capacity is never used" cannot be squared with the

19

"continuing validity" of the 2003 FCC Order). *Reyes* rejected the argument that the 2003 and

20

2008 FCC orders are no longer good law, noting that (1) the D.C. Circuit never overruled them

21

since the time to appeal had long passed; (2) when the D.C. Circuit said the FCC had provided

22

too expansive an interpretation of the TCPA, it was not referring to rulings equating predictive

23

dialers to ATDSs but was "referring to the FCC's interpretation of the TCPA as encompassing

24

devices that have both the present and future capacity to act as ATDSs"; and (3) the D.C. Circuit

"did not say that a predictive dialer, or any other type of device, must be able to generate and dial

random or sequential numbers to meet the TCPA's definition of an autodialer." 2018 WL

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 23

Case No. 4:15-cv-06314-YGR

2220417, at *11-12. The court noted that the defendant was "essentially urging" the court to adopt an interpretation of ATDS—that a predictive dialer must be able to generate and dial random or sequential numbers to qualify—based on *ACA Int'l* when the D.C. Circuit expressly declined to adopt that interpretation. *Id.* at *12. As in *Reyes*, this Court "cannot deviate" from the prior FCC orders and impose its "own interpretation" of the TCPA. *Id.*

Alarm.com relies on two inapposite cases. *Marshall v. CBE Group, Inc.* involved a point-and-click dialing system that required a clicker agent's intervention to place the calls, and the court noted that the "overwhelming weight of authority" even before *ACA Int'l* found that such systems "do not constitute an ATDS as a matter of law in light of the clicker agent's human intervention." No. 2:16-cv-02406-GMN-NJK, 2018 WL 1567852, at *7-8 (D. Nev. March 30, 2018)). Nationwide did not use "clicker agents" or "point-and-click" dialing. Nationwide used a predictive dialing system that automatically dialed numbers and then routed connected calls to available agents. The "overwhelming weight of authority" before *ACA Int'l* is that predictive dialers and other systems that dial calls without human intervention are ATDSs. *Meyer v. Portfolio Recovery Assoc., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012); *see also Manuel v. NRA Grp., LLC*, 200 F. Supp. 3d 495, 501-02 (M.D. Pa. 2016), *aff'd*, 2018 WL 388622 (3d Cir. Jan. 12, 2018) (dialers with the capacity to initiate multiple calls prospectively, before agents become available, fall within the ambit of the TCPA); *Fields v. Mobile Messengers Am., Inc.*, No. C 12-05160 WHA, 2013 WL 6774076, at *3 (N.D. Cal. Dec. 23, 2013) (the inquiry should focus on whether equipment has the capacity to dial numbers without human intervention).

*Dominguez v. Yahoo!* is also inapposite, since it involved a plaintiff who received a text message from the defendant because the previous owner of his cell phone number had signed up to receive text messages. 8 F. Supp. 3d 637, 643 n.6 (E.D. Pa. 2014), *vacated in part*, 629 F. App'x 360 (3d Cir. 2015). Thus, on remand from the Third Circuit, the district court held that the 2003 Order did not govern. *See Dominguez v. Yahoo!, Inc.*, No. 13-1887, 2017 WL 390267, at *4 (E.D. Pa. Jan. 27, 2017) (noting that the 2003 Order is "cabined to its holding that the specific

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 24
CASE NO. 4:15-CV-06314-YGR

type of dialing equipment known as a 'predictive dialer' qualifies as an ATDS").

Alarm.com's proffered statutory interpretation renders swathes of the statute unexplained or meaningless. The statute includes the disjunctive "or," meaning the definitions of ATDS must include systems, like the Ytel system, that *store* telephone numbers regardless of whether they *produce* numbers. *See In re Dumont,* 581 F.3d 1104, 1111 (9th Cir. 2009) (a statute "ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant"). To give meaning to every word, the phrase "using a random or sequential number generator" must modify "produces numbers" because it makes no sense for a device to "store" numbers using a random or sequential number generator. If a device already has the numbers stored, there would be no need to produce the numbers.

If Alarm.com's interpretation was adopted, it would be impossible for any caller to have a meaningful consent policy. A person could consent to only by sheer coincidence. In addition, the exemption for governmental collection calls would be irrelevant if they were not generally subject to the TCPA. 47 U.S.C. § 227(b)(1)(A)(iii). Entities collecting government debt, or any debt, do not randomly call telephone numbers seeking to collect on an account; they call from a list of numbers they believe will either contact a debtor or assist in locating the debtor.

The only statutory interpretation that gives meaning to every word in the statute and makes sense in the context of the statute as a whole finds that the phrase "random or sequential number generator" modifies the phrase "produce telephone numbers to be dialed." This interpretation conforms with the FCC's 2003 and 2008 Orders that a predictive dialer is an ATDS even if it lacks to capacity to randomly or sequentially generate numbers, as well as the Ninth Circuit's decision in *Meyer.* Alarm.com's motion for summary judgment of Plaintiffs' cell phone claim on the ground that the Ytel dialer is not a predictive dialer must be denied. Indeed, summary judgment should be granted on this issue for Plaintiffs.

## V.  CONCLUSION

For these reasons, Alarm.com's motion should be denied and Plaintiffs' motion granted.

