— **EXHIBIT 2** —

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    OAKLAND DIVISION

 4

 5              Civil Action No. 4:15-cv-06314-YGR

 6
   ****************************************
 7 ABANTE ROOTER AND PLUMBING, INC.,       *
   MARK HANKINS, and PHILIP J. CHARVAT,    *
 8 individually and on behalf of all       *
   others similarly situated,              *
 9                                         *
                    Plaintiffs             *
10                                         *
   v.                                      *
11                                         *
   ALARM.COM INCORPORATED, and             *
12 ALARM.COM HOLDINGS, INC.,               *
                                           *
13                  Defendants             *
   ****************************************
14

15

16         DEPOSITION OF:   MATTHEW PITS

17      CATUOGNO COURT REPORTING SERVICES, INC.

18         155 South Main Street, Suite 201

19             Providence, Rhode Island

20          December 8, 2017          9:05 a.m.

21

22

23                  Ellen M. Muir

24                  Court Reporter
```

Matthew Pits
December 8, 2017

Page 54

1          (Exhibit 7)
2     Q.   Now, I've got some records that I can
3  represent to you that were produced by -- the VMS and
4  Alliance are, in essence, the same company; it's just
5  a name change?
6     A.   Correct.
7     Q.   So I can represent that these records
8  came from a case brought by Diana Mey at the Northern
9  District for West Virginia against VMS and Alliance
10 and other defendants.  And I just want to ask you if
11 you know what these are, because we really don't know
12 ourselves.  So I'm opening underneath a folder dated
13 November 5, 2014 VMS, open paren, from Moni, close
14 paren.  And opening the first document, which is ASX
15 and a series of zeros, one confidential.  I'm going
16 to open that and see if you can tell me what that
17 looks like to you.
18    A.   It looks like a call record, but I
19 couldn't identify what system that came from.
20    Q.   Do you know what -- does ASX suggest
21 anything to you?
22    A.   I don't know, no.
23    Q.   And do you know where Alliance obtained
24 this document from in order to produce it in the

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

Page 93

(Break was taken at 11:52 a.m.)

Q.  Mr. Pits, in the Mey litigation in the Northern District of West Virginia, Alliance made a supplemental production on June 30, 2017.  Were you involved in that supplemental production?

A.  I believe so.  I don't recall that specifically, but I believe I was.

Q.  And do you know why that supplemental production was made?

A.  I don't know.  We had outside counsel that was managing that litigation, John Tier.  But I think that it was to make the call records current, because the previous production had been a number of years before in that case.

Q.  In that case.  And were those records -- had those records been produced in response to the Alarm.Com subpoena in this case?

A.  Which records specifically?

Q.  The ones that you were supplementing in the Mey case in West Virginia, were those included in the production in response to the subpoena in this case?

Matthew Pits
December 8, 2017

Page 107

1  offers a particular variety of services, and it uses
2  Alarm.Com integration in certain instances.  And if
3  Alliance had sold a particular product that needs or
4  requires that back-end software integration and it
5  uses Alarm.Com, then, yes, it will have the customer
6  sign an Alarm.Com agreement.
7       Q.   So if someone is signing up for Alarm.Com
8  services on an installation done by Alliance, the
9  only way that they can get it is if they sign an
10 Alarm.Com agreement, correct?
11          MR. SCHLESSINGER:  Same objection.
12      A.   Yes.  If it's facilitated through
13 Alarm.Com.  But, again, Alliance is in the practice
14 of selling its own products and services; and so if
15 it's a particular service that requires Alarm.Com or
16 Alarm.Com can enable, you know, an integration, then,
17 yes, Alliance will have the customer sign an
18 Alarm.Com agreement?
19      Q.   Under the Alarm.Com CLS program, are you
20 aware of whether Alarm.Com has the right to audit
21 Alarm.Com calls to CLS leads?
22      A.   I don't recall having seen their
