— **EXHIBIT  23** —

# In The Matter Of:

*Abante Rooter & Plumbing Inc, et al v. Alarm.com Incorporated*

*Joseph Colosimo*
*February 27, 2018*

*Veritas Legal Services*
*1632 Forbes Avenue*

*Pittsburgh, PA 15219*

Original File Colosimo_Joseph 2-27-18.txt
**Min-U-Script® with Word Index**

```
                                                         19
 1        Q.   How, if at all, is Guardian different than
 2   Alliance Security?
 3        A.   Alliance would be classified as a dealer.
 4   They didn't have their own monitoring center, holding,
 5   buying accounts from other dealers.  They bought, they
 6   sold, installed and sold their companies off.
 7        Q.   But Guardian also does direct marketing to
 8   customers; correct?
 9        A.   Correct.
10        Q.   So I just want to walk through each of these,
11   what I will call, four elements of your report.  You
12   say in your report that the -- well, let me ask you
13   about the Code of Ethics.
14             What is the purpose of the Code of Ethics to
15   your understanding?
16        A.   So the Code of Ethics was written because
17   there became a problem in our industry with dealer
18   programs.  So underneath the alarm company you have a
19   dealer program, and those dealers tend to be a little
20   bit unethical in the way they go to market,
21   misrepresentation of who they work for, why they're
22   there.
23             So the industry in trying to control the
24   problems that was going on in the industry decided to
25   write a Code of Ethics for ethical alarm companies to
```

1   follow to try to control the problem with dealer
2   networks out there.  That was the purpose of the Code
3   of Ethics.
4       Q.   And in order to be a member of the ESA, a
5   company has to pledge to follow the Code of Ethics;
6   correct?
7       A.   Yes.
8            MS. SCHUCHARDT:  Objection to form.
9       Q.   And Guardian, it was a member when you were
10  working there of the ESA; correct?
11      A.   Yes.
12      Q.   And you pledged to follow the Code of Ethics?
13      A.   Yes.
14           MS. SCHUCHARDT:  Objection to form.
15      Q.   And in your opinion -- let me show you this.
16  You say that --
17           MR. BRODERICK:  Will you mark this as
18      Exhibit 4?
19           (Colosimo Deposition Exhibit No. 4 was
20      marked for identification.)
21      Q.   You're not an official.  You don't have any
22  official capacity with the Electronic Security
23  Association, do you?
24      A.   I do not.
25      Q.   Would you say that the Electronic Security

22

1    Z-W-I-R-N.
2              THE COURT REPORTER:  Thank you.
3         And then we have a response to that email
4    dated February 7th, 2018 at 8:55 a.m.  Hello,
5    Mr. Zwirn.  Thank you for reaching out to the
6    Electronic Security Association (ESA)!
7         In response to your email below, all
8    members regardless of membership type fall under
9    our ESA Code of Ethics policy.  If you know of
10   someone in violation, please let me know, and I
11   can provide you with the process to file an
12   official complaint.
13        Let me know if you have any questions.
14   Thanks, Mike, and then below is his signature,
15   Mike Hampton, Vice President of Customer
16   Engagement, Electronic Security Association.
17        It seems like Mr. Hampton of the Electronic
18   Security Association disagrees with your assertion
19   that the Code of Ethics does not apply to an
20   associate member.
21             MS. SCHUCHARDT:  Objection.
22      A.   Well, I don't read it that way.  I think
23   Mr. Zwirn did not tell him that it was a manufacturer
24   he was asking about.  He asked him about member.  I
25   believe that Mr. Hampton took it as an alarm company

