# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABANTE ROOTER AND PLUMBING, INC., MARK HANKINS, and PHILIP J. CHARVAT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALARM.COM INCORPORATED, and ALARM.COM HOLDINGS, INC.,<br><br>Defendants. | Case No. 4:15-cv-06314-YGR<br><br>(Hon. Yvonne Gonzalez Rogers)<br><br>**DECLARATION OF RANDALL A. SNYDER REGARDING EFFECT OF *ACA INTERNATIONAL* ON HIS EXPERT OPINIONS** |

I, Randall A. Snyder, hereby declare as follows:

1.      My name is Randall A. Snyder. I am an adult over the age of 18 and a resident of the state of Nevada. I have personal knowledge of each of the matters stated herein, and if called to testify, I could and would testify competently about them.

2.      I am an independent telecommunications technology consultant and I reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by Terrell Marshall Law Group PLLC in the matter *Abante Rooter v. Alarm.com Incorporated, et al.*, No. 4:15-cv-06314-YGR (N.D. Cal.) to provide my opinions relating to dialing technology described within the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and utilized by Nationwide Alarms, LLC to place calls to cellular telephone numbers.

3.      I previously submitted a Corrected Expert Report in this matter in which I reserved the right to supplement or modify my opinions detailed in that report to the extent that new information is made available through discovery or other means. My Corrected Expert Report has been submitted as Dkt. No. 199-7 in this case.

4.      On March 16, 2018, the D.C. Circuit issued a decision in *ACA International v. Federal Communications Commission*, 885 F.3d 687 (D.C. Cir. 2018). I understand that the *ACA International* decision vacated portions of the FCC's 2015 Declaratory Ruling, which was one of the documents on which I based my opinions in my Corrected Expert Report. *See* Corrected Expert Report ¶ 8(o). I understand that Defendants have filed a motion to exclude my testimony from this case and have asserted that my opinions are no longer valid because they are "premised on the wrong legal standard" and the facts are "too underdeveloped to be considered reliable." Class Counsel have asked me to respond to these assertions.

5.      I am not a lawyer and have no opinion about the appropriate legal standard to apply in this case. However, I have reviewed the *ACA International* decision and submit this report to clarify that the *ACA International* decision does not change my opinions.

6.      My opinion remains that Nationwide Alarms LLC employed automatic telephone dialing services provided by Ytel, for the purpose of making outbound telemarketing calls to consumers.

7.      My opinion remains that Ytel provides cloud-based call center facilities to its customers that remotely use those facilities to create and manage automatic outbound calling campaigns. Ytel is able to offer these call center services by deploying automatic telephone dialing hardware and software that is used to automate dialing functions. Ytel provides automatic telephone dialing services to its customers that have the ability to input a list of telephone numbers to be subsequently dialed.

8.      It remains my opinion that the Ytel cloud-based dialing system Nationwide used to place calls on behalf of the Defendants is equipment which has the capacity to store lists of telephone numbers. Furthermore, it is my opinion that the Ytel cloud-based dialing system Nationwide used to place calls on behalf of the Defendants is equipment which has the inherent

capacity to dial telephone numbers without human intervention.

9.      It remains my opinion that the Ytel Cloud Contact Center dialing system is in fact a predictive dialer and the predictive dialing function is inherent in the Ytel system. Mr. Joseph Moretti, fact witness for Nationwide Alarms LLC, testified that lead sources containing telephone numbers were uploaded into the Ytel dialing system for automatic dialing. (Exhibit A, Moretti Dep., 21:12-19.) In addition, Mr. Moretti testified that when the Ytel dialing system called consumers in automatic mode and if a consumer answered the call, the dialing system would find an available call center agent for the answered call. Call center agents would hear a beep when automatically dialed calls were transferred to them by the Ytel dialing system. (Exhibit A, Moretti Dep., 22:4-13.) This is the definition of how a predictive dialer operates.

10.     Moreover, Ytel's end user license agreement ("EULA") includes the contracted features, "Inbound, outbound and blended call handling," the "Ability to set-up and manage multiple inbound and outbound campaigns," "Web-based IVR editor to control flow of inbound calls," "No agent and after hours call handling," "Ability to set outbound caller ID per campaign, per list or based on customer area code," and "Agents can see calls in queue." (Exhibit B, YTEL 000005.) Each of these telecommunications features is associated with, and relevant to, automatic telephone dialing functions.

11.     To the extent ACA International requires a company to use a dialer in "automatic" mode to be considered an ATDS (as a non-lawyer I do not have an opinion on this legal question), it is my opinion that Nationwide used its dialer in "automatic" mode. Call logs produced by Ytel contain a column called "Comments." Many of the calls in the "Comments" column say "AUTO." Attached to my declaration as Exhibit C is a declaration from the records custodian at Ytel, Inc., Matthew Grofsky, who confirms that AUTO means that an agent "statused" the call as a call that was automatically dialed.

12.     I asked Anya Verkhovskaya to determine the number of calls placed to cell phones where the "Comments" field equals "AUTO." She determined that, of the calls identified on Corrected Exhibit D of my Corrected Expert Report, 30,812 calls were placed to 15,751 cell phones where the "Comments" field equaled AUTO. As I discuss in my Corrected Expert Report, Ms. Verkhovskaya is a respected database analyst on whom I frequently rely to analyze calling records in TCPA cases. I understand she identified the calls statused as AUTO by simply filtering a spreadsheet with information about the cell phone numbers she identified as having been called by Nationwide Alarms LLC using the Ytel system during the class period and counting the results. This is a simple, standardized process using the Microsoft® Excel® application. I am confident that her work is accurate.

I declare that the foregoing is true and correct subject to the laws of perjury of the United States.

Executed in Las Vegas, Nevada, on this 22nd day of May, 2018.


_Randall A. Snyder_
Randall A. Snyder

- Exhibit A -

Joseph Moretti
December 7, 2017

Page 1

1                    UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                         OAKLAND DIVISION

4

5                    Civil Action No. 4:15-cv-06314-YGR

6

    ****************************************
7   ABANTE ROOTER AND PLUMBING, INC.,    *
    MARK HANKINS, and PHILIP J. CHARVAT,  *
8   individually and on behalf of all     *
    others similarly situated,            *
9                                         *
                    Plaintiffs            *
10                                        *
    v.                                    *
11                                        *
    ALARM.COM INCORPORATED, and           *
12  ALARM.COM HOLDINGS, INC.,             *
                                          *
13                  Defendants            *
    ****************************************
14

15

16              DEPOSITION OF:  JOSEPH MORETTI

17        CATUOGNO COURT REPORTING SERVICES, INC.

18          155 South Main Street, Suite 201

19              Providence, Rhode Island

20          December 7, 2017              10:03 a.m.

21

22

23              Ellen M. Muir

24              Court Reporter

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Joseph Moretti
December 7, 2017

Page 21

1   ten different lead sources we had at any given time.

2        Q.   Do you remember --

3        A.   You know, trial and error system.

4        Q.   Was Data World Technologies one of those

5   data lead sources?

6        A.   I don't recall that name at all.

7        Q.   How about Data Guru?

8        A.   I don't recall that name either.

9        Q.   Do you remember any of the names of the

10  sources of --

11       A.   I really don't, to be completely honest.

12       Q.   And when you say "lead sources," was that

13  essentially data with phone numbers and names and

14  addresses of people you would call?

15       A.   Correct.

16       Q.   And you could upload that to the Ytel

17  system.  Did it dial the numbers for you?

18       A.   Yes, sir.  Well, we had manual dial

19  option as well as automatic dial option.

20       Q.   And did you ever place robocalls directly

21  from Nationwide Alarm via the Ytel system?

22            MS. SCHUCHARDT:  Objection to form.

23       A.   A robocall, what's that?

24       Q.   Like a call that would go out with a

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

Joseph Moretti
December 7, 2017

Page 22

1    prerecorded message that would play when the person

2    picked up on the other end?

3         A.    No.

4         Q.    Now, if you ran the Ytel system in an

5    automatic dialling mode, how did your people know

6    when to pick up; how did the system work, would

7    somebody have picked up on the other end?

8         A.    It would beep.

9         Q.    And did the system automatically find the

10   available call center person in your office?

11        A.    I really don't recall exactly how it

12   worked, but I believe it was something similar to

13   that.

14        Q.    Okay.  Did you or Nationwide Alarm have a

15   subscription to the Do Not Call List?

16        A.    Could you please explain what you mean by

17   that, a subscription?

18        Q.    Yeah.  Did you ever download numbers from

19   the federal government's Do Not Call List as the

20   people that you couldn't call?

21        A.    To use in my office?

22        Q.    Yes.

23        A.    Absolutely not.

24        Q.    At Nationwide Alarm you only sold home

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTIONS**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

- Exhibit B -



# Nationwide Alarms LLC



800.382.4913

Ytel, Inc.
17595 Harvard Ave.
Suite C161
Irvine, CA 92614

YTEL_000001



# Introduction

Ytel, Inc. offers cutting edge, proprietary cloud based communications services, featuring turn-key contact center and business communications Software (as that term is defined in the Ytel, Inc. End User License Agreement ("EULA")). Through multi-channel communications and 100% web-based technology, Ytel, Inc. can help you ("Customer") lower costs, increase revenue, and improve your customers' experience.

