1
2   **UNITED STATES DISTRICT COURT**
3   **NORTHERN DISTRICT OF CALIFORNIA**
4

| | |
|---|---|
| **ABANTE ROOTER AND PLUMBING, INC., ET AL.,** | CASE NO. 15-cv-06314-YGR |
| Plaintiffs, | **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT; DENYING MOTION TO EXCLUDE TESTIMONY** |
| vs. | |
| **ALARM.COM INCORPORATED, ET AL.,** | Re: Dkt. Nos. 195, 198, 205 |
| Defendants. | |

Plaintiffs[1] Abante Rooter and Plumbing, Inc., Mark Hankins, and Philip Charvat bring this class action against defendants Alarm.com Incorporated and Alarm.com Holdings, Inc. (collectively, "Alarm.com") alleging four counts: violations of (i) the Telephone Consumer Protection Act ("TCPA") for calls made to cellular telephones; (ii) the TCPA for calls made to residential telephone lines; (iii) 47 C.F.R. § 64.1200(c) for calls made to individuals who were on an internal do-no-call list maintained by defendants and/or their affiliates or agents; and (iv) 47 U.S.C. § 227(c)(5) for calls made to members of the National Do-Not-Call Registry ("DNC Registry"). (Dkt. No. 1, Class Action Complaint ("Compl.").) On May 5, 2017, this Court certified three classes for damages pursuant to Rule 23(b)(3), (Dkt. No. 126 ("Certification Order")), which the Court subsequently modified, decertifying one of the three classes (Dkt. No. 176). Now before the Court are the parties' cross motions for summary judgment and Alarm.com's motion to exclude plaintiffs' proffered expert witnesses, Anya Verkhovskaya and Randall Snyder, from testifying in this matter. (Dkt. No. 195 ("Alarm.com MSJ"); Dkt. No. 205 ("Plaintiffs Cross-MSJ"); (Dkt. No. 198 ("Exclusion Motion").)

Having carefully considered the pleadings, the papers and exhibits submitted, and for the reasons set forth more fully below, the Court **ORDERS** as follows:

---

[1] Claims brought by plaintiff George Ross Manesiotis were dismissed without prejudice pursuant to stipulation on July 25, 2016. (Dkt. No. 58.)

1. Alarm.com's motion for summary judgment on the issue of whether defendants are vicariously liable for the telemarketing calls at issue in this case is **DENIED.**

2. Both parties' motions for partial summary judgment on whether the Ytel Cloud Contact Center dialer ("Ytel Dialer") used to place calls to members of one of the two certified classes constitutes an Automatic Telephone Dialing System ("ATDS") within the meaning of the TCPA are **DENIED.** [2]

3. Alarm.com's motion to exclude testimony of plaintiffs' proffered expert witnesses pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) is **DENIED.**

## I. BACKGROUND

Plaintiffs bring the instant class action[3] against defendants in connection with Alarm.com's

---

[2] In addition, plaintiffs filed one administrative sealing motion (Dkt. Nos. 204) and Alarm.com filed two administrative sealing motions (Dkt. Nos. 194, 219) in connection with their briefing regarding their motions for summary judgment. Plaintiffs' motion and one portion of Alarm.com's first motion are based on confidentiality designations by another party, Alarm.com and Alliance, respectively. (*See* Dkt. Nos. 204, 194-9.) In both instances the designating party failed to file a declaration in support of sealing as required by Civil Local Rule 79-5(e)(1). Alarm.com's remaining motions seek to seal documents based the fact that they contain confidential contractual and other business information. (*See e.g.*, Dkt. No. 194.) In light of the lack of private personal information and the centrality of the information regarding the relationship between Alarm.com and Alliance to the instant dispositive motion regarding vicarious liability, the Court finds that Alarm.com has not shown a compelling reason to seal these documents. *See Pintos v. Pacific Creditors Ass'n,* 605 F.3d 665, 678 (9th Cir. 2010) ("A "party seeking to seal judicial records must show that 'compelling reasons supported by specific factual findings . . . outweigh the general history of access and the public policies favoring disclosure.'") (quoting *Kamakana v. City and County of Honolulu,* 447 F.3d 1172, 1178-79 (9th Cir. 2006)). Accordingly, all pending motions to seal (Dkt. Nos. 194, 204, 219) are **DENIED.**

[3] The classes are defined as follows:

(1) **Cell Phone Class**: All persons in the United States to whom: (a) Alliance's agent Nationwide Alarms, LLC, on defendants' behalf instituted one or more non-emergency telephone calls; (b) promoting defendants' goods or services; (c) to a recipient's cellular telephone number; (d) through the use of an automatic telephone dialing system or an artificial or prerecorded voice; (e) at any time since October 15, 2013; (f) except those persons that provided defendants with their telephone number(s) prior to receiving call(s) from Nationwide, on defendants' behalf.