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 25
CASE NO. 4:15-CV-06314-YGR

1    RESPECTFULLY SUBMITTED AND DATED this 22nd day of May, 2018.

2                          TERRELL MARSHALL LAW GROUP PLLC

3

4                          By: Beth E. Terrell, SBN #178181
                               Beth E. Terrell, SBN #178181
                               Email: bterrell@terrellmarshall.com
5                              Jennifer Rust Murray, *Admitted Pro Hac Vice*
                               Email: jmurray@terrellmarshall.com
6                              Elizabeth A. Adams, SBN #290029
                               Email: eadams@terrellmarshall.com
7                              936 North 34th Street, Suite 300
                               Seattle, Washington 98103
8                              Telephone: (206) 816-6603
                               Facsimile: (206) 319-5450
9
                               John W. Barrett, *Admitted Pro Hac Vice*
10                             E-mail: jbarrett@baileyglasser.com
                               Email: crobinson@baileyglasser.com
11                             Jonathan R. Marshall, *Admitted Pro Hac Vice*
                               Email: jmarshall@baileyglasser.com
12                             Ryan McCune Donovan, *Admitted Pro Hac Vice*
                               Email: rdonovan@baileyglasser.com
13                             BAILEY & GLASSER, LLP
                               209 Capitol Street
14                             Charleston, West Virginia 25301
                               Telephone: (304) 345-6555
15                             Facsimile: (304) 342-1110

16                             Edward A. Broderick *Admitted Pro Hac Vice*
                               Email: ted@broderick-law.com
17                             Anthony I. Paronich, *Admitted Pro Hac Vice*
                               Email: anthony@broderick-law.com
18                             BRODERICK & PARONICH, P.C.
                               99 High Street, Suite 304
19                             Boston, Massachusetts 02110
                               Telephone: (617) 738-7080
20                             Facsimile: (617) 830-0327

21                             Matthew P. McCue
                               E-mail: mmccue@massattorneys.net
22                             THE LAW OFFICE OF MATTHEW P. McCUE
                               1 South Avenue, Suite 3
23                             Natick, Massachusetts 01760
                               Telephone: (508) 655-1415
24
     PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
     JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
     JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 26
     CASE NO. 4:15-CV-06314-YGR

1    Facsimile: (508) 319-3077

2    Chiharu Sekino, SBN #306589
     Email: csekino@sfmslaw.com
3    SHEPHERD, FINKELMAN, MILLER
         & SHAH, LLP
4    44 Montgomery Street, Suite 650
     San Francisco, California 94104
5    Telephone: (415) 429-5272
     Facsimile: (866) 300-7367

6
     James C. Shah, SBN #260435
7    Email: jshah@sfmslaw.com
     SHEPHERD, FINKELMAN, MILLER
8        & SHAH, LLP
     35 East State Street
9    Media, Pennsylvania 19063
     Telephone: (610) 891-9880
10   Facsimile: (866) 300-7367

11   *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 27
CASE NO. 4:15-CV-06314-YGR

1

<u>**CERTIFICATE OF SERVICE**</u>

2

I, Beth E. Terrell, hereby certify that on May 22, 2018, I electronically filed the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

4

to the following:

5

      Kasey C. Townsend, SBN #152992
      Email: ktownsend@murchisonlaw.com

6

      Susan J. Welde, SBN #205401
      Email: swelde@murchisonlaw.com

7

      MURCHISON & CUMMING, LLP
      275 Battery Street, Suite 850

8

      San Francisco, California 94111
      Telephone: (415) 524-4300

9

10

      Martin W. Jaszczuk, *Admitted Pro Hac Vice*
      Email: mjaszczuk@jaszczuk.com

11

      Margaret M. Schuchardt, *Admitted Pro Hac Vice*
      Email:  mschuchardt@jaszczuk.com

12

      Keith L. Gibson, *Admitted Pro Hac Vice*
      Email:  kgibson@jaszczuk.com

13

      Seth H. Corthell, *Admitted Pro Hac Vice*
      Email: scorthell@jaszczuk.com

14

      Daniel I. Schlessinger, *Admitted Pro Hac Vice*
      Email: dschlessinger@jaszczuk.com

15

      JASZCZUK P.C.
      311 South Wacker Drive, Suite 1775

16

      Chicago, Illinois 60606
      Telephone: (312) 442-0311

17

      Craig S. Primis, *Admitted Pro Hac Vice*
      Email:  craig.primis@kirkland.com

18

      KIRKLAND & ELLIS LLP
      655 Fifteenth Street, N.W.

19

      Washington, DC 20005
      Telephone: (202) 879-5921

20

      Facsimile: (202) 879-5200

21

      *Attorneys for Defendants Alarm.com Incorporated and Alarm.com Holdings, Inc.*

22

23

24

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 28
CASE NO. 4:15-CV-06314-YGR

1        DATED this 22nd day of May, 2018.

2                                          TERRELL MARSHALL LAW GROUP PLLC

3                                          By:  /s/ Beth E. Terrell, SBN #178181
                                               Beth E. Terrell, SBN #178181
4                                              Email: bterrell@terrellmarshall.com
                                               936 North 34th Street, Suite 300
5                                              Seattle, Washington  98103-8869
                                               Telephone:  (206) 816-6603
6                                              Facsimile: (206) 319-5450

7                                          *Attorneys for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES - 29
CASE NO. 4:15-CV-06314-YGR