23 capability to audit mapped out or anything like that.
24      Q.   Has Alarm.Com ever audited Alliance?

Matthew Pits
December 8, 2017

Page 108

1  A. Not to my knowledge, no.
2  Q. Has Alarm.Com ever asserted a claim for
3  indemnification against Alliance for this lawsuit?
4  A. No, it has not.
5  MR. BRODERICK: I think I have no further
6  questions. Thank you.
7  MR. SCHLESSINGER: Can I take five
8  minutes?
9
10  (Five-minute break was taken at 12:14.)
11
12  (Back on at 12:18 p.m.)
13
14  EXAMINATION BY MR. SCHLESSINGER:
15  Q. Mr. Pits, my name is Dan Schlessinger.
16  We met briefly earlier. I represent Alarm.Com, and I
17  just want to clarify a few things here. The security
18  systems that Alliance sells includes multiple
19  components typically, right?
20  A. Yes, that's right.
21  Q. And can you list some of the components
22  that are included?
23  A. Well, I mean, each alarm system will have
24  a control panel that goes on the wall. There will be

Matthew Pits
December 8, 2017

Page 109

1  door/window contacts, glass/break enters, fire
2  alarms, motion detectors.  And there's other
3  components that would actually necessitate like an
4  Alarm.Com service, like thermostats that communicate
5  with the system and automatic door locks, things like
6  that.
7      Q.   So what portion of the system that
8  Alliance sells are made by Alarm.Com?
9      A.   Well, none of the hardware is made by a
10 Alarm.Com at all.
11     Q.   So what Alarm.Com provides is software
12 that allows the system to work, correct?
13     A.   Yeah, it's a back-end integration.  So
14 Alarm.Com doesn't monitor so it's not a monitoring
15 station.  Alarm.Com wouldn't be a useful -- really be
16 no need for it -- but it integrates Alliance with the
17 monitoring station and the consumers alarm panel.
18     Q.   Is Alarm.Com the only provider of the
19 software that allows that integration that Alliance
20 sells?
21     A.   No, currently Alliances is selling other
22 systems that have another provider as well, or at
23 least as we've transitioned away from Monitronics.
24 Monitronics required the use of Alarm.Com, and

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
Springfield, MA  Worcester, MA  Boston, MA  Providence, RI

1  Alliance continues to work with Alarm.Com but has
2  other providers as well.
3      Q.   Does Alarm.Com provide Alliance with
4  marketing policies that Alliance uses?
5      A.   No.
6      Q.   Those policies are drafted by you,
7  correct?
8      A.   Yeah.  Or our sales team, and approved by
9  certain individuals in the company, including me.
10     Q.   Does Alarm.Com authorize Alliance when
11 it's making calls to say that it's calling on behalf
12 of Alarm.Com?
13     A.   No, Alliance has never had that built
14 into the their scripting or anything like that.
15     Q.   So Alliance does not do that?
16     A.   No.
17     Q.   Does Alarm.Com provide any scripts to
18 Alliance to use in its marketing?
19     A.   Not that I have ever seen, no.
20     Q.   Does Alarm.Com set quoters for Alliance?
21     A.   No, not to my knowledge.
22     Q.   And does Alarm.Com provide the phones or
23 dialling systems that are used by Alarm.Com?
24     A.   By Alliance?

Page 117

1      I, ELLEN M. MUIR, a Commissioner of the State
2 of Rhode Island, do hereby certify that MATTHEW PITS
3 came before me on the 8th day of December, 2017, at
4 CATUOGNO COURT REPORTING SERVICES, INC., 155 South
5 Main Street, Suite 201, Providence, Rhode Island, and
6 was by me duly sworn to testify to the truth and
7 nothing but the truth as to his knowledge touching
8 and concerning the matters in controversy in this
9 cause; that he was thereupon examined upon his oath
10 and said examination reduced to writing by me; and
11 that the statement is a true record of the testimony
12 given by the witness, to the best of my knowledge and
13 ability.
14      I further certify that I am not a relative or
15 employee of counsel/attorney for any of the parties,
16 nor a relative or employee of such parties, nor am I
17 financially interested in the outcome of the action.
18      WITNESS MY HAND this 18th day of December,
19 2017.
20
21
22 Ellen M. Muir                My Commission expires:
23 Commissioner of the          November 30, 2021
24 State of Rhode Island