23

1 in the organization not following the Code of Ethics.
2 That's my belief.
3     Q. But he says in it, it applies to all members
4 regardless of the type of membership they hold?
5     A. But if you read the code, the whole code
6 talks about selling directly to the general public.
7 It's about how you go to market, when you sell to the
8 general public.
9     Manufacturers don't sell to the general
10 public. They sell to alarm companies. This code was
11 written around alarm companies going to market in the
12 general public.
13     So I believe that he did not explain himself,
14 Mr. Zwirn. When he asked him, he should have asked
15 him is the manufacturer responsible for being held to
16 the Code of Ethics.
17     He did not. He asked him if a member is, and
18 he answered back, yeah. All members are responsible.
19     Q. When you say the manufacturer, but when you
20 sign up for Alarm.com service, you sign a contract;
21 correct?
22     A. You sign a contract with the alarm company.
23     Q. And you pay a monthly fee?
24     A. To the alarm company.
25     Q. Who then pays the fee over to Alarm.com;

```
                                                              42

 1                MS. SCHUCHARDT:   Let me object before
 2      you start talking.  Thank you.  Go ahead.
 3          A.    I'm sorry.
 4          Q.    You don't have enough facts to answer that?
 5          A.    I don't.
 6          Q.    When you were running Guardian and you have a
 7      subdealer and you find out they're doing something.
 8      You say some of these dealers were unethical, not
 9      necessarily yours, but the code was written because
10      some of these dealers are not doing the right things.
11                If you find out they're not doing the right
12      thing and they're violating the Telephone Consumer
13      Protection Act marketing home alarms, wouldn't you
14      fire that subdealer?
15                MS. SCHUCHARDT:   Same objection.
16          A.    Again, it's a hypothetical question you're
17      asking me, that I would need to know all the other
18      facts surrounding the dealer.
19                What happened?  Were they a reputable dealer?
20      Were they a very reputable dealer who had an employee
21      do something wrong?  I would take that into
22      consideration.  These are hypothetical questions that
23      I don't have the facts to answer a question like that.
24          Q.    If you had a subdealer who had entered into
25      an injunction with the United States government
```

1   through the United States Department of Justice
2   prohibiting them from violating the Telephone Consumer
3   Protection Act, would you do business with that
4   subdealer?
5           MS. SCHUCHARDT:  Same objection.
6       A.  Again, hypothetical question.  A lot of facts
7   around it.  What if he's no longer doing
8   telemarketing?  Are you asking me that question?
9       Q.  What if he's still doing telemarketing of
10  your services?  I mean it seems like a pretty easy
11  one.
12      A.  That's an easy one, right.  So you're saying
13  he's not allowed to be doing telemarketing.  He's
14  still doing it.  Would I continue doing business with
15  a dealer that was doing it?  No, I would not.
16      Q.  Where he's not allowed to do telemarketing in
17  violation of the Telephone Consumer Protection Act,
18  would you take steps to find out about that subdealer?
19          MS. SCHUCHARDT:  Same objection.
20          MR. BRODERICK:  I'm not even done with
21     the question.
22      Q.  What is your marketing program?  What are you
23  doing?  How did you get into problems with your
24  telemarketing?  Would you investigate?
25          MS. SCHUCHARDT:  Same objection.

```
 1        A.   If it were myself?
 2        Q.   Yes?
 3        A.   And the company that I had control over and
 4   there was a problem, would I investigate?
 5        Q.   Yes?
 6        A.   Is that the question?  Yes, I would.
 7        Q.   I'd ask you to turn to page three of the Code
 8   of Ethics.  Now, assuming that Mr. Hampton said any
 9   member of the ESA the Code of Ethics applies, even to
10   associate members.
11             I want you to look at Representative Defined
12   on page three, and it says the term representative
13   includes employees, independent contractors, agents,
14   dealers, dealer networks, associates and other
15   individuals and entities who market or sell electronic
16   life safety and security products and services on
17   behalf of a member, regardless of the underlying legal
18   arrangement between the member and the representative.
19             Would you agree with me that what they're
20   trying to say there is it doesn't matter how you
21   structure your relationship?  If you're selling
22   somebody's service, if you're letting somebody sell
23   your service, they are your representative?
24             MS. SCHUCHARDT:  Objection.
25        A.   I don't agree with you.  I told you my
```

```
                                                               99

 1
 2              C E R T I F I C A T I O N
 3
 4
 5         I hereby certify pursuant to F.R.C.P. No.
 6    30(f)(1), that the witness, JOSEPH COLOSIMO, was
 7    duly sworn by me and that the foregoing
 8    deposition is a true record of the testimony of
 9    the witness.
10
11
12
13
14    _____
15    Mary Secot
16
17
18
19
20
21
22
23
24
25
```