# Services

☑ Cloud Contact Center

☐ Message360™: Custom Platform Services

☐ Message360™: Voice Messaging Application

☐ Message360™: Voice Messaging Plus Application

YTEL_000002



# Scope

The Cloud Contact Center™ software application ("CCC") is a Software application that assists in the management and running of a call center.  The CCC runs on a network owned and operated by Ytel, Inc. Subject to the restrictions set forth in the Order Form below (as well as the EULA and Ytel, Inc. Master Services Agreement), Customer can deploy the CCC to multiple agents in multiple locations.  The CCC can accept inbound calls, make manual outbound calls and make automated outbound calls to increase agent utilization.  The technical requirements associated with operating the CCC can be found at the following web address: https://support.ytel.com/hc/en-us/articles/201497670.

The Message360™ custom platform service ("Message360") is an infrastructure as a service that allows Ytel employees to program custom platform services ("CPS") on behalf of customer requirements. Company also has a library of pre-built software applications that run on top of Message360.  They Voice Messaging ("Voice Messaging") which allows customers to upload a phone list and have our network call that list with a pre-recorded message and Voice Message Plus ("Voice Message Plus") which allows customer to upload a phone list, have our network call that list, schedule stop and start times of calling, and view advanced reports on the result of calling said list.

Any software application, functionality, feature, product and/or service (collectively, "Customization") that is/are not expressly included in this Scope and/or Order Form below, whether or not such Customization was included in any oral representation by Ytel, Inc. personnel, shall not be deemed to be included herein, and shall only be made available to Customer at an additional cost, as separately negotiated by the parties and memorialized in a writing executed by both parties.

YTEL_000003



# CCC Features

- Inbound, outbound and blended call handling
- Ability to set-up and manage multiple inbound and outbound campaigns
- HTML5 web-based agent interface
- Ability to use soft phone (Ytel, Inc. Approved X-Lite Version) or Zoiper
- Ability to use web-based phone (Windows only) located inside the agent interface
- 90 Days of call recordings.  Available via web interface. FTP access available upon request
- Three way calling with ability to transfer calls to external source
- Web-based IVR editor to control flow of inbound calls
- No agent and after hours call handling
- Ability to display a dynamic script (dynamic fields supported) per campaign or list
- Ability to transfer customer information from one agent screen to another agent screen
- Ability to "park" customers with custom on-hold music
- Screen pop lead information to agent contact tab.
- Screen pop external CRM via the method of http get (request info from a web server)
- Ability to set-up custom fields for each list
- Ability to set outbound caller ID per campaign, per list or based on customer area code
- Ability to start/stop the recording of agent calls at any time
- Ability to record all calls
- Ability to dial alternate phone numbers for the same customer record
- Agents can schedule a callback to a specific customer/lead
- Callbacks can be handled by the agent who scheduled the callback, or the first available agent
- Ability for agents to use hot keys (quicker call handling)
- API to control agent session. Latest documentation available at http://support.ytel.com/
- API to send data to CCC. Latest documentation available at http://support.ytel.com/
- Built in time clock to track agent hours.  Not to be used for HR payroll reporting
- Ability to work with Ytel, Inc. approved hard phones.  List available at http://support.ytel.com/
- Managers can listen to, or join, in-progress agent/customer calls
- Agents can select "pause codes" so that manager(s) can track agent idle time (break, etc)
- Agents can see calls in queue (manager(s) can turn this feature on/off)
- Ability to export customer and call data from web based interface
- Real-time system dashboard.  Screenshot example available at www.ytel.com
- E-Mail API : Ability to send customers an e-mail with one click
- Use SQL to apply filters to any campaign (example:  filter data by state)

Ytel, Inc. | 17595 Harvard Ave. Suite C161 Irvine, CA 92614 | 800.382.4913
Legal Version (00118002;1) Ytel Version 4.2
Copyright © 2014 Ytel, Inc.| All Rights Reserved

YTEL_000004



# Order Form, EULA and MSA

This Order Form ("Order Form"), consisting of the Scope, Features, Order Form, CCC Pricing, Message360 Pricing, Optional Services, Credit Card Authorization and Card on File, is made and entered into by and among Nationwide Alarms LLC with a business address 999 Main St Unit 111 Pawtucket Providence RI 02860 ("Customer"), and Ytel, Inc., with a business address located at 27422 Portola Parkway, Suite 100, Foothill Ranch, California 92610 ("Company"). **This Order Form is subject to the Master Services Agreement ("MSA"), as well as the End User License Agreement ("EULA") appended thereto.** To the extent that anything in or associated with this Order Form is in conflict or inconsistent with: (a) the MSA, the MSA shall take precedence unless otherwise stated to the contrary herein or in the MSA; and/or (b) the EULA, the EULA shall take precedence unless otherwise stated to the contrary herein or in the EULA. Any capitalized terms not defined herein shall have the meaning set forth in the MSA, unless set forth to the contrary herein.

## Setup Fee

Customer agrees to pay nonrefundable set-up fees for to the specific Services (which includes the Software, as that term is defined in the EULA) requested in this Order Form. Access to the Services will not be made available by Company, nor will access to production level support be provided by Company, until such funds have been received.

## Billing

Customer shall be billed for the Services in the amounts, and as per the schedule, set forth in this Order Form. Company shall monitor non-recurring usage ("NRC") and/or actual usage each month. Company reserves the right, at any time, to bill for NRC or actual usage where Customer's applicable usage exceeds one hundred and ten percent (110%) of the amount specified in this Order Form.

## Payment

Customer shall either pre-pay for Services, or pay by wire, bank deposit or credit card within four (4) days of receiving each invoice from Company. Where Customer fails to make any scheduled payment when due, such overdue amounts will be subject to interest charges in the amount of the lesser of one and one half percent (1.5%) per month, compounded monthly, or the maximum amount permitted by law. Customer shall pay a Twenty-Five Dollar ($25.00) service fee for any returned check, or the actual fees charged by any financial institution arising from any charges related to non-payment of funds, whichever is higher. In addition, Company shall be entitled to recover all reasonable costs of collection (including agency fees, attorneys' fees, court costs and expenses) incurred in attempting to collect payment from Customer hereunder. Company may immediately terminate the Agreement, and deny access to the Services, for non-payment on any past due amounts.

## Term

This Order Form, the MSA and the EULA shall be effective on the Start Date and continue for an initial term of thirty six (36) months. Upon the expiration of the initial term, and any subsequent term, this Order Form, the MSA and the EULA shall renew automatically for additional one (1) year periods, unless terminated: (a) by either party by providing ninety (90) days' prior written notice (notice from Customer can be sent to billing@ytel.com); and (b) as otherwise set forth in the MSA and/or EULA.

YTEL_000005



# CCC Pricing

| Product | Qty | List Price | Discount | Sales Price | Subtotal |
|---|---|---|---|---|---|
| Term (in months) | 36 | | | | |
| Setup (One Time) | 1 | $1,500.00 | -$1,500.00 | $0.00 | $0.00 |
| Cloud Contact Center Seats (Openers) | 15 | $100.00 | | $100.00 | $1500.00 |
| Minutes & Phone Numbers | | | | | |
| Inbound Local Minutes | 6666 | $0.01500 | | $0.01500 | $100.00 |
| Outbound Interstate Minutes (Out of state) | 0 | $0.01500 | | | Included in Unlimited package |
| Outbound Intrastate Minutes (In state) | 0 | $0.01650 | | | Included in Unlimited package |
| Inbound Toll Free Minutes | 0 | $0.02500 | | $0.02500 | Usage |
| DID Activation Fee Per Number | 50 | $5.00 | -$2.50 | $2.50 | $125.00 |
| DID Monthly Fee (Local) | 50 | $5.00 | -$2.50 | $2.50 | $125.00 |
| DID Monthly Fee (Toll Free) | 0 | $10.00 | -$5.00 | $5.00 | $0.00 |
| Outbound Add On | | | | | |
| 3:1 unlimited Outbound Min/Long Distance | 10 | $30.00 | | $30.00 | $300.00 |
| Custom Recommendations (Monthly) | | | | | |
| Custom Recommendations (One Time) | | | | | |
| Automatic Account Top Off | Y | | | | |
| When balance reaches | 25 | | | | |
| Top off with amount | 100 | | | | |
| Monthly Minimum | | $500 | | | |
| Monthly Fees | | | | | $1925.00+ inbound Minutes |
| Total Due Today | | | | | $2025.00 |