(2) **National Do-Not-Call Class ("DNC Class")**: All persons in the United States who: (a) received more than one call, made by Alliance on defendants' behalf; (b) promoting defendants' goods or services; (c) in a twelve-month period; (d) on their cellular telephone line or residential telephone line; (e) whose cellular or residential telephone line number(s) appear on the National Do-Not-Call Registry; (f) at any time since December 30, 2011; (g) except those persons that provided defendants with their telephone number(s) prior to

allegedly unlawful marketing practices. Plaintiffs are consumers and a small business who allegedly received telemarketing calls from Alliance Security ("Alliance") or its agents, allegedly on behalf of Alarm.com. (Compl. ¶ 2.) Plaintiffs assert that Alliance or its agents made these calls to (i) cell phone numbers using an ATDS or an artificial or prerecorded voice and (ii) numbers on the DNC Registry. (*Id.* at ¶¶ 157–64, 169–74.)

Alarm.com is a publically traded company incorporated in Delaware, with its principal place of business in Virginia. (*Id.* at ¶ 9.) It sells cloud-based home automation, monitoring, and security services. (*Id.* at ¶¶ 1, 21.) Alarm.com uses a network of 6,000 third-party security system dealers and service providers, including Alliance, to sell subscriptions to its services. (*Id.* at ¶ 37.) Alliance pays Alarm.com an "activation fee" and "monthly service charge" for each Alarm.com subscription sold. (Dkt. No. 206, Declaration of Beth E. Terrell in Support of Opposition ("Terrell Decl."), Ex. 6 at 19:6–20:8.)

Alliance sells, installs, and services security systems. (Dkt. No. 196, Declaration of Martin Jaszczuk in Support of Motion for Summary Judgment ("Jaszczuk Decl."), Ex. 4, ¶ 8).) To provide these integrated systems, Alliance contracts with companies that manufacture hardware components, develop the "necessary software system for components to communicate as part of an interactive security system" (*e.g.* Alarm.com), and monitor the alarm systems and contract emergency services when the alarm is triggered. (Jaszczuk Decl., Ex. 3, ¶¶ 3, 6.) In support of its sales efforts, Alliance uses Nationwide Alarms, LLC ("Nationwide") to conduct telemarketing. (Compl. ¶¶ 37, 38.)

Alarm.com provides its dealers, including Alliance, with resources and support. It encourages dealers to use the Alarm.com logo and to include its slogan, "powered by Alarm.com," on their websites. (Terrell Decl., Ex. 4 at 92:16–94:9.) Since at least 2012, Alarm.com has also drafted scripts for dealers to use when making telephone calls to potential customers. (*Id.* at 95:20–97:9.) Its "Premier Partner Program" rewards high-performing dealers by providing them with additional sales and marketing tools, a marketing allowance, and an opportunity to participate in Alarm.com's Customers Lead Service ("CLS") program. (Terrell Decl., Ex. 10 at 10834–35.) Alarm.com provides these dealers with leads on potential customers that inquire about

---

receiving call(s) from Alliance or its agents, on defendants' behalf.

3

Alarm.com's products and services through its website or customer service representatives. (Terrell Decl., Ex. 4 at 31:18–32:5.) These potential customers' numbers are compiled in Alarm.com's CLS database. Alarm.com highlights its strong relationship with dealers by promoting them on its website. It further supports dealers though a "partner portal" that enables dealers to create customer accounts, access subscriber information, and receive support, documentation, and training. (Terrell Decl., Ex. 5 at 16671.)