YTEL_000006



# Optional Services

| Standard | |
|---|---|
| Suppression Lists (each list) | $25 |
| Custom Caller ID Name (monthly) | $1 |
| Port In - Resporg to Ytel (per number) - [Minimum of $100 NRC] | $0 |
| Port Out - Resporg Away (per number) - [Minimum of $100 NRC] | $10 |
| XML Feeds (monthly per feed) | $150 |
| Professional Audio Recordings (per file-recording) | $25 |
| Company Name Change | $1,000 |
| Onsite Monitoring Server (monthly) | $500 |
| Need a hard phone? Access our wholesale account at www.netxusa.com | $0 |
| Benchmark Report (We review your entire system and processes) | $800 |
| Professional Services (Tech support is already included, this is for custom work) | $200 |
| Recording Server FTP Login (monthly) | $75 |
| Vanity Number (800 and hard to find numbers) | Upon Request |
| Wireless Phone Scrubbing (per request) | $0.0003 |
| Agent-to-Agent Chat (monthly) | $99 |
| Message360 Advanced IVR & Call Flows (Basic IVR is included with X5) | $0.025 |
| Call Recording (Up to 90 Days) | Included |
| Call Recording (90+ Days) | Call |
| SQL Database Access (monthly) | $500 |
| Become Ytel Certified. 3 Day Course in Foothill Ranch, CA. Includes food/lodging. | $3000 |
| Phone Number Lookup (Carrier Lookup up to 100 numbers) | $25 |
| | |
| Training | |
| Initial training includes 2 hours of training | Included |
| Additional Remote Training (per hour) | $200 |
| On-Site Training -- 6 Hours -- Within 100 Miles of zip code 92620 (per day) | $1,000 |
| On-Site Training -- 100+ Miles from zip code 92620 | Upon Request |
| | |
| Smart Admin | |
| Smart Admin (20 Hours + Dedicated Support Number). 25% Discount. | $3,000 |
| Smart Admin (40 Hours + Dedicated Support Number). 35% Discount. | $5,200 |
| Smart Admin (80 Hours + Dedicated Support Number). 45% Discount. | $8,800 |
| Smart Admin (160 Hours - Full Time Engineer). 55% Discount. | $14,400 |
| *3 Month Minimum Addendum on Smart Admin Agreements. OS v2.0 | |

YTEL_000007



# Credit Card Authorization

Customer must complete this Credit Card Authorization form to schedule payments which will automatically be charged by Company to Customer's credit card.

Recurring Payments:

Upon completing this Credit Card Authorization form, and depending on the applicable Services selected by Customer, the amount due for the applicable Services ordered will be billed directly to the credit card provided below, or later updated ("Card on File"), on a monthly, recurring basis.  Customer authorizes Company to charge for any and all fees associated or related to any service provided to Customer by Company, whether recurring or non-recurring, one-time, or for any billable charge. Customer acknowledges and agrees that Company will not obtain any additional authorization from Customer for this recurring payment.  Every time that Customer uses the Services, Customer re-affirms that Company is authorized to bill Customer's Card on File and to have the monthly fees applied to same.  ALL CHARGES ARE FINAL AND NON-REFUNDABLE.

The fees associated with the Services will appear on Customer's Card on File statement through the identifier "Ytel," "Ytel, Inc.," "YTEL 800 382 4913" or some variation thereof, depending on the preferences associated with the provider of the Card on File.  Failure by Customer to use the Services does not constitute a basis for refusing to pay any associated charges.

Company's authorization to provide and bill for the Services may be obtained by way of Customer's electronic signature or, where applicable, via physical signature and/or voice affirmation. Once an electronic signature is submitted, this electronic order constitutes an electronic letter of agency.  Company's reliance upon Customer's electronic signature was specifically sanctioned and written into law when the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Transactions Act were enacted in 1999 and 2000, respectively. Both laws specifically preempt all state laws that recognize only paper and handwritten signatures.

YTEL_000008



# Card on File

| Credit Card Number | CVV | Expiration Date |
| --- | --- | --- |
| ***************** | 633 | 08/19 |
| | | DD/YY |

**Name on Card**

Barry A Crins

**Billing Address**

85 garfield ave

**Billing Zip Code**

02920

This credit card will be used to automatically bill for all charges set forth herein order form

YTEL_000009



# Authorization

I, the undersigned acting as an authorized agent of Customer, authorize the Company to charge the credit card provided above according to the terms outlined above. If any of the above-noted payment dates fall on a weekend or holiday, I understand that payment(s) may be executed on the next business day.  I understand that this Credit Card Authorization will remain in effect until I cancel it in writing by e-mailing billing@ytel.com, subject to the cancellation terms of the Order Form, MSA and EULA.  This Credit Card Authorization is provided for purposes of paying for the applicable Services set forth above. I certify that I am an authorized user of this credit card and that I will not dispute the scheduled payments with my credit card company, provided that the transactions are in accordance with the terms indicated in this Credit Card Authorization, the Order Form, MSA and EULA.



SIGNATURE

**IN WITNESS WHEREOF**, the Parties have executed this Order Form as of the date below each Party's respective signature.

CUSTOMER
Customer Name:

**Signature:** *Joseph Moretti*
Joseph Moretti (Dec 3, 2016)

**Email:**  jmoretti.nationwidealarms@gmail.com

COMPANY
Ytel, Inc.

**Signature:** Jeff Jordan (Dec 5, 2016)

**Email:**  jeff@ytel.com

YTEL_000010



# Master Services Agreement ("MSA")

This MSA is made and entered into by and between the individual or entity executing this MSA as the customer ("Customer") and Ytel, Inc. ("Company"). For purposes of this MSA, Customer and Company shall be referred to collectively as the "Parties" and each individually as a "Party."

## WITNESSETH:

**WHEREAS**, Company supplies certain software, platforms, technology and communications services and/or consulting services of any kind, including, without limitation, the Software (as defined in the End User License Agreement ("EULA") attached hereto, which is incorporated herein by reference), and consulting services, if any, (collectively, the "Services"), as further specified below, in the EULA and in the Order Form, respectively, and Customer desires to utilize said Services; and

**WHEREAS**, for purposes of this MSA, the term "Order Form" shall refer to the Scope, Order Form and Credit Card Authorization, each of which is incorporated herein by reference (this MSA, the EULA and the Order Form shall be referred to, collectively, as the "Agreement").

**NOW THEREFORE**, in consideration of the respective representations, warranties, covenants and agreements set forth in the Agreement, and subject to Company having all necessary approvals, facilities and agreements to provide the Services, Customer and Company agree as follows:

1. **START DATE.** For purposes of the Agreement, the "Start Date" will be the date that Customer and Company sign each of the Order Form, the EULA and this MSA. Beginning on the Start Date, Company will provide the Services to Customer, as specified both in the EULA and the Order Form. If a conflict exists between the general terms of this MSA and the specific terms of the Order Form, the specific terms of the Order Form will prevail. If a conflict exists between the general terms of this MSA and the specific terms of the EULA, the specific terms of the EULA will prevail with respect to the Software only.

2. **TAXES.** Customer is responsible for, and must pay, any and all applicable sales, use, excise, public utility, or other taxes, regulatory fees and charges now in force or enacted in the future, by any federal, state, local or other governmental body, as well as any other additional costs that may arise as a result of Customer's use of the Services. Similarly, Company may pass through to Customer taxes and fees owed by Company associated with Customer's access to and use of the Services to the extent permissible by law. Said amounts, if any, are in addition to set-up fees and/or charges associated with the consumption of the Services. If Customer is exempt from paying any taxes or fees, Customer must provide documentation, acceptable to Company, certifying that Customer is exempt. Tax exemption will only apply from and after the date that Company acknowledges Customer's exemption request. Customer agrees to indemnify and hold Company, its third party vendors, and their respective parent companies, subsidiaries, affiliated companies, as well as the employees, directors, officers and shareholders of same, harmless from and against any and all claims, liabilities, losses, judgments, damages and expenses including, without limitation, attorneys' fees and costs of litigation, incurred or suffered by such party relating to or arising out of any exemption claimed by Customer.

3. **BILLING ADJUSTMENTS.** Any request for a billing adjustment shall be made in good faith and by e-mail to Company at billing@ytel.com. Any such request shall include detailed documentation to establish the basis for any requested adjustment. Company will determine, in its sole, good-faith discretion, whether any adjustment shall be made and any such adjustments will be credited to Customer's account balance. If a request for a billing adjustment is not made to the e-mail address indicated above within seven (7) days, the charges shall be deemed final, valid and binding, and Customer waives its rights to any credits, offsets or adjustments with regard thereto.

Ytel, Inc. | 17595 Harvard Ave, Suite C161 Irvine, CA 92614 | 800.382.4913

Legal Version {00118003;1} Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved

YTEL_000011



4.   **LATE PAYMENT.**  Company may suspend the Provision of Services indefinitely and/or terminate this MSA, the EULA and any Order Form, in Company's sole and absolute discretion, if payment on any invoice is not received in the time period specified.

5.   **TERMINATION.**  Company shall have the right to limit, suspend and/or terminate Services in the event that, in Company's reasonable determination, Customer's use of the Services is: (a) materially adversely affecting Company's facilities or its ability to provide services to other customers; (b) unlawful, unauthorized or fraudulent; or (c) otherwise in breach of this MSA, the EULA and/or the Order Form.  In the event of any termination of the Agreement, Customer shall pay to Company, immediately upon receipt of any applicable invoice, any and all amounts due to Company under the Agreement.