## II. LEGAL STANDARD

### A. Summary Judgment

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact as to the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the opposing party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that the opposing party lacks evidence to support its case. *Id*. If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. *Anderson*, 477 U.S. at 250; *Soremekun*, 509 F.3d at 984 (9th Cir. 2007); *see* Fed. R. Civ. P. 56(c), (e). The opposing party's evidence must be more than "merely colorable" and must be "significantly probative." *Anderson*, 477 U.S. at 249–50. Further, the opposing party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence showing a genuine dispute of material fact exists. *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Nevertheless, when deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). A district court may only base a ruling on a motion for summary judgment upon facts that would be admissible in evidence at trial. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010); Fed. R. Civ. P. 56(c).

### B. *Daubert* Standard for Expert Opinions

Federal Rule of Evidence 702 permits opinion testimony by an expert as long as the witness is qualified and their opinion is relevant and reliable. An expert witness may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent of expert testimony has the burden of proving admissibility in accordance with Rule 702. Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments). An expert should be permitted to testify if the proponent demonstrates that: (i) the expert is qualified; (ii) the evidence is relevant to the suit; and (iii) the evidence is reliable. *See Thompson v. Whirlpool Corp.*, 2008 WL 2063549, at *3 (W.D. Wash. 2008) (citing *Daubert*, 509 U.S. at 589–90).

### III. CROSS MOTIONS FOR SUMMARY JUDGMENT

The Court will first address Alarm.com's vicarious liability arguments. Next, the Court will analyze whether the Ytel Dialer constitutes an ATDS within the meaning of the TCPA.

### A. Vicarious Liability

"[A] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship . . . between the defendant and a third-party caller." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877 (9th Cir. 2014), *aff'd*, 136 S. Ct. 663 (2016), as revised (Feb. 9, 2016). A plaintiff can establish an agency relationship, and therefore vicarious liability under the TCPA, using the "bedrock theories of agency," actual authority, apparent authority, and ratification. *See Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 449 (9th Cir. 2018); *see also In re Joint Petition filed by Dish Network,* LLC 28 FCC Rcd. 6574, 6586-87 (2013). Furthermore, "[t]he existence of an agency relationship generally presents a question of fact." *Ward v. Mgmt. Analysis Co. Emp. Disability Benefit Plan*, 135 F.3d 1276, 1283 (9th Cir. 1988), *rev'd in part on other grounds*, *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358 (1999). That, however, does

not imply that assertions of an agency relationship automatically raise a genuine issue of material fact and are therefore sufficient to survive a motion for summary judgment under Rule 56(a). *See Kristensen v. Credit Payment Services Inc.*, 879 F.3d 1010, 1012–1013 (9th Cir. 2018) (affirming district court's grant of summary judgment based on plaintiff's failure to establish a genuine issue of material fact as to defendant's liability under the TCPA pursuant to a ratification theory of agency).

The Ninth Circuit has adopted the Federal Communications Commission's ("FCC") deference to the Restatement (Third) of Agency regarding vicarious liability under the TCPA. *See id.* at 1014. The Restatement defines "ratification" as "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency § 4.01(1). A principal ratifies the action of an agent if it "knowingly accepts the benefits of the transaction." *Id.* § 4.01, cmt. d. "Ratification does not occur unless . . . the act is ratifiable as stated in § 4.03." *Id.* § 4.01(3)(a). An act is ratifiable "if the actor acted or purported to act as an agent on the person's behalf." *Id.* § 4.03. Therefore, "[w]hen an actor is not an agent and does not purport to be one," the doctrine of ratification does not apply. *Id.* § 4.03, cmt. b.

Alarm.com argues that plaintiffs cannot establish an actual or apparent agency relationship between Alarm.com and Alliance, and, by the same token, cannot establish that ratification occurred. Specifically, Alarm.com contends that plaintiffs cannot show that (i) either Alarm.com or Alliance manifested assent to Alarm.com's right to control Alliance's allegedly illegal telemarketing activities, (Alarm.com MSJ at 1 (citing *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010)); (ii) Alarm.com said or otherwise conveyed something to the recipients of Alarm.com's telemarketing calls that led the recipients to believe Alliance was Alarm.com's agent (*Id.* at 2 (citing *Markaron at \*8*); or (iii) Alarm.com could have ratified the alleged conduct because, as previously stated, no agency relationship existed and it lacked knowledge of the material facts regarding the allegedly unlawful conduct (*Id.* (citing *Kristensen*, 879 F.3d at 1020)).