6.   **RESPONSIBILITIES OF THE PARTIES.**

a.   **COMPLIANCE.**  Customer represents and warrants that it is aware of, and it and its use of the Services will comply in all respects with: (i) the various state and federal Do Not Call ("DNC") laws, and those governing the National Do Not Call Registry ("NDNCR"), the Telephone Consumer Protection Act (47 USC § 227), and its implementing regulations adopted by the Federal Communications Commission (47 CFR § 64.1200), as amended from time-to-time ("TCPA"), the Amended Telemarketing Sales Rule ("ATSR"), 16 CFR 310 et seq., and Telephone Preference Service ("TPS") laws and/or regulations; (ii) the various Canadian National Do Not Call List Rules ("DNCL"), Telemarketing Rules and Automatic Dialing-Announcing Device ("ADAD") Rules; (iii) applicable telemarketing record keeping requirements; (iv) call hour/time of day restrictions (as required by applicable law or as directed by the called party during the course of the call); (v) disconnect and call abandonment requirements; (vi) prohibitions against contacting facilities and telephonic devices of certain classifications using autodialers (or any other automatic telephone dialing system), artificial voice calls and/or pre-recorded calls without "prior express written consent" (as defined under the TCPA) in each instance; (vii) caller identification and consent requirements; (viii) live operator requirements; and (ix) opt-out and internal do-not-call request requirements (collectively, "Applicable Law").  Some information regarding the DNC, TCPA, TSR, TPS and the Canadian Rules (DNCL, Telemarketing Rules, and ADAD) can be found at:

- http://www.donotcall.gov (DNC)
- http://www.fcc.gov (Federal Communications Commission and the TCPA)
- http://www.ftc.gov (Federal Trade Commission and the ATSR)
- http://www.tpsonline.org.uk/tps (TPS)
- https://www.lnnte-dncl.gc.ca/nrt-ntr-eng (DNCL, Telemarketing Rules, and ADAD Rules)

Without limiting the foregoing, Customer represents and warrants that: (A) at all times prior to and after the effective date of this MSA, the database of consumers to be contacted utilizing the Services ("Customer Database") was/shall be generated, collected, stored and used in compliance with Applicable Law; (B) the Customer Database consists of records of persons who have supplied express affirmative consent to receive commercial telephone calls from Customer; (C) Customer shall scrub the Customer Database against the NDNCR, any and all state DNC Registries and against its internal do-not-call list prior to calling any consumers in the Customer Database; and (D) the Customer Database shall consist of individuals that have provided "prior express written consent" to receive commercial telephone calls (including pre-recorded calls, artificial voice calls and/or autodialed calls) from Customer, within the meaning of the TCPA, to the telephone number(s) provided by such individuals.  Customer shall retain the records of each individual's "prior express written consent" ("Consent Records") for a minimum of five (5) years following creation of same, and shall provide such Consent Records to Company within three (3) business days of receipt of a Company request for same, at any time.  The Consent Records shall include, at a minimum, the language used to obtain "prior express written consent," the IP address of the source of the consumer data (or telemarketing voice consent capture tapes, if applicable) and the date and time stamp indicating the time that the consumer data was collected.

Ytel, Inc. | 17595 Harvard Ave. Suite C161 Irvine, CA 92614 | 800.382.4913

Legal Version {00118003;1} Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved

YTEL_000012



b.  **CONTENT/CAMPAIGN SERVICES/CAMPAIGN PRODUCTS.**  Customer is and shall be solely responsible and liable for: (i) the creation, editorial substance, control and all other aspects of its own data, and third party data utilized by it in connection with the Services, including, but not limited to, source code, phone numbers in the Customer Database, programs, telemarketing scripts, databases, voice files and/or any other computer code ("Content"); (ii) the acts and omissions of any and all employees, contractors and/or agents performing telemarketing and other services on its behalf ("Campaign Services"); and (iii) the products and/or services marketed in connection with the Services ("Campaign Products").

c.  **NO HARMFUL CODE.**  Customer represents and warrants to Company that no Content shall be knowingly transmitted by Customer in connection with the Services containing any program, routine or device which is designed to delete, disable, deactivate, interfere with or otherwise harm any software, program, data, device, system or service including, without limitation, any 'time bomb,' virus, drop dead device, malicious logic, worm, Trojan horse or trap or back door.

d.  **INDEMNIFICATION.**  Customer agrees to indemnify, defend and hold harmless Company and its officers, directors and employees from and against any losses, claims, obligations, liabilities, damages, settlements, costs and expenses (including, but not limited to, consequential damages, incidental damages, special damages, disbursements and attorneys' fees, including attorneys' fees incurred by counsel selected by Company in its sole discretion) arising from or relating to any actual or threatened claim (regardless of any fault or truth to any allegation), suit, action, proceeding, governmental investigation or enforcement action based upon or arising out of: (i) any breach of the Agreement by Customer; (ii) the Customer Database, Content, Campaign Products and/or Campaign Services; and/or (iii) any other acts or omissions of Customer.

7.  **INTELLECTUAL PROPERTY.**

a.  **OWNERSHIP.**  All right, title and interest, including all intellectual property rights and any associated hardware and software of Company or its licensors, and any updates, upgrades or modifications thereof, in and to any ideas, know-how, and/or programs developed by Company or its licensors (including the Services and associated Software) during the course of performance of the Agreement shall remain the property of Company or its licensors.  All right, title, and interest in and to any Content communicated via Company's infrastructure through use of Company Services and any applications shall remain the sole property of Customer and/or its customers or third parties as applicable.

b.  **RESTRICTIONS.**  Customer shall not: (i) disassemble, reverse engineer, decompile, or otherwise attempt to derive source code from the software or documentation, modify, adapt, create derivative works based upon, or translate any Services (including the Software or associated documentation) owned and/or provided by Company; or (ii) copy, install or use Services (including the Software or associated documentation) on any of its computer systems, servers or networks without Company's prior written consent.

8.  **LIMITATION OF LIABILITY.**  OTHER THAN FOR INDEMNIFICATION OBLIGATIONS ARISING HEREUNDER, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY, ANY OF ITS CUSTOMERS OR ANY OTHER PERSON, FIRM OR ENTITY FOR DIRECT, INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, ACTUAL OR PUNITIVE DAMAGES, OR FOR ANY LOST PROFITS OF ANY KIND OR NATURE WHATSOEVER, UNDER ANY LEGAL OR EQUITABLE THEORY, EVEN IF FORESEEABLE, ARISING OUT OF ANY MISTAKE, ACCIDENT, ERROR, OMISSION, INTERRUPTION, OR DEFECT IN TRANSMISSION, OR DELAY ARISING OUT OF OR RELATING TO THE SERVICES OR THE OBLIGATIONS OF EACH PARTY PURSUANT TO THE AGREEMENT INCLUDING, WITHOUT LIMITATION, ANY FAILURE TO PROVIDE TIMELY, ACCURATE PROVISION, OR INSTALLATION OF ANY PORTION OF THE SERVICES, OR CONDITIONS WHICH MAY RESULT FROM ACTIONS OF REGULATORY OR JUDICIAL AUTHORITIES.

Ytel, Inc. | 17595 Harvard Ave, Suite C161 Irvine, CA 92614 | 800.382.4913

Legal Version [00118003;1] Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved

YTEL_000013



9.  **DISCLAIMED WARRANTIES.**  EXCEPT AS EXPRESSLY SET FORTH IN THIS MSA, THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED HEREUNDER.  THE SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTY OR CONDITION OF ANY KIND, EITHER EXPRESS OR IMPLIED.  USE OF THE SERVICES IS AT CUSTOMER'S OWN RISK.  COMPANY DOES NOT WARRANT THAT THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR THAT OPERATION OF THE SERVICES WILL BE UNINTERRRUPTED, ERROR FREE, SECURE, ACCURATE, COMPLETE OR CURRENT. WITHOUT LIMITATION, TO THE FULLEST EXTENT PERMISSIBLE BY LAW, THIS DISCLAIMER EXTENDS TO IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABLE QUALITY, FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES ARISING BY STATUTE OR OTHERWISE IN LAW AND/OR FROM A COURSE OF DEALING OR USAGE OF TRADE.   COMPANY'S SOLE AND EXCLUSIVE OBLIGATION, AND CUSTOMER'S SOLE AND EXCLUSIVE REMEDY, FOR ANY BUG, ERROR OR OTHER FAILURE OF THE SERVICES TO PERFORM AS SET FORTH IN THE AGREEMENT IS A CREDIT OR REFUND, AT COMPANY'S SOLE DISCRETION, BASED ON THE ORIGINAL CHARGE FOR THE APPLICABLE SERVICES.

10.  **REGULATIONS.**  The Agreement is made expressly subject to all present and future valid orders and regulations of any regulatory body having jurisdiction of the subject matter of the Agreement and to the laws of the United States of America, any of its states, or any foreign governmental agency having jurisdiction.  If any terms of the Agreement are found in conflict with any law, the Agreement shall be deemed modified to the extent necessary to make it comply with the law in such a way as is consistent with the intent and purpose of the Agreement.

11.  **NO AGENCY.**  Neither Party is authorized to act as an agent for, nor legal representative of, the other Party. Neither Party has the authority to assume nor create any obligation on behalf of or binding on the other Party.

12.  **FORCE MAJEURE.**  Other than for payment obligations arising hereunder, if either Party's performance under the Agreement is restricted or interfered with, in whole or part, by causes beyond its reasonable control including, but not limited to, acts of God, fire, explosion, vandalism, cable cut, utility curtailments, power failures, storm or other similar occurrence, any law, order, regulation, tariffs or rates which make it impossible or impractical for it or its service providers to provide its services at the current rates, request of the United States government, or of any agency, court, or other instrumentality or civil or military authority, or by national emergency, insurrection, riot, war, strike, lockout or work stoppage or other labor difficulties, supplier failure or shortage or breach or delay ("Force Majeure Event"), then such Party shall be excused from its performance on a day-to-day basis to the extent of the subject Force Majeure Event.  Company's obligation to provide Services is subject to and contingent on the continuation of Company's agreements with its underlying service providers to provide the applicable services to Company at the current rates and on the same conditions under which such service providers are currently providing or offering to provide the applicable services to Company.  Any changes in or termination to those agreements will relieve Company of its obligations and all liability under the Agreement.