Plaintiffs have presented evidence to suggest that both Alarm.com and Alliance may have agreed to Alarm.com having some modicum of control over Alliance's conduct in marketing and selling Alarm.com products and services. *See Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873

F.3d 1045, 1054 (9th Cir. 2017) (citing Restatement (Third) of Agency § 1.01). Pursuant to the agreement between Alarm.com and Alliance ("Dealer Agreement"), once Alliance executes a sale, the customer signs a subscription agreement to which Alliance is not a party and in which Alarm.com agrees to provides services to the customer. (Terrell Decl., Ex. 1 "Definitions".) Additionally, the schedule of protection and alarm monitoring agreements between Alliance and the customer prominently display the Alarm.com logo, contain "Alarm.com Terms," and state that Alarm.com has "authorized" Alliance to market and set its services with certain hardware and other products. (Terrell Decl., Ex. 3.) Alliance's inclusion of Alarm.com's terms is a requirement of the Dealer Agreement. (Terrell Decl., Ex. 1 ¶ 3.4.)

The record also suggests that Alarm.com may have supervised, directed, and partially funded Alliance's marketing of Alarm.com's products and services. The Dealer Agreement requires that Alliance "affix an Alarm.com-provided sticker in the immediate proximity" of the security system's control panel, which displays the Alarm.com trademark and customer website address. (*Id.* ¶ 3.2.) Alliance's business cards displays two logos—that of Alliance and that of Alarm.com. (Terrell Decl., Ex. 8 at Alarm-1248.) Alarm.com also required Alliance to include the slogan "powered by Alarm.com" on its website as a condition for receiving marketing funds from Alarm.com. (*Id.* at Alarm-200.) Until mid-2017, Alliance was required to sell exclusively Alarm.com products and services. (Terrell Decl., Ex. 1 at Alarm-17.) During this period the only way Alliance could sell a service other than that of Alarm.com would be to terminate the Dealer Agreement. (Terrell Decl., Ex. 8 at 55:15–56:13.) Additionally, correspondence from Alarm.com executives suggests that Alliance was working to promote Alarm.com's services. (Terrell Decl., Ex. 9 (note from Alarm.com's Vice President of Sales stating that Alliance had "seen explosive growth because of their effort to incorporate us in to every sale").)

Finally, plaintiffs have proffered evidence that suggests that Alarm.com knew of Alliance's allegedly illegal telemarketing conduct and accepted the benefits therefrom. *See* Restatement (Third) of Agency § 4.06 ("A person is not bound by ratification made without knowledge of material facts involved in the original act . . . ."); *Kristen v. Credit Payment Serv. Inc.*, 2015 WL 4477425, at *3 (D. Nev. July 20, 2015) (citation omitted), *aff'd*, 879 F.3d 1010 (9th Cir. 2018). Alarm.com knew of a Today Show segment, which aired in spring 2012, that reported

that Alliance's predecessor corporation, VMS, had admitted to violations of state telemarketing laws and had been sued in a class action lawsuit for similar violations. (Alarm.com MSJ at 7.) The parties debate the degree to which Alarm.com endeavored to investigate the issue, (*Id.*; Plaintiffs Cross-MSJ at 6,), however plaintiffs' evidence suggests that Alarm.com benefitted from Alliance's marketing. In 2015, Alarm.com received over $700,000 in revenue from Alliance.[4] (Terrel Decl., Ex. 6 at ECF 33.) This along with statements from Alarm.com executives regarding Alliance's "effort to incorporate [Alarm.com] into every sale" (Terrell Decl., Ex. 9) raise a genuine question of material fact as to whether Alarm.com accepted the benefit of Alliance's allegedly illegal telemarketing activity.