13.  **NO WAIVER.**  The failure of either Party to enforce or insist upon compliance with any of the terms of the Agreement or the wavier of any terms contained within the Agreement does not constitute a general waiver or relinquishment of any other terms of the Agreement.

14.  **ASSIGNMENT/BINDING EFFECT.**  The Agreement is binding upon, and inures to the benefit of, the Parties and their respective successors and assigns.  Customer  will not  assign, transfer, license or otherwise transfer all or any part of its rights, duties or other interests in or to the Agreement or the proceeds from the Agreement ("Assignment") without Company's prior written consent.  Company may make an Assignment without Customer's consent at any time during the term of the Agreement.  Any attempt to make an Assignment in violation of this provision shall be null and void.  Customer shall provide written notice to Company of any material change in its ownership (which is defined as a change in ownership affecting majority voting control of at least 50.1%). No Assignment will release either Party from its obligations arising under the Agreement.

Ytel, Inc. | 17595 Harvard Ave, Suite C161 Irvine, CA 92614 | 800.382.6913

4

Legal Version {00118003:1} Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved

YTEL_000014



15.  **AMENDMENT.**  This MSA, the EULA and/or the Order Form(s) may only be amended by an instrument in writing, signed by both Parties, except in the case of rate or fee change notifications which do not require Customer's signature to be effective.  The fees for Services may be modified WITH twenty-four (24) hour's e-mail notice to Customer. In the event of any dispute about the rates set forth in the Order Form and any amendments thereto, the rates quoted on the most recently dated amendment shall prevail.

16.  **ENTIRE AGREEMENT.**  This MSA, together with the EULA, Order Form(s) and any amendments/attachments hereto/thereto, supersedes and merges all prior agreements, promises, understandings, statements, representations, warranties and covenants and all inducements to the making of the Agreement relied on by either Party to the Agreement, whether written or oral, and embodies the Parties' complete and entire agreement with respect to the subject matter of the Agreement.  No statement or agreement, oral or written, made before the signing of the Agreement will vary or modify the written terms of the Agreement.

17.  **NO THIRD PARTY BENEFICIARIES.**  The Agreement is made solely for the benefit of Company and Customer, and their respective successors and permitted assigns.  Nothing in the Agreement should be interpreted to mean that Company and Customer are partners, joint venturers, co-owners or are otherwise participants in a common undertaking.  Neither Party nor its employees are given authority, express or implied, to represent, act for or otherwise create or assume any obligation on behalf of, or binding on, the other Party.  Nothing in the Agreement will confer any rights or remedies on any third party.

18.  **SEVERABILITY.**  If any terms of the Agreement are determined to be illegal, unenforceable or invalid, in whole or in part, for any reason, the terms shall be stricken and will not affect the legality, enforceability or validity of the remainder of the Agreement.  If any terms of the Agreement are stricken as a result of this Section 18, then the stricken provision(s) shall be deemed replaced, to the extent possible, with legal, enforceable, and valid terms that are as similar in tenor to the stricken provision(s) as is legally permissible.  All headings and titles contained in the Agreement are used solely to organize the contents of the Agreement and will not be used to affect the interpretation of the contents of the Agreement.

19.  **CONFIDENTIALITY.**  During the term of the Agreement, and until such time as the Confidential Information (as defined below) is no longer protectable under applicable state law, neither Party will use or disclose any Confidential Information of any other Party except as specifically contemplated herein.  For purposes of the Agreement, "Confidential Information" means: (a) information that is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; (b) the terms of this MSA, the EULA, Order Form(s), any amendments/attachments hereto/thereto and any communications concerning same, including invoices; (c) information that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy and/or confidentiality; and (d) all aspects of, and processes associated with, the Services (which shall be deemed Company's Confidential Information), all technical or non-technical data, formulae, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data and lists of actual or potential business partners.  Confidential Information does not include information that: (i) has been independently developed by the receiving Party without access to the disclosing Party's Confidential Information; (ii) has become publicly known through no breach of this Section 19 by the receiving Party; (iii) has been rightfully received from a third Party authorized to make such disclosure; (iv) has been approved for release in writing by the disclosing Party; or (v) is required to be disclosed by a competent legal or governmental authority. At the request of the disclosing Party, the receiving Party shall return all of the disclosing Party's Confidential Information to the disclosing Party.  When the Agreement terminates, the Parties agree to return to one another any and all materials and confidential information belonging to the other Party.  Both Parties agree that injunctive relief, including specific performance, for violation (or threatened violation) of the confidentiality provisions contained in this Section 19 is appropriate and shall be available to the non-breaching Party without a showing of irreparable harm or injury and without the necessity to post any bond whatsoever. Further, notwithstanding the termination of this Agreement

Ytel, Inc. | 17595 Harvard Ave. Suite C161 Irvine, CA 92614 | 800.382.4913

Legal Version (00118003;1) Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved

YTEL_000015



for any reason or by Agreement, neither party shall disparage, slander or libel the other on any social media or public internet site.  This term shall survive the termination of any termination of this agreement for any reason, whether by contract, rescission or operation of law.

20.  **REPRESENTATION OF AUTHORITY AND INTENT.**  Each Party represents and warrants to the other that the signing and delivery of the Agreement, and the performance of the Party's obligations under the Agreement, has been duly authorized and that the Agreement is a valid and legal agreement that is binding on the Parties and enforceable in accordance with its terms.  The Parties will, at their own costs and expense, execute and deliver any other documents and instruments and will take any other actions as may be reasonably required or appropriate to carry out the intent and purposes of the Agreement.

21.  **ESCALATION PROCEDURES.**  In the event of any disruption of Services or any problems with regard to Services provided by Company, Customer should e-mail support@ytel.com immediately and ask that the applicable problem be escalated to the Company manager on duty.

22.  **GOVERNING LAW AND ADJUDICATION OF DISPUTES.**  The Agreement is in all respects governed by the laws of the State of California, without regard to choice of laws.  The Parties specifically consent to the personal jurisdiction of the State of California for all disputes related to the Agreement.  Any disputes that may arise under the Agreement shall be resolved in accordance with the laws of the State of California, and shall be adjudicated exclusively in the state or federal courts in the State of California.

23.  **COUNTERPARTS.**  The Agreement may be signed in several counterparts, each of which constitutes an original, but all of which will constitute one instrument.

24.  **NOTICES.**  Unless otherwise specifically provided for herein, any notice required by the Agreement is effective and deemed delivered: (a) three (3) business days after posting with the United States Postal Service when mailed by certified mail, return receipt requested, properly addressed and with the correct postage; (b) one (1) business day after pick up by the courier service when sent by overnight courier, properly addressed; and (c) immediately when sent via facsimile, via e-mail or by opening a support ticket by e-mailing support@ytel.com.  The Company ticketing system will provide a ticket number to Customer for reference. Notices will be sent to the addresses specified at the beginning of this document (if included), unless either Party notifies the other of an address/number change in writing.

25.  **HEADINGS.**  The headings in the Agreement are for convenience only and shall not affect the construction hereof.

26.  **DRAFTING.**  Each Party executing the Agreement agrees that it has fully participated in the drafting of the Agreement and that no Party shall be deemed to be the drafting Party.

27.  **ASSENT TO BE BOUND.**  Customer agrees to be bound by the terms of this MSA, and acknowledges that Customer is entering into a legally binding contract, by one or more of the following methods: (a) executing this MSA; (b) clicking to accept or agree where this option is made available to Customer; or (c) by actually using the Services. Customer should print or save a copy of this MSA for Customer's records.  If Customer does not agree with any part of this MSA, Customer is not authorized to access or use the Services.

28.  **ELECTRONIC SIGNATURES.**  Company's authorization to provide and bill for the Services may be obtained by way of Customer's electronic signature or, where applicable, via physical signature and/or voice affirmation.  Once an electronic signature is submitted: (a) this electronic order constitutes an electronic letter of agency; and (b) Customer hereby agrees to: (i) the use of electronic communication in order to enter into this MSA, place orders and create other records hereunder; and (ii) the electronic delivery of notices, policies and records of transactions initiated or completed through use of the Services.  Customer hereby waives any rights or requirements under any laws of

Ytel, Inc. | 17595 Harvard Ave. Suite C161 Irvine, CA 92614 | 800.382.4913.

6

Legal Version (00118003;1) Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved

YTEL_000016



electronic records, to the extent permitted under applicable law.  Company's reliance upon Customer's electronic signature was specifically sanctioned and written into law when the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Transactions Act were enacted in 1999 and 2000, respectively.  Both laws specifically preempt all state laws that recognize only paper and handwritten signatures.

---

### SIGNATURE

**IN WITNESS WHEREOF**, the Parties have executed this Order Form as of the date below each Party's respective signature.