The plaintiffs have presented evidence, which when viewed in a light most favorable to their case, suggests that a reasonable jury may return a verdict finding that Alarm.com is vicariously liable for the telemarketing calls at issue based on a ratification theory. *See* Restatement (Third) of Agency § 4.01, cmt. d.; *see also Kristen*, 2015 WL 4477425, at *3 (noting that a "seller may be held liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits"). Accordingly, Alarm.com's motion for summary judgment as to vicarious liability is **DENIED.**

### B. Automatic Telephone Dialing Systems

The TCPA defines an ATDS as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Predictive Dialers, "unlike prior versions of automated dialing technology [that] created and dialed 10-digit phone numbers arbitrarily . . . [employ] a stored database of numbers which could then be dialed at a rate to ensure that when a

---

[4] The Court is not persuaded by Alarm.com's assertion that because plaintiffs have not presented evidence that any of the named plaintiffs or class members actually purchased an Alarm.com security system from Alliance or its agents, Alarm.com did not benefit from Alliance's conduct. Unlike in *United States v. DISH Network, L.C.C.*, 75 F.Supp.3d 942, 1018 (C.D. Ill. 2014), where the court declined to find ratification because most of the telemarketing calls overall did not result in sales, plaintiffs' here have presented evidence that Alarm.com received substantial revenue from Alliance's marketing and sales efforts. (Terrel Decl., Ex. 6 at ECF 33.) Alarm.com has not presented any evidence to suggest that none of this revenue came from telemarketing efforts. Additionally, *DISH Network* does not discuss whether plaintiffs in that case made a purchase as a result of the telemarketing call they received. *See DISH Network, L.C.C.*, 75 F.Supp.3d at 1018.

consumer answered the phone, a sales person would be available to take the call." *Hernandez v. Collection Bureau of Am., Ltd.*, 2014 WL 4922379 (C.D. Cal. 2014) (quoting 43 F.C.C. 2003, 1953 WL 83579, at 14092 ("2003 Federal Communication Commission ('FCC') Order")). The FCC and several district courts have "recognized that[,] technological advances aside, 'the basic function of such equipment . . . has not changed – the capacity to dial numbers without human intervention.'" *Id.*; *see also Warnick v. Dish Network LLC*, 2014 WL 12537066, at *12 (D. Col. 2014); *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F.Supp.2d 723, 727 (N.D. Ill. 2011) (finding that even though the dialer at issue "cannot generate and dial random or sequential numbers, it is still an 'automatic telephone dialing system," because the dialer "automatically dials numbers stored in [a database of numbers] routes answered calls to available collectors"). "Therefore, because predictive dialers had the capacity to dial numbers without human intervention, the Commission concluded that they fell within the statutory definition of automatic telephone dialing system and the intent of Congress." *Id*; *see also Warnick*, 2014 WL 12537066, at *12; *Griffith,* 838 F.Supp.2d at 727.

In 2008, the FCC issued a declaratory ruling affirming the 2003 FCC Order. *See id.* (citing *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Dkt. No. 92-90, 23 FCC Rcd. 559 (2008) ("2008 FCC Order")). Interpreting the 2008 FCC Order, the Ninth Circuit held that "predictive dialers fall squarely within the FCC's definition of 'automatic telephone dialing system.'" *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). In 2015, the FCC issued another declaratory ruling regarding predictive dialers. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015) ("2015 FCC Order"). In its order, the FCC determined that the capacity of calling equipment includes its current functionalities, as well as future or potential capabilities with modifications, such as software changes. *Id.* at 7974. With respect to the specific functions that a device must be able to perform in order to be an ATDS, the FCC reaffirmed prior orders deciding that predictive dialers qualify as ATDSs and that the basic function of an ATDS is to "dial numbers without human intervention." *Id.* at 7972, 7975. In *ACA International v. FCC*, the D.C. Circuit reviewed the 2015 FCC Order and "set aside" the FFC's finding that "the capacity of calling equipment includes its potential functionalities or future

9

possibility, not just its present ability." *ACA International*, 885 F.3d 687, 695 (D.C. Cir. 2018) (internal quotations omitted).

The record indicates that Nationwide, Alliance's purported agent, used the Ytel Dialer to place calls to the cell phones of members of the Cell Phone Class. (Terrell Decl., Ex. 27 at 18:17–18:19.) The Ytel Dialer provides "several types of automatic telephone dialing software services, including predictive dialing, power dialing, progressive dialing and preview dialing services[,]" as well as campaign and telephone list management functions. (Jaszczuk Decl., Ex. 20 at ¶ 42.) Ytel's Master Service Agreement confirms that the system includes "predictive dialing technology." (*Id.* at ¶ 43.) Nationwide's CEO, Joseph Moretti, testified that Nationwide used the Ytel Dialer in both manual and automatic dialing modes and confirmed that when calls were placed while using the automatic dialing mode, the Ytel Dialer would locate an available call center employee, and then "beep" to signal to that employee that they should answer the call. (Terrell Decl., Ex. 27 at 20:19–22:13.)[5]