#### CUSTOMER
Customer Name:

Signature: _Joseph Moretti_
Joseph Moretti (Dec 3, 2015)

**Email:**  jmoretti.nationwidealarms@gmail.com

#### COMPANY
Ytel, Inc.

Signature: _Jeff Jones (Dec 3, 2015)_

**Email:**  jeff@ytel.com

---

## End User License Agreement – ("EULA")

This EULA, effective as of the last date that a Party executes below, is entered into by and between Ytel, Inc., hereinafter referred to as "Company" and the individual or entity executing this EULA as the end-user of the Software (as defined below) ("Customer"), shall continue in full force and effect until such time as it is terminated per the terms of this EULA.  For purposes of this EULA, Customer and Company shall be referred to collectively as the "Parties" and each individually as a "Party."

This EULA, and any modifications or subsequent versions entered into by and through a writing signed by both

Ytel, Inc. | 17595 Harvard Ave. Suite C161 Irvine, CA 92614 | 800.382.4913

Legal Version {00118003;1} Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved

YTEL_000017



Company and Customer, shall govern the provision of, access to, and use by Customer of, Company's software, associated telephone calls, data, files, information, online or electronic documentation, media and any other Company service applicable thereto (collectively, "Software"). This EULA shall be governed, and incorporated into, that certain Master Services Agreement to which it is attached (the "MSA"). To the extent that anything in or associated with this EULA is in conflict or inconsistent with the MSA, this EULA shall take precedence unless otherwise stated to the contrary herein or in the MSA. Any capitalized terms not defined herein shall have the meaning set forth in the MSA.

**About Company:** In connection with the Software, Company provides, as specified in an Order Form, online cloud-based software and related platforms including, but not limited to, inbound call center software, outbound calling applications, predictive dialing technology, voice broadcasting technology, Interactive Voice Response ("IVR") technology, sip trunking, audio conversion, telephone lobbying system technology, name and address capture, conferencing technology, database scrubbing and message play. The Software allows Customer to contact businesses and individuals via telephone by using Customer's personal/business computer and associated broadband Internet connection.

**Assent to Be Bound:** Customer agrees to be bound by the terms of this EULA, and acknowledges that Customer is entering into a legally binding contract, by one or more of the following methods: (a) executing this EULA; (b) clicking to accept or agree where this option is made available to Customer; or (c) by actually using the Software. Customer should print or save a copy of this EULA for Customer's records. If Customer does not agree with any part of this EULA, Customer is not authorized to access or use the Software.

**Electronic Signatures:** Company's authorization to provide and bill for the Software may be obtained by way of Customer's electronic signature or, where applicable, via physical signature and/or voice affirmation. Once an electronic signature is submitted: (a) this electronic order constitutes an electronic letter of agency; and (b) Customer hereby agrees to: (i) the use of electronic communication in order to enter into this EULA, place orders and create other records hereunder; and (ii) the electronic delivery of notices, policies and records of transactions initiated or completed through use of the Software. Customer hereby waives any rights or requirements under any laws of electronic records, to the extent permitted under applicable law. Company's reliance upon Customer's electronic signature was specifically sanctioned and written into law when the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Transactions Act were enacted in 1999 and 2000, respectively. Both laws specifically preempt all state laws that recognize only paper and handwritten signatures.

**License and Restrictions/No Granting of Rights to Third Parties:** Customer shall not sell, assign, rent, lease, sublease, sublicense, encumber, use the Software (or other Services, as that term is defined in the MSA) in a timesharing or service bureau arrangement, permit simultaneous use of the Software (or other Services) by more than one user, distribute, export, import, act as an intermediary or provider or otherwise grant rights to third parties with regard to the Software (or other Services) unless approved in writing, in advance, by Company. Unless expressly permitted hereunder, Customer shall NOT transfer the Software (or other Services) to any third party under any circumstances. Any such purported transfer shall be null and VOID.

**No Modifications/Reverse Engineering:** Customer shall not undertake, cause, permit or authorize any modification, derivative works, translation, reverse engineering, decompiling, disassembling, hacking or other attempt to derive the source code associated with the Software, its related documentation, including translation or localization (code written to published Application Programming Interfaces ("APIs") for the Software shall not be deemed derivative works), or any part thereof except to the extent permitted by law.

**No Removal of Notices:** Customer agrees that Customer shall not remove or alter any trademark, logo, copyright, proprietary notices, legends, symbols and/or any other indication of intellectual property and/or proprietary rights that Company has in or to the Software (or other Services), whether such notice or indications are affixed on, contained in

Ytel, Inc. | 17595 Harvard Ave. Suite C161 Irvine, CA 92614 | 800.382.4913

Legal Version {00118003;1} Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved

YTEL_000018



or otherwise connected to any materials associated with the Software (or other Services).

**No Publishing:** Customer shall not publish any results of benchmark tests run on any Software to a third party without Company's prior written approval.

**Third Party Software:** The Software may be incorporated into, and/or may incorporate, certain software, plug-ins, applications and other technology provided by, owned and/or controlled by third parties (collectively, "Third Party Software"). Any Third Party Software that may be provided with the Software is made available for use at Customer's option and at Customer's own risk. Any such Third Party Software that may be distributed together with the Service and Software may be subject to Customer explicitly accepting license agreement(s), terms and conditions and/or privacy policies as made available by the applicable third party(ies). Company is not responsible for any Third Party Software and shall have no liability whatsoever for Customer's use of, or inability to use, Third Party Software. Customer acknowledges and agrees that it will proceed solely against the applicable third party, and not to Company or its affiliates, in connection with any dispute regarding the Third Party Software.

## LICENSE GRANT

**License Grant:** Company hereby grants to Customer, subject to the terms, conditions, restrictions and limitations set forth in this EULA, a worldwide, non-exclusive, revocable, non-transferrable license to use those portions of the Software referred to herein as "Cloud Contact Center™," "Message360™" and "SimpleDial™." The features associated with each of these Software offerings are as described below:

**Cloud Contact Center –** is a cloud based call center software application that enables Customer to accept inbound, and make outbound, telephone calls. The Cloud Contact Center software has the ability to route inbound calls based on time, destination and source. Outbound calls can be made manually, or in an automated fashion, using the Cloud Contact Center software. The Cloud Contact Center Software enables Customer to generate reports on how many calls are made, both inbound and outbound, together with certain performance metrics of agents using the Cloud Contact Center software.

**Message360 –** is a programming language, combined with a user portal, that enables Customer to design business communication messages. These messages can be communicated via telephone calls, SMS text messages, chats, tweets, e-mail and direct mail. Where Customer is utilizing Message360, its employees and agents can: (a) choose a series of options and be routed to internal or external destinations; and/or (b) speak or input DTMF digit tones to identify themselves or pass relevant information to Customer. The IVR system associated with Message360 can be connected to Customer's systems to further enhance its communications options. Examples include processing inbound calls and routing them to a destination based on customer input or sending pre-recorded telephone messages to many recipients.

**Software Product Support:** Absent another agreement, Company is under no obligation to provide technical support in connection with the Software under this EULA, and provides no assurance that any specific errors or discrepancies in the Software will be corrected. Company reserves the right (but is not obligated) to add additional features or functions to the existing Software, and to provide bug fixes, error corrections, patches, new releases or any other component not specified within this EULA, from time to time. Customer acknowledges and agrees that Company has no obligation to make any subsequent versions of any component of the Software available to Customer, or to provide bug fixes, error corrections, patches, new releases or any other component not specified within this EULA.

## CUSTOMER'S RESPONSIBILITIES

**Lawful Purposes:** Customer shall use the Software for lawful purposes only. In this respect, Customer may not, without limitation: (a) intercept or monitor, damage or modify any communication which is not intended for Customer;

Ytel, Inc. | 17595 Harvard Ave. Suite C161 Irvine, CA 92614 | 800.382.4913

Legal Version (00118003;1) Ytel Version 4.0.
Copyright 2014 © Ytel, Inc. | All Rights Reserved

YTEL_000019



(b) knowingly transmit content through the Software containing any program, routine or device which is designated to delete, disable, deactivate, interfere with or otherwise harm any software, program, data, device, system, or service from the Software including, without limitation, any 'time bomb', virus, drop dead device, spider, malicious logic, Trojan Horse, trap, or back door; (c) send any unsolicited communication not permitted by Applicable Law (as defined in the MSA); (d) expose any party to material which is offensive, harmful to minors, indecent or otherwise objectionable in any way; (e) use the Software to cause or intend to cause embarrassment or distress to, or threaten, harass or invade the privacy of, any third party; (f) use any material or content that is subject to any third party proprietary rights, unless Customer has the requisite license or permission from the owner of such rights to use same; and/or (g) use any caller ID or ANI that is fraudulent, unauthorized or false.

**Representations and Warranties:** Customer represents and warrants that Customer is authorized to enter into and comply with the terms of this EULA. Furthermore, Customer represents and warrants that Customer shall, at all times, comply with Customer's obligations as set forth in this EULA, as well as all Applicable Law in connection with Customer's use of the Software.

**Indemnification:** Without limiting the indemnification obligations set forth in the MSA, Customer agrees to indemnify and hold harmless Company and Company's affiliated entities, officers, directors, employees and agents from and against all costs, expenses, damages or other losses incurred in connection with actual or threatened claims and/or actions brought by any person or authority arising from or connected with: (a) any fraudulent, unlawful (or allegedly fraudulent or unlawful) telephone calls, messages or other communications delivered by Customer by and through the Software; (b) any violation by Customer of Applicable Law; (c) Customer's violation of any representation, warranty or covenant contained herein; and/or (d) any use by Customer (or anyone else using Customer's login information) of the Software. If Customer fails to promptly investigate and defend or settle any claim of which Customer is notified, then Company has the right to take sole control over the claim and all negotiations for its settlement or compromise. In such event, Customer shall pay, as they become due, all of the reasonable costs and expenses (including reasonable attorneys' fees and related costs) incurred by Company in defending or negotiating settlement of the claim, and Customer shall satisfy any related settlement, award or judgment.