Alarm.com argues that the D.C. Circuit's decision in *ACA International* invalidates the FCC orders upon which plaintiffs' experts relied in determining that the Ytel Dialer "has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or form a list or database of numbers, and to dial such numbers without human intervention." (Alarm.com MSJ at 22 (citing Jaszczuk Decl., Ex. 20 at ¶ 62).) Specifically, Alarm.com argues that in vacating the 2015 FCC Order, the D.C. Circuit limited the definition of an ATDS to that described by the statute and excludes any device which lacks the capacity to store or produce numbers using a random or sequential number generator, even if that device "has the capacity to store or produce telephone numbers to be called . . . from a list or database of numbers" and "dial such numbers without human intervention." (*Id.*)

Alarm.com does not persuade. First, *ACA International* invalidated only the 2015 FCC Order—the court discusses but does not rule on the validity of the 2003 FCC Order or the 2008

---

[5] Plaintiffs also assert in their cross-motion reply that "The Ytel dialer also has the capacity to generate sequential blocks of telephone numbers to be dialed based on area code." (Dkt. No. 230 at 2.) If so, it would support plaintiffs' position. However, the exhibit to which the cite does not seem to support this "fact."

10

FCC Order.[6] *See ACA International*, 885 F.3d at 703; *see also Reyes v. BCA Financial Services, Inc.*, 2018 WL 2220417, at *11 (S.D. Fla. May 14, 2018) (finding that both the 2003 and the 2008 FCC Opinions remain valid following *ACA International*); *Swaney v. Regions Bank*, 2018 WL 2316452, at *1 (N.D. Ala. May 22, 2018). Furthermore, the Ninth Circuit's interpretation of the 2008 FCC Order, in which the Court held that "predictive dialers fall squarely within the FCC's definition of 'automatic telephone dialing system'," remains valid and binding precedent. *See Meyer*, 707 F.3d at 1043.

Second, the court in *ACA International* suggests that including a Predictive Dialer in the definition of an ATDS is a permissible interpretation of the statutory language in the TCPA. In holding that the 2015 FCC Order "espouse[s] both competing interpretations in the same order[,]" and therefore "fails to satisfy the requirement of reasoned decisionmaking," the court noted that with respect to "whether a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed[,] or is it enough if the device can call from a database of telephone numbers generated elsewhere[,]" it "might be permissible for the Commission to adopt either interpretation." *Id.* at 701-03.

Finally, even if the D.C. Circuit had vacated the 2003 and 2008 FCC Orders, *ACA International* does not control the Ninth Circuit's interpretation of the statutory language of the TCPA. See *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) ("When evaluating the issue of whether equipment is an ATDS, the statute's clear language mandates that the focus must be on whether the equipment has the *capacity* to store or produce telephone numbers to be called, using a random or sequential number generator.") (emphasis in original) (internal quotations omitted).

---

[6] The Court does not find persuasive Alarm.com's contention that the D.C. Circuit "directly addressed and rejected" this interpretation. (Defendants' Reply at 13 (quoting *ACA International*, 855 F.3d at 701).) The language to which defendants point addresses the FCC's contention that the D.C. Circuit lacked jurisdiction to review the portion of petitioners' challenge to the 2015 FCC Order that addresses the functions that a device must be able to perform in order to qualify as an ATDS within the meaning of the TCPA because prior FCC orders had addressed the same question. Defendants omitted from their quotation the D.C. Circuit's explanation that "[w]hile the Commission's latest ruling purports to reaffirm the prior orders, that does not shield the agency's *pertinent* pronouncements from review[,]" which makes clear that the court intended to address the reviewability of the 2015 FCC Order. *ACA International*, 885 F.3d at 701 (emphasis supplied).