**Equipment & Tools:** Customer is responsible for providing and maintaining Customer's own bandwidth, compliant ANI's and/or caller IDs, and any related equipment needed to effectively use the Software (and other Services).

**Data & Content:** Customer is responsible for, and Customer represents and warrants that it has all right, power and authority to provide and use, Customer's Content. Customer agrees that Customer will not use any Content that is subject to any third party intellectual property rights, unless Customer has a license or specific permission from the owner to use such Content and to grant Company the license to utilize same as contemplated hereunder. Company reserves the right (but shall have no obligation) to decide whether any Content that Customer uses complies with this EULA. Company may, in its sole discretion, remove such Content and/or terminate this EULA and Customer's use of the Software, without prior notice to Customer, if Customer uses any Content in a manner that is in breach of this EULA.

**Export Restrictions:** Customer acknowledges that the Software is of U.S. origin and agrees to comply with all applicable international and national laws that apply to the Software, including the U.S. Export Administration Regulations, as well as end-user, end-use and destination restrictions issued by the government of the United States and the governments of other nations.

**No Access to Emergency Services:** The Software (and other Services) is not a replacement for Customer's ordinary telephone service. Neither the Software nor any other Services allow Customer to make emergency calls to emergency services. Customer must make alternative communications arrangements to ensure that Customer can make emergency calls where necessary.

Ytel, Inc. | 17505 Harvard Ave. Suite C151 Irvine, CA 92614 | 800.382.4913

Legal Version {00118003;1} Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved



## TERM, TERMINATION, CUSTOMER'S ACCOUNT

**Term of EULA:** Customer's rights with respect to accessing and using the Software will become effective when both Parties execute the Order Form, this EULA and the MSA. This EULA will remain in effect until terminated by either Company or Customer as set forth below.

**Termination:** Company may terminate this EULA where Customer, or anyone using Customer's account, whether permitted by Customer or not, breaches this EULA. Upon any expiration or termination of this EULA: (a) the rights and licenses granted to Customer under this EULA shall cease; (b) Customer shall immediately cease using the Software; and (c) Customer shall immediately cease using, and return to Company, any and all items and documentation relating to the Software in Customer's possession or control that are proprietary to Company or contain Confidential Information (as defined in the MSA).

**Payments:** Payments made to Company are non-refundable. Customer agrees to prepay for all Software and other Services provided by Company. Customer agrees to pay for all telephone calls initiated through the Software outside of Customer's agreed upon calling plan, which becomes effective when Customer pays Customer's monthly bill.

**Suspension:** Customer's right to use of the Software and other Services may be suspended by Company if Customer payment for same is not received by Company when due. Customer may receive, but Company is under no obligation to send, email reminders sent to Customer's preferred email address as specified in Customer's account information, which e-mail address may be updated by Customer by emailing Company at: billing@ytel.com.

## DISCLAIMER OF WARRANTIES AND LIMITATION OF LIABILITY

**No Warranties:** WITHOUT LIMITING THE DISCLAIMERS SET FORTH IN THE MSA, AND EXCEPT AS EXPRESSLY SET FORTH IN THIS EULA, THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED HEREUNDER. THE SOFTWARE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTY OR CONDITION OF ANY KIND, EITHER EXPRESS OR IMPLIED. USE OF THE SOFTWARE IS AT CUSTOMER'S OWN RISK. COMPANY DOES NOT WARRANT THAT THE SOFTWARE WILL MEET CUSTOMER'S REQUIREMENTS OR THAT OPERATION OF THE SOFTWARE WILL BE UNINTERRRUPTED, ERROR FREE, SECURE, ACCURATE, COMPLETE OR CURRENT. WITHOUT LIMITATION, TO THE FULLEST EXTENT PERMISSIBLE BY LAW, THIS DISCLAIMER EXTENDS TO IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABLE QUALITY, FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES ARISING BY STATUTE OR OTHERWISE IN LAW AND/OR FROM COURSE OF DEALING OR USAGE OF TRADE.

**Specific Disclaimer of Liability for Emergency Services:** Company does not provide connections to emergency services via the Software or other Services. Customer should be aware that Company shall not be liable (whether in contract, tort (including negligence) or any other theory of liability, and whether or not the possibility of such damages or loss has been notified to Company) for any claim, damage, or loss, arising from or relating to Customer's failure to make additional arrangements to access emergency services.

**Customer's Own Risk:** Customer acknowledges and agrees that the entire risk arising out of Customer's use of the Software and other Services remains with Customer, to the maximum extent permitted by Applicable Law.

**Limitation of Liability:** Without limiting the limitation of liability provisions contained in the MSA, Customer acknowledges and agrees that Company, its affiliates, licensors and employees will have no liability in connection with or arising from Customer's use of the Software. Without limiting the foregoing, in no event shall Company, its affiliates, agents or employees be liable, whether in contract, warranty, tort (including negligence), product liability or any other form of liability for any: (a) indirect, incidental, special, consequential (including, without limitation, any loss, or corruption, of data, any interruption, computer failure or pecuniary loss) or punitive damages arising out of the use

Ytel, Inc. | 17595 Harvard Ave, Suite C161 Irvine, CA 92614 | 800.382.4913

Legal Version [00116003;1] Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved

YTEL_000021



or inability to use the Software; (b) loss of income, business or profits (whether direct or indirect) arising out of the use or inability to use the Software; and/or (c) loss or damage which may have been incurred by Customer as a result of: (i) any disruptions or delays in any communications when using the Software; (ii) the suspension or termination of this EULA by Customer or by Company for any reason; and/or (iii) the release, or the decision not to release, new versions of the Software to Customer.

These limitations on Company's Liability to Customer shall apply whether or not Company, its affiliates or Company employees have been advised of the possibility of such losses or damages.

**MISCELLANEOUS**

**Entire Agreement:** This EULA, together with the MSA, Order Form(s) and any amendments/attachments hereto/thereto, supersedes and merges all prior agreements, promises, understandings, statements, representations, warranties and covenants and all inducements to the making of this EULA relied on by either Party whether written or oral, and embodies the Parties' complete and entire agreement with respect to the subject matter of this EULA.  No statement or agreement, oral or written, made before the signing of this EULA will vary or modify the written terms of this EULA.

**No Waiver:**  The failure of either Party to enforce or insist upon compliance with any of the terms of this EULA or the wavier of any terms in this EULA does not constitute a general waiver or relinquishment of any other terms of this EULA.

**Confidentiality:**  The Software is deemed Confidential Information (as defined in the MSA) of Company.  Customer will not disclose any use of, or information pertaining to, the Software to any third party without the prior written approval of Company.  Customer shall maintain the confidentiality of the Software with at least the same degree of care that Customer uses to protect Customer's own confidential and proprietary information, but not less than a reasonable degree of care under the circumstances.  Customer will not be liable for the disclosure of any Confidential Information which is: (a) in the public domain other than by a breach of this EULA on Customer's part; (b) rightfully received from a third party without any obligation of confidentiality; (c) rightfully known to Customer without any limitation on use or disclosure prior to its receipt from Company; or (d) generally made available to third parties by Company without restriction on disclosure.

**Ownership of Software:**  All right, title and interest in and to the Software shall at all times remain with Company, and/or its suppliers.  Customer agrees to prevent any unauthorized access to Customer's account.  Except as expressly provided herein, Company does not grant any express or implied right to Customer in or to any Company trade secret information.

**Regulations:**  This EULA is made expressly subject to: (a) all present and future valid orders and regulations of any regulatory body having jurisdiction over the subject matter of this EULA; (b) the laws of the United States of America; or (c) any foreign governmental agency having jurisdiction.

**No Agency:**  Neither Party is authorized to act as an agent for, or legal representative of, the other Party.  Neither Party has the authority to assume or create any obligation on behalf of, or binding on, the other Party.

**No Third Party Beneficiaries:**  This EULA is made solely for the benefit of Customer and Company.  Nothing in this EULA should be interpreted to mean that Customer and Company are partners, joint venturers, co-owners or are otherwise participants in a common undertaking.  Neither Party nor its employees are given authority, express or implied, to represent, act for, or otherwise create or assume any obligation on behalf of, or binding on the other Party.  Nothing in this EULA will confer any rights or remedies on any third party.

Legal Version {00118003;1} Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved

YTEL_000022



**Notices:** Unless otherwise specifically provided for herein, any notice required by this EULA is effective and deemed delivered: (a) three (3) business days after posting with the United States Postal Service when mailed by certified mail, return receipt requested, properly addressed and with the correct postage; (b) one (1) business day after pick up by the courier service when sent by overnight courier, properly addressed; and (c) immediately when sent via facsimile or electronic mail. Notices will be sent to the addresses given at the time that Customer registers for access to the Software, unless Customer notifies Company by emailing support@ytel.com or billing@ytel.com of any applicable address change.