11

Similarly, plaintiffs have failed to establish, as a matter of law, that the Ytel Dialer had the "capacity," as defined by the Ninth Circuit precedent discussed above, to qualify as an ATDS within the meaning of the TCPA. Plaintiffs have not presented any direct evidence, including testimony, regarding the function and capabilities of the Ytel Dialer. Plaintiffs' expert Randall Snyder did not examine the machine, but only reviewed the capabilities literature provided by the manufacturer of the Ytel Dialer and information from witnesses who used the device. (Dkt. No. 199-6, Transcript of Deposition of Randall Snyder ("Snyder Dep. Tr.") at 55:14-24, 78:2-80:5.) Therefore, without proffering direct evidence, plaintiffs cannot show, as a matter of law, that the standard articulated in *Meyer* and *Satterfield* is met. *See Meyer*, 707 F.3d at 1043 (holding that predictive dialers fall squarely within the definition of 'automatic telephone dialing system'); *Satterfield*, 569 F.3d at 951 (holding that a device "need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it").

Accordingly, Alarm.com's motion for partial summary judgment as to whether the Ytel Dialer constitutes an ATDS within the meaning of the TCPA is **DENIED.** Plaintiffs' analogous and opposite motion for partial summary judgment as to the Ytel Dialer is also **DENIED**.

## IV. MOTION TO EXCLUDE

### A. Expert Testimony of Anya Verkhovskaya

Plaintiffs offer Ms. Verkhovskaya, Chief Operating Officer of a class action administration firm, to opine on which calls were made to numbers on the National Do-Not-Call Registry. (Dkt. No. 199-1, Expert Report of Anya Verkhovskaya ("Verkhovskaya Report") at ¶ 33.) Alarm.com does not challenge Ms. Verkhovskaya's qualifications.[7] Rather, defendants contend that Ms. Verkhovskaya's methodology compels the exclusion of her testimony entirely because: (i) plaintiffs have not obtained authentication of or established a foundation for the call records that Ms. Verkhovskaya analyzed; (ii) Ms. Verkhovskaya's ultimate calculation of the number of calls that purportedly violated the TCPA includes calls that were not connected; and (iii) Ms. Verkhovskaya did not conduct an analysis to identify the individuals who received the allegedly

---

[7] Alarm.com previously challenged Ms. Verkhovskaya's testimony. (Dkt. No. 98.) Alarm.com moved to strike her testimony regarding the size of the then-proposed DNC Class on the grounds that her calculations were flawed. (*Id.*) The Court denied defendants' motion. (Certification Order at 7.)

12

offending calls. (Dkt. No. 198, ("Motion to Exclude") at 2.)

Based on the foregoing, Alarm.com questions whether Ms. Verkhovskaya's evidence is reliable and relevant to the instant lawsuit. *See Thompson*, 2008 WL 2063549, at *3 (citing *Daubert*, 509 U.S. at 589–90). First, the Court does not agree with plaintiffs' overreaching assertion that "*any* challenge to the evidence an expert relied upon goes to the weight, not the admissibility, of the expert's testimony." (Dkt. No. 211, ("Exclusion Opposition") at 2 (citing *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998 at 1017 n.14) (emphasis supplied)). Here, however, the principle does apply. Alarm.com's objections fundamentally challenge the weight of Ms. Verkhovskaya's testimony, not its admissibility. *See Hangerter*, 373 F.3d 998 at 1017 n.14 (citing *Children's Broad Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004) ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."). Additionally, the call records at issue here were produced by Alliance in response to a subpoena and were authenticated by representatives of Alliance and Ytel, Inc. as business records and calling records from the Nationwide Ytel account, respectively. (*See* Dkt. No. 209, Declaration of Jennifer Rust Murray ("Murray Decl."), Ex. 1; Ex. 2 at 46:1-24; Terrell Decl., Ex. 28 at ECF 38-39.)

Second, although Ms. Verkhovskaya did not exclude all calls with suggestive tagging, including "failed," "unanswered," and "busy," she did identify and exclude any calls that had a duration of zero seconds. (Exclusion Opposition at 3–4.) Defendants have not provided any evidence, other than the names of the tags themselves, to support their assertion that all calls receiving suggestive tagging were not connected. (Exclusion Motion at 4.) Plaintiffs explain that in selecting her approach to determine and exclude unconnected calls, Ms. Verkhovskaya relied on her knowledge of and experience with call data to conclude that if a call has a duration of more than zero seconds, the call was connected to the recipient in some manner. (Exclusion Opposition at 4.)