**Force Majeure:** Other than with respect to payment obligations arising hereunder, if either Party's performance under this EULA is restricted or interfered with, in whole or part, by causes beyond its reasonable control including, but not limited to, acts of God, fire, explosion, vandalism, cable cut, utility curtailments, power failures, storm or other similar occurrence, any law, order, regulation, tariffs or rates which make it impossible or impractical to provide the Software at the current rates, request of the United States government, or of any agency, court, or other instrumentality or civil or military authority, or by national emergency, insurrection, riot, war, strike, lockout or work stoppage or other labor difficulties, supplier failure, carrier failure or shortage or breach or delay (each, a "Force Majeure Event"), then it is excused from its performance on a day-to-day basis to the extent of this Force Majeure Event. Company's obligation to provide the Software is subject to, and contingent upon, the Company's underlying service providers continuing to provide the services needed to provide Software to Customer at the current rates and on the same conditions under which such service providers are currently providing or offering to provide the applicable services to Company. Company's obligation to provide Services is subject to and contingent on the continuation of Company's agreements with its underlying service providers to provide the applicable services to Company at the current rates and on the same conditions under which such service providers are currently providing or offering to provide the applicable services to Company. As such, any changes in, or termination of, the services provided by its service providers will relieve the Company of its obligations and any liability arising under this EULA.

**Escalation Procedures:** In the event of any disruption of the Software or any problems associated with same, Customer should e-mail support@ytel.com immediately and ask that the applicable problem be escalated to the Company manager on duty.

**Governing Law and Adjudication of Disputes:** This EULA is in all respects governed by the laws of the State of California, without regard to choice of laws. Any disputes that may arise under this EULA shall be resolved in accordance with the laws of the State of California, and shall be adjudicated exclusively in the state or federal courts located in California. Customer specifically consents to the exclusive jurisdiction of the State of California and to the courts located therein.

**Severability:** If any terms of this EULA are determined to be illegal, unenforceable or invalid, in whole or in part, for any reason, the terms shall be stricken and will not affect the legality, enforceability or validity of the remainder of this EULA. If any terms of this EULA are stricken as a result of this Section, then the stricken provision shall be deemed replaced, to the extent possible, with legal, enforceable, and valid terms that are as similar in tenor to the stricken provision as is legally permissible. All headings and titles contained in this EULA are used solely to organize the contents of this EULA and will not be used to affect the interpretation of the contents of this document.

**Headings:** The headings in this EULA are for convenience only and shall not affect the construction hereof.

**Drafting:** Each Party executing this EULA agrees that it has fully participated in the drafting of this EULA and that no Party shall be deemed to be the drafting Party.

**CUSTOMER EXPRESSLY ACKNOWLEDGES THAT CUSTOMER HAS READ THIS EULA AND UNDERSTANDS THE RIGHTS, OBLIGATIONS, TERMS AND CONDITIONS SET FORTH HEREIN. BY SIGNING THIS EULA, CUSTOMER EXPRESSLY CONSENTS TO BE BOUND BY ITS TERMS AND CONDITIONS AND GRANTS TO**

YTEL_000023



**COMPANY THE RIGHTS SET FORTH HEREIN.**

---

### SIGNATURE

**IN WITNESS WHEREOF**, the Parties have executed this Order Form as of the date
below each Party's respective signature.

#### CUSTOMER
Customer Name:

Signature: *Joseph Moretti*
Joseph Moretti (Dec 3, 2015)

**Email:**  jmoretti.nationwidealarms@gmail.com

#### COMPANY
Ytel, Inc.

Signature: Jeff Jo___ (201_)

**Email:**  jeff@ytel.com

---

Ytel, Inc. | 17595 Harvard Ave, Suite C161 Irvine, CA 92614 | 800.382.4913

Legal Version {00118003;1} Ytel Version 4.0
Copyright 2014 © Ytel, Inc. | All Rights Reserved

14



17595 Harvard Ave , Suite C161, Irvine, CA  92614  | 800.382.4913

## Addendum D

The following shall amend the paragraph labeled TERM on page 5 of the User Agreement:

1.   **TERM  ADD**:  *However, Customer shall have the right to cancel account during the first 60 days of service only, by providing at least 30 day written notice. After first 60 days without Notice of Cancellation, the term and renewals set forth above shall take full effect.*

2.   *All other terms and conditions of the MSA shall otherwise remain in full force and effect subject to confidentiality and other intellectual rights.*

**Nationwide Alarms LLC**                                    **Ytel, Inc.**

**Signature:** *Joseph Moretti*                               **Signature:** *Jeff Jones*
Joseph Moretti (Dec 3, 2015)                                          Jeff Jones (Dec 4, 2015)

**Email:**  jmoretti.nationwidealarms@gmail.com        **Email:**  jeff@ytel.com

**Authorized Signature**                                    **Authorized Signature**

Version 2.1

YTEL_000025



Overview     Acquire at Scale     Track and Automate     **Interact and Execute**

# All in one contact center, customizable for every department to communicate how teams and customers choose.



### Inbound

Deliver a 5 star customer experience with turnkey ACD, IVR, and CTI.

### Blended

Get access to custom settings for inbound and outbound call blending.

### Outbound

Choose your dial type: progressive, preview, power, and predictive dialing.

# Communication Channels



Ask **Ytel**

**|SHARE THIS STORY** 🅕 🅣 🅛

Get updates to your inbox

**SUBSCRIBE**

# Perfect Your Outbound Dialing Strategy

PATRICK KENNEDY, YTEL | 26 JUNE 2017

Everyone is looking for the same thing in general with an outbound dialing strategy. Your company wants to improve connection rates and lower the amount of time and money that you spend making each sale. Your ROI hinges on the training and the talent of your call center staff. However, your outbound dialing strategy also has a great deal to do with your success. Here are some of the best ways to use this piece of technology to perfect your outbound dialing strategy.

All of the tips below are predicated on having a predictive dialer, which is one of the best pieces of hardware that you can use to upgrade your dialing. Predictive dialers help to create continuous connections, reduce phone downtime per agent per day and raise outbound KPIs.

## Improve Your Customer Acquisition Lists

Everything starts from a great initial list. Make sure that you have a healthy list that corresponds with your target audience. Keeping your agents on the phone all day with unqualified clients is the worst use of their time and yours. Connect your CRM with your contact center solution to continuously improve the quality of your call lists. Also, segment your lists between buyer profiles to ensure that you are calling the right one for the campaign at hand.

## Using Automation

Used in tandem with one another, predictive dialing and automation will speed up your call frequency exponentially without reducing call quality. This system type will not even give your call center agents a chance to waste time between calls – once one call is complete, the next one is queued up immediately. This also reduces human error in dialing manually. You also have the ability to engage predictive dialers that delve into the proficiency of your individual agents. Overall, you should expect improved KPIs and a higher ROI from your dialing activities each day.

Google Custom Search 🔍



Subscribe to **Ask**.Ytel and Never Miss a Post

**SUBSCRIBE**

**|FEATURED STORIES**



**High Converting Voice Campaigns with Ringless Voicemail**

Conversational Marketing: It's In High Demand

Culture is a Team Sport: Build a Positive Culture

- Exhibit C -

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | | |
|---|---|---|
| ABANTE ROOTER AND PLUMBING, INC., MARK HANKINS, and PHILIP J. CHARVAT, individually and on behalf of all others similarly situated, | : : : : : | Case No. 4:15-cv-06314-YGR |
| Plaintiff, | : : | CLASS ACTION COMPLAINT |
| v. | : : : | |
| ALARM.COM INCORPORATED, and ALARM.COM HOLDINGS, INC., | : : : | |
| Defendants. | : : | |

### AFFIDAVIT OF MATTHEW GROFSKY

1.      I, Matthew Grofsky, being first duly sworn, on oath, am over the age of eighteen years old and, if called to testify in this action, could state the following.

2.      I am a duly authorized custodian of the business records of Ytel, Inc. and have the authority to certify those records as well as custodial responsibility over the records produced.

3.      In May of 2016, Ytel, Inc. received a subpoena from Anthony Paronich of Broderick & Paronich requesting documents regarding Nationwide Alarm, LLC.

4.      In response to that subpoena, Ytel, Inc. has gathered and produced the following information:

        a) A contract with Nationwide Alarms LLC, which was produced in the file "nationwide.pdf".

Records reflecting the outbound calls on Nationwide Alarm, LLC's account. These records were produced in the file, "Nationwide Alarms – 20160602.sql.".

5. The calling records contain a series of items with information about the calls, one of the dispositions in the "Comments" column of the calling reocrds. The calls that contain "AUTO" within the comments field stem from a system automated variable entry. This comments field is updated with "AUTO" upon the agent statusing an auto dialed lead (if the comments field is blank upon statusing the call)."

6. After conducting a complete review of our files, to our knowledge, the documents produced represent a complete set of the documents requested. No documents, within the scope of the subpoena, to our knowledge, have been destroyed or withheld.

7. The copy of the records produced are a true copy of the records of Ytel, Inc, and are the types of records that are maintained in the normal course of conduct of Ytel, Inc.'s business.

8. The records were prepared by the personnel of Ytel, Inc. or automated systems of Ytel, Inc. in the regular course of their business and were created at or about the time of the conduct and/or events that they recorded.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 14 DAY OF MAY, 2018.

Matthew Grofsky