Third, defendants do not provide any authority to support the assertion that because the call records upon which Ms. Verkhovskaya relied did not identify the recipient of the call her testimony is unreliable and irrelevant. Additionally, although the call records are not yet

13

connected to individual class members, they are very much connected to the alleged conduct at issue in this case and may support plaintiffs' establishment of their claims and Alarm.com's damages in the aggregate. *See Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990) ("Where the only question is how to distribute the damages, the interests affected are not the defendant's but rather those of the silent class members."). Because Ms. Verkhovskaya appears to have reviewed call records confirmed to be authentic business records related to the instant lawsuit and faithfully applied her methodology of excluding zero duration calls, her opinion is both reliable and relevant to the instant lawsuit. (*See Thompson*, 2008 WL 2063549, at *3.

For the reasons above, Alarm.com's motion to exclude the testimony of expert Anya Verkhovskaya is **DENIED**.

### B. Expert Testimony of Randall Snyder

Plaintiffs offer Mr. Snyder to opine that the Cell Phone Class members received calls that were made using an ATDS and to bolster Ms. Verkhovskaya's opinions regarding the number of TCPA violations. (Dkt. No. 199-7, Expert Report of Randall Snyder ("Snyder Report") at ¶¶ 63–64.) Again, Alarm.com does not contest Mr. Snyder's qualifications, but argues that Mr. Snyder's testimony is premised upon the wrong legal standard, reiterating its argument in support of summary judgment that the Ytel Dialer does not constitute an ATDS. (Exclusion Motion at 5.) On this basis, Alarm.com questions whether Mr. Snyder's evidence is reliable and relevant to the instant lawsuit. *See Thompson*, 2008 WL 2063549, at *3 (citing *Daubert*, 509 U.S. at 589–90).

For the reasons stated in Section III, B, the Court has determined that a predictive dialer remains an ATDS within the meaning of the TCPA as defined by current Ninth Circuit law. *See Meyer*, 707 F.3d at 1043 (holding that predictive dialers fall squarely within the definition of 'automatic telephone dialing system'); *Satterfield*, 569 F.3d at 951 (holding that a device "need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it"). Therefore, Mr. Snyder applied the correct legal standard in determining that the Ytel Dialer, which "dials form a list or database of numbers . . . without human intervention," is an ATDS. (*See* Dkt. No. 199-6, Deposition of Randall Snyder at 71:19–72:1.)

The Court is unpersuaded by Alarm.com's reliance on *Marshall v. CBE Group, Inc.*, Case No. 2:16-cv-02406, 2018 WL 1567852 (D. Nevada, March 30, 2018). *Marshall* involved a "point-and-click" dialing system, which requires a clicker agent's intervention to place phone calls. *Id.* at *7–8. In excluding Mr. Snyder's testimony in *Marshall*, the court noted that even before *ACA International*, the "overwhelming weigh of authority" found that point-and-click systems "do not constitute an ATDS as a matter of law in light of the clicker agent's human intervention." *Id.* Further, the fact that Mr. Snyder did not physically inspect the Ytel Dialer does not preclude Mr. Snyder's testimony about its nature. Alarm.com does not contest plaintiffs' assertion that the Ytel Dialer had predictive capacities, which were often utilized. *C.f. Dominguez v. Yahoo!, Inc.*, 8 F.Supp.3d 637, 643 n.6 (E.D. Pa. 2014), *rev'd* 629 Fed. Appx. 369 (3d Cir. 2015) (finding that a device that sent SMS text messages is not an ATDS and noting that it is also not a predictive dialer).

For the reasons above, Alarm.com's motion to exclude the testimony of expert Randall Snyder is **DENIED**.

## V. CONCLUSION

For the reasons discussed above, the Court **ORDERS** as follows:

1. On the issue of vicarious liability, Alarm.com's motion for summary judgment is **DENIED.**

2. With regard to classification of the Ytel Dialer as an ATDS, both motions for partial summary judgment are **DENIED**.

3. Alarm.com's motion to exclude testimony of plaintiffs' proffered expert witnesses, Anya Verkhovskaya and Randall Snyder is **DENIED**.

This Order terminates Docket Numbers 195, 198, and 205.

**IT IS SO ORDERED.**

Dated: August 3, 2018

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**